CLAUDIA G. SILVA, County Counsel (SBN 167868)
By: ROBERT A. ORTIZ, Senior Deputy (SBN 246849)
    ADAM C. PHILLIPS, Senior Deputy (SBN 277410)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531- 6416; Fax: (619) 531-6005
E-mail: adam.phillips@sdcounty.ca.gov

Attorneys for Defendant Deputy Michael McGrath

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD EARL GADSDEN,<br><br>                    Plaintiff,<br><br>          v.<br><br>DEPUTY MICHAEL MCGRATH,<br>DEPUTY SHERIFF,<br><br>                    Defendants. | No. 20-cv-02258-WQH-DEB<br><br>**NOTICE LODGMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Courtroom: 14B<br>Judge: Hon. William Q. Hayes<br><br>**[NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT]** |

Defendant Deputy Michael McGrath hereby lodges the following exhibits in support of his motion for summary judgment:

**Exhibit 1** – February 15, 2019 Incident Report

**Exhibit 2** – February 18, 2019 Discipline Hearing Report

**Exhibit 3** – February 15, 2019 Activities Report for the Facility 8 Night Shift

**Exhibit 4** – Photo of Cell 241 in Facility 8 Module C

**Exhibit 5** – Photo of Cell 213 of Housing Unit 6 Module A

///

1   **Exhibit 6** – Portions of the Deposition Transcript of Plaintiff Ronald Gadsden

2   **Exhibit 7** – Portions of the Deposition Transcript of Defendant Michael McGrath

3   **Exhibit 8** – Portions of the Deposition Transcript of Sgt. Desan Tyson

4   **Exhibit 9** – Portions of the Deposition Transcript of Sgt. John Gehris

5   **Exhibit 10** – Portions of the Deposition Transcript of Sgt. Kurtis Kellas

6   **Exhibit 11**– Portions of the Deposition Transcript of Sgt. Alex Doyle

7   **Exhibit 12**– Portions of the Deposition Transcript of Tina Jaworski

8   **Exhibit 13** – Portions of the Deposition Transcript of Stacy Sinner

9   **Exhibit 14** – Gadsden Inmate History Report

10  **Exhibit 15** – Cam 112 Module C Dayroom 181

11  **Exhibit 16** – Cam 113 Module C Dayroom 181

12  **Exhibit 17** – Cam 115 Module C Dayroom 181

17  DATED:  April 24, 2023                    CLAUDIA G. SILVA, County Counsel

18                                           By: s/ADAM C. PHILLIPS, Senior Deputy
                                             Attorney for Defendant Deputy Michael McGrath
19                                           E-mail: adam.phillips@sdcounty.ca.gov

EXHIBIT 1

# SAN DIEGO SHERIFFS DEPARTMENT

**EXHIBIT**
**1**
**11/22/22 - Tyson**

## Incident Report

**Incident #:** 194006340

**Incident Dt/Tm:** 02-15-2019 2015

**Incident Type Code:** 101     Disrespect to Staff

**Additional Code 2 :** 105     Boisterous Activity

**Additional Code 3 :** 701     Interfering w/Jail Operations

**Participants**

| Name (L,F,M,S) | JIM/Book # | Facility | Area | HU | Cell | Bed | Inv |
|---|---|---|---|---|---|---|---|
| GADSDEN, RONALD E. | 700000460 / 18181127 | 3 | 6 | A | 213 | T | O |

DISCIPLINARY ISOLATION 3 DAYS     02-18-2019 0135     02-21-2019 0135
DISCIPLINARY ISOLATION 3 DAYS     02-18-2019 0135     02-21-2019 0135

**Incident Occurred:**

**Fac:** 8       **Area:** 1       **HU:** C

**Location:** Module C cell 241

**Officer:** MMCGRASH, MCGRATH       **Submitted Dt/Tm:** 02-15-2019 2017

**Update By:** SODELLSH, ODELL       **Update Dt/Tm:** 02-16-2019 1941

**Supervisor:** SODELLSH, ODELL       **Approval Dt/Tm:** 02-16-2019 1941

**Use of force?** N     **CS Violence?** N     **Inmate Violence?** N     **Contraband?** N

**Facility Damage?** N     **Disciplinary?** Y     **Hearing Required?** Y

**Action Taken:**

RVR written

**Approval Action:**

Facility: 3
527I MAIN

Page 1 of 3

EXHIBIT A

Printed: 02-19-2019 1903
Printed By: ABRITOSH, BRITO

EXHIBIT 1

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident Information:**

| | |
|---|---|
| **Entry Dt/Tm:** 02-15-2019 2016 | **Entered By:** MMCGRASH, MCGRATH |
| **Update Dt/Tm:** 02-16-2019 1941 | **Updated By:** SODELLSH, ODELL |
| **Approved Dt/Tm:** 02-16-2019 1941 | **Approved By:** SODELLSH, ODELL |

ORIGIN:

On 02/15/19, I was assigned to work the Control Position at FAC8 when inmate Ronald Gadsden (18181127) was being disrespectful to deputies at Facility 8.

DEPUTY'S OBSERVATIONS & ACTIONS:

At approximately 1850 hours, I was logging a safety check and soft count started. The intercom was ringing from several video visits and inmates with questions. I answered the calls in the order they were received. The last call received was Cell 241. As soon as the intercom was turned on, inmate Gadsden demanded the cell door be opened. I responded with, "Excuse me?" He again demanded the door be opened, shouting "let me out now!"

I explained to Gadsden if he has a video visit he needs to ask respectfully to be let out and to call me back when he can do so. Gadsden called back immediately and demanded his video visit again, stating I was not releasing him and I have done this to him three times. Gadsden continued shouting over the intercom, " Fuck this, I need an IA form."

Gadsden will be transferred to George Bailey Detention Facility (GBDF) House 6 Module A with all his module property. Per Gadsden displaying unwillingness to follow rules at FAC 8, I recommend he not be housed at FAC 8.  Gadsden is in violation of the following rules and regulations.

101-Disrespect to Staff

105- Boisterous Activity

701-Interfere with jail operations

INMATE RIGHTS

As an inmate charged with a violation of the San Diego County Detention Facility Services rules and regulations referred to the Disciplinary Hearing Officer for disposition, you have the following rights:

1.  The right to have a written copy of the charges(s) against you at least 24

EXHIBIT A

EXHIBIT 1

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

hours prior to appearing before the Disciplinary Hearing Officer.

2.  If you are illiterate or unable to represent yourself, you have the right to have a full-time member of the staff who is reasonably available to represent you before the Disciplinary Hearing Officer.

3.  The right to call witnesses (or present written statements of unavailable witnesses) and to present documentary evidence in your behalf provided institutional safety would not be jeopardized.

4.  The right to present a statement or to remain silent.  Your silence may be used to draw an adverse inference against you.  However, your silence alone may not be used to support a finding that you committed a prohibited act.

5.  The right to be advised of the Disciplinary Hearing Officer?s decision and the facts supporting the decision in writing.

6.  The right to appeal the decision of the Disciplinary Hearing Officer by means of the Grievance procedure within 10 calendar days once notified of disposition.

7.  I also have the right to an immediate hearing before the Disciplinary Hearing Officer if I sign a waiver.

Facility: 3
527I MAIN

Page 3 of 3
EXHIBIT A

Printed: 02-19-2019 1903
Printed By: ABRITOSH, BRITO

EXHIBIT 1

EXHIBIT 2

**EXHIBIT**
**2**
11/22/22 - Tyson

## SAN DIEGO SHERIFFS DEPARTMENT
### Hearing Report

**JIM:** 700000460                                    **Incident #:** 194006340
**Book #:** 18181127                                  **Incident Dt/Tm:** 02-15-2019 2015
**Name (L,F,M,S):** GADSDEN, RONALD E.

---

**Hearing #:** 400068179          **Tape #/Side (Recording Info) :** NONE:

**Hearing Dt/Tm:** 02-18-2019 0135

**Administrative Segregation?**   Y     pending hearing

**Hearing Assistance Provided?** N

**Other Evidence Considered?**   N

**Pending:**  N

| | | |
|---|---|---|
| **Incident Type Code:** | 101 | Disrespect to Staff |
| **Inmate Plea:** | G | GUILTY |
| **Finding:** | G | GUILTY |
| | | |
| **Additional Code 2 :** | 105 | Boisterous Activity |
| **Inmate Plea:** | G | GUILTY |
| **Finding:** | G | GUILTY |
| | | |
| **Additional Code 3 :** | 701 | Interfering w/Jail Operations |
| **Inmate Plea:** | G | GUILTY |
| **Finding:** | G | GUILTY |

---

EXHIBIT 2

## SAN DIEGO SHERIFFS DEPARTMENT
### Hearing Report

---

**Entry Date / Time:**  02-18-2019 0324                    **Entry By:**  KKELLASH, KELLAS

On 02/15/19, Deputy Velasquez wrote an incident report documenting the
violation of Inmate Rules and Regulations by inmate Ronald Gadsden. Inmate
Gadsden was provided a copy of the incident report and advised of his/her right
to a disciplinary hearing. Inmate Gadsden signed the 24-hour waiver and
requested an immediate hearing.

I conducted a hearing with inmate Gadsden on 02/18/19, at 0135 hours, in Module
6A, at Cell 213.

I asked Gadsden to explain what happened the other day.  He said he was trying
to get the tower deputy to pop his cell door for a visit.  Gadsden said he has
been consistently late to his visits and wanted to ensure he was on-time.
Gadsden admitted to being aggressive and boisterous, but added he felt
disrespected.

I find that inmate Gadsden committed violation(s):

101- Disrespect to staff
105- Inmates shall not take part in aggressive or boisterous activity
701- Delaying Jail operations

I based my decision on the rule violation and Gadsden's statements.

I recommend Gadsden receive three days of disciplinary separation.

THREE DAYS DISCIPLINARY SEPARATION

**Approval:**  Y          **Approval Officer:**  CGARDESH, GARDENHIRE          **Date:** 02-18-2019 0353

**Appeal:**  Y     received appeal of discipline dated 02/28/19

---

EXHIBIT 2

EXHIBIT 3

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

| | **Fac: 008** | **Area:** | **Hu:** | | **Type:** | | |
|---|---|---|---|---|---|---|---|
| **Start Dt/Trm:** 02-15-2019 1810 | | | **End Dt/Trm:** 02-16-2019 0609 | | | | |

| Type | Activity Dt/Trm | Fac | Area | Hu | Count | Description | Entry Dt/Trm | Entered By |
|---|---|---|---|---|---|---|---|---|
| END OF SHIFT | 02-16-2019 0609 | 8 | 1 | ALL | 0 | Team 2 | 02-16-2019 0609 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-16-2019 0605 | 8 | 1 | ALL | 0 | Carlson, 3438, Mann, 4303** | 02-16-2019 0606 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0600 | 8 | 1 | ALL | 0 | Carlson, 3438, Mann, 4303 | 02-16-2019 0600 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-16-2019 0515 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303** | 02-16-2019 0515 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0509 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303 | 02-16-2019 0509 | MCGRATH, MICHAEL |
| SUPERV. LOG REVIEW | 02-16-2019 0437 | 8 | 1 | | 0 | Lt. Gardenhire | 02-16-2019 0437 | GARDENHIRE, CARL |
| SUPERV. LOG REVIEW | 02-16-2019 0436 | 8 | 1 | | 0 | DISREGARD PREVIOUS ENTRY*** | S 02-16-2019 0436 | ODELL, SARAH |
| 11-53 STARTED | 02-16-2019 0436 | 8 | 1 | | 0 | Sgt. Odell | 02-16-2019 0436 | ODELL, SARAH |
| SOFT COUNT<br>A51<br>B50<br>C52 | 02-16-2019 0431 | 8 | 1 | ALL | 153 | Complete** | 02-16-2019 0431 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-16-2019 0430 | 8 | 1 | ALL | 0 | Carlson, 3438, Julian, 3675** | 02-16-2019 0431 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0423 | 8 | 1 | ALL | 0 | Carlson, 3438, Julian, 3675 | 02-16-2019 0424 | MCGRATH, MICHAEL |

EXHIBIT 3

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

| Fac: 008 | Area: | Hu: | Type: |
| --- | --- | --- | --- |

Start Dt/Trm: 02-15-2019 1810          End Dt/Trm: 02-16-2019 0609

| Type | Activity Dt/Trm | Fac | Area | Hu | Count | Description | Entry Dt/Trm | Entered By |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 11-53 ENDED Check ok | 02-16-2019 0333 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303** | 02-16-2019 0333 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0327 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303 | 02-16-2019 0328 | MCGRATH, MICHAEL |
| SUPERVISOR ON FLOOR | 02-16-2019 0253 | 8 | 1 | ALL | 0 | Sgt. Odell #3058 | 02-16-2019 0255 | MCGRATH, MICHAEL |
| 11-53 ENDED check ok | 02-16-2019 0236 | 8 | 1 | ALL | 0 | Carlson, Sosa* | 02-16-2019 0237 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0231 | 8 | 1 | ALL | 0 | Carlson, Sosa | 02-16-2019 0232 | MCGRATH, MICHAEL |
| 11-53 ENDED check ok | 02-16-2019 0150 | 8 | 1 | ALL | 0 | Julian, Sosa* | 02-16-2019 0150 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0135 | 8 | 1 | ALL | 0 | Julian, 3675, Sosa, 3509 | 02-16-2019 0135 | MCGRATH, MICHAEL |
| 11-53 ENDED Check ok | 02-16-2019 0044 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303** | 02-16-2019 0044 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0038 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303 | 02-16-2019 0038 | MCGRATH, MICHAEL |
| 11-53 ENDED Check ok | 02-15-2019 2347 | 8 | 1 | ALL | 0 | Carlson, 3438, Sosa, 3509** | 02-15-2019 2348 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-15-2019 2341 | 8 | 1 | ALL | 0 | Carlson, 3438, Sosa, 3509 | 02-15-2019 2341 | MCGRATH, MICHAEL |

Printed: 12-14-22 1611
Printed By: CCEBALSH, CEBALLOS

EXHIBIT 3

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

**Fac: 008**  **Area:**  **Hu:**  **Type:**

**Start Dt/Tm: 02-15-2019 1810**   **End Dt/Tm: 02-16-2019 0609**

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|------|----------------|-----|------|-----|-------|-------------|-------------|------------|
| 11-53 ENDED<br>Check ok | 02-15-2019 2250 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303** | 02-15-2019 2250 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-15-2019 2244 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303 | 02-15-2019 2244 | MCGRATH, MICHAEL |
| SUPERV. LOG REVIEW | 02-15-2019 2234 | 8 | 1 | | 0 | Sgt. Odell | 02-15-2019 2234 | ODELL, SARAH |
| HARD COUNT<br>A51<br>B50<br>C52 | 02-15-2019 2234 | 8 | 1 | ALL | 153 | Complete** | 02-15-2019 2235 | MCGRATH, MICHAEL |
| RAZORS DISTRIBUTED | 02-15-2019 2232 | 8 | 1 | C | 0 | Refused | 02-15-2019 2233 | MCGRATH, MICHAEL |
| HARD COUNT | 02-15-2019 2216 | 8 | 1 | ALL | 0 | Started | 02-15-2019 2216 | MCGRATH, MICHAEL |
| LOCKDOWN | 02-15-2019 2201 | 8 | 1 | ALL | 0 | All modules for Hard Count | 02-15-2019 2202 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Carlson, 3438, Sosa, 3509 | 02-15-2019 2152 | 8 | 1 | ALL | 0 | Lt. Gardenhire, 3301, Sgt. Odell, 3058*02-15-2019 2153 | | MCGRATH, MICHAEL |
| GRIEVANCES COLLECTED | 02-15-2019 2147 | 8 | 1 | ALL | 0 | Sgt. Odell, 3058 | 02-15-2019 2147 | MCGRATH, MICHAEL |
| SUPERV. INSPECTION | 02-15-2019 2147 | 8 | 1 | ALL | 0 | Lt. Gardenhire, 3301, Sgt. Odell, 3058 | 02-15-2019 2147 | MCGRATH, MICHAEL |
| 11-53 STARTED<br>Carlson, 3438, Sosa, 3509 | 02-15-2019 2146 | 8 | 1 | ALL | 0 | Lt. Gardenhire, 3301, Sgt. Odell, 3058*02-15-2019 2146 | | MCGRATH, MICHAEL |

EXHIBIT 3

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

| **Fac: 008** | **Area:** | **Hu:** | **Type:** |
|---|---|---|---|
| Start Dt/Tm: 02-15-2019 1810 | End Dt/Tm: 02-16-2019 0609 | | |

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|---|---|---|---|---|---|---|---|---|
| SUPERVISOR ON FLOOR | 02-15-2019 2136 | 8 | 1 | ALL | 0 | Lt. Gardenhire, 3301, Sgt. Odell, 3058 | 02-15-2019 2137 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-15-2019 2057 | 8 | 1 | ALL | 0 | Carlson, 3438, Sosa, 3509** | 02-15-2019 2057 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-15-2019 2049 | 8 | 1 | ALL | 0 | Carlson, 3438, Sosa, 3509 | 02-15-2019 2050 | MCGRATH, MICHAEL |
| RAZORS COLLECTED | 02-15-2019 2040 | 8 | 1 | B | 13 | | 02-15-2019 2040 | MCGRATH, MICHAEL |
| RAZORS COLLECTED | 02-15-2019 2039 | 8 | 1 | A | 14 | | 02-15-2019 2040 | MCGRATH, MICHAEL |
| DAYROOM / PHONE TIME | 02-15-2019 2035 | 8 | 1 | C | 0 | Resumed C module | 02-15-2019 2201 | MCGRATH, MICHAEL |
| LAUNDRY EXCHANGE | 02-15-2019 2030 | 8 | 1 | ALL | 0 | Complete | 02-15-2019 2201 | MCGRATH, MICHAEL |
| RAZORS DISTRIBUTED | 02-15-2019 2007 | 8 | 1 | A | 14 | | 02-15-2019 2007 | MCGRATH, MICHAEL |
| RAZORS DISTRIBUTED | 02-15-2019 2004 | 8 | 1 | B | 13 | | 02-15-2019 2004 | MCGRATH, MICHAEL |
| DAYROOM / PHONE TIME | 02-15-2019 1956 | 8 | 1 | ALL | 0 | Resumed B module | 02-15-2019 1956 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-15-2019 1956 | 8 | 1 | ALL | 0 | Mann, 4303, Sosa, 3509** | 02-15-2019 1956 | MCGRATH, MICHAEL |

EXHIBIT 3

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

**Fac:** 008    **Area:**    **Hu:**    **Type:**

**Start Dt/Tm:** 02-15-2019 1810    **End Dt/Tm:** 02-16-2019 0609

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|------|----------------|-----|------|-----|-------|-------------|-------------|------------|
| 11-53 STARTED | 02-15-2019 1952 | 8 | 1 | ALL | 0 | Mann, 4303, Sosa, 3509 | 02-15-2019 1952 | MCGRATH, MICHAEL |
| DAYROOM / PHONE TIME | 02-15-2019 1931 | 8 | 1 | A | 0 | Resumed A module | 02-15-2019 1931 | MCGRATH, MICHAEL |
| LAUNDRY EXCHANGE<br>Blue pants and shirt<br>White rolls, shirt, socks, underwear | 02-15-2019 1919 | 8 | 1 | ALL | 0 | Started** | 02-15-2019 1920 | MCGRATH, MICHAEL |
| SOFT COUNT<br>A52<br>B50<br>C54 | 02-15-2019 1910 | 8 | 1 | ALL | 156 | Complete** | 02-15-2019 1911 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-15-2019 1910 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303** | 02-15-2019 1910 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-15-2019 1857 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303 | 02-15-2019 1857 | MCGRATH, MICHAEL |
| FENCE CHECK<br>Sosa, 3509 | 02-15-2019 1848 | 8 | 1 | ALL | 0 | Complete** | 02-15-2019 2232 | MCGRATH, MICHAEL |
| LOW BUNK/TIER REVIEW | 02-15-2019 1842 | 8 | 1 | ALL | 0 | List reviewed 1 on list | 02-15-2019 1843 | MCGRATH, MICHAEL |
| RAZOR RESTR. REVIEW | 02-15-2019 1842 | 8 | 1 | ALL | 0 | None on list | 02-15-2019 1842 | MCGRATH, MICHAEL |
| PSA LIST REVIEW | 02-15-2019 1841 | 8 | 1 | ALL | 0 | None on list | 02-15-2019 1842 | MCGRATH, MICHAEL |
| NALOXONE | 02-15-2019 1841 | 8 | 1 | ALL | 0 | Accounted for | 02-15-2019 1841 | MCGRATH, MICHAEL |

EXHIBIT 3

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

**Fac: 008**  **Area:**  **Hu:**  **Type:**
Start Dt/Tm: 02-15-2019 1810      End Dt/Tm: 02-16-2019 0609

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|------|---------------|-----|------|-----|-------|-------------|-------------|-----------|
| DNA COLLECTION | 02-15-2019 1841 | 8 | 1 | ALL | 0 | None on list | 02-15-2019 1841 | MCGRATH, MICHAEL |
| KEY AND RADIO COUNT<br>Julian,A. Mann, Visit<br>Carlson,C., Sosa, B | 02-15-2019 1833 | 8 | 1 | ALL | 0 | All keys accounted for** | 02-15-2019 1834 | MCGRATH, MICHAEL |
| 10-8, BRIEFED<br>Lt. Gardenhire, 3301, Sgt. Odell, 3058<br>McGrath, 3838<br>Julian, 3675, Mann, 4303<br>Carlson, 3438, Sosa, 3509 | 02-15-2019 1832 | 8 | 1 | ALL | 0 | Team 2 reviewed logs** | 02-15-2019 1833 | MCGRATH, MICHAEL |
| END OF SHIFT | 02-15-2019 1810 | 8 | 1 | ALL | 0 | TEAM 1, 10-7 | 02-15-2019 1810 | TELLO, GIOVANNI |

EXHIBIT 3

EXHIBIT 4



EXHIBIT 4

EXHIBIT 5



EXHIBIT 5

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


RONALD EARL GADSDEN,                 )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )  Case No.
                                     )  20-cv-02258-WQH-DEB
                                     )
SERGEANT JOHN GEHRIS, DEPUTY         )
SHERIFF; DEPUTY MICHAEL MCGRATH,     )
DEPUTY SHERIFF,                      )
                                     )
            Defendants.              )
- - - - - - - - - - - - - - - - - -



VIDEOTAPED DEPOSITION OF RONALD EARL GADSDEN

OCEANSIDE, CALIFORNIA

MONDAY, NOVEMBER 7, 2022



REPORTED BY:

AMY R. NEYHART

CSR No. 12469

Job No. 279576


1

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

---

**Page 2**

1      UNITED STATES DISTRICT COURT
2      SOUTHERN DISTRICT OF CALIFORNIA
3
4   RONALD EARL GADSDEN,          )
                                  )
5          Plaintiff,             )
                                  )
6      vs.                        ) Case No.
                                  ) 20-cv-02258-WQH-DEB
7                                 )
    SERGEANT JOHN GEHRIS, DEPUTY  )
8   SHERIFF; DEPUTY MICHAEL MCGRATH, )
    DEPUTY SHERIFF;               )
9                                 )
           Defendants.            )
10  ------------------

11
12
13
14
15
16      VIDEOTAPED DEPOSITION OF RONALD EARL GADSDEN, a
17  witness herein, appearing remotely in Oceanside,
18  California, taken on behalf of the Defendant Deputy
19  Michael McGrath, beginning at 10:05 a.m. and ending at
20  4:57 p.m., on Monday, November 7, 2022, before
21  Amy R. Neyhart, CSR 12469
22
23
24
25

---

**Page 3**

1   APPEARANCES:

2

3   For Plaintiff:

4       LAW OFFICE OF ALEX COOLMAN

5       BY ALEX N. COOLMAN, ESQ.

6       3268 Governor Drive, Suite 390

7       San Diego, California 92122

8       619.831.7129

9       alex@coolmanlaw.com

10

11  For Defendant Deputy Michael McGrath:

12      OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO

13      BY ADAM C. PHILLIPS, ESQ.

14      1600 Pacific Highway, Room 355

15      San Diego, California 92101

16      619.531.6416

17      adam.phillips@sdcounty.ca.gov

18

19  Also Present:  Abel Sibrel, Videographer

20
21
22
23
24
25

---

**Page 4**

1                   INDEX
2   WITNESS:  RONALD EARL GADSDEN
3   EXAMINATION BY                          PAGE
4   MR. PHILLIPS                            6
5   MR. COOLMAN                             220
6
7            E X H I B I T S
8   EXHIBIT       DESCRIPTION              PAGE
9   1         San Diego County Sheriff's    114
              Department document
10
    2         Document                      134
11
    3         Document                      140
12
    4         Appeal of Discipline          142
13

14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1            OCEANSIDE, CALIFORNIA
2       MONDAY, NOVEMBER 7, 2022; 10:05 A.M.
3
4
5       THE VIDEOGRAPHER:  Good morning.  The time on
6   the record is 10:05 a.m.  Today's date is November 7,
7   2022.  My name is Abel Sibrel with Peterson Reporting,
8   Video & Litigation Services.  The court reporter for
9   today is Amy Neyhart at Peterson Reporting, located at
10  530 B Street, Suite 350, San Diego, California 92101.
11      This begins the Zoom recorded deposition of
12  Ronald Earl Gadsden testifying in the matter of Ronald
13  Earl Gadsden versus Sergeant John Gehris, et al., in the
14  United States District Court, Southern District of
15  California; Case No. 20-cv-02258-WQH-DEB.
16      Will counsel please identify yourselves and
17  state whom you represent.
18      MR. PHILLIPS:  Adam Phillips on behalf of
19  Defendant Michael McGrath.
20      MR. COOLMAN:  Alex Coolman for Mr. Gadsden.
21      THE VIDEOGRAPHER:  Thank you, Counselors.
22      Can I have our court reporter please swear in
23  the witness.
24  ///
25  ///

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

---

1    A   Oh, you can call people from -- from there --
2    you know, you can use whatever money you have on -- you
3    know, that's been put on your phone situation to call
4    people.
5    **Q   And are you aware of how the shifts work for**
6    **the deputies or is that something that sort of you don't**
7    **really -- you guys don't pay attention too much?**
8    A   I -- I don't know what you mean -- what you
9    mean by how their shifts work.
10   **Q   Well, I'm just trying to get a sense of what --**
11   **you know, like you were talking about earlier with the**
12   **modules and the numbers, you don't -- you know, that's**
13   **not something you really keep track of.  But if you were**
14   **in the same room, you would visually be able to see the**
15   **cell.**
16       **When the -- when the deputies move through**
17   **things, like you were talking about the checks, do you**
18   **understand that they're on different shifts?  In other**
19   **words, there's different deputies at different times and**
20   **how those shifts work or do you have any recollection of**
21   **that at all?**
22   A   In a sense I do.  I -- I mean, it's pretty
23   basic.
24   **Q   So, for instance, when you would go to**
25   **breakfast to look at the list, would that be a different**

50

---

1    team of deputies and sergeants and staff than later that
2    evening?
3    A   Yes.  Well, depending on what time you're
4    talking about.  I mean, I -- if you could be more
5    specific, then I could probably answer that easier.
6    **Q   Sure.**
7    **I mean, let's pick a random -- 8:00 a.m. for --**
8    **I'm -- I don't know.  I'm just thinking about when I**
9    **usually eat breakfast.  8:00 a.m at breakfast, I mean,**
10   **would that be a different, you know, set -- team of**
11   **deputies, et cetera, versus, you know, like 6:00 p.m. at**
12   **night?**
13   A   No.  If it was 8:00 a.m. and 6:00 p.m., no, it
14   would be the same.
15   **Q   Okay.  That would be the same team?**
16   A   Yes.
17   **Q   Is that because those period of hours I just**
18   **described, your understanding would be that it would be**
19   **the same team?  Would that be one shift or do you know**
20   **anything about that?**
21   A   Oh, I don't know.  I can't answer that
22   honestly.  I can't answer that wholeheartedly with
23   confidence.  I can't.
24   **Q   That's okay.**
25   **But you -- you know that if it's 8:00 to 6:00**

51

---

1    those would be the same deputies?
2    A   I'm not sure if they do three shifts or two.  I
3    think they do -- I don't know.  It makes more sense for
4    them to do three shifts -- 8, 16, 24, that would be
5    three shifts.
6    **Q   That's okay if you don't recall it.  I don't**
7    **want you to guess.**
8    A   Yeah, then I'm not -- I'm not entirely sure.
9    **Q   Okay.  Are you aware that there is some kind of**
10   **shift change, though, at particular times?  Is that**
11   **something --**
12   A   (Witness nods head.)
13   **Q   Is that something you knew?**
14   A   I did.  I do.
15   **Q   Do you know when those times were in**
16   **February 15th of 2019?**
17   A   Well, I know -- I think I know what you're
18   getting at.  I know that on February 15th the new shift
19   start -- like when they would be on the floor would be
20   7 o'clock, 7:00 p.m., if that's what you're asking.
21   Same time as my phone call.
22   **Q   Okay.  So your understanding was the new shift,**
23   **they would be on the floor at 7:00?**
24   A   Right.  Well, they would -- they -- I'd -- I
25   assumed that they have to be ready at, you know -- for

52

---

1    their day or night or whatnot for their shift by 7:00,
2    but it's probably before that.  For all I know they
3    might have to be there at 6:00 and get prepared and
4    whatnot and then be ready by 7:00.  I don't know how
5    that part worked.
6    **Q   Okay.  And just going through that day from**
7    **breakfast up until your scheduled video visit at 7:00,**
8    **can you walk me through sort of -- let's not say that**
9    **specific day.  Just walk me through a typical day for**
10   **you at Facility 8 during that time frame.  What would**
11   **you typically do throughout the day?**
12   A   That -- I mean, that -- it's day-to-day,
13   honestly.  It just -- it depends.  But basically, I
14   mean, you try to keep yourself busy, try to keep
15   yourself healthy, you know, so -- you know, there's
16   cleaning times, there's times where, you know, you're
17   not going to be -- sometimes they would let you -- I
18   mean, like it depends on what they're -- they're doing
19   in there, the guards I would say.  Because sometimes you
20   might be allowed out.  You know, certain shifts
21   wouldn't.  It depends on what they're doing.  They might
22   be light on a shift so they wouldn't let people out.
23   But then also it could be a laundry day.  It could be
24   a -- a commissary day, like when they bring you your
25   food and stuff that you ordered and you paid with your

53

---

14

Peterson Reporting Video & Litigation Services

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

**Page 58**

1    A   Yeah.  The windows are probably like four--
2  4 inches by a foot and a half maybe.  So, yeah, through
3  that little window I could see directly over there, and
4  he was already on his video visit.  Like he went right
5  on.
6    Q   Okay.  So you didn't know whether he'd been
7  scheduled or whether he had the same time as you, but
8  at -- when -- you saw him go over to the kiosk and go
9  through a video visit from your cell.  Is that fair to
10  say?
11    A   Yeah, I could see that he was -- I mean, he
12  was -- besides the two workers, he was the only other
13  person permitted out.  They popped his door.  So, I
14  mean, it's pretty obvious when you're looking at it from
15  my point of view.  There's only two other people out
16  because they're cleaning and doing whatever they have to
17  do and then there's a video visit -- that's two video
18  visits supposed to take place, and one person goes out
19  and goes straight to the video visits.  So, I mean, it's
20  pretty -- I mean, I saw the camera footage.  It's pretty
21  basic.  You can -- you can discern it easily.
22    Q   And is that a memory you have independent from
23  looking at the camera footage, the video footage, or is
24  that something that you recall because you were seen in
25  the video?

**Page 59**

1    A   Oh, no.  I completely recall it from my own eye
2  view through the window.
3    Q   From your perception in the cell?
4    A   Correct.
5    Q   On the day of the incident?
6    A   Yes.  At the time, date, yes.  I completely
7  remember it.
8    Q   Okay.  But going back to when you realized that
9  someone else is having a video visit, when you see him
10  out there, that's why you know you had a video visit at
11  the same time.  You didn't talk to him about it or you
12  guys didn't have discussions about it prior to?
13    A   No.  I never talked to him and clarified that
14  he's the other person with the video visit, if that's
15  what you're asking.  No.
16    Q   Did you ever talk to him at all about his video
17  visit?
18    A   No.
19    Q   Okay.  After you see this other inmate going up
20  to one of the kiosks, what do you do next?
21    A   I waited.
22    Q   And how long did you wait?
23    A   I don't know.  He was let out maybe a minute or
24  two before 7:00.  So I waited probably five minutes.
25    Q   Okay.  And what did you do next?

**Page 60**

1    A   Once -- once it was into my, like, pretty -- I
2  don't know, a couple minutes into my visit, I pressed
3  the button.  There's an intercom in my cell to where,
4  like, if somebody was -- I don't know -- hurt or having
5  some kind of problem or whatever, you know, they press a
6  button and then you have -- it's an intercom.  Like
7  one -- I guess you would call it a two-way intercom.
8  And then the person on the other end -- you know, you
9  press a button, the person on the other end answers it.
10    Q   And when you first pressed the intercom, that
11  was a couple of minutes past 7 o'clock?
12    A   Yes.
13    Q   And after you pressed the intercom, what
14  happened next?
15    A   Somebody answered it, actually.  Someone --
16  someone answered it.
17    Q   And do you know who answered it?
18    A   I know now.  But at that time, no, I didn't
19  know who it was.
20    Q   Did the person who answered it say anything?
21    A   They did.
22    Q   What did he or she say?
23    A   Said, "How can I help you?"
24    Q   Did they say anything else?
25    A   No, not at that -- that moment in time, no.

**Page 61**

1    Q   And did you say anything in response?
2    A   I did.
3    Q   And what did you say?
4    A   I said, "I have a video visit.  Can you open my
5  door, please."
6    Q   Did you say anything else?
7    A   I didn't.  Not at that time, no.  I was --
8  that's all I said.
9    Q   And did he say anything in response to that?
10    A   He did not.
11    Q   What happened next?
12    A   I pressed the button again.
13    Q   So going back to the first pushing of the -- of
14  the button, the person answered "How can I help you?"
15  You responded "I have a video visit.  Can you open my
16  door, please."  And then there was no more conversation
17  either from you or from the other person?
18    A   Right.  So they left me at a dead silence.
19    Q   Okay.  Did you hear any noises or anything like
20  that?
21    A   No.  I mean -- well, it depends on what you
22  mean.  Like through the speaker of the intercom?
23    Q   Through the speaker of the intercom.
24    A   No, I didn't hear anything.  It was just kind
25  of a dead silence.  So I kind of walked back to my

Peterson Reporting Video & Litigation Services

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

1 door -- the door thinking that somebody's going to pop
2 the door so -- and then but they didn't, so I pressed
3 the button again.
4    Q    Okay.  So it's dead silence, you don't hear
5 anything coming through the speaker, so you walk over to
6 the door thinking the door is going to be opened.  Is
7 that fair to say?
8    A    Correct.
9    Q    And then the door doesn't open?
10    A    Does not.
11    Q    Then how -- how far away is the door from the
12 intercom speaker?  Is it like a couple steps?  Give me a
13 sense for how long that it takes you to do that.
14    A    Literal -- I don't know.  Like, 4 feet.  It's
15 right here, so like over there -- like, yeah, about
16 4 feet.  Give or take about 4 feet.
17    Q    So would you have to step between the door and
18 the speaker in order to press the speaker and then come
19 back to where the door was or could you reach it from
20 that far?
21    A    I -- well, I definitely -- I mean, I wouldn't
22 stretch like that, so I'd have to walk back over to it.
23 I'd take a step or two and take a step back.
24    Q    Okay.  And that's what you did here on
25 February 15, 2019, after the door didn't open when you

62

1 say anything?
2    A    He did.
3    Q    **What did he say?**
4    A    **"How can I help you?"**
5    Q    Did he say anything else?
6    A    He didn't.
7    Q    And did you say anything in response?
8    A    I did.
9    Q    **And what did you say in response?**
10    A    I said, "I have a video visit.  This is the
11 third time you guys have done this.  Can you pop my
12 door, please."
13    Q    **And did he say anything in response?**
14    A    No.  I -- I don't recall if he said anything at
15 that time.  I don't -- I don't think he did.  I think he
16 left me hanging again.  I think he left me in a dead
17 silence again, I believe, because I went back to the
18 door again and was assuming that the door was going to
19 pop because -- oh, actually, yes, he did say something
20 to me.  He said, "Check your tone."  That's what he
21 said.  He told me to check my tone.  I'd assume he means
22 my vocal tone.
23    Q    And that happened after you said, "I have a
24 video visit.  This is the third time you guys have done
25 this to me.  Pop my door, please"?

64

1 expected it to, you took a step back over to the speaker
2 and then pressed the button again?
3    A    Well, I -- well, I went to the door.  I waited
4 a second.  It didn't open, so I'm just standing there.
5 And mind you, it was a dead silence, so I didn't know
6 whether or not he's going to open the door, what -- you
7 know, I assumed he's going to open the door.  And then
8 he -- as it didn't open and time's going by, I pressed
9 the button again because I was -- I didn't have any -- I
10 didn't understand.  I didn't get what was going on.
11    Q    **Do you recall how long of a period that was**
12 **after you said "I have a video visit.  Can you open my**
13 **door, please," and the next time that you pressed the**
14 **button?**
15    A    I don't know.  Maybe one minute, two -- a
16 minute.  Well, I wasn't sure what -- that he even heard
17 me or who -- like I said, I was left in a dead silence.
18 I -- by him not answering, I figured that he was just
19 going to pop the door so I -- I just -- I don't know.
20 I -- I don't know.  I'd say a minute.
21    Q    **And then you press the button a second time?**
22    A    I did.
23    Q    Did you say anything at that time?
24    A    He -- I didn't say anything initially, no.
25    Q    Did the person on the other side of the speaker

63

1    A    I said, "This is the third time this has
2 happened.  Can you pop my door?"
3        But then he said -- he said "Check your tone,"
4 and that -- that was kind of -- I didn't expect that.
5    Q    So it wasn't dead silence.  He responded,
6 "Check your tone"?
7    A    It was dead silence the first time.  The second
8 time he told me to check my tone.
9    Q    And did he say that specifically, "Check your
10 tone"?
11    A    Verbatim.
12    Q    Did he say anything else?
13    A    No.  No, he did not.
14    Q    **Did you say anything in response to that?**
15    A    Not -- not -- no, I did not.
16    Q    What did you do next?
17    A    I waited.
18    Q    And how long did you wait for?
19    A    A good five, six minutes.  I waited until --
20 until about, I'd say, eight after, ten after the hour.
21    Q    And after you waited, did you do anything after
22 that?
23    A    Yes.
24    Q    What did you do?
25    A    I pressed the button.  I pressed the intercom

65

Peterson Reporting Video & Litigation Services

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

---

**Page 66**

1  button.

2  **Q   So after someone on the speaker says "Check**
3  **your tone," you don't respond verbally at all and you**
4  **wait five to six minutes?**

5  **A   Right.**

6  **Q   And then at that time after you waited the five**
7  **or six minutes, it was approximately 7:08 or 7:10 p.m.?**

8  **A   Correct.**

9  **Q   And then you pressed the button a third time?**

10  **A   Correct.**

11  Q   Do you say anything after you pressed the
12  button or does the person on the other side say
13  something?  Who speaks first?

14  A   The person on the other side responds.

15  **Q   Okay.  And what did he say -- he or she say at**
16  **that time?**

17  **A   "How can I help you?"**

18  Q   And what do you say in -- or do you respond?

19  A   I did.

20  **Q   And what did you say in response?**

21  **A   Again I said, "This is the third time you guys**
22  **have" -- or "This is -- not that you guys specifically**
23  **have done this."  I said, "This is the third time this**
24  **has happened.  I don't know what the problem is, but**
25  **I -- are you going to give me my video visit?  We're**

---

**Page 67**

1  **already 12 minutes or whatever into my visit.  It's not**
2  **their fault that like -- the people that secure these**
3  **visits shouldn't be getting penalized for whatever**
4  **reason.  They pay for the stuff.  They should get their**
5  **full 30 minutes," is basically what I said.  And he told**
6  **me my video visit is canceled.**

7  **Q   And he said that in response to what you just**
8  **described was what you told him?**

9  **A   Yes.**

10  Q   Did he say anything else?

11  A   No.  He said my video visit is canceled and
12  that's it.

13  **Q   So he answers "How can I help you?" after you**
14  press the button a third time.  You say this has
15  happened to you -- this is the third time it's happened
16  to you and you talk about the cost for the other people
17  on the other side in securing it and that you've already
18  gone through 12 minutes and why aren't you getting your
19  video visit.  Something to that effect?

20  A   That's pretty -- yeah, exactly.  Pretty much.

21  Q   And then he responds "Your video visit is
22  canceled"?

23  A   Correct.

24  Q   And did you say anything in response to that?

25  A   I said, "Canceled?"  And then that -- that was

---

**Page 68**

1  basically it.  I said, "My video visit is canceled?"  I
2  mean, there's nothing I can do about it so there's -- I
3  can't do anything about that.

4  **Q   So you -- in response you said, "My video visit**
5  **is canceled?" like a question?**

6  A   Yeah.  Exactly.

7  **Q   And does the person on the other side of the**
8  **speaker say anything back?**

9  A   No.

10  **Q   Is there -- can you describe for me the speaker**
11  box or however you want to describe that?  What would
12  you call it?

13  A   An intercom or speaker box, either or.  I'd say
14  an intercom.

15  **Q   And does the intercom have one button?**

16  A   Yes.

17  **Q   Are you able to tell whether someone is still**
18  **on the line or not?**

19  **A   Not really, no.  You can't -- you can't -- I**
20  **mean, you can't see them.  Like the window we were**
21  **discussing earlier, you can't see the -- the guards**
22  **because there's a reflective mirror on their module.  So**
23  **you can't see them at all.**

24  **And with the intercom, you can't -- I mean, you**
25  **just press the button and hope, basically, because you**

---

**Page 69**

1  don't have any -- you don't have any control of that.
2  They don't have to answer you.  They can just click it
3  or turn it off or whatever -- whatever they do up there.

4  **Q   What did you do next after you asked that**
5  **question, "My video visit's canceled?" question?  What**
6  **do you do next?**

7  **A   I -- I was sitting there kind of confused.**
8  **Like just waiting, hopefully -- I didn't -- well, after**
9  **he told me to check my -- my tone, I knew he was**
10  **serious.  Prior, I thought he was joking because of the**
11  **way that he was answering the intercom.  You know, "How**
12  **can I help you?"  It didn't seem, like, threatening**
13  **or -- or, you know, or malicious or whatnot.  But then**
14  **when he told me to check my tone, I knew he was**
15  **absolutely serious because that isn't -- I'm not used to**
16  **somebody saying that to me or -- I mean, people just**
17  **don't generally talk to other people like that.  So once**
18  **he said that, I knew he was serious.**

19  **So I was more confused of what -- you know,**
20  **like, what -- maybe my girlfriend canceled it.  I didn't**
21  **know.  I had -- I didn't know.  I was confused.  And**
22  **disappointed a little bit.**

23  Q   And when you say you knew he was serious versus
24  joking, what did you think he was joking about earlier?
25  Did he say something else besides "How can I help you?"

---

Peterson Reporting Video & Litigation Services

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

1    A   It was just the way he said it.  Like, "How can
2  I help you?"  It didn't -- it just came off as kind
3  of -- I don't know.  Gesture, like -- like jokingly, you
4  know.  Like he -- it didn't sound like he was in a very
5  bad mood, but I'm just assuming.  Who knows.  You know,
6  to me it just sounded kind of like he was -- like not --
7  you know, not having a bad day I would say.
8    Q   So after you were confused and you asked that
9  question and you had pressed the button the third time
10  on the intercom, did you ever press the button again?
11    A   I did.
12    Q   Okay.  When -- what happened next after your
13  confusion?
14    A   Well, so he had -- the -- the guard had
15  contacted me in my cell and said, "Your visit's canceled
16  now" -- your -- "Your visit is really canceled now."
17    And then once he said that, I pressed the
18  button again and said, "Who am I talking to?"  Because I
19  didn't know who I was talking to, so I had to clarify
20  who I'm talking to because this -- it was going to -- it
21  was going far, like a little too far.  And so I asked
22  who I was talking to, and he told me who I -- who he
23  was.
24    And I said I'd -- "I'd like an IA form because
25  what you're doing, you're being a bully and this is" --

70

1    Q   So when -- did that occur immediately after the
2  confusion you were talking about or did you -- was that
3  over a period of time?  When did that occur?
4    A   I -- I think you're misconstruing the way that
5  I used confused.  I was -- I was confused in the -- as
6  in the tone of his voice or the way that he put -- the
7  way that he answered the intercom, you know, "How can I
8  help you?"  Because it reminded me of, like, when you go
9  to McDonald's and you go through the drive-through and
10  someone says "How can I help you" -- "Welcome to
11  McDonald's.  How can I help you?" or whatever.  So it
12  didn't -- and -- not at any point in time have I gone to
13  a drive-through and somebody say that to where I
14  didn't -- I thought that -- you know, that they'd be
15  disgruntled or anything of that nature.  So that -- I
16  wasn't confused; I was just caught off guard.
17    Q   And thank you for clarifying that.
18    What I'm talking about is after that third time
19  you pressed the intercom, right, and you -- and he says
20  your video visit is canceled and you respond "My video
21  visit is canceled?" and you said you were confused next
22  about why it was canceled, that kind of thing.
23    A   Right.
24    Q   What -- what happens next?  Then someone calls
25  your intercom or what do you recall happening after

71

1  that?
2    A   Someone called my intercom -- well, really what
3  happened is the -- the guy Willy, he had come up to my
4  cell and said, you know, "Why aren't you out for your
5  visit?"
6    And I said, "I don't know.  They won't let me
7  out."
8    And so he went -- he -- he's like, "Well, what
9  do you want me to do" -- well, he came up, after I told
10  him that, and said, "No.  Your visit is still on the
11  intercom.  It's not canceled."
12    I said, "Well, hey, here's my code.  Go in
13  there and -- and talk to my girlfriend and tell her that
14  they won't let me out so I can't do this visit and for
15  her to call up there and complain."  That's what I said
16  prior to him saying that my video visit is canceled,
17  really canceled now.
18    Q   So after that third interaction on the intercom
19  and you say my visit is canceled, question mark, nothing
20  happens.  Then Willy comes up to your cell and asks you
21  why you weren't out for your visit?
22    A   Correct.
23    Q   And then you say, "I don't know"?
24    A   Correct.
25    Q   And then he leaves and then checks the kiosk

72

1  for your name or did he already know at that point and
2  told you?
3    A   Truthfully -- no, he left.  But truthfully I
4  don't -- I didn't watch him do that because I didn't ask
5  him to do that.  He did it on his own accord and then
6  came back up and informed me that it's still on there.
7    Q   And that's when you said you'd give him your
8  code?
9    A   Yes.  In order to get into my -- for me to
10  connect from my side and to get into my -- I don't know
11  what you call it, my access, my file or whatnot.  I have
12  a designated code that I -- I only know.
13    Q   And so you give that code to Willy and say,
14  "Hey, talk to my girlfriend," or what did you say
15  exactly to him as far as you can remember?
16    A   "If you can, contact my girl and ask her -- and
17  tell her what's going on and to call up here and file a
18  complaint."
19    Q   So you give him the code.  You tell him, talk
20  to your girlfriend, and tell somebody and figure
21  out what's going on and file a complaint?
22    A   No.  I told him to tell her to call the jail
23  that I'm being housed at and file a complaint.
24    Q   Okay.  So you hand him the code and you -- and
25  you tell him, "Tell my girlfriend to call the jail and

73

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

1  time you see the screen go dark, that's when the voice
2  on your intercom in your cell comes through and says,
3  "Now your video's really canceled"?
4      A   Actually, the screen kind of like -- it looked
5  like a power surge hit it, like an old television in the
6  sense if you ever saw an old TV, like a -- not like a
7  plasma screen or whatever these are now.  But like an
8  old TV, it -- like if a certain amount of power went to
9  it, it would make it look, like, wavy.  It looked like
10  that, and it reset back to the -- to the screen saver
11  for the whole thing.  It never went black.  It went --
12  it just reset.
13      Q   Okay.  My apologies.  Okay.
14          So you're in your cell.  You see Willy and your
15  girlfriend talking.  You see the screen go, you know,
16  kind of black and white, wavy like an old timey TV.  And
17  then it goes back to the normal home screen.  And at the
18  same time that that happens on the video kiosk, you get
19  a call on the intercom in your cell that says, "Now your
20  video visit is really canceled"?
21      A   Correct.
22      Q   After you received that intercom call, did you
23  respond in any way?
24      A   Well, after -- so then Willy comes up to my
25  door.  And he's, you know, giving me the rundown of

78

1  respond first or do you then say, "Hey, who am I talking
2  to?"  How -- how did that happen?
3      A   Well, they have to respond in order for you to
4  understand that they're communicating.  Because if
5  they -- if you just press the button and start talking,
6  there might not be anybody there.
7      Q   Got it.
8          So he says --
9      A   Correspond with them, communicate.
10      Q   Okay.  Sorry.  I didn't mean to interrupt you.
11          So the person on the intercom says, "Now your
12  video visit is really canceled."  In order for you to
13  talk to them, you have -- you have to press the button.
14  You press the button and then the other person has to
15  respond so you know that the communication is open?
16      A   Yes.
17      Q   Okay.  Does -- does he or she respond?
18      A   Yes.
19      Q   And -- and what does -- what do they -- is it a
20  he or a she?
21      A   It's a he.
22      Q   Okay.  What does he say?
23      A   I don't remember exactly what he said to answer
24  that time, but it wasn't "How can I help you?" that's
25  for sure.  I don't remember what he said verbatim, but

80

1  basically what happened, you know, and the conversation,
2  saying that it got situated or whatever and then it got
3  cut off.
4          As he's saying that -- I mean, he wasn't even
5  there very long at all.  And somebody gets on the
6  microphone for the whole module -- not just on my
7  intercom, but on the -- like -- like an auditorium
8  microphone and says, "Get the F away from that cell."
9  So he just skirmished off.  You know, he got scared and
10  ran away.  He didn't want to -- you know, and I didn't
11  want him to get into any trouble so --
12      Q   And prior to that coming on the -- the
13  speakerphone for the module or -- or what you were
14  talking about, were you able to say anything back?  Did
15  you respond back through the intercom to the person who
16  said, "Now your video visit is really canceled"?
17      A   Well, once -- once he -- he screamed over the
18  intercom, I pressed my intercom, and I -- just to
19  clarify who I was talking to, "Who -- who is this that
20  I'm talking to?" I had ask who I was talking to.
21      Q   Okay.  So after the person on the intercom
22  says, "Now your video visit is really canceled," you
23  press the intercom button again?
24      A   Correct.
25      Q   Okay.  And does -- does the other person

79

1  he acknowledged the fact that I'm pressing the button.
2      Q   And do you remember what -- if you said
3  anything in response?
4      A   I did.
5      Q   What did you say?
6      A   I said, "Who am I talking to?"
7      Q   And what did he say?
8      A   He said, "This is Deputy McGrath."
9      Q   Did he say anything else?
10      A   No.
11      Q   And what did you say?
12      A   I said, "Deputy McGrath, I don't know what your
13  deal is or what your problem is with me, but you're
14  being a bully right now and I need an IA form."
15      Q   Did you say anything else?
16      A   Well, he said, "You want an IA form?"
17          And I said, "Yes.  This is bullshit.  I want an
18  IA form."  Excuse my language.
19      Q   No.  It's okay.  I need to know what you
20  recall, so don't -- don't -- I've heard way worse.
21  Don't feel like you have to censor it for me.
22      A   Okay.  Okay.  But that's what I said.
23      Q   So he says, "You want an IA form?"  And you
24  understood that to be a question.  And then you
25  responded, "Yes.  This is bullshit.  I want an IA form"?

81

21

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

1  in the cell and it's closed, do you have any further
2  interactions with Deputy McGrath through the intercom
3  system?
4      A  I did.
5      Q  Okay.  When's the next time you have another
6  interaction with McGrath through the intercom system?
7      A  I don't know.  It's probably like an hour or
8  more later.
9      Q  And when you say an hour later, is that an hour
10  later than when John was let out of his cell?
11      A  Yes.
12      Q  Okay.  And how did that interaction get
13  initiated?
14      A  I was contacted via intercom.
15      Q  So McGrath called into your cell through the
16  intercom?
17      A  Yes.
18      Q  Okay.  Was John back at that point or was he
19  still gone?
20      A  No.  The day room was open.  So once they
21  released John for his -- oh, sorry.  That was my phone
22  ringing.  I apologize.
23         Once -- once they let -- once John was out for
24  his call, the day room was open, also, I believe, or --
25  or it got opened while he was out there so he was able

102

1      A  Well, he was just basically getting me to
2  respond so -- because, like I said, you can't really --
3  if I was sitting down on my bed, you can't see from --
4  because it's a little window, you know, on a solid metal
5  door.
6         So he said "Gadsden."
7         And I responded, "Yeah, what's up?"  And then
8  he continued.
9         So, yes, he did -- he got my attention and made
10  me respond or rhetorically got me to respond by stating
11  my last name, questioning me -- questioning.
12      Q  And then you respond, "Yeah, what's up?"
13      A  Yes.
14      Q  And then he says -- what does he say?
15      A  He said, "You want an IA form, right?"
16      Q  He says, "You want an IA form, right?"
17      A  He said, "Do you still want an IA form?" is
18  what he said exactly.  "Do you still want an IA form?"
19      A  And I said, "Yes."
20      Q  So he says, "Do you still want an IA form?"
21      A  Correct.
22      Q  And then you respond, "Yes"?
23      A  Yes.  Correct.
24      Q  And then how does he respond?
25      A  He said, "Roll your stuff up.  You're being

104

1  to remain out there.  So he was out there until 10
2  o'clock or probably later because I was being
3  transferred at that point.
4      Q  Did you have an understanding why day room had
5  been closed?
6      A  Day room was closed because from 4:00 to 7
7  o'clock -- I mean, that's when they have it closed every
8  day.
9      Q  So does Deputy McGrath, does he say something
10  through the intercom system or how did you know he was
11  calling you?
12      A  Yeah, he said something through the intercom.
13      Q  Okay.  And -- and what did he say?
14      A  He said, "Gadsden."
15         Would you like me to go on?
16      Q  Is that all he said?
17      A  He said, "Gadsden."
18         And then I said, "Yeah."  I -- I responded,
19  "Yeah, what's up?"
20         And he said, "You want an IA form?"
21         And I said, "Yes, I do."
22         He said, "Okay.  Roll your stuff up.  You're
23  being transferred."
24      Q  So he says "Gadsden," meaning -- and you took
25  that to mean he's asking you to respond?

103

1  transferred."
2      Q  And do you say anything in response -- well,
3  strike that.
4         Did he say anything else?
5      A  Not after that, no.
6      Q  And did you say anything in response?
7      A  I did.  I said, "I need -- I" -- I said, "Being
8  transferred" question mark.  "It's late at night and
9  Friday."
10         And he said -- and then I said, "Well, if I'm
11  going to -- I need bags.  I don't -- how am I going to
12  take all this stuff with me?"
13         And he said, "Someone will bring you bags."
14  That's it.
15      Q  And then he -- he responded, "Someone will
16  bring you bags"?
17      A  Correct.
18      Q  Did he say anything else?
19      A  No.
20      Q  Did you say anything in response to that?
21      A  No.
22      Q  And that's how the conversation ended?
23      A  Yes.
24      Q  Okay.  After that interaction, did you have any
25  other interactions through the intercom system with

105

Peterson Reporting Video & Litigation Services

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

**Page 106**

1  Deputy McGrath?

2  A  No.

3  Q  Going a little bit back in time when you were
4  talking about saying something about "This is bullshit.
5  I want an IA form," do you recall that?

6  A  I do.

7  Q  Did you ever say "Fuck this. I need an IA
8  form"?

9  A  I could have said that. I could see myself
10  saying that. Indirectly, though, not directly to him.
11  Because I said what I said to him.

12  Q  And when you say "indirectly," could you
13  explain to me what you mean by that?

14  A  Because I could be -- like when -- I don't know
15  if that speaker is on or not. So if I was saying
16  something like -- like "Fuck this. I need an IA form,"
17  that -- I -- I could see myself saying that, like,
18  openly rather than directly.

19  So, like, instead of saying it directly to you,
20  I'm speaking -- I'm thinking out loud. You know what I
21  mean? But I wouldn't -- when I was talking to him in
22  the intercom, I was talking directly to him. But if I
23  said that outside of the intercom and open -- like
24  thinking out loud, I could see myself saying that, yes.

25  Q  After that last interaction on the intercom

**Page 107**

1  about -- with Deputy McGrath where he talked about
2  rolling your stuff up, did you have any other
3  interactions other than through the intercom system with
4  Deputy McGrath?

5  A  Besides the -- besides in May?

6  Q  Yeah, besides the May 2019 we already
7  discussed.

8  A  No. No, I did not.

9  Q  Okay. What -- what happened after that
10  conversation?

11  A  Which conversation?

12  Q  The -- the last conversation you had through
13  the intercom system with Deputy McGrath?

14  A  I just waited for hours. I just waited and
15  waited and waited and waited. And then somebody brought
16  me bags, and I put my stuff in it and then waited some
17  more. And then eventually they -- they told me to walk
18  down to the -- to the sally port and, you know, have my
19  stuff ready to go or whatnot, and so I did. When they
20  opened the door, I took it down there.

21  Q  Do you know how long you were in that cell --
22  well, strike that.

23  Do you recall what time someone came and gave
24  you the bags?

25  A  No, I can't -- I can't put, like, a finger on

**Page 108**

1  the exact minute, but I'd say like an hour. I'll --
2  I'll give it an hour, hour or so until I got the bags
3  and then -- like another hour or so or whatnot until I
4  got -- until they, you know, opened the door and took me
5  down there. So overall probably like -- like 10:30 when
6  I left there.

7  Q  And when you say an hour after, you mean an
8  hour after you had the conversation with Deputy McGrath,
9  the last conversation through -- with Deputy McGrath
10  through the intercom system and he said "Someone will
11  bring you bags," it was an hour later when someone did
12  show up and give you the bags?

13  A  Right.

14  Q  Okay.

15  A  Give or take. Because, I mean, like I said, I
16  can't put the exact minute on it, but it wasn't -- it
17  wasn't immediate. That's for sure.

18  Q  And going back to sort of the beginning of your
19  interactions with Deputy McGrath, did you have any
20  interactions with other deputies from that point in
21  time -- from 6:30 p.m. up until the person brought you
22  your bags, did you have any interactions with deputies,
23  speak to them, they speak to you, anything like that?

24  A  No.

25  Q  So Deputy McGrath was the only one you spoke to

**Page 109**

1  in terms of other deputies, sergeants, County employees
2  from 6:30 up until someone brought you the bags?

3  A  Correct.

4  Q  Okay. Do you remember who brought you the
5  bags?

6  A  I don't actually, no.

7  Q  Was it a deputy?

8  A  I don't recall.

9  Q  Did they have a uniform on?

10  A  I -- I don't recall.

11  Q  But you were in your cell when that happened?

12  A  I was.

13  Q  Okay. And those are the -- the brown -- big,
14  brown bags?

15  A  No. These were big, plastic bags. Big, like,
16  industrial garbage bags or something to that effect.
17  They were see-through, big, clear bags.

18  Q  And did that person that brought you the bags
19  say anything to you?

20  A  No, but I don't -- as I said, I don't even
21  recall who brought me the bags, so I -- again, I
22  don't -- I don't remember if they did say anything to
23  me. But, no, because I don't even remember who brought
24  me the bags, honestly.

25  Q  It's okay.

EXHIBIT 6

Ronald Earl Gadsden, 11/7/2022

1  So they could have said something, they could
2  have not said something. You don't recall one way or
3  another?
4  A  Well, I'd say no because they -- for one, I was
5  not -- they weren't permitting people to really talk to
6  me in the first place. So the person brought -- or
7  whoever brought the bags, brought the bags and left them
8  there.
9  Q  Did they leave them outside your cell? Did
10  they put them in your cell?
11  A  No. They slid them -- they slid it under the
12  door.
13  Q  When you say "they," was there more than one
14  person or was it just one person?
15  A  Well, I can't -- no. I mean, they, whoever
16  that was that did it, slid it under the door, meaning --
17  could be -- could have been a female officer or a male
18  officer or a person that has to stay there or anyone.
19  It could -- I mean --
20  Q  Yeah, you just don't know who it was?
21  A  Right. I don't remember how -- I mean, I
22  remember somebody brought me bags, but I don't remember
23  any -- anything except getting bags.
24  Q  And when the person brought the bags, was John
25  in the cell at that time?

110

1  A  No.
2  Q  Did you recognize that to be Deputy McGrath or
3  was that somebody different?
4  A  I don't know, honestly.
5  Q  And then you went down to the sally port?
6  A  I did.
7  Q  And what happened next?
8  A  Then they -- they -- multiple officers came --
9  well, they were there already, and they got -- you know,
10  they got ahold of my belongings and took -- and
11  handcuffed me and took me into the hallway -- or into
12  the sally port I guess you would say.
13  Q  And do you recall how many deputies there were?
14  A  Three, four. Three or four.
15  Q  Did you -- do you remember any of their names?
16  A  I don't.
17  Q  Was any of them Deputy McGrath?
18  A  No.
19  Q  And had you already put all your belongings in
20  the bags we talked about earlier?
21  A  I did.
22  Q  And what happens next?
23  A  And then the -- well, no. First they searched
24  me. That's what they did. They took me out there and
25  they searched -- they searched me. And the guard -- I

112

1  A  No.
2  Q  Was anything else other than the bags given to
3  you?
4  A  Excuse me?
5  Q  Was anything else other than just bags given to
6  you?
7  A  No.
8  Q  And then you said you waited for about another
9  hour after you got the bags before anything else
10  happened?
11  A  Yep. That's -- yep. Yes.
12  Q  And at that point someone opened the door for
13  you?
14  A  The door was popped -- well, the --
15  simultaneously the intercom and the door opened. The
16  door said -- the intercom said, "Go down to the sally
17  port and" -- you know, "go down there." And then the
18  door popped open. So one after the other it transpired
19  like that. Then I went downstairs.
20  Q  And the person through the intercom said, "Go
21  down to the sally port"?
22  A  Yes.
23  Q  Did they -- did they say anything else?
24  A  No.
25  Q  Did you say anything in response?

111

1  don't remember his name, but it's on the piece of paper.
2  He had me sign a piece of paper waiving my right to a
3  72-hour hearing, rather than that I wanted an immediate
4  hearing within 24 hours about the disciplinary action
5  that's supposed to take place. And then they handcuffed
6  me and put me in a van.
7  Q  So they searched you, they asked you about
8  signing that form, and then they handcuffed you and put
9  you into the sally port?
10  A  No. The sally port, I believe it's just kind
11  of the hallway. They took me out -- like the entrance
12  to the -- the module, I guess that's technically the
13  sally port.
14  What he did, took me through the sally port,
15  took me left out of the view of -- and then closed the
16  door to the module and out of the view of the people
17  that are in there and then -- and then did that. And
18  then he had me sign a piece of paper because I wanted
19  an -- he -- he asked me if I admitted guilt for -- for
20  what was being said, and I said no. And he said,
21  "Well" -- I said, "Well, I'd like" -- I mean, I'm
22  supposed to get a hearing you said."
23  That's what he told me, "You have a hearing in
24  72 hours." And I said, "Well" -- he said, "If you sign
25  this, then you get it within 24 hours." And I signed it

113

Ronald Earl Gadsden, 11/7/2022

1    MR. COOLMAN:  Yeah, that sounds great.
2    MR. PHILLIPS:  Okay.  Thank you very much,
3  Mr. Gadsden.  I really appreciate your time.
4    We can go off the record.
5    THE WITNESS:  Okay.
6    THE VIDEOGRAPHER:  This ends the Zoom recorded
7  deposition of Ronald Gadsden, and the time off the
8  record is 4:56 p.m.  Thank you, everyone.
9    (Discussion off the record.)
10    THE COURT REPORTER:  Alex, did you need a copy?
11    MR. COOLMAN:  Yes, please.
12    (The proceedings concluded at 4:57 p.m.)
13    * * *
14
15
16
17
18
19
20
21
22
23
24
25

222

---

1    DEPONENT'S CHANGES OR CORRECTIONS
2  Note:  If you are adding to your testimony, print the
3  exact words you want to add.  If you are deleting from
4  your testimony, print the exact words you want to
5  delete.  Specify with "Add" or "Delete" and sign this
6  form.
7
8  DEPOSITION OF:      RONALD EARL GADSDEN
9  CASE:      GADSDEN V. GEHRIS
10  DATE OF DEPOSITION:    NOVEMBER 7, 2022
11
12  PAGE    LINE    CHANGE/ADD/DELETE
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____    _____
    Ronald Earl Gadsden        Dated
25

224

---

1  STATE OF CALIFORNIA )
                      ) Ss
2  COUNTY OF SAN DIEGO )
3
4    I, Ronald Earl Gadsden, having appeared for my
5  deposition on November 7, 2022, do this date declare
6  under penalty of perjury that I have read the foregoing
7  deposition, I have made any corrections, additions or
8  deletions that I was desirous of making in order to
9  render the within transcript true and correct.
10
11    IN WITNESS WHEREOF,  I have hereunto
12  subscribed my name this _____ day of
13  _____, 2022.
14
15
16
17
18
19    _____
                      Ronald Earl Gadsden
20
21
22
23
24
25

223

---

1  STATE OF CALIFORNIA      )
2
   COUNTY OF SAN DIEGO     )
3
4    I, Amy R. Neyhart, a Certified Shorthand
5  Reporter, do hereby certify:
6    That prior to being examined, the witness in
7  the foregoing proceedings was by me duly sworn to
8  testify to the truth, the whole truth, and nothing but
9  the truth;
10    That said proceedings were taken before me at
11  the time and place therein set forth and were taken down
12  by me stenographically and were transcribed through
13  computerized transcription by me;
14    I further certify that I am neither counsel
15  for, nor related to, any party to said proceedings, nor
16  in any way interested in the outcome thereof.
17    IN WITNESS WHEREOF, I have hereunto subscribed
18  my name.
19
20  Dated: November 21, 2022
21
22
23    _____
24  Amy R. Neyhart
    CSR No. 12469
25

EXHIBIT 6

EXHIBIT 7

```
 1                IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3                         ---oOo---

 4   RONALD EARL GADSDEN,

 5            Plaintiff,

 6   vs.                              No. 20-cv-2258-WQH-DEB

 7   SERGEANT JOHN GEHRIS, Deputy
     Sheriff, and DEPUTY MICHAEL
 8   MCGRATH, Deputy Sheriff,

 9            Defendants.
     _____/
10

11

12

13      REMOTE CONFERENCING DEPOSITION OF MICHAEL MCGRATH

14

15

16

17                Taken before NICOLE HATLER

18                   CSR No. 13730

19                  October 13, 2022

20

21

22

23

24

25                   Job No.  912368
```

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 2

1                        I N D E X
2                                                    PAGE
3     EXAMINATION BY MR. COOLMAN......................4, 77
4     EXAMINATION BY MR. PHILLIPS.....................72
5
6
7
8                      E X H I B I T S
9                                                    PAGE
10    PLAINTIFF'S
11    Exhibit 1   Photo of video console...............16
12    Exhibit 2   Photo of inmate going to
                  video console.......................19
13
      Exhibit 3   Incident Report.....................29
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1     REMOTE CONFERENCING DEPOSITION OF MICHAEL MCGRATH
2
3
4          BE IT REMEMBERED, that pursuant to Notice, and on
5     the 13th day of October 2022, commencing at the hour of
6     9:45 a.m., in the respective locations via Zoom, before
7     me, NICOLE HATLER, a Certified Shorthand Reporter, State
8     of California, personally appeared MICHAEL MCGRATH,
9     produced as a witness in said action, and being by me
10    first duly sworn, was thereupon examined as a witness in
11    said cause.
12                          ---oOo---
13    APPEARANCES ALL REMOTELY VIA ZOOM
14    For the Plaintiff:
15         ALEX COOLMAN
           Law Office of Alex Coolman
16         3268 Governor Drive, #390
           San Diego, California  92122
17         (619) 831-7129
           alex@coolmanlaw.com
18
      For the Defendant:
19
           ADAM C. PHILLIPS, Senior Deputy
20         Office of San Diego County Counsel
           1600 Pacific Highway, Room 355
21         San Diego, CA  92101-2469
           (619) 539-8357
22         Adam.phillips@sdcounty.ca.gov
23    Also present:
24         Ronald Gadsden
25

Page 4

1                    MICHAEL MCGRATH
2                   sworn as a witness
3                  testified as follows:
4          THE REPORTER:  Good morning.  My name is Nicole
5     Hatler, California Certified Shorthand Reporter No.
6     13730.  This deposition will be stenographically reported
7     pursuant to CCP 2025.
8          All righty.  Go ahead and put your hand down.
9          Counsel, you may proceed.
10         MR. COOLMAN:  Thanks very much.
11    EXAMINATION BY MR. COOLMAN:
12    Q.  Morning, sir.
13    A.  Morning.
14    Q.  My name is Alex Coolman.  I'm attorney for
15    Mr. Jasmine.  I wanted to mention I've got a second iPad.
16    So if you see another Alex Coolman that's blacked out, I
17    was trying to be redundant and have a backup.
18    A.  Okay.
19    Q.  It's just me.
20         Before we get going, I want to mention a couple,
21    sort of, basic ideas that apply to this depo, which is
22    that you understand that you're under oath here, you just
23    took the oath, correct?
24    A.  Yes.
25    Q.  And you understand that the meaning of that oath

Page 5

1     is the same at this proceeding as it is at trial, that
2     you should tell the truth and not speculate about things,
3     correct?
4     A.  Yes.
5     Q.  You know also that you're going to get a
6     transcript of your remarks at the conclusion or soon
7     after of this depo, and you'll have a chance to look over
8     those -- that transcript, right?
9     A.  Yes.
10    Q.  And you can make any corrections that you may
11    think relate to that transcript?
12    A.  Yes.
13    Q.  And -- and you understand that, in the event
14    this case goes to trial, your remarks here could
15    potentially be played or read to the jury?
16    A.  Yes.
17    Q.  Okay.  Very good.  Thank you.
18    A.  Uh-huh.
19    Q.  I'm going to just jump into some, kind of, broad
20    level background stuff.
21         You worked for the San Diego County Sheriff's
22    Department, correct?
23    A.  Yes.
24    Q.  And that was from 2016 to 2022?
25    A.  Correct.

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 6

```
 1        Q.  Okay.  And was your title Detentions Deputy or
 2   was there a specific title different than that?
 3        A.  Detentions and Court Services.
 4        Q.  Okay.  What was your badge number?
 5        A.  I can't recall my badge number.
 6        Q.  Was it 3838, possibly?
 7        A.  3838 was my Arjis.
 8        Q.  What's that?
 9        A.  That is, kind of, like, an ID for every deputy
10   that is used.
11        Q.  Okay.
12        A.  It's like an identifier.
13        Q.  Okay.  Got you.
14            3838 was your Arjis number?
15        A.  Correct.
16        Q.  Okay.  Thank you.
17            One of the places you worked was Facility 8 of
18   George Bailey Detention Facility; is that right?
19        A.  Yes.
20        Q.  Okay.  And then at some point, you also
21   transferred to South Bay?
22        A.  Yes.
23        Q.  Okay.  And the whole time you were with the
24   sheriff's department, were you working full time?
25        A.  Yes, full time.
```

Page 7

```
 1        Q.  Okay.  Was the first place you worked at George
 2   Bailey with the sheriff's department -- I mean, was the
 3   first department you worked at the sheriff's department
 4   was George Bailey?
 5        A.  First place assigned was George Bailey.
 6        Q.  Thank you.  Got it.
 7            And were you working at that facility --
 8   Facility 8 at George Bailey on February 15th, 2019?
 9        A.  Can you repeat the question?
10        Q.  Were you working at Facility 8 of the George
11   Bailey detention facility on February 15th, 2019?
12        A.  Yes.
13        Q.  Okay.  Prior to coming to work that day,
14   February 15th, 2019, did you interact with anybody from
15   the sheriff's department at all?
16        A.  Every morning before we started our shift, we
17   had briefing with the whole entire team.
18        Q.  And that was at work, correct?
19        A.  That's at work, correct.
20        Q.  Okay.  I'm asking about before even coming in,
21   so for example, did you call anybody, text anybody,
22   e-mail anybody from the sheriff's department on February
23   15th, 2019?
24        A.  No.
25        Q.  Okay.  What hours were you working on
```

Page 8

```
 1   February 15th, 2019?
 2        A.  Night shift, 1800 hours to 6 -- 6:00, 6:30 a.m.
 3        Q.  Okay.  So 1800 is 6:00 p.m., correct?
 4        A.  Yes.
 5        Q.  And you alluded a moment ago to, kind of, having
 6   an initial briefing period when you got into work,
 7   correct?
 8        A.  Correct.
 9        Q.  Where does that take place?
10        A.  That takes place in briefing room -- just
11   outside the locker room there's a briefing room.
12        Q.  Okay.
13        A.  We meet in there and have a meeting.
14        Q.  Okay.  And, kind of, roughly, how long does that
15   briefing go on?
16        A.  It could be -- it ranges, it could be a few
17   minutes all the way up to 30 minutes.
18        Q.  On this specific day, do you have any
19   recollection of how long it was?
20        A.  I don't recall how long.
21        Q.  In that briefing, was there any
22   discussion of Ronald Gadsden?
23        A.  I don't recall.
24        Q.  Okay.  When you're done with the briefing, where
25   do you go to, essentially, perform your job?
```

Page 9

```
 1        A.  Once briefing was finished, I would exit George
 2   Bailey and drive around the back to Facility 8.
 3        Q.  Okay.  And at Facility 8, is it correct that you
 4   were working in the control position?
 5        A.  Yes, control position Facility 8.
 6        Q.  Okay.  And is control position a title or a
 7   place or is it both?
 8        A.  Control position is -- I'm up there operating
 9   all the doors, gates, letting deputies in and out, nurses
10   in and out, transfers in and out, professional visits in
11   and out, as well as monitoring deputy safety inside the
12   modules.
13        Q.  Okay.  When you say, I'm up there, where --
14   where do you mean specifically?
15        A.  Control is above the modules.  It would have
16   been probably, like, called the second floor.
17        Q.  Uh-huh.
18        A.  We'd walk up some stairs and then control tower,
19   there's windows to see inside of all the modules to
20   monitor for safety, security, keeping an eye on the
21   deputies.
22        Q.  Okay.  So the control position is this physical
23   space that's up on the second floor where you're looking
24   out at the modules, right?
25        A.  Yes.
```

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 18

1  detainees -- you didn't affirmatively let detainees out
2  unless they asked to be let out; is that correct?
3      A.  Most of -- most of them knew they had a visit,
4  and they would call.
5      Q.  Okay.  And what I'm asking is, if they don't
6  ask, would you just follow the schedule and let them go
7  out, or do people affirmatively have to ask to be let
8  out?
9      A.  It would vary.  Every day was different.  Some
10 days, they would be notified.  If there was multiples --
11 we wanted them to have their visits.  So if there was a
12 lot scheduled, we would try to make sure that people
13 weren't hogging up the phone so that other -- others
14 could get their visit on time.  And every day --
15     Q.  Uh-huh.  You -- sorry.  What?
16     A.  Every day was different.
17     Q.  Okay.  You wanted them to have their visits,
18 why?
19     A.  They're scheduled for a visit, and they would
20 get their visit.
21     Q.  I'm asking, why did you want that to happen?
22     A.  For -- for operation purposes, running a smooth
23 shift, getting things done on time.  There's a lot going
24 on at any one given time, so we try to be as efficient as
25 possible during a busy shift.

Page 19

1      Q.  Right.  Aside from efficiency, the jail policies
2  also state, don't they, that detainees are to have their
3  visits unless they're being disciplined for some serious
4  misconduct?
5      A.  I don't know what the exact wording would be for
6  the policy.  I -- I would need to -- to look at that, but
7  the -- the visits would get done.
8      Q.  Uh-huh.  Let me show you a video real quick, if
9  I can do this correctly.  If I can -- this is a short
10 clip of this same area we just saw.
11     Are you able to see this?
12     A.  Yes.
13     Q.  Okay.  It's just two clips that are, kind of,
14 run together, and I want to direct your attention to the
15 lower left where the guy is coming out of the cell.
16     A.  Okay.
17     Q.  And it shows the second angle of the same thing.
18     A.  Okay.
19     Q.  Now you -- you saw, again, set down a sheet of
20 paper and pull up the chair at this video kiosk, right?
21     A.  Yes.
22     Q.  Okay.  Let's call this exhibit --
23          (Reporter clarification.)
24     MR. COOLMAN:  -- 2.
25          (Exhibit 2 was marked for identification.)

Page 20

1  BY MR. COOLMAN:
2      Q.  Do you have any recollection of letting this
3  individual out of his cell to make a video call?
4      A.  I do not.
5      Q.  Okay.  Let me turn to the specific interaction
6  with Mr. Gadsden on the -- or just slightly before that.
7      Had you had any interaction with Mr. Gadsden
8  before the intercom conversation on February 15th, 2019?
9      A.  I don't recall.
10     Q.  But you did end up having a conversation with
11 Mr. Gadsden over the intercom?
12     A.  Yes.
13     Q.  Do you have any idea what time that conversation
14 started?
15     A.  I don't recall the time.
16     Q.  Can you walk me through a little bit of how it
17 goes initially?
18     Do you get a call or a buzz or a signal that
19 he's trying to contact you, or what does that sound like?
20     A.  The control computer has multiple screens,
21 different cameras are available on there, that shows all
22 the -- all the modules.  The notifications would come
23 through some type of beeping sound, and that would be the
24 notification that there's a call coming in from somewhere
25 in the facility.

Page 21

1      Q.  Okay.  So you answered the -- the beep or
2  whatever the signal is, correct?
3      A.  Yes.
4      Q.  And what did you say?
5      A.  The beeping can be anything coming in from any
6  cell, any crossover, any gate.  It ranges from any
7  question, people asking if they're coming out for day
8  room, if commissary is coming that night, if -- if
9  they're going to get to watch TV, channel check, just a
10 multitude of different questions come in every day.
11     Q.  Right.
12     A.  Every day is different.
13     Q.  Maybe I'm not being clear.  I'm asking what did
14 you say when you got the signal from -- that Ron Gadsden
15 was trying to talk to you.  What did you say?
16     A.  I don't recall exactly how I answered that call.
17     Q.  How do you typically answer those calls?
18     A.  Typically, I would answer a call and say, How
19 can I help you?
20     Q.  Okay.  You write in your answers to the
21 interrogatories that -- that Gadsden started speaking, he
22 demanded that the cell be opened in a loud voice; is that
23 correct?
24     A.  That's correct.
25     Q.  What specifically did he say?

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 22

1     A.  When the intercom for his cell would have been
2  keyed up, there was the instant demanding of, Let me out,
3  I have a visit.
4     Q.  Is that what he says, Let me out, I have a
5  visit?
6     A.  From -- from the answer of a call.
7     Q.  I -- I don't understand.
8     A.  Sorry.  Repeat the question, please.
9     Q.  I'm just asking what Ron Gadsden said.
10       Did he say, Let me out, I have a visit, or
11  something else?
12     A.  I don't recall the exact wording.
13     Q.  So you don't know what he said?
14       MR. PHILLIPS:  Objection.  Mischaracterizes
15  testimony; argumentative.
16  BY MR. COOLMAN:
17     Q.  Sir, you just said you don't recall the exact
18  wording; is that correct?
19     A.  I don't recall the exact wording.
20     Q.  You said he used a loud voice.  Can you give
21  me -- well, I guess you don't know exactly what he said,
22  so I'm not -- I'm not going to ask you -- let met me
23  think about this, I guess.
24       So let me back up.  You don't recall exactly
25  what he said, but you recall the subject he's asking

Page 23

1  about; is that right?
2     A.  I recall answering an intercom and a demand to
3  be out of the sell.
4     Q.  Well, when you say it's a demand, what do you
5  mean it's a demand?
6       Were there some words that he used that were
7  demanding?
8     A.  Let me out now.
9     Q.  You do recall that he said that, or don't you
10  recall?
11     A.  I recall there being a demand to be let out.
12     Q.  Okay.  But you don't actually remember what
13  words he used?
14     A.  As far as the order of the words, how it came
15  out, I don't recall the exact order.
16     Q.  You also are -- don't recall the exact words,
17  correct?
18       MR. PHILLIPS:  Objection.  Asked and answered;
19  argumentative.
20  BY MR. COOLMAN:
21     Q.  But you thought it was loud?
22     A.  Yes.
23     Q.  Why didn't you let Gadsden perform his video
24  call?
25       MR. PHILLIPS:  Objection.  Vague and ambiguous

Page 24

1  as to time.
2  BY MR. COOLMAN:
3     Q.  You can answer.
4       MR. PHILLIPS:  You can answer, Mike, if you
5  understand it.
6       THE WITNESS:  Okay.  Repeat the question,
7  please?
8  BY MR. COOLMAN:
9     Q.  The question was, Why didn't you let Ron Gadsden
10  perform his video call?
11       And let me be more specific.  He says, I've got
12  a video call, let me out.  Why didn't you let him out?
13     A.  So working the control position, I'm responsible
14  for safety of all the deputies, I'm responsible for
15  safety of the inmates, opening and closing doors, making
16  sure that no one is coming out if they're not needed to
17  come out.  I have deputies in three different modules
18  that I have to monitor at any one time, deputies that are
19  conducting count for the facility, confirming that
20  everyone is accounting for.  We need to know if there's
21  anyone out at court still, anyone out at a professional
22  visit, if there's a nurse on the floor, if medication
23  needs to be passed.  These are all activities -- daily
24  activities that are monitored from the control deputy.
25     Q.  That's -- that's true every day, isn't it?

Page 25

1     A.  Yes.
2     Q.  And that was true at 7:11 p.m. when the other
3  detainee was let out, correct?
4       MR. PHILLIPS:  Objection.  Vague and ambiguous.
5  BY MR. COOLMAN:
6     Q.  I'm asking, were those same conditions in place
7  when the other detainee was let out to make his video
8  call?
9       MR. PHILLIPS:  Same objections.
10  BY MR. COOLMAN:
11     Q.  You can answer, sir.
12     A.  Daily operations that are conducted every day.
13     Q.  Okay.  You alluded to the safety of the deputy.
14       Let me ask you this, did you prepare an incident
15  report related to this case -- related to your
16  interaction with Ron Gadsden?
17     A.  Yes.
18     Q.  Okay.  I'm going to go a little out of order for
19  myself, but I want to ask you a question about this
20  safety concern.
21       Are you able to see the incident report I've got
22  on the screen here?
23     A.  Yes.
24     Q.  There is some blue header information from the
25  federal court system, but other than that, does this look

MICHAEL MCGRATH - 10/13/2022

Page 26

1 like the incident report you prepared?
2     A. Can you scroll down a little bit?
3     Q. Sure. Sorry.
4     A. Okay. That looks like the one that I wrote.
5     Q. Okay. Just backing up a little.
6        You have been trained on writing reports,
7 haven't you?
8     A. Yes.
9     Q. And you know your reports are supposed to be
10 complete, correct?
11     A. Say that one more time, please?
12     Q. You know that your reports are supposed to be
13 complete, correct?
14     A. Yes.
15     Q. Your reports are supposed to be accurate, right?
16     A. Yes.
17     Q. Because you know that reports can be used in
18 legal proceedings, right?
19     A. Yes.
20     Q. Okay. In the incident report, you don't make
21 any reference to concern about the safety of other
22 deputies, do you?
23     A. There's no specific wording in the report.
24     Q. Is there any non-specific wording in the report
25 about the safety of deputies?

Page 27

1     A. Safety check and soft count started.
2     Q. Uh-huh. Is there any reference to anything that
3 Ron Gadsden is doing that raised the concern about the
4 safety of other people?
5        MR. PHILLIPS: Objection. Asked and answered.
6        You can answer, if you understand it, Mike.
7        THE WITNESS: Repeat the question?
8 BY MR. COOLMAN:
9     Q. Is there any reference in the incident report to
10 Ron Gadsden taking any action that raised a concern about
11 the safety of other people?
12        MR. PHILLIPS: Same objection. Vague and
13 ambiguous.
14        You can answer.
15 BY MR. COOLMAN:
16     Q. Let me get -- let me break it down.
17        Is there any reference in here, for example, to
18 Ron Gadsden threatening somebody?
19     A. No.
20     Q. Is there any reference in here to Ron Gadsden
21 using force against anybody?
22     A. No.
23     Q. Is there any reference in here to Ron Gadsden
24 having a weapon?
25     A. No.

Page 28

1     Q. Is there any reference to Ron Gadsden destroying
2 property?
3     A. No.
4     Q. In fact, on this page, there are categories
5 about in the middle of the screen, one of which says,
6 Inmate violence. And there's a notation, N, for no
7 inmate violence, correct?
8     A. Correct.
9     Q. There's a contraband question. It says, N, no
10 contraband?
11     A. Correct.
12     Q. There's a facility damage question, and the
13 notation there is, N, no facility damage?
14     A. That's correct.
15     Q. Ron Gadsden didn't do anything that raised a
16 security risk, did he?
17        MR. PHILLIPS: Objection. Vague and ambiguous.
18        You can answer, Mike.
19        THE WITNESS: My concern in control is for
20 safety. If I feel that there is a cell in any module
21 that is calling and demanding to be let out now, I'm not
22 going to allow that cell door to be opened for the safety
23 of my deputies in the module. I -- I don't know how
24 angry that person could be when that door opens because
25 they may be upset about something. I don't want someone

Page 29

1 to be let out that is already angry and that may decide
2 they want to attack a deputy. My job is for their safety
3 while they are in the module.
4 BY MR. COOLMAN:
5     Q. Uh-huh. Were any of those concerns noted in the
6 incident?
7        MR. PHILLIPS: Objection. Asked and answered.
8        You can answer it again, Mike, if you want.
9        THE WITNESS: Safety check and soft count.
10 BY MR. COOLMAN:
11     Q. All right. Let's rewind a little bit to the
12 interaction that went on with Ron.
13        He asked to be let out; you don't let him out.
14 What happens next? I'm going to stop sharing this -- I'm
15 sorry to interrupt, but we'll call this 3.
16        (Exhibit 3 was marked for identification.)
17 BY MR. COOLMAN:
18     Q. So he asked to be let out of the cell. You
19 don't let him out. You hang up on him?
20     A. Multiple calls come in through the intercom --
21     Q. Sir, I'm just asking a question.
22        Did you hang up on him?
23     A. I answered the next call.
24     Q. Okay. But what happened to the call with Ron?
25     A. Once another call is answered, the previous call

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 30

1  is hung up.
2      Q.  Okay.  So you did hang up on him.  It's just
3  what happened, right?
4      A.  By default, the machine hangs up.
5      Q.  Okay.  And then what happens next?
6      A.  I'm monitoring deputies while they're doing
7  their security check and soft count.  The intercom is
8  still buzzing, multiple calls from all three modules.  I
9  have to walk away from the window that overlooks the
10 module, leaving my deputies with no one to watch their
11 back, and I have to walk -- physically walk over to the
12 intercom and key up the intercom again, and another call
13 comes through.
14     Q.  Okay.  And you answer it, correct?
15     A.  Yes.
16     Q.  And what do you say?
17     A.  How can I help you?
18     Q.  And what does Ron say?
19     A.  Intercom was answered, again, demanding to be
20 let out of the cell.
21     Q.  And is it the case here, as well, that you don't
22 remember the specific words?
23     A.  I don't recall the specific words in order.
24     Q.  And you don't let him out of the cell, correct?
25     A.  Correct.

Page 31

1      Q.  You understood why he was asking to be let out
2  of the cell, right?
3          It wasn't that he wanted to just run around in
4  the day room?
5          MR. PHILLIPS:  Objection.  Calls for
6  speculation; vague and ambiguous.
7  BY MR. COOLMAN:
8      Q.  Well, I'm asking, did you understand why he
9  wanted to go out of his cell?
10         MR. PHILLIPS:  Same objections.
11 BY MR. COOLMAN:
12     Q.  You can answer, sir.
13     A.  Calls come through asking for a visit, any
14 question for property, TV, multiple questions come in.
15     Q.  Sure.
16         My question was, did you understand why Ron was
17 asking to be let out of his cell?
18     A.  Yes.
19     Q.  Okay.  And what -- what was the reason you
20 thought he wanted to be let out of his cell?
21     A.  Say that again, please?
22     Q.  What was the reason you thought Ron wanted to be
23 let out of his cell?
24     A.  He wanted to be let out for his video visit.
25     Q.  Thank you.

Page 32

1          By the way, I want to say, if at any point you
2  want to take a break or whatever, it's fine.  I want to
3  go a little more here, but then, myself, I got to step
4  out.
5      A.  Actually, I need to use the restroom.  So could
6  we --
7      Q.  You want to step out for a few minutes or
8  something?
9          MR. COOLMAN:  Let's go off the record for ten
10 minutes.
11         MR. PHILLIPS:  Are we taking a break?  Sorry.  I
12 missed that.
13         MR. COOLMAN:  Yeah.  Just take a quick bathroom
14 break for ten minutes.
15         MR. PHILLIPS:  Ten minutes.  Okay.
16         MR. COOLMAN:  Thank you.
17 (A recess was held from 10:31 a.m. until 10:45 a.m.)
18         MR. COOLMAN:  Back on the record.
19 BY MR. COOLMAN:
20     Q.  Okay.  Going back to the incident report, the
21 incident report does refer to the data that Ron Gadsden
22 requested an IA form, correct?
23     A.  Correct.
24     Q.  And did you know what he meant by an IA form?
25     A.  Yes.

Page 33

1      Q.  What was that?
2      A.  Internal affairs.
3      Q.  Okay.  Was that an important detail to you?
4      A.  No.
5      Q.  It was not an important detail, but you included
6  it in your report, correct?
7      A.  It was included in my report.
8      Q.  Uh-huh.  Why did you include it in your report?
9      A.  It was included in the report because of the
10 foul language used in requesting.
11     Q.  Okay.  But you didn't just describe the foul
12 language.  You also referred to the request for an IA
13 form, right?
14     A.  The foul language with the request for an IA
15 form.
16     Q.  Right.  What -- how many incident reports do you
17 think you've filed or wrote in the six months prior to
18 this incident, just ballpark?
19     A.  I can't recall how many.
20     Q.  Okay.  But were there some?
21     A.  Yes.
22     Q.  Do you think it might be as many as ten?
23     A.  I can't put a number on it.  I don't recall how
24 many were written.
25     Q.  Okay.  But there were some?

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

1    A.  There were some written.

2    Q.  Sure.

3        Okay.  And in the six months after this

4  incident, were there also some incident reports that you

5  wrote up?

6    A.  Yes.

7    Q.  Okay.  To the best of your recollection, how

8  many of those incident reports, if any of them, involved

9  somebody being transferred out of Facility 8?

10    A.  I cannot recall what each incident report

11  involved.

12    Q.  I understand that.

13        I'm asking, do you know if -- let me put it this

14  way.

15        Do you know if any of those incident reports

16  involved somebody being transferred out of Facility 8?

17    A.  For being transferred out of Facility 8 for

18  incident report, I would need to see all of the incident

19  reports.  I can't specify how many left or how many there

20  was.

21    Q.  Sure.

22        So you don't know off the top of your head if

23  anybody was transferred out of Facility 8 in any of those

24  reports?

25    A.  I don't recall.

1    Q.  Okay.  In any of those other incident reports,

2  had you referred to a person requesting an IA form?

3    A.  I don't recall.

4    Q.  Okay.  Let me, kind of, shift gears a little

5  bit.

6        Who was the watch commander on shift in

7  February 2019, if you know?

8    A.  I don't recall who the watch commander was.

9    Q.  Do you recall who was the housing control deputy

10  in February 2019?

11    A.  Can you be more specific?

12    Q.  Well, are there -- are there multiple housing

13  control deputies, typically?

14    A.  Well, at Facility 8 and George Bailey.  So, I

15  mean, if you could be more specific on which facility.

16    Q.  Yeah.  I'm sorry.  My question is a little

17  vague.  I don't know how it all works.

18        I guess what I'm asking is, is there a

19  housing -- is there typically a housing control deputy

20  who's in charge of Facility 8?

21    A.  So I was the control deputy for Facility 8 back

22  then.

23    Q.  Okay.  Got it.

24        Did you work -- excuse me -- with a sworn staff

25  member to prepare the incident report?

1    A.  I don't recall another deputy helping me with

2  anything.

3    Q.  Okay.  Did you provide the report to the

4  disciplinary hearing officer?

5    A.  So I typed the report, I notified my floor

6  deputies that I was going to write this rule violation,

7  and that this person needed to be transferred out of

8  Facility 8.

9    Q.  Okay.  My question was, did you provide the

10  report to the disciplinary hearing officer?

11    A.  No.  The report was logged into JIMS, and the

12  sergeant looks at it from there.  They are the ones that

13  give the discipline.

14    Q.  Okay.  So through logging it into JIMS, you're

15  effectively transmitting it to the disciplinary officer;

16  is that -- is that correct?

17    A.  That's correct.

18    Q.  Okay.  And you referred to the sergeant a moment

19  ago.  Who is that?

20    A.  The sergeant that is over -- there's -- there

21  was typically three sergeants over the facility.  They

22  all play a different role on which housing units they

23  monitor for that day.

24    Q.  Okay.  Do you recall specifically who those

25  people were on February 15, 2019?

1    A.  I don't recall.

2    Q.  Do you know who the disciplinary review officer

3  was -- who the review officer was?

4    A.  I don't recall who was giving the discipline.

5    Q.  Okay.  You, yourself, did not physically move

6  Ron Gadsden out of Facility 8, right?

7    A.  I did not.

8    Q.  Okay.  Who did move him?

9    A.  One of the partners that was working the floor

10  that day would have made the transfer.

11    Q.  Just one person?

12    A.  I don't recall how many deputies moved him out

13  of the facility.

14    Q.  Okay.  And you don't recall any of their names?

15    A.  I do not.

16    Q.  Do you recall the names of anybody at all that

17  you worked with on February 15th, 2019?

18    A.  I don't recall who I worked with that day.

19    Q.  Not even a single person?

20    A.  No.

21    Q.  How was Ron Gadsden's movement documented from

22  Facility 8 to wherever he went next?

23    A.  There was just the -- the rule violation and

24  then on their -- towards the end of that write-up, it

25  would have stated that he was going to be transferred

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 38

1  out.  And then he --
2      Q.  And -- sorry.
3      A.  -- once -- once he leaves the facility, his name
4  will be put into the -- the -- the queue as he left
5  Facility 8, and then he would be put back into George
6  Bailey's JIMS.
7      Q.  Okay.  So JIMS would be the source for the
8  information about the movement; is that correct?
9      A.  Yes.  JIMS --
10     Q.  Okay.
11     A.  -- shows that he was moved out and then put into
12  a new housing unit at George Bailey.
13     Q.  Okay.  Great.  Let me ask some, sort of, broader
14  questions about internal affairs.
15         Did you, yourself, ever give Ron Gadsden an IA
16  form?
17     A.  Repeat the question, please?
18     Q.  Did you, yourself, ever give Ron Gadsden an IA
19  form?
20     A.  I don't recall giving him an IA form.
21     Q.  Okay.  What is your understanding of the effect
22  of having an IA complaint filed against yourself when
23  you're a sheriff's deputy?
24     A.  My understanding is that it's reviewed, and they
25  look at it and they make a decision based on -- on their

Page 39

1  review.
2      Q.  Does it have any effect on a person's career?
3      A.  I don't know.
4      Q.  Do you think -- this is, kind of, a
5  philosophical question.
6         But do you think law enforcement should have an
7  internal affairs process?
8      A.  Most definitely.
9      Q.  Okay.  Why?
10     A.  Just to make sure deputies are -- are doing
11  their job and they're conducting their safety checks and
12  making sure the -- the welfare of -- of the inmate is
13  taken care of and the safety is done on time.
14     Q.  Okay.  Do you think deputies -- I'm sorry --
15  detainees in a jail should have access to internal
16  affairs forms?
17     A.  Yes.
18     Q.  Okay.  So we've talked about the creation of the
19  incident report and the logging of this movement in JIMS.
20         Did you communicate with anybody else on
21  February 15th, 2019, about this incident except through
22  those two mechanisms?
23     A.  I'm sorry.  You broke up on the last part of the
24  question.  Can you repeat --
25     Q.  Sorry.  It was a long question, too.

Page 40

1         Besides JIMS and the incident report, did you
2  communicate with anybody else about this incident that
3  had occurred?
4      A.  The only communication was with the deputies
5  that made the movement.
6      Q.  And in the following week, did you communicate
7  with anybody else about this incident?
8      A.  No.
9      Q.  All right.  I'm rewinding a little bit back to
10  the specific language of the incident report -- or
11  actually, I'm sorry.  This isn't -- in your response to
12  interrogatories, you state that your interaction with
13  Gadsden about this call generally delayed -- or generally
14  resulted in the delay of all facility aid operations for
15  deputies, staff, and inmates.
16         What operations specifically were delayed?
17     A.  Delay of operations could have included nursing
18  staff on the floor providing medication for they;
19  professional visits, if someone -- a deputy would have to
20  escort an inmate out for professional visit and sit with
21  them, so we would lose a deputy off the floor that was
22  providing security; transferring out of transfers that
23  could have been going to another facility; court returns
24  that were coming back into the facility would cause
25  deputies -- they would have to leave the floor and go

Page 41

1  meet the bus by the road.
2      Q.  Right.  Now I take your point there --
3      MR. PHILLIPS:  Objection.  If he's answering the
4  question, you got to let him finish his answer to the
5  question.  You can't interrupt.
6      MR. COOLMAN:  Yeah.  I'm sorry.
7  BY MR. COOLMAN:
8      Q.  Yeah.  Go ahead.
9      A.  So deputies would have to leave the floor to
10  meet the bus.  Depending on how many we have on the
11  floor, we would like most of them to go because we could
12  have 50 inmates coming off the bus at one time, and we
13  need security.  And you got a couple deputies that are
14  outnumbered.  We need as many as we can for security
15  reasons and to watch our partner's back.
16         They then have to bring them back in and account
17  for them, put it down on the list that's printed for
18  court that they've returned.  I, in turn, have to flood
19  them back into the JIMS system accounting for them,
20  making sure that our count is matching and that there's
21  no one else gone.
22         Releases, we would have several releases that
23  would need to go to George Bailey.  They would have to be
24  loaded into a van and driven around to George Bailey.  If
25  it was a high-level inmate that was in Module C, two

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

1  deputies would have to escort for releases.  So two more
2  would be off the floor.
3      The nurse may not have been helped on time;
4  there would have been a delay in medication, and
5  medication is very high priority at those facilities.
6  And all this, while it was happening, I have to control
7  all the gates for the buses, the transportation vans, I
8  have to make sure no one is escaping, I have to watch my
9  cameras, I have to open and close gates and doors -- all
10  of this happening while the intercom is ringing with
11  several questions from three different modules, ranging
12  from commissary to phone time to day room to TV channels
13  to balance checks to any question that they have.  I
14  would be answering those calls all at the same time while
15  I'm monitoring my deputies that are in the facility,
16  outside the facility, all the gates, all the cameras.
17      Q.  Okay.  I -- I get that in the abstract, but your
18  response is using language, like, this could have
19  happened, or the nurses may have done this.
20      What actually did happen?  What -- what actually
21  did get delayed?
22      A.  Those -- those are delays that now this person
23  has to be transferred out, I have multiple deputies off
24  the floor, and I now don't have a deputy that can assist
25  with any oncoming traffic or anything that needs done.

1      Q.  How long was the conversation with Ron Gadsden?
2      A.  I don't recall exact timing.
3      Q.  Well, was it more than three minutes?
4      A.  I don't recall the time.
5      Q.  Was it -- I mean, your description of it is that
6  there was a couple of interactions, and then you said, I
7  need an IA form.
8      How long could that have taken?
9      A.  I don't recall the time.
10      Q.  Okay.  So was anybody escaping at this time this
11  was going on?
12      A.  There was no escapes.
13      Q.  Right.  Were buses arriving right then?
14      A.  I don't recall buses arriving.
15      Q.  Were 50 inmates getting processed right then?
16      A.  Our deputy's in the module conducting count and
17  safety check, accounting that everyone was there, and
18  that whoever was not there that was still out at court
19  was accounting for.  Deputies are walking through the
20  module looking into each individual cell and counting,
21  Okay, we know we have two in this one, we got three in
22  this one, etc.
23      Q.  Right.
24      A.  And then relaying that information back to me on
25  control, and I confirm that that is the count we have and

1  confirm that there are so many we have out of the
2  facility.
3      Q.  Uh-huh.  So that's what was actually going on,
4  the deputies were doing a count, correct?
5      A.  The deputies were conducting safety check with
6  soft count.
7      Q.  Right.
8      A.  Checking for the welfare of all the inmates
9  housed at Facility 8 and accounting for them.
10      Q.  Right.  Were these deputies part of this
11  conversation with you and Ron?
12      A.  The deputies were conducting their check.  I was
13  monitoring the deputies in the modules from the windows,
14  leaving the window -- essentially leaving them at a
15  higher risk to walk over to the control panel to answer
16  the call and taking the calls as they came in.
17      Q.  Right.  So the answer is, No, they were not part
18  of that conversation, correct?
19      A.  They were not part of the conversation.
20      Q.  They were not even aware of the conversation,
21  were they?
22      A.  At the time of the conversation, they were
23  conducting a safety and security check.
24      Q.  Right.  So the answer is they were not aware?
25      MR. PHILLIPS:  Objection.  Calls for

1  speculation.
2  BY MR. COOLMAN:
3      Q.  How would they have been aware of it?
4      A.  They were aware when I notified them that I was
5  going to write an RDR and this person needed to be
6  transferred out of the facility.
7      Q.  Right.  But the actual conversation had no
8  affect on their work at all, did it?
9      A.  The conversation had an affect because I had to
10  leave my post as providing security and watching over my
11  deputies in the module watching their back, I had to
12  leave and walk over -- physically walk over to the
13  intercom system and key up the call, which I had no
14  visible -- visibility of my deputies at that point.
15      Q.  Okay.  Sir, you testified earlier that when
16  you're initially speaking with Ron, another call comes
17  in, right?
18      A.  For the -- the first call.
19      Q.  Right.  You have this initial interaction with
20  Ron, and then another alarm goes off, or whatever, for
21  another person who wants to speak with you, right?
22      A.  Correct.
23      Q.  Okay.  And you take that call?
24      A.  Right.  I took the calls when they came in.
25      Q.  Uh-huh.  And does taking that call interfere

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 46

1  with the jail operations, too?
2      A.  It does.
3      Q.  Does it -- does it put the deputies at risk?
4      A.  Yes.  I'm -- I was watching the deputies
5  conducting safety check and soft count.  I then have to
6  walk away from the intercom again -- the window and
7  answer the intercom.
8      Q.  Okay.  So sir, you're testifying that merely
9  speaking to you on an intercom interferes with jail
10 operations?
11     A.  It interferes with the safety and security of
12 the facility, the deputies, and the inmates that are
13 housed there.
14     Q.  Okay.  Thank you.
15         The specific thing that you -- well, another
16 point that you refer to in your incident report is that
17 Ron engaged in boisterous activity.
18         What activity was he engaged in specifically?
19     A.  When the intercom was picked up, he immediately
20 raised agitated voice coming over the intercom demanding
21 the door be opened, and the screeching of the intercom
22 came across and it was just demanding and yelling to --
23 to let me out.
24     Q.  What do you mean screeching?
25     A.  When a voice is yelling, the intercom starts to

Page 47

1  make a higher pitch sound.
2      Q.  Are you able to turn the volume down?
3      A.  I don't recall a volume control.
4      Q.  Okay.  Are you able to mute the person?
5      A.  I don't recall being able to mute.
6      Q.  Okay.  And is there a recording of the intercom
7  conversation that you know of?
8      A.  Say that one more time?
9      Q.  Is the intercom conversation recorded?
10     A.  I don't know.
11     Q.  Okay.  So on the subject of boisterous activity,
12 you identified him having an agitated voice and you
13 described him as screeching or the sound is screeching.
14         So speech is the only activity he's actually
15 engaged in, correct?
16     MR. PHILLIPS:  Objection.  Mischaracterizes
17 prior testimony; compound question.
18 BY MR. COOLMAN:
19     Q.  Okay.  Let me just put it more simply.
20         Is speech the only activity he engaged in?
21     A.  I can't see what he's doing inside of his cell.
22     Q.  You can't.  That's right.  So you didn't see him
23 do anything?
24     A.  I'm working the control panel.  I can see into
25 the modules, I can see my deputies, and the cell doors.

Page 48

1      Q.  Right.  I'm asking what the basis is of your
2  report when you say he engaged in boisterous activity.
3         The only activity you perceived was speech,
4  correct?
5      MR. PHILLIPS:  Objection.  Vague and ambiguous.
6  BY MR. COOLMAN:
7      Q.  You can answer.
8      A.  No.  The -- the demanding over the intercom and
9  the foul language, I explained to call me back when you
10 can be more respectful.  And the yelling over the
11 intercom -- he was yelling and I could not get my words
12 out to explain what was going on.  And so, I said, Call
13 back when you can be more respectful.
14     Q.  What about that is not speech?
15     A.  Be more specific, please.
16     Q.  I'm asking you what activity did Ron Gadsden
17 engage in besides speech.
18     MR. PHILLIPS:  Objection.  Asked and answered.
19 He just said, he's yelling, he's talking over him.  I
20 mean, that's some speech -- you keep asking the same
21 questions over and over again.  I'm going to start
22 objecting.
23     MR. COOLMAN:  You're already objecting.
24     MR. PHILLIPS:  Sorry.  Objection.  Asked and
25 answered, multiple times.

Page 49

1         Mike, go ahead.  You can answer it again, if you
2  understand it.
3         THE WITNESS:  Calls through the intercom, the
4  yelling over the intercom, the demanding to be let out,
5  and tried to explain that you need to call back when you
6  can be more respectful, call me back calmly.  And he
7  could not do that.
8  BY MR. COOLMAN:
9      Q.  Okay.  Let me turn to this point about
10 disrespect to staff because that's another of the points
11 he mentioned in the incident report.
12         Which staff did he disrespect?
13     A.  The disrespect was directed towards me over the
14 intercom with the -- the yelling, the demanding, the not
15 allowing me to speak and let him know what's going on or
16 give him any further instructions on what's happening
17 right now.  And I stated, Call me back when you can be
18 more respectful, and that could not be done.
19     Q.  What further instructions would you have given
20 him if he had given you the opportunity to do that?
21     A.  Further instructions would have been, I have
22 deputies doing a safety check, they are accounting for
23 all the inmates, checking on the welfare of everybody.
24 When they are done completing that, I will let you out
25 for your visit.

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 50

1    Q.  You had already let a different detainee out for
2    a visit, correct?
3    A.  I don't know what he was let out for.
4    Q.  You saw him on the video, right?  We looked at
5    that earlier.
6        MR. PHILLIPS:  Objection.  Vague and ambiguous;
7    mischaracterizes the testimony; there's a time stamp on
8    the video, it speaks for itself.
9    BY MR. COOLMAN:
10   Q.  You can answer.
11   A.  The screens are used for ordering commissary as
12   well as video visits.
13   Q.  You understand, don't you, that video visits are
14   for a specific window of time, aren't they?
15   A.  Video visits are scheduled.
16   Q.  Right.  So if you delay the start of the video
17   visit for 10 or 15 minutes, that's 10 or 15 minutes that
18   the detainee cannot spend in the visit, right?
19   A.  If there was a delay in the facility and
20   something happened requiring deputies to be off of the
21   floor, then everything would have been delayed for three
22   different modules, hundreds of inmates.
23   Q.  I'm not sure -- maybe my question wasn't clear.
24       What I'm saying is, if you don't allow an inmate
25   to start their visit at the scheduled time, doesn't that

Page 51

1    cut into the available time for the visit?
2        MR. PHILLIPS:  Objection.  Vague and ambiguous;
3    incomplete hypothetical.
4    BY MR. COOLMAN:
5    Q.  You can answer.
6    A.  The -- excuse me.  If there was deputies off the
7    floor, if an incident had taken place, all visits for all
8    inmates would have been delayed.
9    Q.  I still feel like I'm not being clear.  I'm not
10   asking about a hypothetical situation.  I'm asking what
11   actually happens here -- or happened.
12       You're saying you would have explained to him
13   that there was a safety check going on and that his video
14   visit could start later.
15   A.  If I was able to speak without the yelling and
16   the interruption over and over again while I'm trying to
17   speak, I would have given that information passed down to
18   him that, as soon as my deputies are clear and we have
19   accounted for everyone in this facility, you will be let
20   out for your visit.
21   Q.  And how long did you think that was going to
22   take?
23   A.  Every check is different.  There's not a
24   specific time that that takes.
25   Q.  So it's your approach to not let detainees make

Page 52

1    their videos calls while there's a safety check going on?
2    A.  While a safety check and soft count is
3    conducted, movement through the facility is restricted.
4    Q.  Movement through the facility is restricted even
5    for detainees who have scheduled video calls; is that
6    correct?
7    A.  Once that visit was scheduled, if the
8    interruption and the yelling wouldn't have been over the
9    intercom and I could have explained that as soon as we're
10   done his visit would have went as scheduled.
11   Q.  Okay.  So you would have explained to Ron that
12   video visits don't go on during safety checks; is that
13   right?
14   A.  I would have explained that once my safety check
15   and my count is clear, he will be let out of his cell.
16   Q.  And so, presumably, nobody else was allowed to
17   make a video visit at that time because of this concern
18   about the safety check, right?
19       MR. PHILLIPS:  Objection.  Mischaracterizes
20   prior testimony.
21   BY MR. COOLMAN:
22   Q.  You can answer, if you understand.
23   A.  Safety and security check is priority.  Our
24   priority is the wellbeing of all the inmates in the three
25   different modules, and priority safety for my deputies

Page 53

1    that are conducting and accounting for everyone that's
2    present.
3    Q.  Uh-huh.  And if there were another detainee
4    making a video call in the middle of the same time that
5    we're talking about, wouldn't that suggest that,
6    actually, detainees can make video calls in the middle of
7    the count?
8    A.  I don't recall if there was other video visits
9    scheduled at that time.
10   Q.  No.  I'm asking.  Suppose, just hypothetically
11   speaking, another inmate would -- got out and made a
12   half-hour long video visit right exactly in the same time
13   we're talking about.  Wouldn't that suggest to you that,
14   in fact, video visits can go on just fine during a safety
15   check?
16   A.  So I can't -- I can't suppose who -- who was
17   scheduled.  I don't know who was scheduled.  I -- I don't
18   recall anyone else scheduled or that was let out at that
19   specific time.
20   Q.  You did watch the clip with me a few minutes
21   back before the break, right?
22       You saw that?
23   A.  Yes.
24   Q.  And maybe you haven't seen the video.
25       Do you understand that that guy sits there for

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 54

1  half an hour and makes a video call?

2      A.  I don't recall anyone coming out for a visit.

3      Q.  Whether you recall it or not, that's what the

4  video shows, doesn't it?

5      A.  It doesn't specify that he wasn't ordering

6  commissary or on a video call.

7      Q.  All right.  Let's shift gears a little bit.

8          Are you familiar, broadly speaking, with the

9  sheriff's department policies on disciplinary action?

10     A.  Repeat the question, please?

11     Q.  Are you familiar, generally speaking, with the

12 San Diego Sheriff's policies on disciplinary action?

13     A.  I'm familiar with the RVR.

14     Q.  What does RVR stand for?

15     A.  Rule violation report.

16     Q.  Okay.  To the best of your knowledge, under the

17 policies of the San Diego Sheriff's Department, what was

18 the difference between a major and a minor disciplinary

19 violation?

20     A.  I don't recall the exact policy.  I would have

21 to review that.

22     Q.  What are some examples of a minor disciplinary

23 violation?

24     A.  Minor could be the disrespect to staff;

25 boisterous activity; interfering with jail operations;

Page 55

1  tampering with locks, doors, lights; not locking down

2  when they are supposed to; not being clothed; tearing

3  apart clothes; destruction of jail property.

4      Q.  Okay.  Maybe -- I just want to make sure I

5  understand your testimony.  It sounded to me like you

6  said the three factors that are cited in the incident

7  report are all minor violations; is that right?

8      A.  As a rule violation.

9      Q.  But -- but you consider those to be minor

10 violations; is that correct?

11     A.  The severity of it being minor that -- as far as

12 the discipline, I don't have any control over that.  The

13 sergeant makes the decision on how far they're going to

14 go with the discipline.

15     Q.  Well, I think that's a different issue.  I'm

16 asking what you personally consider those violations to

17 be, whether they be major or minor.

18     A.  It is a rule violation.  The rules of the

19 facility were broken.  Therefore, the -- the report was

20 written.

21     Q.  Okay.  And you don't have an opinion on whether

22 they're major or minor?

23     A.  For them being major or minor, I don't -- I

24 don't have any specific.

25     Q.  Okay.  So when I asked you for some examples of

Page 56

1  minor rule violations and you referred to those three

2  things, disrespect to staff and interfering with jail

3  operations, was that a mistake or are you changing your

4  testimony?

5          MR. PHILLIPS:  Objection.  Argumentative;

6  mischaracterizes testimony.

7          You can answer.  Are you changing your testimony

8  or did you understand what minor or major meant as

9  Mr. Coolman described it or something else?

10         THE WITNESS:  The differences between minor and

11 major, I don't know the specifics of that.

12 BY MR. COOLMAN:

13     Q.  Okay.  What was your goal in writing --

14             (Reporter clarification.)

15 BY MR. COOLMAN:

16     Q.  What was your goal in writing up Mr. Gadsden?

17     A.  The write-up was written due to Gadsden's

18 boisterous activity, the yelling over the intercom, the

19 raised voice, the demanding to be let out, the repetitive

20 call -- the multiple calls that came in after I had

21 already explained, When you can be more respectful, call

22 me back.  And when the call came back in, there was the

23 disrespect again and the yelling and demanding to be let

24 out.

25         And the third call had came through, again, with

Page 57

1  the yelling and the demanding, and at that point, I made

2  the decision to write the rule violation, and I notified

3  my floor deputies that he needed to be transferred.

4      Q.  Okay.  I get that.  What I'm asking about is

5  what were you trying to accomplish.  What was your

6  objective?

7      A.  The rule violation is to inform Gadsden that he

8  has broke the rules at Facility 8 and to let him know

9  that Facility 8 was a facility that inmates wanted to be

10 at -- they had more privileges, they got longer TV time,

11 there was less -- less fighting over the phones, and more

12 time for them to enjoy phone time, TV, they had the nicer

13 chairs to sit in.

14         And once that -- the basic rules were broken,

15 then there was the -- you needed to be transferred out.

16 You could no longer be at this facility and enjoy the --

17 the perks that came along with being at that facility.

18     Q.  Okay.  So let me -- let me say back to you what

19 I think I heard you say, and you tell me if this is

20 correct.  One idea was to inform Gadsden that he had

21 broken rules, and the other is, essentially, to say,

22 Look, Facility 8 has some perks and you're going to lose

23 those if you miss behave; is that correct?

24     A.  Yes.

25     Q.  Okay.  Now to accomplish this goal, you took

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 58

1  away his video visit, right?
2      A.  Yes.
3      Q.  Did you also confine him to his cell for a few
4  hours after that conversation?
5      A.  I did not.
6      Q.  So was he let out at the same time as all the
7  other detainees that evening?
8      A.  Can you be more specific?
9      Q.  Well, I -- was there, at some point in the
10  evening, a time when inmates or detainees were allowed
11  out to use the day room?
12      A.  I don't recall if anyone was let out for day
13  room.
14      Q.  Okay.  In any event, you did take away his video
15  visit.  My question is, at the point when you took away
16  the visit, hadn't you accomplished the goals that you
17  were trying to accomplish?
18      A.  The write-up for the rule violation, and it was
19  explained that he was going to be written up for these
20  reasons and that he was going to be transferred out.
21      Q.  Well, okay.  I get that you're saying that he
22  was going to be transferred out, and we'll get to that in
23  a minute.  I'm asking, once the video visit was taken
24  away, hadn't you made it clear to him that he's violating
25  rules?

Page 59

1      A.  I made it clear to him that he was going to be
2  written up because he violated the rules at Facility 8.
3      Q.  Okay.  Well, let -- let -- let's turn to the
4  discussion of whether he had to be transferred.  You said
5  several times in your testimony today that he had to be
6  or that he needed to be.
7          Why is that?  Why did you need to be
8  transferred?
9      A.  So high-level inmates at Facility 8, there
10  was -- they automatic -- they had to be transferred out
11  of Facility 8.  There was no area for them to stay at for
12  discipline.
13      Q.  What is the basis of your belief that they had
14  to be transferred out?
15      A.  There was nowhere for them to be housed at
16  Facility 8, being a high-level inmate.
17      Q.  Well, Mr. Gadsden was already a high-level
18  inmate.  He was already housed at that facility, right?
19      A.  Once the rule violation was written, that
20  required a transfer out.
21      Q.  Why?
22      A.  There was nowhere to house an inmate that had a
23  rule violation.
24      Q.  What does the rule violation have to do with
25  where he was housed?

Page 60

1      A.  Facility 8 high levels that broke the rules were
2  transferred to George Bailey.  That was the policy that
3  was in place.
4      Q.  Okay.  I'd like to share my screen with you.
5          MR. PHILLIPS:  We're going up on another hour
6  here, so two hours in.  Are we going to break for lunch
7  is the idea -- or are you going to give me an idea in
8  terms of timing, Alex?
9          MR. COOLMAN:  Well, I'll tell you what, I'd like
10  to ask this question.  And then if you'd you want to
11  break for lunch, we can.  I don't have too much more, but
12  I think I might have another, you know, 20 minutes-ish.
13          MR. PHILLIPS:  So maybe just a bathroom break,
14  kind of, just a quick break and then --
15          MR. COOLMAN:  That's fine.
16          MR. PHILLIPS:  And see if we need lunch?
17          MR. COOLMAN:  I'm sorry?
18          MR. PHILLIPS:  And then see if we even need
19  lunch?
20          MR. COOLMAN:  Sure.  Yeah.  So maybe we can do a
21  break and then try to wrap it up.  Like I said, I -- it's
22  not much more.
23          MR. PHILLIPS:  Apologies.  I didn't mean to -- I
24  thought it would be a good time.
25  BY MR. COOLMAN:

Page 61

1      Q.  Okay.  So I am turning to what's called the JPMU
2  Training Manual.  I'm going to go to the first page of
3  this document.  This is the male population management
4  unit training manual.
5          Have you ever seen this manual?
6      A.  I don't recall.
7      Q.  Okay.  Do you think you may have reviewed it at
8  some point?
9      A.  I don't recall.
10      Q.  Okay.  I'm turning to page 20 of this.
11          Do you see at the top of the page where it says
12  Facility 8 and there's a bullet point there?
13      A.  Yes.
14      Q.  Okay.  So it says, Unsentenced inmates must meet
15  the following criteria:  2, no known significant
16  disciplinary problems.
17          Would you agree that under the policy that we're
18  looking at right now, an inmate who doesn't have a
19  significant disciplinary problem can stay in Facility 8.
20          MR. PHILLIPS:  Objection.  The document speaks
21  for itself.  And I would just say this, he's
22  misrepresenting and it doesn't show the context of this
23  particular page in the manual and its application.
24          You can answer, if you understand it, Mike.
25          THE WITNESS:  I don't understand the question.

MICHAEL MCGRATH - 10/13/2022

Page 62

1    MR. COOLMAN: Fair enough. Fair enough. Why
2  don't we take a break as Mr. Phillips suggested and come
3  back in 10 to 15 minutes. And I'll try to get through
4  the final bit. Does that sound okay?
5    MR. PHILLIPS: Sure. Yeah. How much -- how
6  long? Five? Ten?
7    MR. COOLMAN: Oh, well, I was saying maybe ten
8  minutes.
9    MR. PHILLIPS: Ten minutes.
10    Mike, is that okay with you?
11    THE WITNESS: Yeah.
12    MR. COOLMAN: All right. Good deal. Off the
13  record, I guess.
14  (A recess was held from 11:34 a.m. until 11:46 a.m.)
15    MR. COOLMAN: Back on the record. Cool. Thank
16  you.
17  BY MR. COOLMAN:
18    Q. As I said, I don't have too much more. I -- I
19  have a few more questions, but I think we should be able
20  to get out of here not too late for lunch.
21    MR. PHILLIPS: Great.
22  BY MR. COOLMAN:
23    Q. I want to talk about other disciplinary options
24  that could have been used. There were options you could
25  have used that didn't involve transferring Ron out of

Page 63

1  Facility 8.
2    Am I correct there?
3    A. When I was working at Facility 8, I was
4  instructed by my supervisors that the high level -- high
5  level inmates were to be transferred out to George
6  Bailey.
7    Q. And do you mean high-level inmates were to be
8  transferred out what -- if what happened?
9    A. So the other modules, the low-level modules
10  had -- had space available. If there was a rule
11  violation, they were able to stay there and serve
12  whatever discipline was -- was given down to them by the
13  supervisors.
14    Q. Okay.
15    A. The high-level inmates, there was no available
16  cells for them to stay at Facility 8 to be housed to
17  serve a discipline. We were instructed that they were to
18  be transferred to serve their discipline out at George
19  Bailey.
20    Q. Okay. And when you say they are to be
21  transferred if there's a rule violation, do you mean
22  they're -- they are to be transferred if there is any
23  rule violation at all?
24    A. Yes. High level's rule violations were
25  transferred out.

Page 64

1    Q. Okay. So it was not an option then for you to
2  just give Mr. Gadsden a written warning?
3    A. It was not my choice at all to give any type of
4  discipline. That's solely based on the sergeant's
5  decision.
6    Q. You could not have given Ron verbal counseling?
7    A. If I felt that it was a verbal, then I could
8  have given a verbal. Based on the -- multiple
9  disrespect, the not allowing me to speak, the yelling,
10  the language, it was my decision that this was not going
11  to be a verbal warning. There was already multiple
12  chances for him to be respectful.
13    Q. Okay. Could you have taken away his TV
14  privileges?
15    A. That's not my decision for discipline.
16    Q. Okay. Could you have taken away his commissary
17  privileges?
18    A. All discipline is given from the supervisors.
19    Q. Okay. I won't go through too many more of
20  these.
21    Could you have assessed a fine against him?
22    A. All discipline was given from the supervisors.
23    Q. And could you have assessed him an extra work
24  detail?
25    A. All discipline was given by the supervisors.

Page 65

1    Q. Okay. So if I understand correctly, you do
2  agree that certain things could have been handled
3  verbally, but beyond that, it all has to go to, I believe
4  you said, the -- the sheriff -- no, it has to go up to
5  the higher level?
6    A. Repeat that, please?
7    Q. Yeah. I'm sorry. That was a bad question.
8    So as I understand what you're saying, there is
9  a certain class of interactions that could be handled
10  verbally, and that's up to your discretion, right?
11    A. If I decided to have -- give a verbal warning, I
12  would have done so. Any further discipline is all based
13  on the sergeant's discretion.
14    Q. Right. So transferring Gadsden then was not
15  your choice?
16    A. Not my choice.
17    Q. Okay. But the decision to write him up was your
18  choice?
19    A. The rule violation was my decision to make.
20    Q. Okay. And we sort of covered this, and I -- I'm
21  sorry if I'm asking the same question differently.
22    Could you have caused Ron to be transferred to
23  disciplinary segregation if you wanted to?
24    A. All the discipline is done through the
25  sergeants. They make that decision. I have no say so on

MICHAEL MCGRATH - 10/13/2022

Page 66

1  what their decision is going to be.
2      Q.  Okay.  And you understand it is alleged on this
3  case he ultimately did spend six or seven days in
4  disciplinary segregation?
5          You -- you know that, right?
6      A.  I -- I don't know any specifics of how long he
7  was there.  I never had interaction after that with him.
8      Q.  I understand.
9          But do you understand that that is what he
10  alleges occurred?
11     A.  I don't recall if that's in there.
12     Q.  Well, let's assume that's what's alleged.  Did
13  whoever made the decision to put Ron Gadsden in
14  disciplinary segregation make a mistake, in your opinion?
15     A.  The sergeants make their disciplinary decisions.
16  I have no say so.  I have no opinion in that.
17     Q.  So whatever happened after they transferred out,
18  it -- it's just not -- it's not something you have a view
19  about one way or the other?
20     A.  Once he's transferred out, I have nothing
21  further -- no further involvement with him.
22     Q.  Uh-huh.  Okay.  So do you know, then, who did
23  make that decision to put him in a disciplinary
24  segregation?
25     A.  I don't recall.

Page 67

1      Q.  Okay.  What documents would you look at to
2  answer that question if you had access to them?
3      A.  If I have access to the JIMS system, I would be
4  able to look up to see if there had been any previous
5  disciplines for anyone housed at Facility 8 or if they
6  had a current discipline pending.
7      Q.  I don't understand that answer.  I'm asking to
8  figure out who made the decision to transfer Ron
9  Gadsden's disciplinary segregation, what documents could
10  be consulted?
11     A.  The -- the sergeant makes the discipline
12  decision.  They update their decision into JIMS.
13     Q.  And who was the sergeant?
14     A.  I don't recall the sergeant.
15     Q.  You don't recall the sergeant.  Was that
16  effectively your boss?
17     A.  Can you be more specific on the question?
18     Q.  Yeah.  Did -- did the sergeant -- was that your
19  supervisor?
20     A.  I don't recall the sergeant that gave the
21  discipline.
22     Q.  Do you recall any of the names of the sergeants
23  you worked for?
24     A.  I can't recall.  There's so many.
25     Q.  I'm changing gears here, just to a broader

Page 68

1  question about communication.
2          In February of 2019, did you have a work e-mail?
3      A.  Yes.
4      Q.  What was your e-mail address?
5      A.  I believe -- I recall it was
6  Michael.mcgrath@SDSheriff.  I don't recall the last part,
7  if it was dot net, dot org, dot com.
8      Q.  Okay.  Did you have a work cell phone in
9  February of 2019?
10     A.  I did not.
11     Q.  Okay.  Did you have a personal e-mail in
12  February of 2019?
13     A.  Yes.
14     Q.  What was your e-mail address?
15     A.  My personal e-mail?
16     Q.  Uh-huh.
17     A.  I would prefer not to give that out.
18     Q.  I understand, but this isn't my problem.  It's a
19  deposition.
20     A.  MichaelMcGrath83@gmail.
21     Q.  And did you have a personal cell phone in
22  February of 2019?
23     A.  Yes.
24     Q.  And what was the number?
25     A.  (619) 322-8150.

Page 69

1      Q.  322-8150?
2      A.  Yes.
3      Q.  Okay.  Thank you.
4          What was the cell phone provider?
5      A.  I believe it was T-Mobile.
6      Q.  Thank you.  I just have a few more things.
7          Had you interacted with Ron Gadsden prior to
8  February 15, 2019?
9      A.  I don't recall.
10     Q.  Okay.  Do you recall accepting a package of
11  legal mail for him on February 4th, 2019?
12     A.  I don't recall.
13     Q.  Okay.  Let me share my screen with you real
14  quick.
15          Directing your attention -- are you able to see
16  this manila envelope?
17     A.  Yes.
18     Q.  Okay.  Directing your attention to the top of
19  that envelope or maybe the top of the screen, at any
20  rate, do you see the 3838 there?
21     A.  Yes.
22     Q.  Is that your Arjis number?
23     A.  That is.
24     Q.  Okay.  And did you, apparently, sign that
25  envelope?

EXHIBIT 7

MICHAEL MCGRATH - 10/13/2022

Page 70

1    A.  Yes.
2    Q.  Okay.  Thank you.
3        Do you know a sheriff's department employee
4  named David Smith?
5    A.  No.
6    Q.  You have no association with him at all?
7    A.  No.
8    Q.  Okay.  Have you ever spoken with David Smith?
9    A.  I think there was a David Smith on my team.
10   Q.  Which team would that be?
11   A.  Team 2.
12   Q.  I'm sorry.  I don't know the inner workings of
13 the whole thing.
14       Can you give me a little more context?
15   A.  So there was four teams at the facility.  Two
16 teams typically worked a 12 1/2-hour shift, and then once
17 their shift was over, the oncoming team would come in and
18 they would work 12 1/2-hour shift.  And then after that
19 shift, the next team would come in.
20       Typically team -- two teams would share, like, a
21 week schedule, and then we would be off work, and then
22 the other two teams would share the next week schedule.
23   Q.  Okay.  So did I understand you to say that David
24 Smith was on Team 2 with you?
25   A.  I recall a Smith on Team 2.

Page 71

1    Q.  You don't know his first name?
2    A.  I don't recall his first name.
3    Q.  Okay.  Did you ever have any conversations with
4  Mr. Smith regarding Ron Gadsden?
5    A.  I don't recall.
6    Q.  Okay.  And do you know if you, after
7  February 15, 2019, ever had any additional interactions
8  with Ron Gadsden?
9    A.  I don't recall any interactions.
10   Q.  Okay.  I -- that's all I basically have.  If
11 you -- if you don't mind, I want to look at my notes for
12 a minute and may follow up on one or two things.
13       Let me just ask you a little bit more about the
14 whole structure of the sergeants of a facility.
15       Did I understand correctly that you testified
16 that there was three sergeants over the facility?
17   A.  There -- in a shift, there typically was three
18 sergeants.
19   Q.  Okay.  And those people varied from day-to-day?
20   A.  It could vary.  If someone was out sick or on
21 vacation, there would have been a sergeant to fill in for
22 them.
23   Q.  But in general, it was the same three people?
24   A.  For -- for a period, a lot of sergeants would --
25 would get hired and come in, and we would lose one, gain

Page 72

1  one, lose one, gain one.  So that was constantly
2  happening.
3    Q.  Okay.  And do I understand correctly that
4  you're -- you don't recall the names of any of the
5  sergeants who were in charge in February of 2019 --
6  February 15, 2019?
7    A.  For -- for the facility, I don't recall who was
8  in charge.
9    Q.  Okay.  I think that's all I've got.  Thank you
10 very much for your time today.  I appreciate it.
11       MR. PHILLIPS:  I just have a couple follow-up
12 questions.
13 EXAMINATION BY MR. PHILLIPS:
14   Q.  Mr. McGrath, is there something unique about the
15 security of Facility 8 versus other facilities?
16   A.  Facility 8 was outside of George Bailey.  It was
17 located in the back.  Deputies were placed there because
18 they had -- typically had good rapport with inmates, they
19 could handle high stress situations with -- with getting
20 situations under control.
21       The facility, if there was any -- any security
22 issues, if a deputy got jumped or there was a fight, to
23 get cover from the other facility, deputies would have to
24 leave George Bailey, go out the back, and essentially run
25 down the street.  And it would take several minutes for

Page 73

1  them to get there, leaving us at a higher risk to where
2  our -- our cover couldn't be there in ten seconds.  It
3  took a long time.  And by the time they got there, it
4  could have been over.  There could have been significant
5  injury to deputies, inmates.  There was only so many of
6  us and we had -- we would have to rely on outside help
7  from George Bailey.
8    Q.  You have looked at an exhibit earlier.  I think
9  it was Plaintiff's Exhibit 3.  It was entitled an
10 incident report, there was several pages, and you said
11 that you -- you wrote that report, right?
12   A.  Yes.
13   Q.  Did you write everything in that report or is
14 there a portion of that -- how does that get processed
15 into JIMS, if you recall?
16       MR. PHILLIPS:  And maybe, Alex, if you don't
17 mind putting that up if you have it readily available?
18       MR. COOLMAN:  Sure.  Yeah.  It sounds like there
19 were two questions there.  Those were good questions
20 though.
21       MR. PHILLIPS:  You're right.  Sorry.
22 BY MR. PHILLIPS:
23   Q.  Going back to Exhibit 3, the Plaintiff's
24 Exhibit 3, the incident report, Mr. McGrath, what portion
25 of that did you write?

MICHAEL MCGRATH - 10/13/2022

Page 74

1    MR. COOLMAN: I could scroll up and down.
2    THE WITNESS: Sorry. Yeah. So everything under
3 the origin and the deputy's observations and actions, I
4 wrote. And then the codes for 101, 105, and 701, I put
5 those in. And then the inmate rights was a document
6 provided for us that is attached to every incident
7 report, and the inmate writes us to notify them of their
8 discipline and what they can do, what their steps are.
9    And that is -- that was a paper that was already
10 created for the department that was to be added to every
11 incident report.
12 BY MR. PHILLIPS:
13    Q. Okay. And I just want to be clear, there was
14 three separate calls that you had with Mr. Gadsden on the
15 day of the incident, right?
16    A. Yes.
17    Q. And after the first one, you told him to be more
18 respectful when he called back?
19    A. Yes.
20    Q. And you said the same thing after the second
21 one?
22    MR. COOLMAN: I'm not sure that's what the
23 testimony was. I believe he testified that he hung up on
24 him by operation of answering a different call.
25 BY MR. PHILLIPS:

Page 75

1    Q. Did you tell him to call back when he could be
2 more respectful?
3    A. I did.
4    Q. Did you do that on more than one call or was it
5 just one call?
6    A. I -- I don't recall saying it more than once.
7    Q. Did you make the decision to write the rule
8 violation report prior to the time that Mr. Gadsden said,
9 Fuck this, I need an IA form?
10    A. I made the decision to write the rule violation
11 as soon as -- the third call came in from his cell, I
12 picked up the call, and immediately was just yelling,
13 again, let me out of here, over and over, and the
14 screeching over the intercom and the demanding to me to
15 let him out. At that point, I had made the decision, I'm
16 going to write him up. I've given him multiple
17 opportunities to be more respectful and to -- to bring
18 his voice down and to -- to calmly ask. That's all --
19 that's all I wanted, and he could not do that. So at
20 that point, I made the decision this is going to be a
21 write-up.
22    Q. And was that before or after Mr. Gadsden said,
23 Fuck this, I need an IA form?
24    A. That was before.
25    Q. The last question I have concerns your, sort of,

Page 76

1 speculation about what Gadsden want when he wanted out of
2 the cell. And I think you said that you thought he
3 wanted to get out for his video visit, right?
4    A. Yes.
5    Q. Were there other things going through your mind
6 as to what problems with letting him out or what other
7 reasons he may have for wanting out other than the video
8 visit?
9    A. Other reasons could have been checking balance,
10 trying to order something on commissary, run to another
11 cell to pass food, to -- to talk to somebody. I had
12 deputies in the modules conducting their count. I wasn't
13 going to interrupt them. They could have lost their
14 count by having an extra person in the day room.
15    Q. Was Mr. Gadsden calm, in your opinion, at that
16 point?
17    A. No. I -- the immediate demanding and the
18 yelling, and I just asked to be more respectful, and it
19 couldn't be done, and demanding. Again, I was not able
20 to speak clearly to this person or give any clear
21 instructions.
22    MR. PHILLIPS: That's -- that's all the
23 questions I have.
24    MR. COOLMAN: Okay. I have one or two quick
25 follow-ups.

Page 77

1    THE WITNESS: I'm going to turn this light back
2 on. It keeps turning off.
3    MR. COOLMAN: Okay.
4    THE WITNESS: There we go.
5 EXAMINATION BY MR. COOLMAN:
6    Q. So you just said that -- that you made the
7 decision to write-up Mr. Gadsden before he makes that
8 comment about, Fuck this, I need an IA form, correct?
9    A. Yes.
10    Q. Okay. So your understanding then was that he
11 was going to be transferred out of Facility 8 based
12 purely on his vocal tone and the request for the -- the
13 video call and to be let out, correct?
14    A. Repeat the question, please? You're breaking up
15 a little bit.
16    Q. I'm sorry.
17    So at the time you made the decision to write
18 him up, you were aware that he had called three times and
19 used a vocal tone that was intense or demanding, right?
20    A. So the decision was off of the -- the third call
21 and the immediate -- as soon as I keyed it up, there was
22 just yelling and demanding. And from there, I said,
23 Okay, this is going to be a write-up.
24    Q. Okay. So on the basis of that demanding tone,
25 your understanding was he was going to be transferred out

EXHIBIT 7

---

**Page 78**

1 of Facility 8 because you were writing him up?

2 A. So the high levels were transferred to George

3 Bailey.

4 Q. **Right. And the other question I had was around**

5 **the concerns -- well, we've covered it, really. I don't**

6 **think I need to belabor it. I guess I have nothing else.**

7 THE REPORTER: Before we go off the record, did

8 you want to order a copy?

9 MR. PHILLIPS: I'll just take a digital.

10 certified, please. I know you were talking about CCP,

11 but this is in federal court.

12 So I'm assuming this will go per code under the

13 federal rules, Alex?

14 MR. COOLMAN: Yeah, I think so.

15 THE REPORTER: It is federal. So Mr. Coolman,

16 you wanted a copy, as well, correct?

17 MR. COOLMAN: Sure.

18 (Whereupon proceedings concluded at 12:12 p.m.)

---

**Page 79**

1 REPORTER'S CERTIFICATE

3 I, NICOLE HATLER, a Shorthand Reporter, State of

4 California, do hereby certify:

5 That MICHAEL MCGRATH, in the foregoing deposition

7 named, was present and by me sworn as a witness in the

8 above-entitled action at the time and place therein

9 specified;

10 That said deposition was taken before me at said

11 time and place, and was taken down in shorthand by me, a

12 certified Shorthand Reporter of the State of California,

13 and was thereafter transcribed into typewriting, and that

14 the foregoing transcript constitutes a full, true and

15 correct report of said deposition and of the proceedings

16 that took place;

17 That before completion of the proceedings,

18 review of the transcript [] was [X] was not requested.

19 IN WITNESS WHEREOF, I have hereunder subscribed

20 my hand this 8th day of November 2022.

22 *Nicole Hatler*

23 NICOLE HATLER, CSR NO. 13730

24 State of California

---

**Page 80**

ERRATA SHEET

4 I declare under penalty of perjury that I have read the

5 foregoing _____ pages of my testimony, taken

6 on _____ (date) at

7 _____ (city),_____ (state),

9 and that the same is a true record of the testimony given

10 by me at the time and place herein

11 above set forth, with the following exceptions:

Page  Line  Should read:            Reason for Change:

---

**Page 81**

ERRATA SHEET

Page  Line  Should read:            Reason for Change:

Date:

Signature of Witness

Name Typed or Printed

EXHIBIT 8

```
 1                IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   RONALD EARL GADSDEN,              ) CASE NO.
                                       ) 20-cv-2258-WQH-DEB
 5                 Plaintiff,          )
     vs.                               )
 6                                     )
     SERGEANT JOHN GEHRIS, Deputy      )
 7   Sheriff, and DEPUTY MICHAEL       )
     MCGRATH, Deputy Sheriff,          )
 8                                     )
                   Defendants.         )
 9   _____)

10

11

12            VIDEOCONFERENCE DEPOSITION OF

13                    DESAN TYSON

14                San Diego, California

15                November 22, 2022

16

17

18

19

20

21

22

23        Reported by Deborah M. DeSilva, CRR, CSR

24               Certificate No. 7307

25                 Job No. 938411B
```

EXHIBIT 8

DESAN TYSON - 11/22/2022

**Page 2**

```
1              IN THE UNITED STATES DISTRICT COURT
2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA
3
4   RONALD EARL GADSDEN,          ) CASE NO.
                                  ) 20-cv-2258-WQH-DEB
5               Plaintiff,        )
                                  )
6   vs.                           )
                                  )
    SERGEANT JOHN GEHRIS, Deputy  )
7   Sheriff, and DEPUTY MICHAEL   )
    MCGRATH, Deputy Sheriff,      )
8                                 )
                Defendants.       )
9   _____)
10
11
12          The Videoconference Deposition of DESAN TYSON
13   was taken pursuant to Notice of Taking Deposition on
14   Tuesday, November 22, 2022, commencing at 10:16 a.m.,
15   reported by Deborah M. DeSilva, CRR, CSR No. 7307,
16   Certified Shorthand Reporter in and for the State of
17   California.
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                VIDEOCONFERENCE APPEARANCES
2
3   For Plaintiff:
4       ALEX N. COOLMAN, ESQ.
        3268 Governor Drive, Suite 390
5       San Diego, California  92122
        619.831.7129
6       alex@coolmanlaw.com
7
8   For Defendants:
9       OFFICE OF SAN DIEGO COUNTY COUNSEL
        BY:  ADAM C. PHILLIPS, Senior Deputy
10      1600 Pacific Highway, Suite 355
        San Diego, California  92101
11      619.539.8357
        adam.phillips@sdcounty.ca.gov
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                    I N D E X
2
3   WITNESS:  DESAN TYSON
4   EXAMINATION BY:                              PAGE
5       By Mr. Coolman                          5, 44
6       By Mr. Phillips                            43
7
8
9                  INDEX OF EXHIBITS
10
11  EXHIBIT                                      PAGE
12  Exhibit 1    Incident Report                  14
13  Exhibit 2    Hearing Report                   16
14  Exhibit 3    JIMS printout                    25
    Exhibit 4    Disciplinary Hearing Rights Waiver   45
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1                VIDEOCONFERENCE PROCEEDINGS
2                TUESDAY, NOVEMBER 22, 2022
3                     10:16 A.M.
4
5        THE REPORTER:  Good morning.  My name is Debbie
6   DeSilva, Certified Shorthand Reporter No. 7307, and I
7   will be reporting today's deposition remotely by
8   stenographic means.
9        Would counsel please state your appearances for
10  the record, beginning with the noticing attorney.
11       MR. COOLMAN:  Good morning.  Alex Coolman for
12  the plaintiff, Ron Gadsden.
13       MR. PHILLIPS:  Good morning.  Adam Phillips on
14  behalf of defendant, Michael McGrath.
15                     -oOo-
16                  DESAN TYSON,
17  having been administered an oath remotely by the court
18  reporter, testified as follows:
19
20                E X A M I N A T I O N
21  BY MR. COOLMAN:
22       Q.  Good morning, Sergeant Tyson.
23       A.  Good morning, sir.
24       Q.  Thanks for being here.  I went relatively
25  quickly through the first witness, and I'm not going to
```

EXHIBIT 8

DESAN TYSON - 11/22/2022

Page 10

1  Q.  Well, for the sheriff's department, right?
2  A.  Well, it's -- we have discretionary -- each
3  deputy can -- they have their discretion on whether they
4  want to separate an inmate depending on the totality of
5  the situation.
6  Q.  Okay.  So is there a difference between
7  physically separating an inmate and disciplining an
8  inmate?
9  A.  Yes.
10  Q.  Okay.  And can you spell that out a little bit?
11  When does separation occur?
12  A.  Separation can occur, for an example, if -- if
13  you have an inmate who's being unruly or boisterous and
14  they're amongst a general housing setting.
15  Q.  Okay.
16  A.  To separate them would mean to remove them from
17  the housing unit and place them in isolation.  That
18  could be pending discipline or it could -- it could be
19  in a holding cell until they calm down.  But as far as
20  separation, it's removing them from a general housing
21  area.
22  Q.  Okay.  So being separated, then, if I
23  understand correctly, isn't necessarily the same thing
24  as being disciplined.  It's more of a physical movement?
25  A.  It's a physical movement, but the discipline is

Page 11

1  pending what rule violation will go along explaining
2  what the reason for the immediate separation was for
3  or why you're separating them.
4  Q.  Right.  Okay.
5  So is that decision to physically move an
6  inmate one that a deputy can make his or herself?
7  A.  Initially they have the discretion to separate
8  an individual from a general housing -- general housing
9  area, yes.  They have that discretion, but they are
10  not -- they do not make the final decision on whether
11  that will be finalized.
12  Q.  And when you say "that will be finalized," you
13  mean the movement could be reversed or --
14  A.  It could be, depending on the supervisor who
15  will be reviewing the situation.
16  Q.  Okay.  Well, let's turn to that.
17  When there is a rule violation report, that
18  goes to a disciplinary review officer, or where does the
19  report go?
20  A.  The report is written, and then that -- a copy
21  of that report should be given to the inmate that's
22  alleged to commit the violation.  That report is also
23  given or put in a supervisor's queue, which is the
24  hearing officer; that's generally a sergeant.
25  Q.  Okay.  I've got to move my screen because I'm

Page 12

1  getting sun here.  Sorry about that.
2  So is it, then, the disciplinary hearing
3  officer who approves discipline?
4  A.  Along with that rule violation, a segregated
5  housing order form should be given to the supervisor to
6  approve the separation, and it's -- usually there's a
7  box -- there's several boxes on that form.  The box that
8  should be checked because of the rule violation should
9  be "Administratively Segregated Pending Discipline," or
10  a hearing, pending a hearing.
11  Q.  You referred to, I think, a surrogate housing
12  form?  Was that correct?
13  A.  Segregated housing order.
14  Q.  Segregating housing order.  Okay.
15  And I'm sorry, I just have to go over it slowly
16  so I understand.  The segregated housing order is
17  generated by who?
18  A.  It's generated by the deputy, along with the
19  incident report rule violation, and that form needs to
20  be given to the supervisor to approve -- I'm sorry, to
21  give the final decision on whether that -- that person
22  will be -- will remain separated pending the hearing.
23  Q.  Okay.  So does that segregated housing order
24  get generated any time an inmate is moved to a different
25  housing area?

Page 13

1  A.  No, it's only generated when someone's
2  segregated or separated from the general population.
3  Q.  Okay.
4  A.  If they're going to be placed in an area
5  designated for administrative segregation or
6  disciplinary segregation.
7  Q.  Okay.  And that is something that would be
8  created by the deputy rather than by the supervisor?
9  A.  Yes, the deputy needs to include that with
10  their rule violation if they're going to be segregating
11  an inmate pending the hearing.
12  Q.  Okay.  So would it ever occur that an inmate
13  would be moved to segregation but no segregated housing
14  order would be created?
15  A.  I'm sorry, can you --
16  Q.  I'm sorry, yeah.
17  Would it ever happen that an inmate would be
18  moved to segregation but no segregated housing order
19  would be created?
20  MR. PHILLIPS:  Objection.  Calls for
21  speculation.  Incomplete hypothetical.
22  You can answer, if you understand it.
23  BY MR. COOLMAN:
24  Q.  You can answer, if you understand the question.
25  A.  Okay.  Individuals are moved to disciplinary

EXHIBIT 8

DESAN TYSON - 11/22/2022

Page 22

1    But it's not a go-to discipline-type approach
2  for first-time, minor incidents, is it?
3    A.  It depends on the severity of the incident.
4    Q.  Right.  I'm saying for minor incidents.
5    A.  For minor incidents, no.
6    Q.  Would using disciplinary segregation in
7  response to minor incidents advance a legitimate
8  correctional goal?
9    A.  It's progressive, depending on the history
10  of behavior.  If we -- if we have a history of
11  disciplinary issues, minor or major, disciplinary
12  isolation may be warranted for those -- for those
13  actions, yes.
14    Q.  Okay.  Can you tell me more about this word
15  "progressive"?  What do you mean by that?
16    A.  Progressive discipline.
17    Q.  Yes.
18    A.  Well, in the beginning, I had mentioned what an
19  example would be of a minor rule violation, a wristband,
20  not wearing it.  If there's documentation maybe in the
21  incident report, not necessarily a rule violation, and
22  the deputy looks that up and sees that the inmate has
23  already had a rule or an incident report for the same
24  thing and it's maybe the third time, that may constitute
25  them getting a rule violation, and their discipline

Page 23

1  could be disciplinary separation for a day, depending on
2  whatever, as an example.
3    Q.  Right.  So tell me if this sounds right.  A
4  progressive discipline approach is one in which more
5  serious discipline is imposed for more serious acts with
6  a more serious context?
7    MR. PHILLIPS:  Objection.  Vague and ambiguous.
8  Form.
9    You can answer, if you understand it.
10    THE WITNESS:  In my experience, I follow this
11  model, progressive discipline, yes.
12  BY MR. COOLMAN:
13    Q.  And flipping it around, less serious
14  disciplinary responses should be used to respond to less
15  serious forms of disciplinary problems of a less serious
16  context; is that right?
17    MR. PHILLIPS:  Same objections.
18    THE WITNESS:  In my -- in my experience, that's
19  the model that I've used as far as issuing discipline.
20  BY MR. COOLMAN:
21    Q.  Okay.  Do you know if segregation can be
22  accomplished within Facility 8 without moving an inmate
23  somewhere else?
24    A.  In my experience, Facility 8, it can -- you can
25  segregate someone there within the facility, but it

Page 24

1  presents operational issues as far as allowing other
2  inmates out, or if another inmate's celled with the
3  person who's being segregated, it presents an
4  operational issue.  I think that's -- you know, I
5  haven't worked at Facility 8 in a while, but I believe
6  that's why they -- they typically will transfer someone
7  out to George Bailey where they have an area designated
8  for disciplinary lockdown or separation, so it doesn't
9  impact the operations at Facility 8.
10    Q.  Okay.  Can you explain that in a little more
11  detail?  How would having somebody segregated affect the
12  operations?
13    A.  For example, if you have -- at Facility 8,
14  there's two inmates that are housed per cell.  So if you
15  have one individual who is placed on lockdown, that
16  means they're not going to be able to come out to day
17  room or they'll be excluded from normal activities
18  because their door will be locked.  Well, that prevents
19  their cellmate from coming out and, hence, they'll have
20  to call the deputy through the box.  It will delay them
21  from getting day room, potentially social visits or any
22  other activity that's going on in the day room or that
23  they're afforded.
24    Q.  All right.
25    A.  It also may cause a delay amongst the other

Page 25

1  inmates when it comes to maybe inmate meals.  They --
2  they have to make sure -- if the inmates aren't able to
3  come out on their own when there's a group released, the
4  inmates may now have to account for all the meals so
5  that those inmates aren't forgotten about.  Typically,
6  the deputy should separate them, but sometimes there's a
7  mixture of food on carts, and they may get forgotten
8  about.  So it can impact the operations.
9    Q.  Okay.  Do you know if Facility 8 has any empty
10  cells that can be used for segregation or any --
11    A.  They do not have a designated area for
12  separation.
13    Q.  Okay.  I'm still sharing my screen, correct?
14    A.  Yes.
15    Q.  Okay.  I wanted to show you a JIMS printout
16  related to the same incident that we're talking about in
17  this case.
18    MR. PHILLIPS:  And then this will be Exhibit 3,
19  Alex?
20    MR. COOLMAN:  Yes.  I'm sorry.
21    MR. PHILLIPS:  That's okay.
22    MR. COOLMAN:  I'm a little too informal.
23    (Exhibit 3 was identified.)
24  BY MR. COOLMAN:
25    Q.  If you look at the -- let me scroll up a little

EXHIBIT 8

DESAN TYSON - 11/22/2022

Page 26

1  bit.

2       If you look at the top, I guess, five entries

3  here, all of which have a little bit of yellow

4  highlighting on them, there are some JIMS entries

5  related to the transfer of Ron Gadsden to disciplinary

6  segregation that occurred on February 15th, 2019.

7       My question is, does this appear to be a

8  complete printout of JIMS entries related to that

9  incident or would you expect to see other JIMS entries

10 for somebody who was transferred to disciplinary

11 segregation?

12      MR. PHILLIPS: Objection. This is outside the

13 scope of the noticed deposition.

14      You can answer, if you understand it.

15      THE WITNESS: In my experience from dealing

16 with this type of report, it has all the movement or

17 activity that's occurred with that inmate's -- within

18 their history. So if there's movement from one facility

19 to another, it should be annotated in this report.

20 BY MR. COOLMAN:

21      Q. So it should be. But I guess what I'm asking

22 is, does it appear that anything else would be here

23 that's not here in terms of the decision to put him in

24 disciplinary segregation?

25      A. That wouldn't be in this report.

Page 27

1       Q. Okay. And so just rewinding, if I understand

2  correctly --

3       A. I'm sorry, can I --

4       Q. Yes.

5       A. There's an -- I see an incident that was logged

6  in this history, that incident on the 15th. It's the

7  last highlighted one.

8       Q. Yes.

9       A. I don't know what that incident is referencing,

10 so it could be, because it doesn't go into detail. It's

11 just -- it's just time-stamping it in his history.

12      It looks like a Deputy "Grath" wrote an

13 incident report. So that could actually be a rule

14 violation. I'm not sure what type of incident report

15 that is.

16      Q. And are you referring to the very first entry?

17 It's, I guess, at 21:58.

18      A. It's at 20:17 on February 15th. There's an

19 incident report there that was inputted by "MMCGRASH."

20      Q. Right. Got you.

21      A. And that's an incident report. I don't know

22 what type of incident report that is. And then shortly

23 after that, at 20:45, the inmate was moved.

24      Q. Right. Got you. Okay.

25      So I'm still on the trail, as you know, of the

Page 28

1  question of who made the decision. And as far as I

2  understand your answer -- and tell me if I'm wrong --

3  the only document that would describe who made the

4  decision is the segregated housing order?

5       A. Depending on the severity of the incident, the

6  deputy has the discretion to move the inmate to -- to

7  separate them. There's a J-72 form, or segregated

8  housing order form, that needs to go along with a rule

9  violation, and that needs to be given to the supervisor.

10 That supervisor would then make that decision, if the

11 separation would continue, or the segregation would

12 continue pending the hearing.

13      So the deputy has the discretion to

14 initially -- to separate the inmate.

15      And I'm sorry, I keep going back and forth with

16 "segregate," "separate." It's the same.

17      Q. Yeah. It's a little tricky, but I understand

18 what you're saying.

19      So the deputy, then, has the discretion to

20 separate the inmate into a different housing area,

21 potentially even into segregation, correct?

22      A. That decision would lie on the supervisor who's

23 going to -- who's going to make the final decision on

24 it.

25      Q. Well -- but I don't mean for purposes of

Page 29

1  discipline, but I just mean to move, physically move --

2       A. To initially move them, that could be at the

3  discretion of the deputy.

4       Q. Okay. Thank you.

5       And then it will be later in the hearing that

6  the decision is made whether to keep the inmate in

7  segregation, correct?

8       A. That's part of it.

9       So after the deputy initially moves the inmate

10 to separation pending the hearing, they would -- they

11 would then submit a form, a segregated housing form, to

12 the supervisor that's working the area to make the final

13 decision on if that inmate will remain in separation

14 pending the hearing for that rule violation.

15      Q. Okay. And that's the J-72 form?

16      A. Yes.

17      Q. Okay. And I'm sorry, I'm just being lawyerly,

18 I guess, but the J-72 form is filled out by the deputy,

19 right, the deputy who initially transfers the person?

20      A. Yes. And that should reference the incident on

21 that form.

22      Q. All right. Okay. Let me rewind real quick to

23 the hearing report that we looked at earlier.

24      At the bottom of this page, or I guess,

25 actually, in the center of the page, there's a statement

EXHIBIT 8

DESAN TYSON - 11/22/2022

Page 30

1  that says, "I recommend Gadsden receive three days of
2  disciplinary separation," and then it says, "Approval
3  Officer ... Gardenhire."
4         What I'm trying to figure out is, does that
5  reference to an approval officer mean it was Gardenhire
6  who recommended three days of disciplinary separation?
7         A.  So ultimately the review officer is the one who
8  has the final decision on if the discipline will be
9  upheld.  That's usually a lieutenant.  And I believe
10 Gardenhire is a lieutenant.
11        The hearing officer is usually a sergeant.  So
12 it looks like this is the sergeant's recommendation and
13 Gardenhire is in "agreeance" with the discipline that's
14 recommended by the sergeant.
15        Q.  Is there any -- is Kellas the sergeant, then?
16        A.  Kellas -- it looks like Kellas is the entry
17 sergeant who did the hearing.
18        Q.  Okay.
19        A.  He's the hearing officer, or "they."  I
20 don't --
21        Q.  Fair enough.  All right.
22        So Kellas performs the hearing at 1:35 in the
23 morning, or whatever it was, Kellas then concludes that
24 Gadsden should be given three days of disciplinary
25 separation, and Gardenhire approves that decision?  Does

Page 31

1  that sound correct?
2         MR. PHILLIPS:  Objection.  Calls for
3  speculation.  The document speaks for itself.  It's
4  outside the scope of the noticed deposition.
5         MR. COOLMAN:  It certainly doesn't speak for
6  itself.
7         MR. PHILLIPS:  You can answer, if you
8  understand it.
9         THE WITNESS:  It appears that Gardenhire would
10 be the reviewing officer for the incident if they have
11 the -- his approval there.
12 BY MR. COOLMAN:
13        Q.  Okay.  And Kellas is the individual who makes
14 the recommendation?
15        MR. PHILLIPS:  Same objections.
16        THE WITNESS:  Yes.
17 BY MR. COOLMAN:
18        Q.  At least, that's what it appears to you,
19 correct?
20        A.  Yes.
21        MR. PHILLIPS:  Same objections.
22 BY MR. COOLMAN:
23        Q.  Would anybody else have had to approve this
24 recommendation for three days of disciplinary
25 segregation beyond the lieutenant?

Page 32

1         A.  I didn't quite understand your question.  Can
2  you repeat it again?
3         Q.  Well, so we've been talking about the idea that
4  perhaps Gardenhire approved the disciplinary
5  segregation.
6         Did anybody else need to sign off on that
7  decision besides Gardenhire, or whoever that was?
8         A.  No.  Based on that, I would assume that
9  Gardenhire is the review officer.  They are the final
10 decision -- they make the final decision unless it's
11 appealed after that point.
12        Q.  Okay.  Let me turn now to questions of safety
13 in segregation -- or actually, let me say I don't want
14 to go on for too long without a break.
15        Should we take a break for a few minutes?
16        MR. PHILLIPS:  Sure.  Yeah, if we could take
17 maybe five minutes.
18        MR. COOLMAN:  Sure.  Why don't we do five
19 minutes.  I don't have that much more.  Probably not
20 more than 30 minutes more of material.  But why don't we
21 take five minutes and then we'll come back.
22        MR. PHILLIPS:  Sounds good.
23        THE REPORTER:  Okay.  We're off the record.
24        (Recess, 10:55 a.m. to 11:07 a.m.)
25 ///

Page 33

1  BY MR. COOLMAN:
2         Q.  Back on the record.
3         Let's see, I had a couple more quick questions
4  about the decision to -- or the movement to segregation
5  cell.
6         Let me share my screen again real quick.  I had
7  a follow-up question about Gadsden's location as far as
8  it can be discerned.
9         I'm going back to the hearing report, which I
10 think was 1 --
11        MR. PHILLIPS:  I think that's Exhibit 2, the
12 hearing report.
13        MR. COOLMAN:  Oh, I'm sorry, I'm sorry.
14        MR. PHILLIPS:  That's okay.
15 BY MR. COOLMAN:
16        Q.  My question was just this.  Do you see where I
17 have the cursor here?  It says, "I conducted a hearing
18 with inmate Gadsden," at such and such a time, "in
19 Module 6A, at Cell 213"?
20        A.  Yes.
21        Q.  As far as you know, is Module 6A, Cell 213, is
22 that a disciplinary segregation cell?
23        A.  6A as a whole is a disciplinary separation
24 module.
25        Q.  Okay.  And Cell 213, as far as you know, is --

EXHIBIT 8

DESAN TYSON - 11/22/2022

Page 34

1    A. It's a room or cell within that module.

2    Q. Okay. Great. And before the break, you --

3  I'll stop sharing here.

4         Before the break, you had mentioned that the

5  deputy has discretion to move an inmate -- setting aside

6  the question of how they're ultimately disciplined --

7  but they have discretion to move them.

8         Does that discretion include moving them all

9  the way to 6A?

10   A. Yes.

11   Q. Okay. And then the one other question I had

12  was about the hearing officer. We were just looking at

13  the hearing report a moment ago.

14        When the hearing officer's conducting a

15  disciplinary hearing, would they normally have the

16  incident report that is the basis for, you know, the

17  claim that the person needs to be disciplined?

18   A. Yes, they should have reviewed it and should

19  have -- I would have it on hand.

20   Q. Okay.

21   A. They should -- they should to refer to it.

22   Q. Right, right. Okay. Very good. Thank you.

23        All right. So the last set of questions I had

24  had to do with kind of safety in disciplinary

25  segregation.

Page 35

1         Is disciplinary segregation intended to be

2  physically dangerous to an inmate?

3    A. No, it should not be.

4    Q. Is disciplinary segregation intended to cause

5  health problems to an inmate?

6    A. No.

7    Q. Are there any unique safety concerns associated

8  with disciplinary segregation in terms of the inmate's

9  health and well-being?

10   A. No.

11   Q. Okay. Is suicide a concern when an inmate is

12  put in disciplinary segregation?

13   A. I'm sorry, can you repeat your question again?

14   Q. Does the sheriff's department have concerns

15  about the risk that inmates will commit suicide in

16  disciplinary segregation?

17   A. Our concern is suicide for all inmates, not

18  just inmates in disciplinary segregation.

19   Q. Sure. Okay. So there's not any unique risks

20  for being housed in disciplinary segregation in terms of

21  the risk of suicidality?

22   A. We have measures in place that we utilize

23  currently. We -- we have a -- we have to contact

24  medical staff and mental health staff when we place an

25  inmate in separation.

Page 36

1    Q. Okay. So that's what I'm asking about.

2         Can you give me more detail? What are the

3  protocols that are used to ensure somebody is mentally

4  healthy and doing okay in segregation?

5    A. These are our current practices. I'm -- I

6  can't recall what the practice was, you know, back

7  during this incident.

8    Q. Fair enough.

9    A. Currently, if an inmate is going to be placed

10  in administrative separation or in disciplinary

11  separation, the deputy who initially places that

12  individual in separation has to notify our medical

13  services division and mental health services so then

14  they can review that individual. What they do at that

15  point, I don't know. And when I say "they," I'm

16  referring to mental health and medical services, as long

17  as someone has notified them of the placement.

18   Q. So some effort is made at a policy level to

19  look out for the mental health and the physical health

20  of an inmate when they're put in segregation, it sounds

21  like?

22   A. Yes.

23   Q. Is it common to house multiple inmates together

24  in disciplinary segregation?

25   A. Depending on the circumstance, if they meet the

Page 37

1  same classification level, due to spacing if they -- if

2  they're -- if they're -- what's the word I should use?

3  -- if they are -- if -- you know, if they can cohabitate

4  together, if they don't have any issues with one

5  another, if they meet the same or similar classification

6  levels and they're there in isolation together, they can

7  do their time together.

8    Q. Okay. So it's not, per se, against the rules

9  or whatever?

10   A. No.

11   Q. It does happen?

12   A. It does happen, yes.

13   Q. Okay. If an inmate has psychological problems

14  like anxiety or depression, could that be a factor

15  suggesting that they should not be celled with some

16  other person in disciplinary segregation?

17        MR. PHILLIPS: Objection. Vague and ambiguous.

18  Incomplete hypothetical. Outside the scope of the

19  noticed deposition.

20        You can answer, if you understand it, Sergeant

21  Tyson.

22        THE WITNESS: In my experience, if there's an

23  inmate who's exhibiting extreme cases of mental illness,

24  we -- we typically won't house them with anyone.

25  They'll be on a "keep separate all" status. But if they

EXHIBIT 8

DESAN TYSON - 11/22/2022

1  of the sheriff's policies?
2       A.  Absolutely.
3       Q.  Okay.  Does the fact that an inmate is going
4  through trial have any bearing on whether they should be
5  housed in disciplinary segregation?
6       A.  No.
7       Q.  Okay.  And what about their access to hygiene
8  if they're in trial and in disciplinary segregation?
9  Should they be allowed to shave and shower and things
10 like that?
11      A.  Yes.  They're given the opportunity to shower
12 within -- within a 72-hour period.  Now, if they're
13 going to court, exceptions can be made.  They could be
14 given a razor to shave prior to going to court.
15      Q.  Okay.  So typically, then, if somebody is going
16 to trial while housed in disciplinary segregation, they
17 should be given an opportunity to kind of put themselves
18 together to be presentable in court, right?
19      A.  That's for any inmate, yes.
20      Q.  Okay.  But the fact that they're in
21 disciplinary segregation doesn't mean that they should
22 have to show up in court at trial looking like a mess,
23 right?
24      A.  No, that's not -- no.
25          MR. COOLMAN:  Okay.  I think that's all I've

1  got.  And, Sergeant Tyson, I really appreciate your
2  time.
3          THE WITNESS:  Thank you, sir.
4          MR. COOLMAN:  Thank you.
5                    -o0o-
6             E X A M I N A T I O N
7  BY MR. PHILLIPS:
8       Q.  I just had a couple follow-up questions.
9          Sergeant Tyson, you were talking earlier about
10 separation and segregation, and I got a little confused
11 between the two.
12         Let me start with Facility 8.  Is it common for
13 deputies to transfer inmates who have been written a
14 rule violation report from Facility 8 to 6A at George
15 Bailey?
16      A.  It is common practice to transfer them out due
17 to operational issues that are presented by leaving
18 someone locked down there.
19      Q.  And when the deputy starts the separation to
20 6A, for instance, is that an operational thing or is
21 that a form of discipline?
22      A.  Initially, it's operational.
23      Q.  And that operational decision to separate
24 administratively an inmate, for instance, from
25 Facility 8 to 6A, that's a decision that has to be

1  approved by a sergeant?
2       A.  That final decision is -- is determined by the
3  sergeant, yes.
4       Q.  And all of this occurs before the disciplinary
5  hearing, correct?
6       A.  Correct.
7          MR. PHILLIPS:  That's all the questions I have.
8                    -o0o-
9        F U R T H E R   E X A M I N A T I O N
10 BY MR. COOLMAN:
11      Q.  Okay.  I will follow up on that real quick,
12 then.
13         You just said the final determination is made
14 by a sergeant, and -- in other words, that's the final
15 determination about physically moving the inmate
16 somewhere prior to discipline being imposed, right?
17      A.  Correct, the administration separation, the
18 deputy initiates that process to 6A.  The sergeant, the
19 supervisor, makes the final decision on whether that
20 will be upheld pending the hearing for discipline.
21      Q.  Okay.  So that, to me, again, raises this
22 question of where is that decision reflected?  What
23 paperwork?
24      A.  On the J-72 form, the segregated housing order.
25      Q.  Okay.  So whoever approves the movement should

1  have signed off on the J-72 form?
2       A.  Correct.
3       Q.  Okay.  And then that is distinct from the
4  disciplinary decision that gets made at the hearing?
5       A.  Those are two separate processes, yes.
6       Q.  And actually, I'm reminded of one other
7  question I wanted to ask that has to do with hearings.
8          I'm not sharing my screen.  Let me do that
9  again.
10         There's a form that I believe Ron signed -- it
11 says, "Disciplinary Hearing Rights Waiver."  Do you see
12 that?
13      A.  Yes, I believe that's a 72-B form.
14         MR. COOLMAN:  Okay.  So let's mark this.  Is
15 this 4, I think?
16         MR. PHILLIPS:  Exhibit 4, yeah.
17         (Exhibit 4 was identified.)
18 BY MR. COOLMAN:
19      Q.  I'm trying to understand the effect of checking
20 the box that looks like Ron checked here where it says,
21 "I am waiving my rights to a 24-hour delay ... and
22 request an immediate hearing on the rule violation(s)
23 brought against me."
24         Can you help me understand, what -- what does
25 that mean in terms of when the hearing will occur?

EXHIBIT 8

DESAN TYSON - 11/22/2022

Page 46

```
1      A.  Each inmate that has a -- that's alleged of
2   committing a rule violation has a due process, and it
3   looks like he's waiving his -- his 24 hours and he's
4   requesting an immediate hearing, if a supervisor's
5   available to conduct it at that time.  Normally, we
6   would wait 24 hours, but he's waiving that right.
7      Q.  Okay.  And so is the idea, then, that there
8   will literally be an immediate hearing or, like, within
9   a few minutes or hours or something like that?
10     A.  The -- it's a request for an immediate hearing.
11  It doesn't instantaneously happen.  It could happen
12  within an hour.  It could take several hours.
13     Q.  Okay.
14     A.  But it just -- it lets us know that at any
15  given time, we're ready to go do it.  We're not bound to
16  wait.
17     Q.  That makes sense.  I understand.  Okay.
18         Given the hearing report that we have that we
19  looked at earlier -- let me look here -- where it looks
20  like that took place on February 18th, 1:35 a.m., do you
21  draw the conclusion that that's the hearing that he
22  ultimately had?
23     A.  Can you scroll to the bottom to see who
24  approved it?  That would kind of --
25     Q.  Okay.
```

Page 47

```
1      A.  So, to me, this looks like the time that
2   Gardenhire approved the discipline.  I'm not -- I would
3   have to see when Kellas made his entry or if it's
4   written -- "I conducted a hearing with inmate" -- so,
5   yes, if that's what Kellas is writing, that he had -- he
6   conducted the hearing at 01:35 hours, then, yes.  It
7   correlates with the time that's stamped.
8      Q.  Okay.  So, then, if I understand the procedure,
9   normally there's this right to a 24-hour delay, an
10  inmate can waive that, but that doesn't mean they get an
11  instantaneous hearing; they get a hearing at some point
12  within 72 hours?
13     A.  Yes.
14     Q.  Okay.  And it looks like --
15     A.  It could be immediate, but it all depends on,
16  you know, what's available.
17     Q.  Okay.  That's helpful.
18         I think that's all I've got.
19         THE REPORTER:  Mr. Phillips, do you need a
20  copy?
21         MR. PHILLIPS:  Yeah, I'd like a certified
22  digital, please.
23         And I would also just on the record ask that
24  the witness have 30 days to review the transcript and
25  make any necessary changes.
```

Page 48

```
1         THE REPORTER:  Thank you.
2         MR. COOLMAN:  Sounds good.
3         (Whereupon, the deposition was concluded at
4   11:27 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 49

```
1             DECLARATION UNDER PENALTY OF PERJURY
2
3         I hereby declare under penalty of perjury that
4   the foregoing is my deposition under oath; that these
5   are the questions asked of me and my answers thereto;
6   that I have read my deposition and have made the
7   corrections, additions, or changes to my answers that I
8   deem necessary.
9         IN WITNESS THEREOF, I hereby subscribe my name
10  this _____ day of _____, 20____.
11
12
13             _____
14                      DESAN TYSON
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 8

DESAN TYSON - 11/22/2022

Page 50

REPORTER'S CERTIFICATE

1
2
3        I, Deborah M. DeSilva, Certified Shorthand
4   Reporter licensed in the State of California,
5   License No. 7307, hereby certify that the deponent was
6   duly sworn by me remotely and the foregoing testimony
7   was reported by me remotely and was thereafter
8   transcribed with computer-aided transcription; that the
9   foregoing is a full, complete, and true record of said
10  proceeding.
11       I further certify that I am not of counsel or
12  attorney for either or any of the parties in the
13  foregoing proceeding and caption named or in any way
14  interested in the outcome of the cause in said caption.
15       The dismantling, unsealing, or unbinding of the
16  original transcript will render the reporter's
17  certificate null and void.
18       In witness whereof, I have hereunto set my hand
19  this day:  November 29, 2022.
20
21
22
23
            *Deborah M. DeSilva*
            Deborah M. DeSilva, RPR, CRR
24          CSR No. 7307
25

---

Page 52

Errata Sheet

1
2   Page _____ Line _____ Reason _____
3   Change From _____
4   Change To _____
5   Page _____ Line _____ Reason _____
6   Change From _____
7   Change To _____
8   Page _____ Line _____ Reason _____
9   Change From _____
10  Change To _____
11  Page _____ Line _____ Reason _____
12  Change From _____
13  Change To _____
14  Page _____ Line _____ Reason _____
15  Change From _____
16  Change To _____
17  Page _____ Line _____ Reason _____
18  Change From _____
19  Change To _____
20  Page _____ Line _____ Reason _____
21  Change From _____
22  Change To _____
23
24  Signature_____Date_____
25          Desan Tyson   |   11/22/2022

---

Page 51

Errata Sheet

1
2   Page _____ Line _____ Reason _____
3   Change From _____
4   Change To _____
5   Page _____ Line _____ Reason _____
6   Change From _____
7   Change To _____
8   Page _____ Line _____ Reason _____
9   Change From _____
10  Change To _____
11  Page _____ Line _____ Reason _____
12  Change From _____
13  Change To _____
14  Page _____ Line _____ Reason _____
15  Change From _____
16  Change To _____
17  Page _____ Line _____ Reason _____
18  Change From _____
19  Change To _____
20  Page _____ Line _____ Reason _____
21  Change From _____
22  Change To _____
23
24  Signature_____Date_____
25          Desan Tyson   |   11/22/2022

---

Page 53

HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE

1
2   Litigation Services is committed to compliance with applicable federal
3   and state laws and regulations ("Privacy Laws") governing the
4   protection andsecurity of patient health information.Notice is
5   herebygiven to all parties that transcripts of depositions and legal
6   proceedings, and transcript exhibits, may contain patient health
7   information that is protected from unauthorized access, use and
8   disclosure by Privacy Laws. Litigation Services requires that access,
9   maintenance, use, and disclosure (including but not limited to
10  electronic database maintenance and access, storage, distribution/
11  dissemination and communication) of transcripts/exhibits containing
12  patient information be performed in compliance with Privacy Laws.
13  No transcript or exhibit containing protected patient health
14  information may be further disclosed except as permitted by Privacy
15  Laws. Litigation Services expects that all parties, parties'
16  attorneys, and their HIPAA Business Associates and Subcontractors will
17  make every reasonable effort to protect and secure patient health
18  information, and to comply with applicable Privacy Law mandates,
19  including but not limited to restrictions on access, storage, use, and
20  disclosure (sharing) of transcripts and transcript exhibits, and
21  applying "minimum necessary" standards where appropriate. It is
22  recommended that your office review its policies regarding sharing of
23  transcripts and exhibits - including access, storage, use, and
24  disclosure - for compliance with Privacy Laws.
25       © All Rights Reserved. Litigation Services (rev. 6/1/2019)

---

Litigation Services  |  800-330-1112
www.litigationservices.com  |  The LIT Group 079F

EXHIBIT 8

EXHIBIT 9

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   RONALD EARL GADSDEN,             ) CASE NO.
                                      ) 20-cv-2258-WQH-DEB
 5                 Plaintiff,         )
     vs.                              )
 6                                    )
     SERGEANT JOHN GEHRIS, Deputy     )
 7   Sheriff, and DEPUTY MICHAEL      )
     MCGRATH, Deputy Sheriff,         )
 8                                    )
                   Defendants.        )
 9   _____)

10

11

12            VIDEOCONFERENCE DEPOSITION OF

13                    JOHN GEHRIS

14               San Diego, California

15               December 14, 2022

16

17

18

19

20

21

22

23        Reported by Deborah M. DeSilva, CRR, CSR

24               Certificate No. 7307

25                  Job No. 944510
```

EXHIBIT 9

JOHN GEHRIS - 12/14/2022

Page 2

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   RONALD EARL GADSDEN,          ) CASE NO.
                                   ) 20-cv-2258-WQH-DEB
 5            Plaintiff,           )
     vs.                          )
 6                                )
                                  )
     SERGEANT JOHN GEHRIS, Deputy )
 7   Sheriff, and DEPUTY MICHAEL  )
     MCGRATH, Deputy Sheriff,     )
 8                                )
              Defendants.         )
 9   _____)
10
11
12        The Videoconference Deposition of JOHN GEHRIS
13   was taken pursuant to Notice of Taking Deposition
14   on Wednesday, December 14, 2022, commencing at
15   2:57 p.m., reported by Deborah M. DeSilva, CRR, CSR
16   No. 7307, Certified Shorthand Reporter in and for the
17   State of California.
18
19
20
21
22
23
24
25
```

Page 3

```
 1             VIDEOCONFERENCE APPEARANCES
 2
 3   For Plaintiff:
 4       ALEX N. COOLMAN, ESQ.
         3268 Governor Drive, Suite 390
 5       San Diego, California  92122
         619.831.7129
 6       alex@coolmanlaw.com
 7
 8
     For Defendants:
 9
         OFFICE OF SAN DIEGO COUNTY COUNSEL
10       BY:  ADAM C. PHILLIPS, Senior Deputy
         1600 Pacific Highway, Suite 355
11       San Diego, California  92101
         619.539.8357
12       adam.phillips@sdcounty.ca.gov
13
14
     Also Present:
15
         Ronald Earl Gadsden
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2
 3   WITNESS: JOHN GEHRIS
 4   EXAMINATION BY:                         PAGE
 5       By Mr. Coolman                      5, 31
 6       By Mr. Phillips                        29
 7
 8
 9
10               INDEX OF EXHIBITS
11   EXHIBIT                                 PAGE
12   Exhibit 1    Incident Report (3 pages)    21
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              VIDEOCONFERENCE PROCEEDINGS
 2              WEDNESDAY, DECEMBER 14, 2022
 3                    2:57 P.M.
 4
 5        (Mr. Gadsden was not present for the following
 6   proceedings.)
 7
 8        THE REPORTER:  Good afternoon.  My name is
 9   Debbie DeSilva, Certified Shorthand Reporter No. 7307,
10   and I will be reporting today's deposition remotely by
11   stenographic means.
12        Would counsel please state your appearances for
13   the record, beginning with the noticing attorney.
14        MR. COOLMAN:  Good afternoon.  My name is Alex
15   Coolman.  I'm for the plaintiff, Ronald Gadsden.
16        MR. PHILLIPS:  Good afternoon.  Adam Phillips
17   on behalf of defendant, Michael McGrath.
18                    -o0o-
19                 JOHN GEHRIS,
20   having been administered an oath remotely by the court
21   reporter, testified as follows:
22
23              E X A M I N A T I O N
24   BY MR. COOLMAN:
25        Q.  Sergeant, is that the correct title for you,
```

EXHIBIT 9

JOHN GEHRIS - 12/14/2022

Page 6

1    sir?
2         A.  It is, Sergeant Gehris.
3         Q.  Okay.  First of all, I just wanted to say thank
4    you for being here.  I know you were working really
5    hard, and this is probably not the funnest thing in the
6    world.
7              I'm going to try to be concise and get through
8    this relatively quickly and let you get on with your
9    life.
10        A.  Okay, sir.
11        Q.  The preliminary stuff I want to ask you, you
12   understand you're under oath here today, correct?
13        A.  I do.
14        Q.  And you know that the oath has the same effect
15   here as it would in a trial, right?
16        A.  Yes.
17        Q.  And you know that you'll get an opportunity to
18   look over a transcript of your remarks and you can make
19   corrections to those remarks if there's anything that
20   looks inaccurate, correct?
21        A.  I was unaware that I would get the opportunity
22   to do that, but I understand.
23        Q.  Okay.  Good deal.  And other than being
24   overworked, is there any reason why you can't give your
25   best testimony here today?

Page 7

1         A.  There is no reason why we can't continue, no.
2         Q.  Okay.  Thank you very much.
3              You may know that the general time frame that
4    I'm concerned with in this case is 2019.  Let me ask
5    you, in 2019 were you employed with the San Diego County
6    Sheriff's Department?
7         A.  I was.
8         Q.  Okay.  And what was your title at that time?
9         A.  Up until February 1st of 2019, I was a
10   sheriff's deputy working at San Diego Central Jail.  I
11   was promoted to sergeant on February the 1st of 2019,
12   and I have been a deputy sheriff sergeant since that
13   time.
14        Q.  Okay.  Got you.
15             And then I have the impression -- I don't know
16   if it's right -- you could tell me -- that part of your
17   work was in kind of a supervisory capacity for the
18   housing in Housing 6; is that correct?
19        A.  That is part of the responsibilities of a
20   sergeant assigned to the George Bailey Detention
21   Facility, yes.
22        Q.  Okay.  And so are there several different
23   sergeants who occupy that role depending on the day and
24   so forth?
25        A.  Typical deployment, there are three sergeants:

Page 8

1    one that covers central, which is the central part of
2    the facility; then there's a north side, which is
3    Houses 1, 2, and 3; and then a south side, which is 4,
4    5, and 6.
5         Q.  Okay.  Got you.
6              So you would sometimes have under your
7    authority the south side with 4, 5, and 6; is that
8    right?
9         A.  That is part of my responsibility, yes.
10        Q.  Okay.  And do I understand correctly that
11   House 6 has some modules that are used for segregation?
12        A.  House 6, Module A is a mixed-use administrative
13   separation module.
14        Q.  I've got you.  Okay.
15             Does that mean that if an individual is
16   initially detained in 6A for administrative reasons and
17   then is put in disciplinary segregation, would they then
18   move somewhere else or not necessarily?
19        A.  Are you saying if somebody is housed there, can
20   they then be moved elsewhere?
21        Q.  I guess I'm saying -- so it's administrative
22   segregation, as I understand it, in 6A.  Once a
23   disciplinary hearing occurs and somebody is sent to
24   disciplinary segregation, are they necessarily moved
25   somewhere else or not always?

Page 9

1         A.  If they're in 6A and they are placed in
2    administrative separation, are they moved somewhere
3    else?
4         Q.  I'm sorry, I'm not being clear.
5              So, like, the administrative segregation can
6    sometimes precede a disciplinary hearing, right?
7         A.  Yes, it can.
8         Q.  Okay.  And so I'm asking about after a
9    disciplinary hearing, assuming somebody's found to have
10   done something and they're going to be put in
11   disciplinary segregation, are they typically moved
12   somewhere else or could they continue to be in 6A after
13   that time?
14        A.  Once somebody finishes their disciplinary
15   isolation time in 6A, we typically move them to other
16   housing locations because there are a finite number of
17   cells --
18        Q.  Okay.
19        A.  -- and other persons going into the
20   disciplinary isolation may need that cell.
21        Q.  Okay.  Is it your role as the sergeant to
22   decide which individual cell folks go into when they're
23   in 6A?
24        A.  No, that is not my role.
25        Q.  Who does make that determination?

EXHIBIT 9

JOHN GEHRIS - 12/14/2022

1  A.  The House 6 either floor deputies or control
2  deputy --
3  Q.  Okay.
4  A.  -- would look at their -- they would determine
5  what cell's available and decide where to put someone.
6  Q.  And the control deputy would be whoever's in
7  the control position in House 6, right?
8  A.  That is correct.
9  Q.  Okay.  So rewinding real quick to the
10  distinction between administrative segregation and
11  disciplinary segregation, is it right to say that
12  somebody could be held in segregation administratively
13  for a while, but that's not necessarily punishment;
14  punishment would come after a hearing; is that correct?
15  A.  Correct.  When somebody is -- when a report's
16  written for violating the rules and regulations that the
17  incarcerated people must follow, a lot of times they are
18  placed into 6-Adam, which is the separation module,
19  pending a hearing, and that's done for a variety of
20  reasons.  Most likely the reason it's done is they were
21  being disruptive or they were housed when the offense
22  occurred, so they're moved there so that they're no
23  longer in the same location.
24  (Whereupon, Mr. Gadsden joined the deposition
25  videoconference.)

1  BY MR. COOLMAN:
2  Q.  Okay.  Are there any other reasons somebody
3  gets put -- this is -- Mr. Gadsden, I think, is going to
4  watch this.
5  Is there any other reason that somebody would
6  be put in segregation besides being administratively
7  separated or being punished?  I mean, are there any
8  other reasons a person would be in segregation?
9  A.  Yes, there's a variety of reasons why we place
10  people into administrative separation.  Violating inmate
11  rules and regulations and being placed there is one.
12  Then there's people that are determined by our Jail
13  Population Management Unit to need permanent segregation
14  or separation housing.  And there's -- the reasons for
15  that are many, and I'm not really involved in that
16  process.
17  Q.  I've got you.  Okay.
18  Do mental health concerns sometimes justify
19  putting a person in segregation?
20  A.  I have seen that that is the case.  Typically,
21  that decision to place someone in separation for mental
22  health reasons, that's made by the mental health staff.
23  It's not necessarily a deputy's responsibility to make
24  those determinations.
25  Q.  Okay.  And when the determination is made to

1  put somebody in segregation, is that rationale always
2  spelled out on a J-72 form or is that just one of the
3  forms that could detail why the person's put in
4  segregation?
5  A.  In order to put any incarcerated person into
6  administrative separation, a J-72 form would be filled
7  out.  There's a variety of -- I don't have the form in
8  front of me, but one of the reasons would be pending a
9  disciplinary hearing; another one could be failure to
10  meet jail standards.  There's a variety of reasons on
11  the J-72.
12  Q.  Fair enough.
13  But there's not any other form that you're
14  aware of that would be filled out instead of a J-72 form
15  that would explain why someone's in segregation, is
16  there?
17  A.  That I'm aware of, there's that form and then
18  typically an accompanying report, but that -- the lights
19  just went out.  Sorry, I'm still here.
20  Q.  Okay.
21  MR. PHILLIPS:  We can see you.
22  THE WITNESS:  Okay.
23  BY MR. COOLMAN:
24  Q.  All right.  Let me switch to another topic.
25  Turning to the question of kind of sanitation

1  in the cells in 6A, is there an effort made by the
2  deputies to keep those cells clean on a regular basis?
3  A.  Yes.  Typically, whenever a cell is vacated,
4  that cell will be swept, mopped, new bedding, new linen
5  would be placed in there, and then also during weekly
6  housing hygiene inspections that module is cleaned as
7  well, or at least it should be.
8  Q.  Okay.  So there's both a weekly cleaning and
9  then there's a cleaning that will go on when the inmate,
10  whoever's in there, moves out?
11  A.  To my knowledge, that's how it happens, yes.
12  Q.  Okay.  Have you ever in your experience seen
13  inmates do things like put feces on the walls on the
14  cells in 6A?
15  A.  I have never seen that myself in 6A, no.
16  Q.  Are you aware that that can occur sometimes in
17  the jails?
18  A.  I'm aware that that can occur in the jails;
19  however, I've never seen that in 6A.
20  Q.  Have you encountered it in any other San Diego
21  County jails?
22  A.  Yes.
23  Q.  How is that typically handled?  Like an inmate
24  puts poop on the walls or something like that, what is
25  done about that?

EXHIBIT 9

JOHN GEHRIS - 12/14/2022

Page 34

1        DECLARATION UNDER PENALTY OF PERJURY

2

3            I hereby declare under penalty of perjury that
4    the foregoing is my deposition under oath; that these
5    are the questions asked of me and my answers thereto;
6    that I have read my deposition and have made the
7    corrections, additions, or changes to my answers that I
8    deem necessary.
9            IN WITNESS THEREOF, I hereby subscribe my name
10   this _____ day of _____, 20____.
11
12
13
14        _____

                  JOHN GEHRIS
15
16
17
18
19
20
21
22
23
24
25

Page 35

1            REPORTER'S CERTIFICATE

2

3            I, Deborah M. DeSilva, Certified Shorthand
4    Reporter licensed in the State of California, License
5    No. 7307, hereby certify that the deponent was by me
6    duly sworn remotely and the foregoing testimony was
7    reported by me remotely and was thereafter transcribed
8    with computer-aided transcription; that the foregoing is
9    a full, complete, and true record of said proceeding.
10           I further certify that I am not of counsel or
11   attorney for either or any of the parties in the
12   foregoing proceeding and caption named or in any way
13   interested in the outcome of the cause in said caption.
14           The dismantling, unsealing, or unbinding of the
15   original transcript will render the reporter's
16   certificate null and void.
17           In witness whereof, I have hereunto set my hand
18   this day:  December 20, 2022.
19        XX   Reading and Signing was requested.
20        ____ Reading and Signing was waived.
21        ____ Reading and Signing was not requested.
22
23
              _____
24            Deborah M. DeSilva, RPR, CRR
              CSR No. 7307
25

Page 36

1        Errata Sheet

2    Page _____ Line _____ Reason _____
3    Change From _____
4    Change To _____
5    Page _____ Line _____ Reason _____
6    Change From _____
7    Change To _____
8    Page _____ Line _____ Reason _____
9    Change From _____
10   Change To _____
11   Page _____ Line _____ Reason _____
12   Change From _____
13   Change To _____
14   Page _____ Line _____ Reason _____
15   Change From _____
16   Change To _____
17   Page _____ Line _____ Reason _____
18   Change From _____
19   Change To _____
20   Page _____ Line _____ Reason _____
21   Change From _____
22   Change To _____
23
24 Signature_____Date_____
25            John Gehris  |  12/14/2022

Page 37

1        Errata Sheet

2    Page _____ Line _____ Reason _____
3    Change From _____
4    Change To _____
5    Page _____ Line _____ Reason _____
6    Change From _____
7    Change To _____
8    Page _____ Line _____ Reason _____
9    Change From _____
10   Change To _____
11   Page _____ Line _____ Reason _____
12   Change From _____
13   Change To _____
14   Page _____ Line _____ Reason _____
15   Change From _____
16   Change To _____
17   Page _____ Line _____ Reason _____
18   Change From _____
19   Change To _____
20   Page _____ Line _____ Reason _____
21   Change From _____
22   Change To _____
23
24 Signature_____Date_____
25            John Gehris  |  12/14/2022

EXHIBIT 9

JOHN GEHRIS - 12/14/2022

Page 38

```
 1     HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE
 2   Litigation Services is committed to compliance with applicable federal
 3   and state laws and regulations ("Privacy Laws") governing the
 4   protection andsecurity of patient health information.Notice is
 5   herebygiven to all parties that transcripts of depositions and legal
 6   proceedings, and transcript exhibits, may contain patient health
 7   information that is protected from unauthorized access, use and
 8   disclosure by Privacy Laws. Litigation Services requires that access,
 9   maintenance, use, and disclosure (including but not limited to
10   electronic database maintenance and access, storage, distribution/
11   dissemination and communication) of transcripts/exhibits containing
12   patient information be performed in compliance with Privacy Laws.
13   No transcript or exhibit containing protected patient health
14   information may be further disclosed except as permitted by Privacy
15   Laws. Litigation Services expects that all parties, parties'
16   attorneys, and their HIPAA Business Associates and Subcontractors will
17   make every reasonable effort to protect and secure patient health
18   information, and to comply with applicable Privacy Law mandates,
19   including but not limited to restrictions on access, storage, use, and
20   disclosure (sharing) of transcripts and transcript exhibits, and
21   applying "minimum necessary" standards where appropriate. It is
22   recommended that your office review its policies regarding sharing of
23   transcripts and exhibits - including access, storage, use, and
24   disclosure - for compliance with Privacy Laws.
25       © All Rights Reserved. Litigation Services (rev. 6/1/2019)
```

EXHIBIT 9

EXHIBIT 10

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   RONALD EARL GADSDEN,              )
                                       )
 5              Plaintiff,             )
                                       )
 6       vs.                           ) No. 20-cv-2258-WQH-DEB
                                       )
 7   SERGEANT JOHN GEHRIS, Deputy      )
     Sheriff, and DEPUTY MICHAEL       )
 8   McGRATH, Deputy Sheriff,          )
                                       )
 9              Defendants.            )
     _____)
10

11

12

13

14            DEPOSITION OF KURTIS KELLAS

15            TUESDAY, DECEMBER 13, 2022

16      APPEARING REMOTELY VIA ZOOM VIDEOCONFERENCE

17

18

19

20

21

22      Reported by Elana Zucconi, CSR No. 9651, RPR, CRR

23                  Job No. 943990

24

25
```

EXHIBIT 10

KURTIS KELLAS - 12/13/2022

Page 2

1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA
3
4   RONALD EARL GADSDEN,                )
                                       )
5              Plaintiff,              )
                                       )
6        vs.                          ) No. 20-cv-2258-WQH-DEB
                                       )
7   SERGEANT JOHN GEHRIS, Deputy       )
    Sheriff, and DEPUTY MICHAEL        )
8   McGRATH, Deputy Sheriff,           )
                                       )
9              Defendants.             )
    _____)
10
11
12
13
14
15
16
17
18
19
20
21      VIDEOCONFERENCE DEPOSITION OF KURTIS KELLAS, taken
22   remotely from San Diego, California, on Tuesday,
23   December 13, 2022 at 1:00 p.m., before Elana Zucconi,
24   Certified Shorthand Reporter, in and for the State of
25   California.

Page 3

1   REMOTE APPEARANCES:
2
3   For Plaintiff:
4           LAW OFFICE OF ALEX COOLMAN
            ALEX COOLMAN, ESQ.
5           3268 Governor Drive, Suite 390
            San Diego, California  92122
6           619.831.7129
            alex@coolmanlaw.com
7
8
9   For Defendants:
10          OFFICE OF SAN DIEGO COUNTY COUNSEL
            ADAM C. PHILLIPS, ESQ.
11          1600 Pacific Highway, Room 355
            San Diego, California  92101
12          619.539.8357
            Adam.phillips@sdcounty.ca.gov
13
14
15
16
17
18
19
20
21
22
23
24
25                    INDEX

Page 4

1
2   WITNESS:  KURTIS KELLAS
3   EXAMINATION                              PAGE
4   MR. COOLMAN                              6, 23
5   MR. PHILLIPS                             19
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25              INDEX TO EXHIBITS

Page 5

1   EXHIBITS                                 MARKED
2   Exhibit 1   San Diego Sheriff's Department   14
                Hearing Report dated 02-15-2019
3
    Exhibit 2   San Diego Sheriff's Department   24
4               Incident Report dated
                02-15-2019
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT 10

KURTIS KELLAS - 12/13/2022

Page 22

1  mail to be distributed the next night shift.
2     Q     And was that your custom and practice in
3  February of 2019?
4     A     Yes.
5     Q     Are you familiar with Facility 8?
6     A     Yes, I am.
7     Q     Is there anything unique about Facility 8?
8     A     Several things different about Facility 8.
9     Q     And in terms of security or safety concerns,
10  can you describe for me what would be different from
11  Facility 8 from the rest of George Bailey?
12     A     Facility 8 is physically separated from George
13  Bailey.  It takes about two to three minutes to walk
14  there, from the back door of George Bailey to Facility
15  8.  There were generally at the time four to five
16  deputies assigned there and their closest cover was a
17  few minutes away.
18     Q     Was it a common practice for deputies in
19  Facility 8 in February of 2019 to transfer high-level
20  inmates to Module 6A at George Bailey facility?
21     A     6A, only pending write-ups.
22     Q     So after a rule violation report?
23     A     Yes, that is correct.
24     Q     Is that an operational thing or is that a
25  discipline thing?

Page 23

1     A     That's operational pending discipline.
2           MR. PHILLIPS:  That's all the questions I have,
3  Alex.
4           MR. COOLMAN:  Okay.  I have two quick
5  follow-ups.
6
7                     FURTHER EXAMINATION
8  BY MR. COOLMAN:
9     Q     I had asked earlier about the location of the
10  hearing and Mr. Phillips was asking you whether any of
11  the language in the report seemed inaccurate as far as
12  you could recall and I believe you answered that there
13  is no -- nothing seems inaccurate, with the possible
14  exception of the reference to Deputy Velasquez.
15           In the second paragraph of the report, it
16  refers to the idea that the hearing was conducted in
17  Module C -- I am sorry -- in Module 6A at Cell 213.  As
18  far as you -- I mean, I guess what I am asking is, there
19  is not any basis to believe that that is inaccurate, is
20  there, as far as you know?
21     A     Correct.
22     Q     Okay.
23           And I wanted to ask a clarifying question about
24  the way the hearing data is populated into the incident
25  report, because I thought what you said was that after

Page 24

1  you conduct a hearing, the fact that the hearing was
2  conducted is populated into the incident report.  So am
3  I understanding correctly that the incident report
4  should reflect the fact that the hearing was conducted
5  and that there were conclusions drawn in the hearing?
6     A     Yes, sir, the first page of the incident report
7  will also now show their discipline.  If you scroll to
8  the top of the first page here, it shows just kind of
9  basic housekeeping things and this is for, like, the
10  green report.  The incident report is very similar in it
11  has date, time of the incident and inmate's name and
12  location, and then once I enter the discipline and the
13  hearing notes, it populates on that first page.
14     Q     Okay.  I think I have that.
15           MR. COOLMAN:  Let's call this 2.  And maybe
16  this is what you are talking about here.
17           (Exhibit 2 marked)
18  BY MR. COOLMAN:
19     Q     It looks like -- well, maybe you can tell me.
20           Do you see this incident report?
21     A     Yes, sir, I do.
22     Q     Is there a spot on there where it sort of
23  indicates that the hearing took place?  I guess there
24  is, right, where it says --
25     A     Yes, sir.

Page 25

1     Q     -- (indiscernible crosstalk) 2019.
2     A     Yes, sir.  That's -- right under Gadsden's
3  name, it's the discipline that was imposed and then next
4  to that is the start date of the discipline and then
5  next to that is the end date of the discipline.
6     Q     Okay.  Thank you.  That's helpful.  I've spent
7  a long time trying to interpret all these documents and
8  they are not real easy, but that's very helpful.  I
9  think that's all I've got.
10           MR. COOLMAN:  Adam, do you have anything else?
11           MR. PHILLIPS:  No.  That's all I have.  And I
12  would just ask if I am going per Code to give the
13  witness 30 days to review his deposition for any
14  inaccuracies.
15           MR. COOLMAN:  Yeah.  Sounds good.
16  Sergeant Kellas, thank you for time.  I really
17  appreciate it.
18           THE WITNESS:  Absolutely.
19           THE REPORTER:  Mr. Phillips, would you like to
20  purchase a copy?
21           MR. PHILLIPS:  Yes, I would like a digital.
22           (Deposition concluded at 1:29 p.m.)
23
24
25

KURTIS KELLAS - 12/13/2022

Page 26

DECLARATION UNDER PENALTY OF PERJURY

3       I, KURTIS KELLAS, do hereby certify under

4 penalty of perjury that I have read the foregoing

5 transcript of my deposition taken on December 13, 2022;

6 that I have made such corrections as appear noted herein

7 in ink, initialed by me; that my testimony as contained

8 herein, as corrected, is true and correct.

10       DATED this _____ day of _____,

11 2023, at _____, California.

17       _____

18             Kurtis Kellas

---

Page 27

ERRATA SHEET

Page No._____ Line No. _____

Change:_____

Reason for change: _____

Page No._____ Line No. _____

Change:_____

Reason for change: _____

Page No._____ Line No. _____

Change:_____

Reason for change: _____

Page No._____ Line No. _____

Change:_____

Reason for change: _____

Page No._____ Line No. _____

Change:_____

Reason for change: _____

Page No._____ Line No. _____

Change:_____

Reason for change: _____

KURTIS KELLAS _____ Dated _____

---

Page 28

REPORTER'S CERTIFICATION

3       I, Elana Zucconi, Certified Shorthand

4 Reporter, in and for the State of California, do hereby

5 certify:

7       That the foregoing witness was by me duly

8 sworn; that the deposition was then taken before me

9 remotely at the time and place herein set forth; that

10 the testimony and proceedings were reported

11 stenographically by me and later transcribed in

12 typewriting under my direction; that the foregoing is a

13 true record of the testimony and proceedings taken at

14 that time.

16       IN WITNESS WHEREOF, I have subscribed my name

17 on this date:  December 14, 2022

24       Elana Zucconi, CSR No. 9651

---

Page 29

1 HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE

2 Litigation Services is committed to compliance with applicable federal

3 and state laws and regulations ("Privacy Laws") governing the

4 protection and security of patient health information. Notice is

5 hereby given to all parties that transcripts of depositions and legal

6 proceedings, and transcript exhibits, may contain patient health

7 information that is protected from unauthorized access, use and

8 disclosure by Privacy Laws. Litigation Services requires that access,

9 maintenance, use, and disclosure (including but not limited to

10 electronic database maintenance and access, storage, distribution/

11 dissemination and communication) of transcripts/exhibits containing

12 patient information be performed in compliance with Privacy Laws.

13 No transcript or exhibit containing protected patient health

14 information may be further disclosed except as permitted by Privacy

15 Laws. Litigation Services expects that all parties, parties'

16 attorneys, and their HIPAA Business Associates and Subcontractors will

17 make every reasonable effort to protect and secure patient health

18 information, and to comply with applicable Privacy Law mandates,

19 including but not limited to restrictions on access, storage, use, and

20 disclosure (sharing) of transcripts and transcript exhibits, and

21 applying "minimum necessary" standards where appropriate. It is

22 recommended that your office review its policies regarding sharing of

23 transcripts and exhibits - including access, storage, use, and

24 disclosure - for compliance with Privacy Laws.

25   © All Rights Reserved. Litigation Services (rev. 6/1/2019)

EXHIBIT 10

EXHIBIT 11

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  RONALD EARL GADSDEN,            ) CASE NO.
                                    ) 20-cv-2258-WQH-DEB
 5              Plaintiff,          )
    vs.                             )
 6                                  )
    SERGEANT JOHN GEHRIS, Deputy    )
 7  Sheriff, and DEPUTY MICHAEL     )
    MCGRATH, Deputy Sheriff,        )
 8                                  )
                Defendants.         )
 9  _____)

10

11

12           VIDEOCONFERENCE DEPOSITION OF

13                    ALEX DOYLE

14              San Diego, California

15              November 22, 2022

16

17

18

19

20

21

22

23      Reported by Deborah M. DeSilva, CRR, CSR

24              Certificate No. 7307

25                 Job No. 938411A
```

EXHIBIT 11

ALEX DOYLE - 11/22/2022

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   RONALD EARL GADSDEN,          ) CASE NO.
                                   ) 20-cv-2258-WQH-DEB
 5              Plaintiff,         )
                                   )
 6        vs.                      )
                                   )
 7   SERGEANT JOHN GEHRIS, Deputy  )
     Sheriff, and DEPUTY MICHAEL   )
 8   MCGRATH, Deputy Sheriff,      )
                                   )
 9              Defendants.        )
     _____)
10
11
12        The Videoconference Deposition of ALEX DOYLE was
13   taken pursuant to Notice of Taking Deposition on
14   Tuesday, November 22, 2022, commencing at 9:30 a.m.,
15   reported by Deborah M. DeSilva, CRR, CSR No. 7307,
16   Certified Shorthand Reporter in and for the State of
17   California.
18
19
20
21
22
23
24
25
```

Page 3

```
 1              VIDEOCONFERENCE APPEARANCES
 2
 3   For Plaintiff:
 4        ALEX N. COOLMAN, ESQ.
          3268 Governor Drive, Suite 390
 5        San Diego, California  92122
          619.831.7129
 6        alex@coolmanlaw.com
 7
 8   For Defendants:
 9        OFFICE OF SAN DIEGO COUNTY COUNSEL
          BY:  ADAM C. PHILLIPS, Senior Deputy
10        1600 Pacific Highway, Suite 355
          San Diego, California  92101
11        619.539.8357
          adam.phillips@sdcounty.ca.gov
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                     I N D E X
 2
 3   WITNESS:  ALEX DOYLE
 4   EXAMINATION BY:                              PAGE
 5        By Mr. Coolman                            5
 6        By Mr. Phillips                          17
 7
 8
 9
10              INDEX OF EXHIBITS
                     (None)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              VIDEOCONFERENCE PROCEEDINGS
 2              TUESDAY, NOVEMBER 22, 2022
 3                   9:30 A.M.
 4
 5        THE REPORTER:  Good morning.  My name is Debbie
 6   DeSilva, Certified Shorthand Reporter No. 7307, and I
 7   will be reporting today's deposition remotely by
 8   stenographic means.
 9        Would counsel please state your appearances for
10   the record, beginning with the noticing attorney.
11        MR. COOLMAN:  Good morning.  Alex Coolman for
12   the plaintiff, Ron Gadsden.
13        MR. PHILLIPS:  Good morning.  Adam Phillips on
14   behalf of Defendant, Michael McGrath.
15                   -o0o-
16              ALEX DOYLE,
17   having been administered an oath remotely by the court
18   reporter, testified as follows:
19
20              E X A M I N A T I O N
21   BY MR. COOLMAN:
22        Q.  Good morning, Mr. Doyle.  Thank you for being
23   here.
24        A.  Good morning, sir.
25        Q.  I want to go through a couple of preliminary
```

EXHIBIT 11

ALEX DOYLE - 11/22/2022

Page 14

1  responded to in some shape or form, whether that's a
2  full investigation in which a case would be opened or a
3  correspondence letter.
4       A correspondence letter is a letter explaining
5  the circumstances of the complaint and why it is not fit
6  for an administrative investigation.
7       Q.  I've got you.
8       So that would typically be sent in response in
9  a situation where the initial evaluation of the
10 complaint suggests that there's not a whole lot of meat
11 on the bone, I guess?
12      A.  There's not enough evidence of staff
13 misconduct, correct.
14      Q.  Got you.
15      Do you know if deputies in the jail can punish
16 inmates for simply requesting IA forms?
17      MR. PHILLIPS:  Objection.  Outside the scope of
18 the noticed deposition.
19      You can answer based on your personal
20 experience, if you have any knowledge of that.
21      THE WITNESS:  Sir, would you like an answer
22 based on my experience with the department outside of
23 the Internal Affairs Unit?
24 BY MR. COOLMAN:
25      Q.  Yes, please.

Page 15

1       A.  So that would not be grounds for a rule
2  violation report in the context of what you described.
3       If there's further context, if it was -- you
4  know, sworn at someone or in a disrespectful tone or if
5  there are other additive factors, it could.  But that in
6  itself is not grounds for a rule violation report that
7  could lead to discipline.
8       Q.  Okay.  If a deputy did discipline a person for
9  requesting an Internal Affairs form, that would be
10 improper, wouldn't it?
11      MR. PHILLIPS:  Objection.  Calls for
12 speculation.  It's outside the scope of the noticed
13 deposition.
14 BY MR. COOLMAN:
15      Q.  You can answer, sir, if you know.
16      A.  Sir, my answer, for clarification, will be from
17 my departmental experience outside of Internal Affairs.
18      So a deputy cannot discipline an incarcerated
19 individual.  They can write a rule violation report, but
20 discipline is determined by a sergeant.
21      Q.  Okay.  So I think I understood your concern to
22 be that a deputy cannot discipline an individual --
23 sorry, that's my phone.
24      A.  That is correct.
25      Q.  Okay.  In your opinion, if a deputy did

Page 16

1  discipline an individual for requesting an Internal
2  Affairs form, would that advance a legitimate
3  correctional goal?
4       MR. PHILLIPS:  Same objection -- objections, I
5  should say, sorry.
6       You can answer, if you understand it.
7       THE WITNESS:  If I'm understanding your
8  question, sir, a deputy should not discipline an
9  incarcerated individual based on the premise of them
10 asking for a request form.  That is not in line with our
11 department's values and mission.
12      MR. COOLMAN:  Okay.  Thank you very much.  I
13 think that's actually all I have.
14      If I understand correctly, we're just talking
15 about the first two issues, which are Internal Affairs,
16 the purpose of Internal Affairs broadly, and the role of
17 forms in that system, and the other witness will speak
18 to the other issue.  That's correct, right?
19      MR. PHILLIPS:  Yes.
20      MR. COOLMAN:  All right.  Well, then,
21 Mr. Doyle, then I am all done, and I really appreciate
22 your time.  Thank you for your answers.
23      THE WITNESS:  Not a problem.
24      THE REPORTER:  Mr. Phillips, do you need a
25 copy?

Page 17

1       MR. PHILLIPS:  Yes, a certified digital,
2  please.
3       While we're still on the record, I'd also just
4  ask -- I guess we'll go per Code, and I'd ask for 30
5  days for Sergeant Doyle to review that transcript for
6  inaccuracies.
7       MR. COOLMAN:  Okay.
8       THE REPORTER:  All right.  Off the record?
9       MR. PHILLIPS:  Yes.
10      MR. COOLMAN:  Yes.
11      (Discussion off the record.)
12      -oOo-
13      E X A M I N A T I O N
14 BY MR. PHILLIPS:
15      Q.  Sergeant Doyle, you were talking about your
16 personal experience in the detention facility earlier.
17      Have you ever worked at George Bailey?
18      A.  I have, sir.
19      Q.  And in your time as a deputy at George Bailey,
20 would you say it was typical after a rule violation to
21 transfer inmates to 6A pending a disciplinary hearing?
22      A.  At the time I was assigned to George Bailey, 6A
23 was used for disciplinary separation, disciplinary
24 isolation.  Incarcerated folks call it "lockdown," but
25 that was standard practice, to move someone to that

EXHIBIT 11

ALEX DOYLE - 11/22/2022

Page 18

1   module after a rule violation report.
2           MR. PHILLIPS:  Okay.  Thank you.  That's all
3   the questions I have.
4           MR. COOLMAN:  I have nothing.
5           THE REPORTER:  So we'll go off the record,
6   then?
7           MR. PHILLIPS:  Yes.
8           MR. COOLMAN:  Thank you.
9           (Whereupon, the deposition was concluded at
10  9:48 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 19

1           DECLARATION UNDER PENALTY OF PERJURY
2
3           I hereby declare under penalty of perjury that
4   the foregoing is my deposition under oath; that these
5   are the questions asked of me and my answers thereto;
6   that I have read my deposition and have made the
7   corrections, additions, or changes to my answers that I
8   deem necessary.
9           IN WITNESS THEREOF, I hereby subscribe my name
10  this _____ day of _____, 20____.
11
12          _____
                    ALEX DOYLE
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 20

1                           REPORTER'S CERTIFICATE
2
3           I, Deborah M. DeSilva, Certified Shorthand
4   Reporter licensed in the State of California,
5   License No. 7307, hereby certify that the deponent was
6   duly sworn by me remotely and the foregoing testimony
7   was reported by me remotely and was thereafter
8   transcribed with computer-aided transcription; that the
9   foregoing is a full, complete, and true record of said
10  proceeding.
11          I further certify that I am not of counsel or
12  attorney for either or any of the parties in the
13  foregoing proceeding and caption named or in any way
14  interested in the outcome of the cause in said caption.
15          The dismantling, unsealing, or unbinding of the
16  original transcript will render the reporter's
17  certificate null and void.
18          In witness whereof, I have hereunto set my hand
19  this day:  November 29, 2022.
20
21
22
23          _____
            Deborah M. DeSilva, RPR, CRR
24          CSR No. 7307
25

Page 21

1   Errata Sheet
2   Page _____ Line _____ Reason _____
3   Change From _____
4   Change To _____
5   Page _____ Line _____ Reason _____
6   Change From _____
7   Change To _____
8   Page _____ Line _____ Reason _____
9   Change From _____
10  Change To _____
11  Page _____ Line _____ Reason _____
12  Change From _____
13  Change To _____
14  Page _____ Line _____ Reason _____
15  Change From _____
16  Change To _____
17  Page _____ Line _____ Reason _____
18  Change From _____
19  Change To _____
20  Page _____ Line _____ Reason _____
21  Change From _____
22  Change To _____
23
24  Signature_____Date_____
25          Alex Doyle  |  11/22/2022

EXHIBIT 11

EXHIBIT 12

TINA JAWORSKI - 12/14/2022

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2       SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   RONALD EARL GADSDEN,            CERTIFIED COPY
 5            Plaintiff,
 6   vs.              Case No.:  20-cv-02258-
                                  WQH-DEB
 7
     SERGEANT JOHN GEHRIS, DEPUTY
 8   SHERIFF; DEPUTY MICHAEL
     MCGRATH, DEPUTY SHERIFF,
 9
             Defendants.
10   _____/
11
12   VIDEO-RECORDED DEPOSITION OF TINA JAWORSKI
13        Taken at San Diego, California
14            December 14, 2022
15
16
17
     Reported by Dana E. Simon - CSR
18   Certificate No. 12683
19
20
21
22
23
24
25   Job No. 944158
```

Page 2

```
 1           I N D E X
 2   VIDEO-RECORDED DEPOSITION OF TINA JAWORSKI
     DECEMBER 14, 2022
 3
 4   EXAMINATION                      PAGE
 5   BY MR. PHILLIPS:                  4
 6
 7
 8         INDEX OF EXHIBITS
 9      (No exhibits were offered.)
10
11
12
13   INFORMATION REQUESTED BY COUNSEL
14           PAGE LINE
15            17  22
                  19   5
16
17
18
19
20
21
22
23   Errata Page                      89
24   Witness Signature Page           90
25   Reporter Certification Page      91
```

Page 3

```
 1        On Wednesday, December 14, 2022, commencing at
 2   the hour of 9:15 a.m., at 1600 Pacific Highway, Room
 3   355, in the City of San Diego, County of San Diego,
 4   State of California, before me, Dana E. Certified
 5   Shorthand Reporter in and for the State of California,
 6   personally appeared:
 7              TINA JAWORSKI,
 8   called as a witness by the defendants, who, being by me
 9   first duly sworn, was thereupon examined and testified
10   in said cause:
11         A P P E A R A N C E S
12   FOR THE PLAINTIFF:
13      LAW OFFICE OF ALEX COOLMAN
        BY:  ALEX COOLMAN, ESQ.
14      3268 Governor Drive, Suite 390
        San Diego, California 92122-2902
15      619.831.7129
        coolman@gmail.com
16
     FOR THE DEFENDANT DEPUTY MICHAEL McGRATH:
17
        OFFICE OF COUNTY COUNSEL
18      BY:  ADAM C. PHILLIPS, ESQ.
        1600 Pacific Highway, Room 355
19      San Diego, California 92101-2469
        619.531.6416
20      adam.phillips@sdcounty.ca.gov
21   THE VIDEOGRAPHER:
        Alex Payan
22
23
24
25
```

Page 4

```
 1   SAN DIEGO, CALIFORNIA; DECEMBER 14, 2022; 9:15 A.M.
 2
 3
 4        THE VIDEOGRAPHER:  Good morning.  We're on the
 5   record at 9:15 a.m. on December 14th, 2022.  My name is
 6   Alex Payan, videographer with Litigation Services.  Our
 7   court reporter today is Dana Simon.
 8        This begins Media No. 1 in the deposition of
 9   Tina Jaworski testifying in the matter of Ronald Earl
10   Gadsden versus Sergeant John Gehris, et al.
11        We're located at 1600 Pacific Highway, Room
12   355, in San Diego, California.  Will Counsel please
13   identify themselves and state whom they represent.
14        MR. PHILLIPS:  Adam Phillips on behalf of
15   defendant Michael McGrath.
16        MR. COOLMAN:  And I'm Alex Coolman for Ron
17   Gadsden.
18        THE VIDEOGRAPHER:  Thank you.  Would the
19   reporter please administer the oath.
20             TINA JAWORSKI,
21      After having been first duly sworn, testified as
22                 follows:
23             EXAMINATION
24   BY MR. PHILLIPS:
25      Q    Good morning, Ms. Jaworski.  Hopefully I'm not
```

EXHIBIT 12

TINA JAWORSKI - 12/14/2022

Page 29

1  Q   And did that person -- well, was it a male?  A
2  female?
3  A   A male.
4  Q   Could you describe him?
5  A   I don't recall.  I mean, he was dark-skinned.
6  Q   Any -- I mean, did he have hair?
7  A   I don't -- I don't recall.  I mean I was like,
8  surprised.  I mean, the element of surprise.  You know,
9  you're waiting for your partner to show up on the video,
10 and then some guy comes out {indicating}, you know,
11 like -- I was like, What is going on?  Like what -- this
12 is strange.  And I -- you know, I think I was a little
13 overwhelmed with concern.  You know, like that had never
14 happened.  Like, you know, Ronnie was always very prompt
15 with his -- with his phone calls.  You know, he knew
16 what time we communicated.  He knew what time I'd be
17 calling.  He knew what time his visits were.  He never
18 missed a visit.  Not in person, not -- not a phone call.
19 Not, you know, it -- so I was concerned.
20 Q   And how long were you sitting there on the
21 phone until the person popped up and surprised you?
22 A   Probably a good five minutes, at least.
23 Q   And how long did he talk to you for?
24 A   That little guy that popped up?
25 Q   Yeah.

Page 30

1  A   Seconds.
2  Q   And when you say "little," what makes you think
3  he was little?
4  A   Just 'cause he's like this little guy that came
5  out from under the screen.  He wasn't like, you know,
6  like buff or anything.  He was like --
7  Q   So he was skinny?
8  A   It looked like it from the video.  I mean like
9  I said, he came up from like underneath like.  It's not
10 like he, like, walked up to a screen, you know?  It's
11 like he just -- he was probably hiding.  I would assume
12 that it's probably against the rules to be walking into
13 someone else's visit.  I mean, because I had to go
14 through, like, a process to, you know, be able to talk,
15 you know, or have communication with an inmate.
16 Q   So other than saying that they weren't letting
17 him out, did the little man say anything else?
18 A   No.  Not that I recall.
19 Q   And when you first clicked on the link -- I
20 understand you don't remember the exact time -- but what
21 was your custom and practice?  Would you try and access
22 the video five minutes after the video visit was
23 supposed to start, at the time, or --
24 A   At the time.
25 Q   Okay.  Are you allowed to click on the link

Page 31

1  earlier than that time?
2  A   I don't think so.
3  Q   So it would have been promptly at seven?
4  A   Yeah.  I mean, because the -- the way they were
5  set up is like at this time, this time.  So I would
6  assume that other people were on their visits like -- I
7  don't know.  I would imagine that the jails don't have
8  like a plethora of, like, videoconferencing rooms and
9  stuff for inmates.
10 Q   And so you distinctly remember being there
11 right on time at 7:00 o'clock?
12 A   Mh-hmm.
13 Q   And --
14 A   I mean there's always a possibility I could
15 have been, like, running a couple minutes late, but
16 highly unlikely.  I was usually right on time.
17 Q   And then five minutes later the little man pops
18 up, says, "Hey they're not letting him out."
19 A   Mh-hmm.
20 Q   For a few seconds.  What happens next?
21 A   I just waited.  I just sat there and waited
22 because I'm like, is an officer going to come up?  You
23 know, they know that this video visit is open.  Like --
24 and I'm sitting here watching what's going on, and that
25 little man just popped up.  So I'm like sitting

Page 32

1  there, waiting for an officer to come and give me an
2  explanation, or I was hoping that Ronnie would come out.
3  You know, maybe they were figuring something out in the
4  cell or something, and he was going to be able to attend
5  his visit.  And I just waited.  I sat there.
6  Q   Did you see anyone else other than the little
7  man?
8  A   No.
9  Q   So -- I'm sorry.  That was a "no"?
10 A   No.
11 Q   What did you do next after waiting?
12 A   Went stir crazy in my mind.  Worried about what
13 could have been happening and what was going on.
14 Q   At some point did you end the video visit?
15 A   Yeah.
16 Q   And how long --
17 A   Well, when it ended.  I'm not sure how long.
18 Like I ended it when it ended.  I don't know -- I can't
19 recall how long they were.
20 Q   And so based on the other video visits you had,
21 at a certain time it just stopped?
22 A   Mh-hmm.  It'll cut you off.  It'll cut off.
23 Q   And your understanding is that's what happened
24 on February 15th, 2019?
25 A   Mh-hmm.

EXHIBIT 12

TINA JAWORSKI - 12/14/2022

**Page 33**

1  Q   Is that a "yes"?
2  A   Yes.  I mean I was still hopeful that he was
3  going to show up, even if it was for the last three
4  minutes, so that I could sleep knowing that he was okay.
5  You know?
6  Q   Yeah.  So you wanted to stay 'til the end?
7  A   Yeah.  Well, I would like to see that he was
8  okay.  I mean, jail's not the safest place.
9  Q   Did you do anything after the video visit
10  ended, like call the jail?  Anything like that?
11  A   Yeah, I did.
12  Q   And tell me how that -- what happened?
13  A   They couldn't give me any information.  "Ma'am
14  we can't give you any information."
15  Q   And who did you call?
16  A   The main jail.  Whatever the main number was.
17  Q   And did you know whether that was the main
18  number for the facility he was in, or was there some
19  main line?
20  A   It was the -- it was the main number for the
21  facility that he was at.
22  Q   And you had known that from before, or did you
23  look it up online?
24  A   I looked it up.
25  Q   And when you looked it up, does it have a

**Page 34**

1  number for each facility?  How did you know which one to
2  call?  I don't recall.  But I do think I looked at like
3  a main number, and then I asked, like, Is this this
4  facility?  And I got another number to like the direct
5  facility?  It's like any other institution or government
6  facility; you have to call around and get the right
7  number.
8  Q   So someone transferred you at some point or --
9  A   No.  I was never transferred.  I just got
10  another number.
11  Q   So you tried multiple numbers?
12  A   I would say at least two.
13  Q   And why did you call?
14  A   To see what had happened.  I had a video visit,
15  and it didn't happen, and I would like to know if this
16  inmate is okay, to see if this inmate is safe.  I'm
17  concerned.
18  Q   And do you remember the person you talked to
19  about that?
20  A   No.  They wouldn't give me their name.  I tried
21  to get it, though.
22  Q   Do you remember if it sounded like --
23  A   It was a female.
24  Q   And as best you recall, what do you first say
25  to her?

**Page 35**

1  A   I said:  "Hello, my name is Tina Jaworski.  I
2  had a video visit with this inmate, and they did not
3  show to their visit, and I'm concerned that they didn't
4  show for their visit.  They always show for their visit,
5  and I'm concerned for their safety."
6       I don't know if they've been brought to the
7  hospital or what -- you know, what is going on, but I
8  just -- I would like to know that -- you know, that that
9  inmate is safe, you know?
10  Q   And what did the female say back to you?
11  A   "I'm sorry, ma'am.  I can't give you any
12  information."
13  Q   Did she say anything else?
14  A   No.
15  Q   Did you say anything else to her?
16  A   No.  I said, "Well, thank you.  I appreciate
17  your time.
18  Q   At any time during that video visit, could you
19  see or hear Mr. Gadsden?
20  A   No.  And there's no way that he could have been
21  around, because if he knew I was sitting there waiting,
22  if he had the ability just to say, I'm okay, or say
23  something, he would have.  Because he knows I'm going to
24  freak out, like, and be concerned about whether he's
25  okay or not.

**Page 36**

1       So I called the jail back.  I'm persistent.
2  I'm not going to just let it lay at that.  You know, I
3  waited hours, you know, because I'm totally into stress,
4  worry because bad things do happen in jail, you know?  I
5  called back and I got ahold of another female, and I
6  pressed it, I pressed it, I pressed it.  I am concerned.
7  I want to know that he is okay.  Like that's at least
8  what I needed to know.  I mean, I know I'm not going to
9  get the story.  But is he okay?
10       And so one female did give me information.  You
11  know, she looked up his -- whatever the number is, and
12  she's like, "I can't give you any information, but he is
13  okay."
14       Because I'm like, Has he been transported
15  outside the hospital?  No one has contacted his family,
16  you know.  I know we're not married, like, they don't
17  have to notify me, but they -- I had already checked in
18  with his mother, his sister, and everyone, and no one
19  has heard from him.  And that's concerning.
20  Q   And that second call, was that to the same
21  number or --
22  A   Mh-hmm, yeah.  Same number.
23  Q   And the other female, could you tell by the
24  tone of voice that it was a different person, or was it
25  the same female as before?

EXHIBIT 12

TINA JAWORSKI - 12/14/2022

Page 89

1   DEPOSITION ERRATA SHEET
2   DEPOSITION OF:  Tina Jaworski
3   DATE: December 14, 2022
4   REASON CODES:  1.  To clarify the record.
5                  2.  To conform to the facts.
6                  3.  To correct transcription errors.
7   Page_____Line_____Reason Code_____
8   From_____to_____
9   Page_____Line_____Reason Code_____
10  From_____to_____
11  Page_____Line_____Reason Code_____
12  From_____to_____
13  Page_____Line_____Reason Code_____
14  From_____to_____
15  Page_____Line_____Reason Code_____
16  From_____to_____
17  Page_____Line_____Reason Code_____
18  From_____to_____
19  Page_____Line_____Reason Code_____
20  From_____to_____
21  Page_____Line_____Reason Code_____
22  From_____to_____
23  Page_____Line_____Reason Code_____
24  From_____to_____
25

Page 90

1       DECLARATION UNDER PENALTY OF PERJURY
2
3
4       I, TINA JAWORSKI, the witness herein, declare under
5   penalty of perjury that I have read the foregoing in its
6   entirety; and that the testimony contained therein, as
7   corrected by me, is a true and accurate transcription of
8   my testimony elicited at said time and place.
9
10      Executed this _____ day of _____ 2023, at
11  _____, _____.
12     (City)                    (State)
13
14
15
16
17                       _____
                              TINA JAWORSKI
18
19
20
21
22
23
24
25

Page 91

1   STATE OF CALIFORNIA)
2                      )ss.
3   COUNTY OF SAN DIEGO)
4       I, Dana E. Simon, Certified Shorthand Reporter
5   No. 12683, for the State of California, do hereby
6   certify:
7       That, prior to being examined, the witness named
8   in the foregoing deposition was duly sworn to testify to
9   the truth, the whole truth and nothing but the truth;
10      That said deposition was taken down by me in
11  shorthand at the time and place therein named, and was
12  thereafter reduced by me to typewritten form, and that
13  the same is a true, correct, and complete transcript of
14  said proceedings;
15      Before completion of the deposition, review of
16  the transcript {X} was { } was not requested.  If
17  requested, any changes made by the deponent (and
18  provided to the reporter) during the period allowed are
19  appended hereto.  I further certify that I am not
20  interested in the outcome of the action.
21      Witness my hand this 5th day of January, 2023.
22
23          Dana Simon
24          Dana Simon, CSR, No. 12683
25

EXHIBIT 12

EXHIBIT 13

Deposition of

# Stacy Sinner

February 22, 2023

Volume I

Gadsen

vs.

Gehris



www.aptusCR.com | 866.999.8310

EXHIBIT 13

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3   RONALD EARL GADSDEN,        )  Civil Action No.:
                                 )  20-cv-02258-WQH-DEB
 4              Plaintiffs,      )
                                 )
 5   vs.                         )
                                 )
 6   SERGEANT JOHN GEHRIS,       )
     DEPUTY SHERIFF; DEPUTY      )
 7   MICHAEL MCGRATH, DEPUTY     )
     SHERIFF,                    )
 8                               )
                Defendants.      )
 9   _____)
10
11
12
13
14           DEPOSITION OF STACY SINNER
15                   Volume I
16          Wednesday, February 22nd, 2023
17
18
19
20
21   Reported By:
     Monica Lepe-Georg
22   CSR No. 11976
     Appearing Remotely From Cloverdale, California
23
     Job No. 10115310
24
25   Pages 1 - 99
```

**Page 2**

```
 1
 2
 3        REMOTE DEPOSITION OF STACY SINNER, VOLUME
 4   NO. I, taken on behalf of Defendant Deputy Michael
 5   McGrath, beginning at 8:59 a.m. and ending at
 6   11:27 a.m., on Wednesday, February 22nd, 2023, before
 7   Monica Lepe-Georg, Certified Shorthand Reporter No.
 8   11976.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                REMOTE APPEARANCES
 2
 3   FOR PLAINTIFF:
 4        LAW OFFICE OF ALEX COOLMAN
 5        BY:  ALEX N. COOLMAN, ESQ.
 6        3268 Governor Drive
 7        Suite 390
 8        San Diego, California 92122-2902
 9        Telephone:  619.831.7129
10        Fax:  n/a
11        E-mail:  alex@coolmanlaw.com
12
13   FOR DEFENDANTS:
14        OFFICE OF COUNTY COUNSEL
15        COUNTY OF SAN DIEGO
16        BY:  ADAM C. PHILLIPS, ESQ.
17        1600 Pacific Highway
18        Room 355
19        San Diego, California 92101-2469
20        Telephone:  619.531.6416
21        Fax:  619.531.6005
22        E-mail:  adam.phillips@sdcounty.ca.gov
23
24   ALSO PRESENT:
25        Vincent Taisague, Aptus Monitor
```

**Page 4**

```
 1                INDEX OF EXAMINATIONS
 2
 3                                            PAGE
 4   EXAMINATION BY MR. PHILLIPS               7
 5   EXAMINATION BY MR. COOLMAN                94
 6
 7
 8
 9                INDEX OF EXHIBITS
10             (Electronically submitted)
11
12   EXHIBIT NO.        DESCRIPTION           PAGE
13   Exhibit A     Résumé, Stacy Sinner        14
14   Exhibit B     December 10, 2022, Expert   31
15                 Witness Report, Six pages
16   Exhibit C     San Diego County Sheriff's  39
17                 Department Detention Services
18                 Bureau - Manual of Policies
19                 and Procedures, Bates-Nos.
20                 CSD000039 to CSC000044
21
22
23                 Information Requested
24                    Page 12, Line 18
25
```

EXHIBIT 13

Volume I
Stacy Sinner

Gadsen vs.
Gehris

Page 25

1  prison sentence would stay at the county level for --
2  during a period of time when the state facilities were
3  really full, and so there was some legislative action
4  that occurred that allowed the local facilities to hold
5  those shorter-term prison inmates, and that -- for
6  example, that would have been one of the phases where
7  we increased capacity.
8      Q.  Okay.  And the minimum facility, how many beds
9  is that?
10     A.  So that was a project.  That was a new
11  construction project that was overbuilt intentionally
12  to be able to add space to in the future, but I think
13  we had about -- about 90 male beds and about 30 female
14  beds when we opened.
15     Q.  And do you know how many inmates per year
16  would come through now globally or, if you're able to
17  break it down, max and minimum?
18     A.  I don't recall.  There was a time I could have
19  told you that number instantly, but I let it go, I
20  think.
21     Q.  Yeah.  Rightfully so, right?  I mean, you put
22  in your time.  Retirement is, I think, something all
23  government employees see at the -- hopefully at the end
24  of the tunnel at some point.
25        Can you give me a range?  I mean, just

Page 26

1  generally, like, did you know if it's in, like, the
2  hundreds of thousands range?  Tens of thousands?
3  Thousands?  If you had to give a --
4      A.  I would say a -- probably thousands.
5      Q.  Thousands.
6      A.  Of bookings, you're asking me, right?  Like --
7      Q.  Yeah, like, on a fiscal year -- how the
8  inmates would come through the system -- I'm sorry, not
9  inmates, incarcerated persons would come through
10  the prison?
11     A.  Nice.
12     Q.  About -- so would that be anywhere from a
13  thousand to 9,000 when you say thousands?
14     A.  It would be closer to nine, I would think.
15     Q.  So would approximately 9,000 be right?
16     A.  I don't know.  Sorry.  I'm -- you know, again,
17  I'm sort of guessing with you.  I realize you're trying
18  to narrow it, but the narrower we get, the more likely
19  I am to be wrong, so --
20     Q.  Sure, no, and I -- I, 100 percent, get that.
21  So it could be anywhere from one to 9,000?  Do you
22  think it could be -- could have been more than 9,000?
23     A.  Could have been.
24     Q.  Okay.  Do you think it could have been more
25  than 15,000?

Page 27

1      A.  No, I don't think so.
2      Q.  Okay.  So do you think we'd be safe if we said
3  between one and 15,000?
4      A.  Sure.
5      Q.  So 1,000 to 15,000 inmates would come through,
6  in a fiscal year, at both the max and minimum
7  facilities?
8      A.  Yes.
9         This is another one of those places where you
10 could leave a blank and I could get you the real good
11 information, if you'd like.
12     Q.  That's okay.  I'm sure we can do that later.
13 It's sufficient for today.
14     A.  Okay.
15     Q.  And you talked about the jail before that
16 being a linear style.  What do you mean by that?
17     A.  It's a physical plant design, defined by long,
18 straight lines with cells typically in a row.
19     Q.  And what's the difference between that and the
20 new facility that was built in 1993?
21     A.  The new facility was a direct supervision
22 facility.  It was actually a combination of direct
23 supervision and podular remote supervision --
24        THE STENOGRAPHER:  I'm sorry, "a direct
25 supervision and"...

Page 28

1         THE WITNESS:  Podular remote supervision, so
2  better sight lines, you know, a more-open-concept
3  supervising environment.
4  BY MR. PHILLIPS:
5      Q.  And can you tell me what direct supervision
6  management of incarcerated persons means?
7      A.  Sure.  So, I mean, direct supervision is -- is
8  two things, really.  It is a physical plant design,
9  right, so you need a physical plant to support direct
10 supervision.  It's also an operational philosophy, in
11 terms of what kinds of staff behaviors will result in
12 the kinds of inmate -- in the kinds of incarcerated
13 persons' behaviors that are desirable.  Strategies.
14     Q.  So direct supervision encompasses both on --
15 on sort of an operational plan and a physical layout?
16     A.  Yes.
17     Q.  How is that different than a remote
18 surveillance or an intermittent surveillance management
19 system?
20     A.  Sure, in direct supervision, a staff member
21 will be in the same physical space with incarcerated
22 people all the time.
23        And in a remote-surveillance situation, there
24 may be -- this usually happens when there are smaller
25 populations -- I'm sorry for that stuttering.

EXHIBIT 13

Page 29

1    The -- a single correctional officer may be
2    responsible for supervising perhaps three smaller
3    classifications of inmates, which means that they can't
4    be inside those areas at all times because they have to
5    supervise three different classifications and those
6    classifications of people can't be together.  So
7    there's usually a physical barrier between the
8    correctional officer and the incarcerated people,
9    although the correctional officer would still spend a
10   fair amount of time inside each of those housing units.
11       Q.  So, in the direct supervision system, the
12   correctional deputies will actually be in the housing
13   unit module with the incarcerated persons?
14       A.  Yes.
15       Q.  And I stutter all the time, I mess questions
16   up.  The great thing about having a court reporter is
17   they never see that stuff when you look at the writing.
18       And the direct supervision management, that
19   was the management system that was in place during your
20   tenure at Olmsted County Sheriff's Department?
21       A.  Yes.  Since 1993.
22       Q.  So that would have been up until -- while --
23   while you were still a detention deputy?
24       A.  Yes.
25       Q.  So your experience as a sergeant, the captain

Page 30

1    of operations, and the director of detention services,
2    the management system used by the Olmsted County
3    detention facilities was the direct supervision
4    management?
5        A.  Yes.
6        Q.  What's the population of Olmsted County?
7        A.  Oh, boy, a hundred thousand-ish.
8        Q.  Would 165,000 sound about right?
9        A.  Is it that high now?
10       Q.  Everywhere -- everywhere is growing.
11       A.  Yes.
12       Q.  Do you know the approximate square miles of
13   the county?  Is it a big county?  Is it a small county?
14       A.  I don't know, I'm sorry.  You know, my -- our
15   patrol division people would know that instantly, too,
16   and it's just --
17       Q.  Would 655 square miles sound about right?
18       A.  Sure.  I'm assuming you looked it up and
19   that's why you say that number.  Just pull it out of
20   air, right?
21       Q.  Yeah.  I have to admit, I didn't -- I was not
22   familiar with the county, but I did order a Border
23   Collie for my wife years ago, four or five years ago,
24   when they had that crazy winter up on the north side.
25   And that was where the puppy was.  So it was supposed

Page 31

1    to come for Christmas, and then she had to just wait
2    there, watching weather reports for, like, four weeks
3    until the weather clears so they could put the dog on
4    the plane and get over here.  So it wasn't the best --
5    best Christmas present ever.  But --
6        A.  I'm sure it was.  Just delayed.
7        Q.  I imagine you guys have some weather probably
8    going on right now, but it doesn't look --
9        A.  Yes, we do.  We are having a blizzard this
10   moment.
11       Q.  Okay.  I'd like to shift now to your report
12   that you did in this case, and I'd like to put that in
13   as exhibit -- what exhibit do I have that -- Exhibit B.
14   Makes sense because we just did Exhibit A.  So I'm
15   going to share my screen and show you Exhibit B.
16       (Exhibit B was marked for identification.)
17   BY MR. PHILLIPS:
18       Q.  And I'm going to ask you just a few questions
19   about this document.  And I'll scroll down.  It looks
20   like it's six pages.  It's titled December 10th, 2022,
21   Expert Witness Report.  It has your name there, case
22   list, qualifications, document review.  And I've
23   highlighted a few things I'd like to go over later.
24   Summary.
25       Does this look like your report, obviously

Page 32

1    minus the highlighting that I've put in --
2        A.  Yes.
3        Q.  -- in this case?
4        A.  Yes.
5        Q.  Okay.  So I'd like to first go to page -- I
6    think this is two.  It starts on page 2.  And there's a
7    list of documents that you reviewed in writing the
8    report.  It continues on to page 3 before the title of
9    "Summary."
10       And I want to just make sure -- well, are
11   these the documents that you reviewed?
12       A.  Yes.  And I just took the title of those
13   documents, usually, off the -- just off the top of the
14   page.
15       Q.  Right.  Okay.
16       Have you reviewed any other documents?
17       A.  No.
18       Q.  So, the universe of documents you reviewed in
19   rendering your opinion are the ones listed on the
20   bottom of page 2, under "The documents I have reviewed
21   to date are listed below," and then continue on to
22   page 3; is that right?
23       A.  That's correct.
24       Q.  Okay.  We'll stop that for now, just because
25   it's always annoying to me to have to have small icons

Volume I                                                              Gadsen vs.
Stacy Sinner                                                             Gehris

Page 33

1  when I'm looking at the screen.
2       And so part of what you reviewed was some of
3  the policies and procedures of the San Diego Department
4  of Detention Services Bureau?
5     A. Yes.
6     Q. I'm not sure why everyone always has to have
7  such a long title.  It makes it difficult to -- to say.
8     A. Mr. Phillips, I'm -- I'm sorry, I want to go
9  back and tell you that I also did look at the
10 California Jail Standards, just in preparation for this
11 deposition.
12    Q. Sure.  Okay.  And is there a particular set of
13 documents or a particular reference you have when you
14 say California Jail Standards?
15    A. Specifically, I found Section 1266 and 1062 to
16 be relevant to this discussion.
17    Q. And when you say Section 126 [sic] and 1062,
18 is that of a regulation?  Is there a particular code
19 cited -- that you're citing?
20    A. This is California Jail Standards, the minimum
21 standards for jails in California, and this is just
22 the -- the numbering system that's used to organize.
23    Q. Okay.  And you're saying Section 126 and
24 Section 1062, those are the sections that you reviewed?
25    A. 1-2-6-6, 1266, and 1062.

Page 34

1     Q. Apologies.  Okay.
2     A. No worries.
3     Q. So 1266 and 1062 are the sections that you
4  reviewed.
5        Have you reviewed anything else?
6     A. I perused the entire rule.  These are just the
7  things that I pulled out that I thought were relevant
8  to this discussion.
9     Q. Okay.  Have your opinions changed, in regards
10 to your report that you provided on December 10th,
11 after reviewing those sections you just identified?
12    A. No.
13    Q. And we can actually just go to that.  Are
14 you -- do you know what Title 15 of the California Code
15 of Regulations is?
16    A. That, I think, is the jail code -- rules code,
17 yes.
18    Q. And that's the document you perused and -- and
19 pulled out those two sections from?
20    A. Yes.
21    Q. Are you familiar with the California Board of
22 State and Community Corrections?
23    A. No.
24    Q. Do you know what George Bailey Detention
25 Facility is?

Page 35

1     A. It's a facility that is operated by the San
2  Diego County Sheriff's Department to hold incarcerated
3  persons.
4     Q. Do you know anything else about George Bailey
5  Detention Facility?
6     A. I do not.
7     Q. Are you familiar with Facility 8?
8     A. Again, it's a facility that incarcerated
9  persons are held by the San Diego County Sheriff's
10 Office and that's all I know.
11    Q. Have you worked as a peace officer in San
12 Diego County?
13    A. No.
14    Q. Have you worked as a peace officer in Southern
15 California?
16    A. No.
17    Q. Have you worked as a peace officer in
18 California?
19    A. No.
20    Q. Have you ever been the chief of police of a
21 city?
22    A. No.
23    Q. Have you ever been an undersheriff?
24    A. No, not that title, but director of detention
25 services would be the same as an undersheriff in

Page 36

1  Olmsted County, Minnesota.  Just --
2     Q. Different names?
3     A. Right.
4     Q. And you mentioned that you had trained law
5  enforcement officers.  How many law enforcement
6  officers -- well, strike that.
7        Do you train law enforcement officers as well
8  or is it only limited to detentions officers?
9     A. I have trained law enforcement officers.
10    Q. Okay.
11    A. In -- in my role in the military police
12 career, I trained 40,000 entry-level soldiers, but,
13 yes, we did cross-train.  In the Olmsted County
14 Sheriff's Office, I would train, for example,
15 interpersonal skills to the members of the law
16 enforcement division, just as an assistant to that
17 other division.
18    Q. Got it.  And when you were a director of
19 detentions -- did I say that right?
20    A. You can say jail administrator.
21    Q. Let's say jail administrator.  That's easier
22 for me to remember.
23    A. Let's do that.
24    Q. When you were the jail administrator, did --
25 at the time you retired, did they have an academy for

EXHIBIT 13

Volume I
Stacy Sinner

Gadsen vs.
Gehris

Page 93

1    Q. And scrolling down to Section 5. It's titled
2 Administrative Segregation, and I'm -- I've highlighted
3 the brief sentence in that section.
4     Where it says: "A sworn supervisor may make
5 the determination that an inmate is required to be
6 placed in administrative segregation while the incident
7 report is being written and pending the hearing."
8     Is it your understanding that a sergeant or
9 some other type of supervisor is the one that makes the
10 determination that an inmate is placed in
11 administrative segregation while the incident report is
12 being written and pending the hearing?
13    A. It does appear that that's supposed to be the
14 way it's done by this policy statement, yes.
15    Q. Okay. And when you say, "That's the way it's
16 supposed to be done," do you have an opinion, in this
17 case, that it was done differently?
18    A. Just because it says that he's going to be
19 moved in the initial incident report that
20 Deputy McGrath wrote. So maybe he presumed that it
21 would be authorized or perhaps he had a conversation
22 with the supervisor in advance of writing his report
23 and knew that it was going to be authorized. He says
24 he will be transferred to the George Bailey Detention
25 Facility with all his property. And that's the

Page 94

1 incident report that Deputy McGrath wrote.
2    Q. Okay. Anything else?
3    A. No.
4     MR. PHILLIPS: Okay. I think that's all the
5 questions I have. I'm going to review my notes. I
6 don't think I have anything more, but, Alex, if you
7 have any questions, if you want to chime in while I'm
8 kind of going back over things.
9     MR. COOLMAN: Sure.
10         EXAMINATION
11 BY MR. COOLMAN:
12    Q. I -- I actually just had one -- one question
13 or one area that had to do with cancelation of visits
14 after the visit on February 15th, 2019.
15     Earlier I think you were asked a question
16 that -- about whether McGrath appeared to have anything
17 to do with the cancelation of the future visits, and
18 I -- I think you said that it seemed like that had
19 occurred later and maybe it wasn't McGrath.
20     My question is: If the evidence were that
21 McGrath himself personally canceled the future visits
22 and that that cancelation occurred on February 15th,
23 prior to the disciplinary hearing, would that change
24 your opinion about whether McGrath had any involvement
25 in canceling the future visits?

Page 95

1    A. Absolutely.
2     MR. COOLMAN: Okay. That's all I wanted to
3 ask about.
4     MR. PHILLIPS: I think that's all the
5 questions I have.
6     Thank you very much, Ms. Sinner. I appreciate
7 you bearing with me and taking a large portion of your
8 morning -- or, I guess, afternoon.
9     THE WITNESS: Yeah, thank you. I appreciate
10 your professionalism and friendliness.
11     MR. PHILLIPS: All right. Well, thank you
12 very much. I appreciate it as well.
13     I guess we're going to go per code.
14     MR. COOLMAN: Yeah, sure.
15     THE STENOGRAPHER: Is this expedited or does
16 anyone need a rough?
17     MR. PHILLIPS: I'll just take a certified
18 digital, please.
19     THE STENOGRAPHER: And Mr. Coolman, would you
20 like a copy?
21     MR. COOLMAN: No, digital is fine, please.
22     THE STENOGRAPHER: Okay. Electronic copy?
23     MR. COOLMAN: Yes, please.
24     THE STENOGRAPHER: Okay. Thank you.
25     (DEPOSITION OF STACY SINNER CONCLUDED AT
     11:27 A.M.)

Page 96

```
1   STATE OF CALIFORNIA   )
                          )
2                         )
    COUNTY OF SONOMA      )
3
4       I, Monica Lepe-Georg, a Certified Shorthand
5   Reporter of the State of California, do hereby certify:
6       That prior to being examined, the witness in
7   the foregoing proceedings was by me duly sworn to
8   testify to the truth, the whole truth, and nothing but
9   the truth;
10      That said proceedings were taken remotely
11  before me at the time and places therein set forth and
12  were taken down by me in shorthand and thereafter
13  transcribed into typewriting under my direction and
14  supervision;
15      I further certify that I am neither counsel
16  for, nor related to, any party to said proceedings, not
17  in anywise interested in the outcome thereof.
18      IN WITNESS WHEREOF, I have this date
19  subscribed my name.
20  Dated:  March 3rd, 2023
21
22                         _____
                           MONICA LEPE-GEORG, No. 11976
23
24
25
```

Page 93..96

EXHIBIT 13

EXHIBIT 14

EXHIBIT 14

CSD000330

```
JIMS - E000015                    San Diego County Sheriff                        Page: 1 of 27
                                     Inmate History Report
Run Date:  15-JUL-2019                                                        Effective Date:
Run Time:  09:44                    Show all event types                          01-JAN-2000
                                                                                TO 15-JUL-2019

Booknum: 18181127      Name: GADSDEN, RONALD          Fac: 927  Area:    Hu:
Event Dt: 01-JUL-19 07:21  Event Type: REL    Destination: FINAL RELEASE
Comments:
Event Dt: 01-JUL-19 07:21  Event Type: RFND   Destination: FINAL FUNDS RELEASE   Entered by: BMOLINSH  Entry Dt:  01-JUL-19 07:21
Comments:
$ 41.30 transferred to the historical balance.  The GENERAL Account for Booking # 18181127 has been inactivated.   Entered by: BMOLINSH  Entry Dt:  01-JUL-19 07:21
Event Dt: 01-JUL-19 01:04  Event Type: RELSTO Destination: RELEASE STORAGE       Entered by: IORTIZSH  Entry Dt:  01-JUL-19 01:04
Comments:
  GBRACK: 003142
Event Dt: 01-JUL-19 01:04  Event Type: MOVE   Destination: NEW HOUSING           Entered by: IORTIZSH  Entry Dt:  01-JUL-19 01:04
Comments:
  Moved Book #18181127 TO fac 3 area X .
Event Dt: 01-JUL-19 01:04  Event Type: XVIS   Destination: NEW HOUSING           Entered by: IORTIZSH  Entry Dt:  01-JUL-19 01:04
Comments:
  Deleted future visits because of facility transfer
Event Dt: 01-JUL-19 01:03  Event Type: MOVE   Destination: NEW HOUSING           Entered by: IORTIZSH  Entry Dt:  01-JUL-19 01:03
Comments:
  Moved Book #18181127 FROM fac 8 area 1 hu  C cell 144 bed T TO fac 8 area X .
Event Dt: 30-JUN-19 22:37  Event Type: WW     Destination: WANTS/WARRANTS CHECK   Entered by: HPATAWSH  Entry Dt:  30-JUN-19 22:37
Comments:
  Release Clearance set to A
Event Dt: 30-JUN-19 13:28  Event Type: RELSTO Destination: RELEASE STORAGE        Entered by: JCHAMPSH  Entry Dt:  30-JUN-19 13:28
Comments:
  GBRACK: 003142
Event Dt: 21-JUN-19 18:06  Event Type: IN     Destination:                        Entered by: GTELLOSH  Entry Dt:  21-JUN-19 18:06
Comments:
  Changed STATUS from IN to IN.
Event Dt: 16-JUN-19 00:40  Event Type: TRNRES Destination:                        Entered by: GGUILLSH  Entry Dt:  16-JUN-19 00:40
                                          LV
Comments:
  RESOLVED EXCEPTION
Event Dt: 16-JUN-19 00:40  Event Type: TRNEXC Destination:                        Entered by: GGUILLSH  Entry Dt:  16-JUN-19 00:40
                                          PN
Comments:
  EXCEPTION entering FAC8 (Facility 8).  Inmate is not supposed to be in-transit.
```

EXHIBIT 14

CSD000331

JIMS - E000015

Run Date:   15-JUL-2019
Run Time:   09:44

San Diego County Sheriff
Inmate History Report

Show all event types

Page: 2 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127    Name: GADSDEN, RONALD    Fac: 927 Area:    Hu:

Event Dt:13-JUN-19 23:12  Event Type: MOVE    Destination: NEW HOUSING    Entered by: CDUNCASH    Entry Dt: 13-JUN-19 23:12
Comments:
  Moved Book #18181127 FROM fac 8 area 1 hu C cell 249 bed T TO fac 8 area 1 hu C cell 144 bed T.

Event Dt:12-JUN-19 19:30  Event Type: TRNRES  Destination:    Entered by: JDENO2SH    Entry Dt: 12-JUN-19 19:30
Comments:    LV

RESOLVED EXCEPTION
Event Dt:12-JUN-19 19:21  Event Type: TRNEXC Destination: 008    Entered by: JDENO2SH    Entry Dt: 12-JUN-19 19:21
Comments:    PN
  EXCEPTION entering SBDF (South Bay Detention Facility).  Inmate is expected at GBDF (George Bailey Detention Facility)/Transfer to
  Facility 8

Event Dt:12-JUN-19 19:21  Event Type: MOVE    Destination: NEW HOUSING    Entered by: JESCOBSH    Entry Dt: 12-JUN-19 19:21
Comments:
  Moved Book #18181127 TO fac 8 area 1 hu C cell 249 bed T.

Event Dt:12-JUN-19 19:16  Event Type: RELSTO Destination: RELEASE STORAGE    Entered by: JESCOBSH    Entry Dt: 12-JUN-19 19:16
Comments:
  GBRACK: 003142

Event Dt:12-JUN-19 19:16  Event Type: MOVE    Destination: NEW HOUSING    Entered by: JESCOBSH    Entry Dt: 12-JUN-19 19:16
Comments:
  Moved Book #18181127 TO fac 8 area X .

Event Dt:12-JUN-19 19:16  Event Type: XVIS    Destination: NEW HOUSING    Entered by: JESCOBSH    Entry Dt: 12-JUN-19 19:16
Comments:
  Deleted future visits because of facility transfer

Event Dt:12-JUN-19 15:14  Event Type: TRNL    Destination: 008    Entered by: DMANCISH    Entry Dt: 12-JUN-19 15:14
Comments:
  Inmate Leaving SBDF (South Bay Detention Facility).  Next stop:  GBDF (George Bailey Detention Facility)/Transfer to Facility 8

Event Dt:12-JUN-19 13:09  Event Type: MOVE    Destination: NEW HOUSING    Entered by: OPRECISH    Entry Dt: 12-JUN-19 13:09
Comments:
  Moved Book #18181127 FROM fac 6 area 4 hu A cell 05 bed T TO fac 6 area X .

Event Dt:11-JUN-19 16:55  Event Type: RELSTO Destination: RELEASE STORAGE    Entered by: DBARANSH    Entry Dt: 11-JUN-19 16:55
Comments:
  SBHANGER: 000416

Event Dt:10-JUN-19 12:31  Event Type: RELSTO Destination: RELEASE STORAGE    Entered by: DBARANSH    Entry Dt: 10-JUN-19 12:31
Comments:
  SBHANGER: 000343

EXHIBIT 14

CSD000332

```
JIMS - E000015                       San Diego County Sheriff                    Page: 3 of 27
                                        Inmate History Report
Run Date:  15-JUL-2019                                                         Effective Date:
Run Time:  09:44                         Show all event types                   01-JAN-2000
                                                                              TO 15-JUL-2019

Booknum: 18181127      Name: GADSDEN, RONALD      Fac: 927 Area:      Hu:
Event Dt:10-JUN-19 09:42  Event Type: RELSTO Destination: RELEASE STORAGE    Entered by: WLEEX2SH  Entry Dt: 10-JUN-19 09:42
Comments:
  CJRACK: 000052
Event Dt: 08-JUN-19 16:45  Event Type: VISS  Destination: 6 4A, 4B8          Entered by: EVISIT    Entry Dt: 07-JUN-19 14:36
Comments:
  TINA JAWORSKI
Event Dt: 08-JUN-19 15:52  Event Type: VISA  Destination: 4A, 4B8            Entered by: ASUSEBSH  Entry Dt: 08-JUN-19 15:52
Comments:
  TINA JAWORSKI
Event Dt: 31-MAY-19 17:58  Event Type: TRNR  Destination: SD201              Entered by: RAGUILSH  Entry Dt: 31-MAY-19 17:58
Comments:
  Inmate Entering SBDF (South Bay Detention Facility).Arrest: 4,  Charge: 1,  Court: SD201,  Court Dt/Tm: 5/31/2019 09:00:00,  ROC: PHS,
  Court Case #: SCD275729
Event Dt: 31-MAY-19 16:39  Event Type: IN    Destination: IN                 Entered by: DJONE2SH  Entry Dt: 31-MAY-19 16:39
Comments:
  Changed STATUS from CRT to IN using flood fill.
Event Dt: 31-MAY-19 14:17  Event Type: TRNL  Destination: SD201              Entered by: ASPRAGSH  Entry Dt: 31-MAY-19 14:17
Comments:
  Inmate Leaving CSB - San Diego Central.  Next stop:  SBDF (South Bay Detention Facility)Arrest: 4,  Charge: 1,  Court: SD201,  Court
  Dt/Tm: 5/31/2019 09:00:00,  ROC: PHS,  Court Case #: SCD275729
Event Dt: 31-MAY-19 06:43  Event Type: TRNR  Destination: SD201              Entered by: ASPRAGSH  Entry Dt: 31-MAY-19 06:43
Comments:
  Inmate Entering CSB - San Diego Central.Arrest: 4,  Charge: 1,  Court: SD201,  Court Dt/Tm: 5/31/2019 09:00:00,  ROC: PHS,  Court Case
  #: SCD275729
Event Dt: 31-MAY-19 05:43  Event Type: TRNL  Destination: SD201              Entered by: DMANCISH  Entry Dt: 31-MAY-19 05:43
Comments:
  Inmate Leaving SBDF (South Bay Detention Facility).  Next stop:  CSB - San Diego CentralArrest: 4,  Charge: 1,  Court: SD201,  Court
  Dt/Tm: 5/31/2019 09:00:00,  ROC: PHS,  Court Case #: SCD275729
Event Dt: 31-MAY-19 04:27  Event Type: CRT   Destination: COURT              Entered by: TBURNSSH  Entry Dt: 31-MAY-19 04:27
Comments:
  Changed STATUS from IN to CRT using flood fill.
Event Dt: 30-MAY-19 23:00  Event Type: WBRP  Destination: WRISTBAND REPLACED  Entered by: TBURNSSH  Entry Dt: 31-MAY-19 21:03
Comments:
  Informed of the Rules, Replaced Wristband
```

EXHIBIT 14

CSD000333

JIMS - E000015

Run Date: 15-JUL-2019
Run Time: 09:44

San Diego County Sheriff
Inmate History Report
Show all event types

Booknum: 18181127    Name: GADSDEN, RONALD    Fac: 927 Area:

Event Dt: 27-MAY-19 12:30  Event Type: VISS    Destination: 6 4A, 4B8    Hu:
Comments:
    Entered by: EVISIT    Entry Dt: 26-MAY-19 14:50

TINA JAWORSKI, THEMBI HAWKINS
Event Dt: 27-MAY-19 11:33  Event Type: VISA    Destination: 4A, 4B8
Comments:
    Entered by: NNAFARSH    Entry Dt: 27-MAY-19 11:33

THEMBI HAWKINS, TINA JAWORSKI
Event Dt: 25-MAY-19 16:45  Event Type: VISS    Destination: 6 4A, 4B10
Comments:
    Entered by: EVISIT    Entry Dt: 24-MAY-19 23:46

TINA JAWORSKI
Event Dt: 25-MAY-19 15:49  Event Type: VISA    Destination: 4A, 4B10
Comments:
    Entered by: FSALUTSH    Entry Dt: 25-MAY-19 15:49

TINA JAWORSKI
Event Dt: 18-MAY-19 15:15  Event Type: VISS    Destination: 6 4A, 4B8
Comments:
    Entered by: EVISIT    Entry Dt: 17-MAY-19 16:38

TINA JAWORSKI
Event Dt: 12-MAY-19 11:30  Event Type: VISS    Destination: 6 4A, 4B7
Comments:
    Entered by: EVISIT    Entry Dt: 11-MAY-19 18:11

TINA JAWORSKI
Event Dt: 12-MAY-19 10:33  Event Type: VISA    Destination: 4A, 4B7
Comments:
    Entered by: SCORPUSH    Entry Dt: 12-MAY-19 10:33

TINA JAWORSKI
Event Dt: 03-MAY-19 17:13  Event Type: MOVE    Destination: NEW HOUSING
Comments:
    Entered by: OPRECISH    Entry Dt: 03-MAY-19 17:13

Moved Book #18181127 FROM fac 6 area 4 hu A cell 03 bed M TO fac 6 area 4 hu A cell 05 bed T.
Event Dt: 03-MAY-19 17:13  Event Type: MOVE    Destination: NEW HOUSING
    Entered by: OPRECISH    Entry Dt: 03-MAY-19 17:13
Comments:
Moved Book #18181127 TO fac 6 area 4 hu A cell 03 bed N.
Event Dt: 03-MAY-19 16:52  Event Type: MOVE    Destination: NEW HOUSING
    Entered by: DLLANESH    Entry Dt: 03-MAY-19 16:52
Comments:
Moved Book #18181127 FROM fac 6 area 4 hu A cell 05 bed T TO fac 6 area X .
Event Dt: 03-MAY-19 16:49  Event Type: MOVE    Destination: NEW HOUSING
    Entered by: DLLANESH    Entry Dt: 03-MAY-19 16:49
Comments:
Moved Book #18181127 TO fac 6 area 4 hu A cell 05 bed T.

EXHIBIT 14

CSD00334

JIMS - E000015

San Diego County Sheriff
Inmate History Report

Show all event types

Run Date: 15-JUL-2019
Run Time: 09:44

Page: 5 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127     Name: GADSDEN, RONALD     Fac: 927 Area:     Hu:

Event Dt: 03-MAY-19 16:49  Event Type: MOVE  Destination: NEW HOUSING  Entered by: DLLANESH  Entry Dt: 03-MAY-19 16:49
Comments:
Moved Book #18181127 FROM fac 6 area 1 hu A cell 16 bed B TO fac 6 area X

Event Dt: 03-MAY-19 16:48  Event Type: INCI  Destination: INC #194018476  Entered by: DLLANESH  Entry Dt: 03-MAY-19 16:49
Comments:
INCIDENT TYPE CODE(S): ISR; INVOLVEMENT: OTHER.

Event Dt: 27-APR-19 12:30  Event Type: VISS  Destination: 6 1A, 1B11  Entered by: EVISIT  Entry Dt: 26-APR-19 21:33
Comments:
TINA JAWORSKI

Event Dt: 27-APR-19 11:38  Event Type: VISA  Destination: 1A, 1B11  Entered by: SCORPUSH  Entry Dt: 27-APR-19 11:38
Comments:
TINA JAWORSKI

Event Dt: 26-APR-19 20:59  Event Type: TRNRES  Destination: LV  Entered by: AGUARDSH  Entry Dt: 26-APR-19 20:59
Comments:
RESOLVED EXCEPTION

Event Dt: 26-APR-19 20:53  Event Type: TRNEXC  Destination: SD201 PN  Entered by: AGUARDSH  Entry Dt: 26-APR-19 20:53
Comments:
EXCEPTION entering SBDF (South Bay Detention Facility). Inmate is expected at SBDF (South Bay Detention Facility)Arrest: 4, Charge:
1, Court: SD201, Court Dt/Tm: 04-26-2019 0830, ROC: JT, Document # : SCD275729

Event Dt: 26-APR-19 20:50  Event Type: MOVE  Destination: NEW HOUSING  Entered by: VSHEVKSH  Entry Dt: 26-APR-19 20:50
Comments:
Moved Book #18181127 FROM fac 6 area 1 hu A cell 15 bed M TO fac 6 area 1 hu A cell 16 bed B.

Event Dt: 26-APR-19 19:29  Event Type: IN  Destination: IN  Entered by: DGERALSH  Entry Dt: 26-APR-19 19:29
Comments:
Changed STATUS from CRT to IN using flood fill.

Event Dt: 26-APR-19 14:06  Event Type: TRNL  Destination: SD201  Entered by: ASPRAGSH  Entry Dt: 26-APR-19 14:06
Comments:
Inmate Leaving CSB - San Diego Central. Next stop: SBDF (South Bay Detention Facility)Arrest: 4, Charge: 1, Court: SD201, Court
Dt/Tm: 04-26-2019 0830, ROC: JT, Document # : SCD275729

Event Dt: 26-APR-19 06:46  Event Type: CRT  Destination: COURT  Entered by: SCHILSSH  Entry Dt: 26-APR-19 06:46
Comments:
Changed STATUS from IN to CRT using flood fill.

EXHIBIT 14

CSD000335

JIMS - E000015

Run Date: 15-JUL-2019
Run Time: 09:44

San Diego County Sheriff
Inmate History Report

Show all event types

Page: 6 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127     Name: GADSDEN, RONALD     Fac: 927 Area:     Hu:

Event Dt:26-APR-19 06:45 Event Type: TRNR     Destination: SD201     Entered by: KMILLJSH     Entry Dt: 26-APR-19 06:45
Comments:

Inmate Entering CSB - San Diego Central.Arrest: 4.     Court: SD201,     Charge: 1,     Court Dt/Tm: 04-26-2019 0830,     ROC: JT,     Document # :
SCD275729
Event Dt:26-APR-19 06:18 Event Type: TRNL     Destination: SD201     Entered by: DGERALSH     Entry Dt: 26-APR-19 06:18
Comments:

Inmate Leaving SBDF (South Bay Detention Facility). Next stop:     CSB - San Diego Central.Arrest: 4,     Charge: 1,     Court: SD201,     Court
Dt/Tm: 04-26-2019 0830,     ROC: JT,     Document # : SCD275729
Event Dt:25-APR-19 21:31 Event Type: TRNR     Destination: SD201     Entered by: JMCCARSH     Entry Dt: 25-APR-19 21:31
Comments:

Inmate Entering SBDF (South Bay Detention Facility).Arrest: 4,     Charge: 1,     Court: SD201,     Court Dt/Tm: 04-25-2019 0830,     ROC: JT,
Document # : SCD275729
Event Dt:25-APR-19 19:40 Event Type: IN     Destination: IN     Entered by: DRIVERSH     Entry Dt: 25-APR-19 19:40
Comments:

Changed STATUS from CRT to IN using flood fill.
Event Dt:25-APR-19 17:52 Event Type: TRNL     Destination: SD201     Entered by: RROBI2SH     Entry Dt: 25-APR-19 17:52
Comments:

Inmate Leaving CSB - San Diego Central. Next stop:     SBDF (South Bay Detention Facility).Arrest: 4,     Charge: 1,     Court: SD201,     Court
Dt/Tm: 04-25-2019 0830,     ROC: JT,     Document # : SCD275729
Event Dt:25-APR-19 06:33 Event Type: TRNR     Destination: SD201     Entered by: ASPRAGSH     Entry Dt: 25-APR-19 06:33
Comments:

Inmate Entering CSB - San Diego Central.Arrest: 4,     Charge: 1,     Court: SD201,     Entered by: DMANCISH     Entry Dt: 25-APR-19 06:29
Event Dt:25-APR-19 06:29 Event Type: TRNL     Destination: SD201     ROC: JT,     Document # :
SCD275729     Court Dt/Tm: 04-25-2019 0830,
Comments:

Inmate Leaving SBDF (South Bay Detention Facility). Next stop:     CSB - San Diego Central.Arrest: 4,     Charge: 1,     Court: SD201,     Court
Dt/Tm: 04-25-2019 0830,     ROC: JT,     Document # : SCD275729
Event Dt:25-APR-19 04:54 Event Type: CRT     Destination: COURT     Entered by: HRUGGASH     Entry Dt: 25-APR-19 04:54
Comments:

Changed STATUS from IN to CRT using flood fill.
Event Dt:24-APR-19 22:38 Event Type: TRNR     Destination: SD201     Entered by: JMCCARSH     Entry Dt: 24-APR-19 22:38
Comments:

Inmate Entering SBDF (South Bay Detention Facility).Arrest: 4,     Charge: 1,     Court: SD201,     Court Dt/Tm: 04-24-2019 0830,     ROC: JT,
Document # : SCD275729

EXHIBIT 14

CSD00336

JIMS - E000015

Run Date: 15-JUL-2019
Run Time: 09:44

San Diego County Sheriff
Inmate History Report
Show all event types

Page: 7 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127   Name: GADSDEN, RONALD   Fac: 927 Area: Hu:

Event Dt: 24-APR-19 20:02   Event Type: IN   Destination: IN   Entered by: DRIVERSH   Entry Dt: 24-APR-19 20:02
Comments:

Changed STATUS from CRT to IN using flood fill.
Event Dt: 24-APR-19 18:33   Event Type: TRNL   Destination: SD201   Entered by: TDOWNISH   Entry Dt: 24-APR-19 18:33
Comments:

Inmate Leaving CSB - San Diego Central. Next stop:  SBDF (South Bay Detention Facility)Arrest: 4, Charge: 1, Court: SD201, Court
Dt/Tm: 04-24-2019 0830, ROC: JT, Document # : SCD275729
Event Dt: 24-APR-19 06:39   Event Type: TRNR   Destination: SD201   Entered by: ASPRAGSH   Entry Dt: 24-APR-19 06:39
Comments:

Inmate Entering CSB - San Diego Central.Arrest: 4,   Charge: 1,   Court: SD201,   Court Dt/Tm: 04-24-2019 0830,   ROC: JT,   Document # :
SCD275729
Event Dt: 24-APR-19 05:43   Event Type: TRNL   Destination: SD201   Entered by: DMANCISH   Entry Dt: 24-APR-19 05:43
Comments:

Inmate Leaving SBDF (South Bay Detention Facility).  Next stop:   CSB - San Diego CentralArrest: 4,  Charge: 1,  Court: SD201,  Court
Dt/Tm: 04-24-2019 0830, ROC: JT, Document # : SCD275729
Event Dt: 24-APR-19 04:41   Event Type: CRT   Destination: COURT   Entered by: VSHEVKSH   Entry Dt: 24-APR-19 04:41
Comments:

Changed STATUS from IN to CRT using flood fill.
Event Dt: 23-APR-19 21:28   Event Type: TRNR   Destination: SD201   Entered by: SSCHOESH   Entry Dt: 23-APR-19 21:28
Comments:

Inmate Entering SBDF (South Bay Detention Facility).Arrest: 4,   Charge: 1,   Court: SD201,   Court Dt/Tm: 04-23-2019 0830,   ROC: JT,
Document # : SCD275729
Event Dt: 23-APR-19 19:28   Event Type: IN   Destination: IN   Entered by: VSHEVKSH   Entry Dt: 23-APR-19 19:28
Comments:

Changed STATUS from CRT to IN.
Event Dt: 23-APR-19 17:17   Event Type: TRNL   Destination: SD201   Entered by: LWEARNSH   Entry Dt: 23-APR-19 17:18
Comments:

Inmate Leaving CSB - San Diego Central. Next stop:  SBDF (South Bay Detention Facility)Arrest: 4, Charge: 1, Court: SD201, Court
Dt/Tm: 04-23-2019 0830, ROC: JT, Document # : SCD275729
Event Dt: 23-APR-19 06:30   Event Type: TRNR   Destination: SD201   Entered by: ASPRAGSH   Entry Dt: 23-APR-19 06:30
Comments:

Inmate Entering CSB - San Diego Central.Arrest: 4,   Charge: 1,   Court: SD201,   Court Dt/Tm: 04-23-2019 0830,   ROC: JT,   Document # :
SCD275729

EXHIBIT 14

CSD00337

JIMS - E000015

Run Date: 15-JUL-2019
Run Time: 09:44

**San Diego County Sheriff**
**Inmate History Report**
Show all event types

Page: 8 of 27
Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127    Name: GADSDEN, RONALD    Fac: 927 Area:    Hu:

Event Dt: 23-APR-19 06:25 Event Type: TRNL    Destination: SD201    Entered by: GREYN2SH    Entry Dt: 23-APR-19 06:25
Comments:

Inmate Leaving SBDF (South Bay Detention Facility). Next stop: CSB - San Diego Central Arrest: 4, Charge: 1, Court: SD201, Court
Dt/Tm: 04-23-2019 0830, ROC: JT, Document # : SCD275729
Event Dt: 23-APR-19 04:28 Event Type: CRT    Destination: COURT    Entered by: BOLIVASH    Entry Dt: 23-APR-19 04:28
Comments:

Changed STATUS from IN to CRT using flood fill.
Event Dt: 22-APR-19 19:40 Event Type: TRNRES Destination:    Entered by: KTYREESH    Entry Dt: 22-APR-19 19:40
LV
Comments:

RESOLVED EXCEPTION
Event Dt: 22-APR-19 19:40 Event Type: TRNEXC Destination: SD012    Entered by: KTYREESH    Entry Dt: 22-APR-19 19:40
PN
Comments:

EXCEPTION entering SBDF (South Bay Detention Facility).  Inmate is expected at SBDF (South Bay Detention Facility) Arrest: 4, Charge:
1, Court: SD012, Court Dt/Tm: 4/22/2019 09:00:00, ROC: FP, Court Case #: SCD275729
Event Dt: 22-APR-19 19:19 Event Type: IN    Destination: IN    Entered by: DGERALSH    Entry Dt: 22-APR-19 19:19
Comments:

Changed STATUS from CRT to IN using flood fill.
Event Dt: 22-APR-19 14:30 Event Type: TRNL    Destination: SD012    Entered by: ASPRAGSH    Entry Dt: 22-APR-19 14:30
Comments:

Inmate Leaving CSB - San Diego Central. Next stop: SBDF (South Bay Detention Facility) Arrest: 4, Charge: 1, Court: SD012, Court
Dt/Tm: 4/22/2019 09:00:00, ROC: FP, Court Case #: SCD275729
Event Dt: 22-APR-19 06:21 Event Type: TRNR    Destination: SD012    Entered by: KMILL3SH    Entry Dt: 22-APR-19 06:21
Comments:

Inmate Entering CSB - San Diego Central Arrest: 4, Charge: 1, Court: SD012, Court Dt/Tm: 4/22/2019 09:00:00, ROC: FP, Court Case
#: SCD275729
Event Dt: 22-APR-19 05:33 Event Type: TRNL    Destination: SD012    Entered by: GREYN2SH    Entry Dt: 22-APR-19 05:33
Comments:

Inmate Leaving SBDF (South Bay Detention Facility). Next stop: CSB - San Diego Central Arrest: 4, Charge: 1, Court: SD012, Court
Dt/Tm: 4/22/2019 09:00:00, ROC: FP, Court Case #: SCD275729
Event Dt: 22-APR-19 04:11 Event Type: CRT    Destination: COURT    Entered by: JDENO2SH    Entry Dt: 22-APR-19 04:11
Comments:

Changed STATUS from IN to CRT.
Event Dt: 21-APR-19 12:30 Event Type: VISS    Destination: 6 1A, 1BB    Entered by: EVISIT    Entry Dt: 20-APR-19 16:06
Comments:

TINA JAWORSKI, AMBER BEEBE

EXHIBIT 14

CSD00338

```
JIMS - E000015                    San Diego County Sheriff                        Page: 9 of 27
                                     Inmate History Report
Run Date:  15-JUL-2019                                                         Effective Date:
Run Time:  09:44                   Show all event types                          01-JAN-2000
                                                                               TO 15-JUL-2019


Booknum: 18181127      Name: GADSDEN, RONALD       Fac: 927 Area:      Hu:
Event Dt: 21-APR-19 11:27  Event Type: VISA    Destination: 1A, 1BB    Entered by: DHAMBLSH  Entry Dt: 21-APR-19 11:27
Comments:
AMBER BEEBE, TINA JAWORSKI
Event Dt: 18-APR-19 20:04  Event Type: IN      Destination: IN         Entered by: DRIVERSH  Entry Dt: 18-APR-19 20:04
Comments:
Changed STATUS from CRT to IN using flood fill.
Event Dt: 18-APR-19 04:41  Event Type: CRT     Destination: COURT      Entered by: HRUGGASH  Entry Dt: 18-APR-19 04:41
Comments:
Changed STATUS from IN to CRT using flood fill.
Event Dt: 16-APR-19 17:05  Event Type: MOVE    Destination: NEW HOUSING  Entered by: GEPPSMSH  Entry Dt: 16-APR-19 17:05
Comments:
Moved Book #18181127 FROM fac 6 area 1 hu A cell 14 bed M TO fac 6 area 1 hu A cell 15 bed M.
Event Dt: 11-APR-19 13:00  Event Type: GRIEV   Destination: GRIEV #194000549  Entered by: JMARTISH  Entry Dt: 16-APR-19 01:45
Comments:
GRIEVANCE SUBJECT CODE(S): FAC, JTHR
Event Dt: 09-APR-19 19:26  Event Type: IN      Destination: IN         Entered by: CGEORGSH  Entry Dt: 09-APR-19 19:26
Comments:
Changed STATUS from CRT to IN using flood fill.
Event Dt: 09-APR-19 19:22  Event Type: TRNR    Destination: NCI        Entered by: TMARSHSH  Entry Dt: 09-APR-19 19:22
Comments:
Inmate Entering SBDF (South Bay Detention Facility).Arrest: 1, Charge: 1,  Court: NCI, Court De/Tm: 04-09-2019 1330, ROC: FP,
Document # : CN358372
Event Dt: 09-APR-19 18:55  Event Type: TRNL    Destination: NCI        Entered by: JMONT3SH  Entry Dt: 09-APR-19 18:55
Comments:
Inmate Leaving SDCJ (San Diego Central Jail).   Next stop:  SBDF (South Bay Detention Facility).Arrest: 1,  Charge: 1,  Court: NCI,
Court De/Tm: 04-09-2019 1330, ROC: FP, Document # : CN358372
Event Dt: 09-APR-19 18:32  Event Type: TRNR    Destination: NCI        Entered by: JMONT3SH  Entry Dt: 09-APR-19 18:32
Comments:
Inmate Entering SDCJ (San Diego Central Jail).Arrest: 1,  Charge: 1,  Court: NCI, Court De/Tm: 04-09-2019 1330, ROC: FP, Document #
: CN358372
Event Dt: 09-APR-19 17:10  Event Type: TRNL    Destination: NCI        Entered by: EMACKESH  Entry Dt: 09-APR-19 17:10
Comments:
Inmate Leaving CSB - North County.   Next stop:  SDCJ (San Diego Central Jail).Arrest: 1,  Charge: 1,  Court: NCI, Court De/Tm: 04-09-
2019 1330, ROC: FP, Document # : CN358372
```

EXHIBIT 14

CSDD00339

```
JIMS - E000015              San Diego County Sheriff                    Page: 10 of 27
                              Inmate History Report
Run Date: 15-JUL-2019                                           Effective Date:
Run Time: 09:44              Show all event types                  01-JAN-2000
                                                               TO 15-JUL-2019

Booknum: 18181127    Name: GADSDEN, RONALD        Fac: 927 Area:    Hu:
Event Dt:09-APR-19 08:49 Event Type: TRNR   Destination: NC1
                                                    Entered by: ADUARTISH  Entry Dt:  09-APR-19  08:49
Comments:
Inmate Entering CSB - North County Arrest: 1,   Court: NC1,   Court Dt/Tm: 04-09-2019 1330,  ROC: FP,   Document # : CN358372
Event Dt:09-APR-19 08:00 Event Type: TRNL   Destination: NC1
                                                    Entered by: JREISXSH  Entry Dt:  09-APR-19  08:00
Comments:
Inmate Leaving SDCJ (San Diego Central Jail).  Next stop:   CSB - North County Arrest: 1,   Charge: 1,   Court: NC1,   Court Dt/Tm: 04-09-
2019 1330,  ROC: FP,   Document # : CN358372
Event Dt:09-APR-19 06:09 Event Type: TRNR   Destination: NC1
                                                    Entered by: JREISXSH  Entry Dt:  09-APR-19  06:09
Comments:
Inmate Entering SDCJ (San Diego Central Jail).Arrest: 1,   Charge: 1,   Court: NC1,   Court Dt/Tm: 04-09-2019 1330,  ROC: FP,   Document #
: CN358372
Event Dt:09-APR-19 05:45 Event Type: TRNL   Destination: NC1
                                                    Entered by: GREYEN2SH  Entry Dt:  09-APR-19  05:45
Comments:
Inmate Leaving SBDF (South Bay Detention Facility).  Next stop:   SDCJ (San Diego Central Jail)Arrest: 1,   Charge: 1,   Court: NC1,
Court Dt/Tm: 04-09-2019 1330,  ROC: FP,   Document # : CN358372
Event Dt:09-APR-19 04:12 Event Type: CRT    Destination: COURT
                                                    Entered by: CGEORGSH  Entry Dt:  09-APR-19  04:12
Comments:
Changed STATUS from IN to CRT using flood fill.
Event Dt:08-APR-19 14:30 Event Type: VISS   Destination: 6 1A, 1B13
                                                    Entered by: EVISIT  Entry Dt:  07-APR-19  13:54
Comments:
TINA JAWORSKI
Event Dt:08-APR-19 13:36 Event Type: VISA   Destination: 1A, 1B13
                                                    Entered by: DHAMBLSH  Entry Dt:  08-APR-19  13:36
Comments:
TINA JAWORSKI
Event Dt:05-APR-19 14:53 Event Type: TRNR   Destination: SD012
                                                    Entered by: DMANCISH  Entry Dt:  05-APR-19  14:53
Comments:
Inmate Entering SBDF (South Bay Detention Facility).Arrest: 4,   Charge: 1,   Court: SD012,   Court Dt/Tm: 04-05-2019 0900,  ROC: FP,
Document # : SCD275729
Event Dt:05-APR-19 14:45 Event Type: IN     Destination: IN
                                                    Entered by: TMASCASH  Entry Dt:  05-APR-19  14:45
Comments:
Changed STATUS from CRT to IN using flood fill.
Event Dt:05-APR-19 14:07 Event Type: TRNL   Destination: SD012
                                                    Entered by: AFABIASH  Entry Dt:  05-APR-19  14:07
Comments:
Inmate Leaving CSB - San Diego Central.  Next stop:   SBDF (South Bay Detention Facility)Arrest: 4,   Charge: 1,   Court: SD012,   Court
Dt/Tm: 04-05-2019 0900,  ROC: FP,   Document # : SCD275729
```

EXHIBIT 14

CSD000340

JIMS - E000015

Run Date:  15-JUL-2019
Run Time:  09:44

San Diego County Sheriff
Inmate History Report
Show all event types

Page: 11 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127      Name: GADSDEN, RONALD      Fac: 927 Area:      Hu:

Event Dt: 05-APR-19 06:36   Event Type: TRNR   Destination: SD012   Entered by: NSLEEMSH   Entry Dt: 05-APR-19 06:36
Comments:

Inmate Entering CSB - San Diego Central.Arrest: 4,   Charge: 1,   Court: SD012,   Court Dt/Tm: 04-05-2019 0900,   ROC: FP,   Document # :
SCD275729
Event Dt: 05-APR-19 06:02   Event Type: TRNL   Destination: SD012   Entered by: DMANCISH   Entry Dt: 05-APR-19 06:02
Comments:

Inmate Leaving SBDF (South Bay Detention Facility).   Next stop:   CSB - San Diego Central.Arrest: 4,   Charge: 1,   Court: SD012,   Court
Dt/Tm: 04-05-2019 0900,   ROC: FP,   Document # : SCD275729
Event Dt: 05-APR-19 04:21   Event Type: CRT   Destination: COURT   Entered by: HRUGGASH   Entry Dt: 05-APR-19 04:21
Comments:

Changed STATUS from IN to CRT using flood fill.
Event Dt: 02-APR-19 15:38   Event Type: TRNR   Destination: SD012   Entered by: GREYN2SH   Entry Dt: 02-APR-19 15:38
Comments:

Inmate Entering SBDF (South Bay Detention Facility).Arrest: 4,   Charge: 1,   Court: SD012,   Court Dt/Tm: 04-02-2019 0900,   ROC: FP,
Document # : SCD275729
Event Dt: 02-APR-19 15:06   Event Type: IN   Destination: IN   Entered by: MHAMNESH   Entry Dt: 02-APR-19 15:06
Comments:

Changed STATUS from CRT to IN using flood fill.
Event Dt: 02-APR-19 14:13   Event Type: TRNL   Destination: SD012   Entered by: ASPRAGSH   Entry Dt: 02-APR-19 14:13
Comments:

Inmate Leaving CSB - San Diego Central.   Next stop:   SBDF (South Bay Detention Facility)Arrest: 4,   Charge: 1,   Court: SD012,   Court
Dt/Tm: 04-02-2019 0900,   ROC: FP,   Document # : SCD275729
Event Dt: 02-APR-19 06:38   Event Type: TRNR   Destination: SD012   Entered by: ASPRAGSH   Entry Dt: 02-APR-19 06:38
Comments:

Inmate Entering CSB - San Diego Central.Arrest: 4,   Charge: 1,   Court: SD012,   Court Dt/Tm: 04-02-2019 0900,   ROC: FP,   Document # :
SCD275729
Event Dt: 02-APR-19 05:37   Event Type: TRNL   Destination: SD012   Entered by: GREYN2SH   Entry Dt: 02-APR-19 05:37
Comments:

Inmate Leaving SBDF (South Bay Detention Facility).   Next stop:   CSB - San Diego Central.Arrest: 4,   Charge: 1,   Court: SD012,   Court
Dt/Tm: 04-02-2019 0900,   ROC: FP,   Document # : SCD275729
Event Dt: 02-APR-19 04:49   Event Type: CRT   Destination: COURT   Entered by: DGERALSH   Entry Dt: 02-APR-19 04:49
Comments:

Changed STATUS from IN to CRT using flood fill.

EXHIBIT 14

CSD000341

```
JIMS - E000015                    San Diego County Sheriff                      Page: 12 of 27

Run Date:  15-JUL-2019                 Inmate History Report                Effective Date:
Run Time:  09:44                        Show all event types                   01-JAN-2000
                                                                             TO 15-JUL-2019

Booknum: 18181127       Name: GADSDEN, RONALD       Fac: 927 Area:      Hu:

Event Dt: 01-APR-19 15:32  Event Type: WW    Destination: WANTS/WARRANTS CHECK   Entered by: AGONZ3SH   Entry Dt: 01-APR-19 15:32
Comments:
Initial Clearance set to C
Event Dt: 01-APR-19 14:30  Event Type: VISS   Destination: 6 1A, 1B10            Entered by: EVISIT    Entry Dt: 31-MAR-19 22:22
Comments:
TINA JAWORSKI
Event Dt: 01-APR-19 13:34  Event Type: VISA   Destination: 1A, 1B10             Entered by: NNAFARSH  Entry Dt: 01-APR-19 13:34
Comments:
TINA JAWORSKI
Event Dt: 28-MAR-19 15:14  Event Type: TRNR   Destination: SD012                Entered by: DMANCISH  Entry Dt: 28-MAR-19 15:14
Comments:
Inmate Entering SBDF (South Bay Detention Facility)Arrest: 4, Charge: 1, Court: SD012, Court Dt/Tm: 03-28-2019 0900, ROC: FP,
Document # : SCD275729
Event Dt: 28-MAR-19 14:57  Event Type: IN     Destination: IN                   Entered by: JCLAY5SH  Entry Dt: 28-MAR-19 14:57
Comments:
Changed STATUS from CRT to IN using flood fill.
Event Dt: 28-MAR-19 14:21  Event Type: TRNL   Destination: SD012                Entered by: ASPRAGSH  Entry Dt: 28-MAR-19 14:21
Comments:
Inmate Leaving CSB - San Diego Central. Next stop: SBDF (South Bay Detention Facility)Arrest: 4, Charge: 1, Court: SD012, Court
Dt/Tm: 03-28-2019 0900, ROC: FP, Document # : SCD275729
Event Dt: 28-MAR-19 06:35  Event Type: TRNR   Destination: SD012                Entered by: ASPRAGSH  Entry Dt: 28-MAR-19 06:35
Comments:
Inmate Entering CSB - San Diego Central.Arrest: 4, Charge: 1, Court: SD012, Court Dt/Tm: 03-28-2019 0900, ROC: FP, Document # :
SCD275729
Event Dt: 28-MAR-19 06:17  Event Type: TRNL   Destination: SD012                Entered by: DMANCISH  Entry Dt: 28-MAR-19 06:17
Comments:
Inmate Leaving SBDF (South Bay Detention Facility). Next stop: CSB - San Diego CentralArrest: 4, Charge: 1, Court: SD012, Court
Dt/Tm: 03-28-2019 0900, ROC: FP, Document # : SCD275729
Event Dt: 28-MAR-19 04:33  Event Type: CRT    Destination: COURT                Entered by: TBURNSSH  Entry Dt: 28-MAR-19 04:33
Comments:
Changed STATUS from IN to CRT using flood fill.
Event Dt: 24-MAR-19 15:15  Event Type: VISS   Destination: 6 1A, 1B8            Entered by: EVISIT    Entry Dt: 23-MAR-19 16:51
Comments:
TINA JAWORSKI
```

EXHIBIT 14

CSD00342

JIMS - E000015

Run Date:   15-JUL-2019
Run Time:   09:44

San Diego County Sheriff
Inmate History Report

Show all event types

Booknum: 18181127      Name: GADSDEN, RONALD      Fac: 927 Area:      Hu:

Event Dt: 24-MAR-19 14:21  Event Type: VISA    Destination: 1A, 1B8    Entered by: SCORPUSH  Entry Dt:  24-MAR-19 14:21
Comments:
    TINA JAWORSKI
Event Dt: 17-MAR-19 12:30  Event Type: VISS    Destination: 6 1A, 1B9    Entered by: EVISIT    Entry Dt:  16-MAR-19 13:44
Comments:
    TINA JAWORSKI
Event Dt: 17-MAR-19 11:33  Event Type: VISA    Destination: 1A, 1B9    Entered by: SCORPUSH  Entry Dt:  17-MAR-19 11:33
Comments:
    TINA JAWORSKI
Event Dt: 10-MAR-19 15:15  Event Type: VISS    Destination: 6 1A, 1B8    Entered by: EVISIT    Entry Dt:  09-MAR-19 17:00
Comments:
    TINA JAWORSKI
Event Dt: 10-MAR-19 14:19  Event Type: VISA    Destination: 1A, 1B8    Entered by: ASUSEBSH  Entry Dt:  10-MAR-19 14:19
Comments:
    TINA JAWORSKI
Event Dt: 05-MAR-19 15:28  Event Type: IN      Destination: IN    Entered by: AGUARDSH  Entry Dt:  05-MAR-19 15:28
Comments:
    Changed STATUS from CRT to IN using flood fill.
Event Dt: 05-MAR-19 15:01  Event Type: TRNR    Destination: SD012    Entered by: GREYN2SH  Entry Dt:  05-MAR-19 15:02
Comments:   Court: SD012,    Court Dt/Tm: 03-05-2019 0900,   ROC: FP,
Event Dt: 05-MAR-19 14:13  Event Type: TRNL    Destination: SD012    Entered by: ASPRAGSH  Entry Dt:  05-MAR-19 14:13
Comments:
    Inmate Entering SBDF (South Bay Detention Facility).Arrest: 4,    Charge: 1,
    Document # : SCD275729
Event Dt: 05-MAR-19 06:31  Event Type: TRNR    Destination: SD012    Entered by: ASPRAGSH  Entry Dt:  05-MAR-19 06:31
Comments:
    Inmate Leaving CSB - San Diego Central.  Next stop:  SBDF (South Bay Detention Facility)Arrest: 4,    Charge: 1,   Court: SD012,    Court
    Dt/Tm: 03-05-2019 0900,   ROC: FP,   Document # : SCD275729
Event Dt: 05-MAR-19 05:37  Event Type: TRNL    Destination: SD012    Entered by: GREYN2SH  Entry Dt:  05-MAR-19 05:37
Comments:
    Inmate Entering CSB  -  San Diego Central.Arrest: 4,    Charge: 1,    Court: SD012,    Court Dt/Tm: 03-05-2019 0900,   ROC: FP,   Document # :
    SCD275729
Event Dt: 05-MAR-19 05:37  Event Type: TRNL    Destination: SD012    Entered by: GREYN2SH  Entry Dt:  05-MAR-19 05:37
Comments:
    Inmate Leaving SBDF (South Bay Detention Facility).  Next stop:  CSB - San Diego Central.Arrest: 4,    Charge: 1,   Court: SD012,   Court
    Dt/Tm: 03-05-2019 0900,   ROC: FP,   Document # : SCD275729

EXHIBIT 14

CSDD00343

```
JIMS - E000015          Name:        San Diego County Sheriff                    Page: 14 of 27
                                      Inmate History Report
Run Date:  15-JUL-2019                                                   Effective Date:
Run Time:  09:44                      Show all event types                       01-JAN-2000
                                                                          TO 15-JUL-2019

Bookrun: 18181127    Name: GADSDEN, RONALD        Fac: 927  Area:        Hu:

Event Dt: 05-MAR-19 04:14  Event Type: CRT    Destination: COURT     Entered by: DCOMERSH  Entry Dt: 05-MAR-19  04:14
Comments:
Changed STATUS from IN to CRT.
Event Dt: 03-MAR-19 12:30  Event Type: VISS    Destination: 1A, 1B2   Entered by: SCORPUSH  Entry Dt: 02-MAR-19  11:23
Comments:
TINA JAWORSKI
Event Dt: 03-MAR-19 11:17  Event Type: VISA    Destination: 1A, 1B2   Entered by: DPANSASH  Entry Dt: 03-MAR-19  11:17
Comments:
TINA JAWORSKI
Event Dt: 01-MAR-19 16:47  Event Type: MOVE    Destination: NEW HOUSING   Entered by: AGUARDSH  Entry Dt: 01-MAR-19  16:47
Comments:
Moved Book #18181127 TO fac 6 area 1 hu A cell 14 bed M.
Event Dt: 01-MAR-19 16:47  Event Type: RELSTO  Destination: RELEASE STORAGE   Entered by: AGUARDSH  Entry Dt: 01-MAR-19  16:47
Comments:
GBHANGER: 000136
Event Dt: 01-MAR-19 16:47  Event Type: MOVE    Destination: NEW HOUSING   Entered by: AGUARDSH  Entry Dt: 01-MAR-19  16:47
Comments:
Moved Book #18181127 TO fac 6 area X .
Event Dt: 01-MAR-19 16:47  Event Type: XVIS    Destination: NEW HOUSING   Entered by: AGUARDSH  Entry Dt: 01-MAR-19  16:47
Comments:
Deleted future visits because of facility transfer
Event Dt: 01-MAR-19 16:03  Event Type: TRNR    Destination: 006   Entered by: GREYN2SH  Entry Dt: 01-MAR-19  16:03
Comments:
Inmate Entering SBDF (South Bay Detention Facility) Transfer to SBDF Facility Trans
Event Dt: 01-MAR-19 15:54  Event Type: TRNL    Destination: 006   Entered by: DROJASSH  Entry Dt: 01-MAR-19  15:54
Comments:
Inmate Leaving GBDF (George Bailey Detention Facility).  Next stop:  SBDF  (South Bay Detention Facility/Transfer to SBDF Facility
Trans
Event Dt: 01-MAR-19 13:28  Event Type: MOVE    Destination: NEW HOUSING   Entered by: DCARRXSH  Entry Dt: 01-MAR-19  13:28
Comments:
Moved Book #18181127 FROM fac 3 area 4 hu B cell 124 bed B TO fac 3 area X .
Event Dt: 28-FEB-19 21:29  Event Type: RELSTO  Destination: RELEASE STORAGE   Entered by: IMURGUSH  Entry Dt: 28-FEB-19  21:29
Comments:
GBHANGER: 000136
```

EXHIBIT 14

CSD000344

```
JIMS - E000015                      San Diego County Sheriff                          Page: 15 of 27
                                     Inmate History Report
Run Date:  15-JUL-2019                                                           Effective Date:
Run Time:  09:44                   Show all event types                             01-JAN-2000
                                                                                TO 15-JUL-2019

Bookmnum: 18181127     Name: GADSDEN, RONALD       Fac: 927  Area:       Hu:

Event Dt: 25-FEB-19 20:42  Event Type: IN       Destination: IN     Entered by: RIZQUISH   Entry Dt:  25-FEB-19 20:42
Comments:
Changed STATUS from CRT to IN using flood fill.
Event Dt: 25-FEB-19 17:54  Event Type: TRNR    Destination: SD012   Entered by: JSANDJSH   Entry Dt:  25-FEB-19 17:54
Comments:
Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 4, Charge: 2,   Court: SD012, Court Dt/Tm: 02-25-2019 1330, ROC: BR,
Document # : SCD275729
Event Dt: 25-FEB-19 16:18  Event Type: TRNL    Destination: SD012   Entered by: RROBI2SH   Entry Dt:  25-FEB-19 16:18
Comments:
Inmate Leaving CSB - San Diego Central.  Next stop: GBDF (George Bailey Detention Facility)Arrest: 4,  Charge: 2,   Court: SD012,
Court Dt/Tm: 02-25-2019 1330, ROC: BR, Document # : SCD275729
Event Dt: 25-FEB-19 08:01  Event Type: TRNR    Destination: SD012   Entered by: NSLEEMSH   Entry Dt:  25-FEB-19 08:01
Comments:
Inmate Entering CSB - San Diego Central.Arrest: 4,  Charge: 2,   Court: SD012,   Court Dt/Tm: 02-25-2019 1330, ROC: BR,  Document # :
SCD275729
Event Dt: 25-FEB-19 06:46  Event Type: TRNL    Destination: SD012   Entered by: KCAVACSH   Entry Dt:  25-FEB-19 06:46
Comments:
Inmate Leaving GBDF (George Bailey Detention Facility).  Next stop: CSB - San Diego CentralArrest: 4,  Charge: 2,   Court: SD012,
Court Dt/Tm: 02-25-2019 1330, ROC: BR, Document # : SCD275729
Event Dt: 25-FEB-19 04:23  Event Type: CRT     Destination: COURT   Entered by: JPAGEXSH   Entry Dt:  25-FEB-19 04:23
Comments:
Changed STATUS from IN to CRT using flood fill.
Event Dt: 22-FEB-19 20:57  Event Type: IN      Destination: IN      Entered by: RESCOBSH   Entry Dt:  22-FEB-19 20:57
Comments:
Changed STATUS from CRT to IN using flood fill.
Event Dt: 22-FEB-19 17:48  Event Type: TRNR    Destination: NC1     Entered by: RCHAVASH   Entry Dt:  22-FEB-19 17:48
Comments:
Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 1, Charge: 1,   Court: NC1,   Court Dt/Tm: 02-22-2019 0830,  ROC: FP,
Document # : CN358372
Event Dt: 22-FEB-19 16:40  Event Type: TRNL    Destination: NC1     Entered by: SSUAR2SH   Entry Dt:  22-FEB-19 16:40
Comments:
Inmate Leaving SDCJ (San Diego Central Jail).  Next stop: GBDF (George Bailey Detention Facility)Arrest: 1,  Charge: 1,   Court: NC1,
Court Dt/Tm: 02-22-2019 0830, ROC: FP, Document # : CN358372
```

Case 3:20-cv-02258-WQH-DEB   Document 62-3   Filed 04/24/23   PageID.474   Page 110 of 127

EXHIBIT 14

CSD000345

JIMS - E000015

San Diego County Sheriff
Inmate History Report

Show all event types

Page: 16 of 27

Run Date:   15-JUL-2019
Run Time:   09:44

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127      Name: GADSDEN, RONALD      Fac: 927  Area:      Hu:

Event Dt: 22-FEB-19 15:55  Event Type: TRNR   Destination: NC1      Entered by: SSUAR2SH   Entry Dt: 22-FEB-19 15:55
Comments:

Inmate Entering SDCJ (San Diego Central Jail).Arrest: 1,   Court: NC1,   Court Dt/Tm: 02-22-2019 0830,   ROC: FP,   Document #
: CN358372
Event Dt: 22-FEB-19 15:54  Event Type: TRNR   Destination: NC1      Entered by: SSUAR2SH   Entry Dt: 22-FEB-19 15:55
Comments:

Inmate Entering SDCJ (San Diego Central Jail).Arrest: 1,   Court: NC1,   Court Dt/Tm: 02-22-2019 0830,   ROC: FP,   Document #
: CN358372
Event Dt: 22-FEB-19 15:12  Event Type: TRNL   Destination: NC1      Entered by: EMACKESH    Entry Dt: 22-FEB-19 15:12
Comments:

Inmate Leaving CSB - North County.   Next stop:   SDCJ (San Diego Central Jail)Arrest: 1,   Charge: 1,   Court: NC1,   Court Dt/Tm: 02-22-
2019 0830, ROC: FP,  Document # : CN358372
Event Dt: 22-FEB-19 07:57  Event Type: TRNR   Destination: NC1      Entered by: JBANKSSH    Entry Dt: 22-FEB-19 07:57
Comments:

Inmate Entering CSB - North County.Arrest: 1,   Charge: 1,   Court: NC1,   Court Dt/Tm: 02-22-2019 0830,   ROC: FP,   Document # : CN358372
Event Dt: 22-FEB-19 07:51  Event Type: TRNL   Destination: NC1      Entered by: JMONT3SH    Entry Dt: 22-FEB-19 07:51
Comments:

Inmate Leaving SDCJ (San Diego Central Jail).   Next stop:   CSB - North CountyArrest: 1,   Charge: 1,   Court: NC1,   Court Dt/Tm: 02-22-
2019 0830, ROC: FP,  Document # : CN358372
Event Dt: 22-FEB-19 06:50  Event Type: TRNR   Destination: NC1      Entered by: JMONT3SH    Entry Dt: 22-FEB-19 06:50
Comments:

Inmate Entering SDCJ (San Diego Central Jail).Arrest: 1,   Charge: 1,   Court: NC1,   Court Dt/Tm: 02-22-2019 0830,   ROC: FP,   Document #
: CN358372
Event Dt: 22-FEB-19 05:41  Event Type: TRNL   Destination: NC1      Entered by: KCAVACSH    Entry Dt: 22-FEB-19 05:42
Comments:

Inmate Leaving GBDF (George Bailey Detention Facility).   Next stop:   SDCJ (San Diego Central Jail)Arrest: 1,   Charge: 1,   Court: NC1,
Court Dt/Tm: 02-22-2019 0830, ROC: FP,  Document # : CN358372
Event Dt: 22-FEB-19 03:48  Event Type: CRT   Destination: COURT      Entered by: NCROCESH    Entry Dt: 22-FEB-19 03:48
Comments:

Changed STATUS from IN to CRT using flood fill.
Event Dt: 21-FEB-19 14:42  Event Type: MOVE   Destination: NEW HOUSING      Entered by: JOSBORSH    Entry Dt: 21-FEB-19 14:42
Comments:

Moved Book #18181127 TO fac 3 area 4 hu B cell 124 bed B.

EXHIBIT 14

CSD000346

```
JIMS - E000015                San Diego County Sheriff              Page: 17 of 27
                               Inmate History Report
Run Date:  15-JUL-2019                                          Effective Date:
Run Time:  09:44              Show all event types                 01-JAN-2000
                                                                TO 15-JUL-2019

Booknum: 18181127    Name: GADSDEN, RONALD      Fac: 927 Area:  Hu:
Event Dt: 21-FEB-19 14:39  Event Type: MOVE   Destination: NEW HOUSING    Entered by: JSABEL2SH  Entry Dt: 21-FEB-19 14:39
Comments:
 Moved Book #18181127 FROM fac 3 area 3 area 6 hu A cell 211 bed T TO fac 3 area X .
Event Dt: 19-FEB-19 22:02  Event Type: LOCK   Destination: LOCKDOWN       Entered by: JWALL2SH   Entry Dt: 19-FEB-19 22:02
Comments:
 Changed STATUS from IN to LOCK.
Event Dt: 19-FEB-19 17:16  Event Type: IN     Destination: IN             Entered by: RMATAXSH   Entry Dt: 19-FEB-19 17:16
Comments:
 Changed STATUS from CRT to IN.
Event Dt: 19-FEB-19 11:47  Event Type: TRNR   Destination: SD012          Entered by: AGUTI3SH   Entry Dt: 19-FEB-19 11:47
Comments:
 Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 4, Charge: 1,  Court: SD012,  Court Dt/Tm: 02-19-2019 0900,  ROC: FP,
 Document #: SCD275729
Event Dt: 19-FEB-19 10:30  Event Type: TRNL   Destination: SD012          Entered by: RROBI2SH   Entry Dt: 19-FEB-19 10:30
Comments:
 Inmate Leaving CSB - San Diego Central.  Next stop: GBDF (George Bailey Detention Facility)Arrest: 4,  Charge: 1,  Court: SD012,
 Court Dt/Tm: 02-19-2019 0900,  ROC: FP,  Document # : SCD275729
Event Dt: 19-FEB-19 06:54  Event Type: TRNR   Destination: SD012          Entered by: CCORBESH   Entry Dt: 19-FEB-19 06:54
Comments:
 Inmate Entering CSB - San Diego Central.Arrest: 4,  Charge: 1,  Court: SD012,  Court Dt/Tm: 02-19-2019 0900,  ROC: FP,  Document # :
 SCD275729
Event Dt: 19-FEB-19 06:23  Event Type: TRNL   Destination: SD012          Entered by: KCAVACSH   Entry Dt: 19-FEB-19 06:23
Comments:
 Inmate Leaving GBDF (George Bailey Detention Facility).  Next stop: CSB - San Diego CentralArrest: 4,  Charge: 1,  Court: SD012,
 Court Dt/Tm: 02-19-2019 0900,  ROC: FP,  Document # : SCD275729
Event Dt: 19-FEB-19 04:43  Event Type: CRT    Destination: COURT          Entered by: ELUNAXSH   Entry Dt: 19-FEB-19 04:43
Comments:
 Changed STATUS from IN to CRT.
Event Dt: 19-FEB-19 00:09  Event Type: SHWR   Destination: REFUSED SHOWER Entered by: ELUNAXSH   Entry Dt: 19-FEB-19 00:09
Comments:
Event Dt: 18-FEB-19 18:14  Event Type: WW     Destination: WANTS/WARRANTS CHECK  Entered by: VSALAZSH  Entry Dt: 18-FEB-19 18:14
Comments:
 Initial Clearance set to C
```

EXHIBIT 14

CSDD00347

JIMS - E000015

Run Date:  15-JUL-2019
Run Time:  09:44

San Diego County Sheriff
Inmate History Report

Show all event types

Page: 18 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127    Name: GADSDEN, RONALD    Fac: 927 Area:    Hu:

Event Dt: 15-FEB-19 21:58  Event Type: MOVE    Destination: NEW HOUSING    Entered by: MHINOJSH    Entry Dt: 15-FEB-19 21:58
Comments:
Moved Book #18181127 TO fac 3 area 6 hu A cell 213 bed T.
Event Dt: 15-FEB-19 20:47  Event Type: MOVE    Destination: NEW HOUSING    Entered by: MMCGRASH    Entry Dt: 15-FEB-19 20:47
Comments:
Moved Book #18181127 TO fac 3 area X .
Event Dt: 15-FEB-19 20:47  Event Type: XVIS    Destination: NEW HOUSING    Entered by: MMCGRASH    Entry Dt: 15-FEB-19 20:47
Comments:
Deleted future visits because of facility transfer
Event Dt: 15-FEB-19 20:45  Event Type: MOVE    Destination: NEW HOUSING    Entered by: MMCGRASH    Entry Dt: 15-FEB-19 20:45
Comments:
Moved Book #18181127 FROM fac 8 area 1 hu C cell 241 bed M TO fac 8 area X .
Event Dt: 15-FEB-19 20:15  Event Type: INCI    Destination: INC #194006340    Entered by: MMCGRASH    Entry Dt: 15-FEB-19 20:17
Comments:
INCIDENT TYPE CODE(S): 101, 105, 701; INVOLVEMENT: OTHER.
Event Dt: 13-FEB-19 14:32  Event Type: PCAL    Destination: PHONE CALL    Entered by: FWILL2SH    Entry Dt: 13-FEB-19 14:33
Comments:
Attorny Call back 819-338-4758
Event Dt: 31-JAN-19 15:59  Event Type: MOVE    Destination: NEW HOUSING    Entered by: KWILS2SH    Entry Dt: 31-JAN-19 15:59
Comments:
Moved Book #18181127 FROM fac 8 area 1 hu C cell 246 bed T TO fac 8 area 1 hu C cell 241 bed M.
Event Dt: 31-JAN-19 12:26  Event Type: IN    Destination: IN    Entered by: FWILL2SH    Entry Dt: 31-JAN-19 12:26
Comments:
Changed STATUS from SICK to IN using flood fill.
Event Dt: 31-JAN-19 07:22  Event Type: SICK    Destination: SICK CALL    Entered by: FWILL2SH    Entry Dt: 31-JAN-19 07:22
Comments:
Changed STATUS from IN to SICK using flood fill.
Event Dt: 23-JAN-19 22:06  Event Type: TRNR    Destination: NCI    Entered by: DULLOASH    Entry Dt: 23-JAN-19 22:06
Comments:
Inmate Entering FAC8 (Facility 8).Arrest: 1,    Charge: 1,    Court: NCI,    Court Dt/Tm: 01-23-2019 0830,    ROC: FP,    Document # : CN358372
Event Dt: 23-JAN-19 21:55  Event Type: IN    Destination: IN    Entered by: DULLOASH    Entry Dt: 23-JAN-19 21:55
Comments:
Changed STATUS from CRT to IN using flood fill.

EXHIBIT 14

CSD000348

JIMS - E000015

Run Date:    15-JUL-2019
Run Time:    09:44

San Diego County Sheriff
Inmate History Report
Show all event types

Page: 19 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127    Name: GADSDEN, RONALD    Fac: 927 Area:    Hu:

Event Dt:23-JAN-19 20:44 Event Type: TRNL    Destination: NC1

Comments:

Inmate Leaving GBDF (George Bailey Detention Facility).    Next stop: FAC6 (Facility 8)Arrest: 1, Charge: 1, Court: NC1, Court
Dt/Tm: 01-23-2019 0830, ROC: FP, Document # : CN358372    Entered by: MTILLMSH Entry Dt:    23-JAN-19 20:44

Event Dt:23-JAN-19 20:37 Event Type: TRNR    Destination: NC1

Comments:

Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 1, Charge: 1,    Court: NC1,    Court Dt/Tm: 01-23-2019 0830, ROC: FP,
Document # : CN358372    Entered by: MTILLMSH Entry Dt:    23-JAN-19 20:37

Event Dt:23-JAN-19 18:34 Event Type: TRNL    Destination: NC1

Comments:

Inmate Leaving SDCJ (San Diego Central Jail).    Next stop: GBDF (George Bailey Detention Facility)Arrest: 1,    Charge: 1,    Court: NC1,
Court Dt/Tm: 01-23-2019 0830, ROC: FP, Document # : CN358372    Entered by: JBARR3SH Entry Dt:    23-JAN-19 18:34

Event Dt:23-JAN-19 16:14 Event Type: TRNR    Destination: NC1

Comments:

Inmate Entering SDCJ (San Diego Central Jail).Arrest:    1,    Charge:    1,    Court: NC1,    Court Dt/Tm: 01-23-2019 0830,    ROC: FP,    Document #
: CN358372    Entered by: CCROS3SH Entry Dt:    23-JAN-19 16:14

Event Dt:23-JAN-19 15:59 Event Type: TRNL    Destination: NC1

Comments:

Inmate Leaving CSB - North County.    Next stop: SDCJ (San Diego Central Jail)Arrest: 1,    Charge:    1,    Court: NC1,    Court Dt/Tm: 01-23-
2019 0830, ROC: FP, Document # : CN358372    Entered by: JSTUBBSH Entry Dt:    23-JAN-19 15:59

Event Dt:23-JAN-19 09:11 Event Type: TRNR    Destination: NC1

Comments:

Inmate Entering CSB - North County.Arrest: 1,    Charge: 1,    Court: NC1,    Court Dt/Tm: 01-23-2019 0830,    ROC: FP,    Document # : CN358372
Event Dt:23-JAN-19 07:40 Event Type: TRNL    Destination: NC1    Entered by: ADUARTSH Entry Dt:    23-JAN-19 09:11

Comments:

Inmate Leaving SDCJ (San Diego Central Jail.    Next stop: CSB - North CountyArrest: 1,    Charge: 1,    Court: NC1,    Court Dt/Tm: 01-23-
2019 0830, ROC: FP, Document # : CN358372    Entered by: JREISXSH Entry Dt:    23-JAN-19 07:40

Event Dt:23-JAN-19 07:00 Event Type: TRNR    Destination: NC1

Comments:

Inmate Entering SDCJ (San Diego Central Jail).Arrest: 1,    Charge: 1,    Court: NC1,    Court Dt/Tm: 01-23-2019 0830,    ROC: FP,    Document #
: CN358372    Entered by: JMONT3SH Entry Dt:    23-JAN-19 07:00

Event Dt:23-JAN-19 05:46 Event Type: TRNL    Destination: NC1

Comments:

Inmate Leaving GBDF (George Bailey Detention Facility).    Next stop: SDCJ (San Diego Central Jail)Arrest: 1,    Charge: 1,    Court: NC1,
Court Dt/Tm: 01-23-2019 0830, ROC: FP, Document # : CN358372    Entered by: ZBARNESH Entry Dt:    23-JAN-19 05:46

Comments:

EXHIBIT 14

CSD000349

San Diego County Sheriff
Inmate History Report

Show all event types

JIMS - E000015

Run Date:  15-JUL-2019
Run Time:  09:44

Booknum: 18181127    Name: GADSDEN, RONALD    Fac: 927  Area: Hu:
Event Dt: 23-JAN-19 03:50  Event Type: CRT    Destination: COURT
Comments:
Changed STATUS from IN to CRT using flood fill.
Event Dt: 23-JAN-19 03:45  Event Type: TRNR    Destination: NC1

Entered by: JSOSAXSH  Entry Dt:  23-JAN-19 03:50

Entered by: ZBARNESH  Entry Dt:  23-JAN-19 03:45

Comments:
Inmate Entering GBDF (George Bailey Detention Facility)Arrest: 1, Charge: 1,  Court: NC1,  Court Dt/Tm: 01-23-2019 0830,  ROC: FP,
Document # : CN358372
Event Dt: 23-JAN-19 03:39  Event Type: TRNL    Destination: NC1

Entered by: JSOSAXSH  Entry Dt:  23-JAN-19 03:39

Comments:
Inmate Leaving FAC8 (Facility 8).  Next stop: GBDF (George Bailey Detention Facility)Arrest: 1, Charge: 1,  Court: NC1,  Court
Dt/Tm: 01-23-2019 0830, ROC: FP,  Document # : CN358372
Event Dt: 23-JAN-19 03:39  Event Type: TRNL    Destination: NC1

Entered by: JSOSAXSH  Entry Dt:  23-JAN-19 03:39

Comments:
Inmate Leaving FAC8 (Facility 8).  Next stop: GBDF (George Bailey Detention Facility)Arrest: 1, Charge: 1,  Court: NC1,  Court
Dt/Tm: 01-23-2019 0830,  ROC: FP,  Document # : CN358372
Event Dt: 23-JAN-19 00:20  Event Type: TRNRES Destination:
                                        LV

Entered by: JSOSAXSH  Entry Dt:  23-JAN-19 00:20

Comments:
RESOLVED EXCEPTION
Event Dt: 23-JAN-19 00:18  Event Type: TRNEXC Destination: SD111
                                        EN

Entered by: JSOSAXSH  Entry Dt:  23-JAN-19 00:18

Comments:
EXCEPTION entering FAC8 (Facility 8).  Inmate is expected at FAC8 (Facility 8)Arrest: 4, Charge: 1,  Court: SD11,  Court Dt/Tm: 01-
22-2019 0815, ROC: FP,  Document # : SCD275729
Event Dt: 22-JAN-19 20:36  Event Type: TRNL    Destination: SD111

Entered by: RALVARSH  Entry Dt:  22-JAN-19 20:36

Comments:
Inmate Leaving GBDF (George Bailey Detention Facility).  Next stop: FAC8 (Facility 8)Arrest: 4, Charge: 1,  Court: SD111,  Court
Dt/Tm: 01-22-2019 0815, ROC: FP,  Document # : SCD275729
Event Dt: 22-JAN-19 20:35  Event Type: TRNL    Destination: SD111

Entered by: RALVARSH  Entry Dt:  22-JAN-19 20:36

Comments:
Inmate Leaving GBDF (George Bailey Detention Facility).  Next stop: FAC8 (Facility 8)Arrest: 4, Charge: 1,  Court: SD111,  Court
Dt/Tm: 01-22-2019 0815, ROC: FP,  Document # : SCD275729
Event Dt: 22-JAN-19 18:45  Event Type: IN    Destination: IN

Entered by: JSOSAXSH  Entry Dt:  22-JAN-19 18:45

Comments:
Changed STATUS from CRT to IN.

EXHIBIT 14

CSD000350

JIMS - E000015

**San Diego County Sheriff**
**Inmate History Report**

Show all event types

Run Date: 15-JUL-2019
Run Time: 09:44

Page: 21 of 27
Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127    Name: GADSDEN, RONALD    Fac: 927  Area:    Hu:
Event Dt:22-JAN-19 16:19  Event Type: TRNR    Destination: SD111    Entered by: AGUTI3SH    Entry Dt:    22-JAN-19 16:19
Comments:

Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 4,    Charge: 1,    Court: SD111,    Court Dt/Tm: 01-22-2019 0815,    ROC: FP,
Document # : SCD275729
Event Dt:22-JAN-19 14:04  Event Type: TRNL    Destination: SD111    Entered by: CCORBESH    Entry Dt:    22-JAN-19 14:04 .
Comments:

Inmate Leaving CSB - San Diego Central.    Next stop:  GBDF (George Bailey Detention Facility)Arrest: 4,    Charge: 1,    Court: SD111,
Court Dt/Tm: 01-22-2019 0815,  ROC: FP,  Document # : SCD275729
Event Dt:22-JAN-19 10:21  Event Type: TRNR    Destination: SD111    Entered by: SRAMI2SH    Entry Dt:    22-JAN-19 10:21
Comments:

Inmate Entering CSB - San Diego Central.Arrest: 4,    Charge: 1,    Court: SD111,    Court Dt/Tm: 01-22-2019 0815,  ROC: FP,  Document # :
SCD275729
Event Dt:22-JAN-19 09:23  Event Type: TRNL    Destination: SD111    Entered by: ZBARNESH    Entry Dt:    22-JAN-19 09:23
Comments:

Inmate Leaving GBDF (George Bailey Detention Facility).  Next stop:  CSB - San Diego CentralArrest: 4,    Charge: 1,    Court: SD111,
Court Dt/Tm: 01-22-2019 0815,  ROC: FP,  Document # : SCD275729
Event Dt:22-JAN-19 03:37  Event Type: TRNR    Destination: SD111    Entered by: ZBARNESH    Entry Dt:    22-JAN-19 03:37
Comments:

Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 4,    Charge: 1,    Court: SD111,    Court Dt/Tm: 01-22-2019 0815,    ROC: FP,
Document # : SCD275729
Event Dt:22-JAN-19 01:01  Event Type: CRT    Destination: COURT    Entered by: MMCGRASH    Entry Dt:    22-JAN-19 01:01
Comments:

Changed STATUS from IN to CRT.
Event Dt:22-JAN-19 00:52  Event Type: TRNL - Destination: SD111    Entered by: MMCGRASH    Entry Dt:    22-JAN-19 00:52
Comments:

Inmate Leaving FAC8 (Facility 8).  Next stop:  GBDF (George Bailey Detention Facility)Arrest: 4,    Charge: 1,    Court: SD111,    Court
Dt/Tm: 01-22-2019 0815,  ROC: FP,  Document # : SCD275729
Event Dt:17-JAN-19 17:11  Event Type: IN    Destination: IN    Entered by: FWILL2SH    Entry Dt:    17-JAN-19 17:11
Comments:

Changed STATUS from SICK to IN.
Event Dt:17-JAN-19 13:55  Event Type: SICK    Destination:    Entered by: FWILL2SH    Entry Dt:    17-JAN-19 13:55
Comments:

Changed STATUS from SICK to SICK.

EXHIBIT 14

CSDD00351

JIMS - E000015        Name: GADSDEN, RONALD

Run Date: 15-JUL-2019
Run Time: 09:44

San Diego County Sheriff
Inmate History Report

Show all event types

Page: 22 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Booknum: 18181127        Name: GADSDEN, RONALD        Fac: 927  Area:  Hu:

Event Dt: 17-JAN-19 13:53  Event Type: SICK      Destination:              Entered by: FWILL2SH  Entry Dt: 17-JAN-19 13:53
Comments:
Changed STATUS from SICK to SICK.
Event Dt: 17-JAN-19 07:32  Event Type: SICK      Destination: SICK CALL    Entered by: FWILL2SH  Entry Dt: 17-JAN-19 07:32
Comments:
Changed STATUS from IN to SICK using flood fill.
Event Dt: 03-JAN-19 00:03  Event Type: TRNRES Destination:              Entered by: DULLOASH  Entry Dt: 03-JAN-19 00:04
                                             LV
Comments:
RESOLVED EXCEPTION
Event Dt: 03-JAN-19 00:00  Event Type: TRNEXC Destination: NC1          Entered by: DULLOASH  Entry Dt: 03-JAN-19 00:00
                                             PN
Comments:
EXCEPTION entering FAC8 (Facility 8). Inmate is expected at FAC8 (Facility 8)Arrest: 1, Charge: 1, Court: NC1, Court Dt/Tm: 01-02-
2019 0830, ROC: FP, Document # : CN358372
Event Dt: 02-JAN-19 21:34  Event Type: IN        Destination: IN           Entered by: DULLOASH  Entry Dt: 02-JAN-19 21:34
Comments:
Changed STATUS from CRT to IN using flood fill.
Event Dt: 02-JAN-19 18:28  Event Type: TRNL      Destination: NC1          Entered by: AFERRASH  Entry Dt: 02-JAN-19 18:28
Comments:
Inmate Leaving GBDF (George Bailey Detention Facility). Next stop: FAC8 (Facility 8)Arrest: 1, Charge: 1, Court: NC1, Court
Dt/Tm: 01-02-2019 0830, ROC: FP, Document # : CN358372
Event Dt: 02-JAN-19 18:27  Event Type: TRNR      Destination: NC1          Entered by: AFERRASH  Entry Dt: 02-JAN-19 18:27
Comments:
Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 1, Charge: 1, Court: NC1, Court Dt/Tm: 01-02-2019 0830, ROC: FP,
Document # : CN358372
Event Dt: 02-JAN-19 17:44  Event Type: TRNL      Destination: NC1          Entered by: CSIMMSSH  Entry Dt: 02-JAN-19 17:44
Comments:
Inmate Leaving SDCJ (San Diego Central Jail). Next stop: GBDF (George Bailey Detention Facility)Arrest: 1, Charge: 1, Court: NC1,
Court Dt/Tm: 01-02-2019 0830, ROC: FP, Document # : CN358372
Event Dt: 02-JAN-19 15:46  Event Type: TRNR      Destination: NC1          Entered by: CSIMMSSH  Entry Dt: 02-JAN-19 15:46
Comments:
Inmate Entering SDCJ (San Diego Central Jail).Arrest: 1, Charge: 1, Court: NC1, Court Dt/Tm: 01-02-2019 0830, ROC: FP, Document #
: CN358372

JIMS - E000015

Run Date:  15-JUL-2019
Run Time:  09:44

San Diego County Sheriff
Inmate History Report

Show all event types

Page: 23 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

EXHIBIT 14

Booknum: 18181127    Name: GADSDEN, RONALD    Fac: 927 Area:    Hu:

Event Dt: 02-JAN-19 15:40 Event Type: TRNL    Destination: NC1    Entered by: JBANKSSH    Entry Dt: 02-JAN-19 15:40
Comments:

Inmate Leaving CSB - North County.    Next stop: SDCJ (San Diego Central Jail)Arrest: 1, Charge: 1, Court: NC1,    Court Dt/Tm: 01-02-
2019 0830, ROC: FP, Document # : CN358372
Event Dt: 02-JAN-19 08:27 Event Type: TRNR    Destination: NC1    Entered by: ADUARTSH    Entry Dt: 02-JAN-19 08:27
Comments:

Inmate Entering CSB - North County.Arrest: 1, Charge: 1,    Court: NC1,    Court Dt/Tm: 01-02-2019 0830,    ROC: FP,    Document # : CN358372
Event Dt: 02-JAN-19 07:37 Event Type: TRNL    Destination: NC1    Entered by: JMONT1SH    Entry Dt: 02-JAN-19 07:37
Comments:

Inmate Leaving SDCJ (San Diego Central Jail).    Next stop: CSB - North CountyArrest: 1, Charge: 1, Court: NC1,    Court Dt/Tm: 01-02-
2019 0830, ROC: FP, Document # : CN358372
Event Dt: 02-JAN-19 06:55 Event Type: TRNR    Destination: NC1    Entered by: JMONT3SH    Entry Dt: 02-JAN-19 06:55
Comments:

Inmate Entering SDCJ (San Diego Central Jail).Arrest: 1, Charge: 1,    Court: NC1,    Court Dt/Tm: 01-02-2019 0830,    ROC: FP,    Document #
: CN358372
Event Dt: 02-JAN-19 05:33 Event Type: TRNL    Destination: NC1    Entered by: ZBARNESH    Entry Dt: 02-JAN-19 05:33
Comments:

Inmate Leaving GBDF (George Bailey Detention Facility).    Next stop: SDCJ (San Diego Central Jail)Arrest: 1, Charge: 1, Court: NC1,
Court Dt/Tm: 01-02-2019 0830, ROC: FP, Document # : CN358372
Event Dt: 02-JAN-19 03:44 Event Type: TRNR    Destination: NC1    Entered by: ZBARNESH    Entry Dt: 02-JAN-19 03:44
Comments:

Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 1, Charge: 1,    Court: NC1,    Court Dt/Tm: 01-02-2019 0830,    ROC: FP,
Document # : CN358372
Event Dt: 02-JAN-19 03:27 Event Type: TRNL    Destination: NC1    Entered by: JOSEGUSH    Entry Dt: 02-JAN-19 03:27
Comments:

Inmate Leaving FAC8 (Facility 8).    Next stop: GBDF (George Bailey Detention Facility)Arrest: 1, Charge: 1,    Court: NC1,    Court
Dt/Tm: 01-02-2019 0830, ROC: FP, Document # : CN358372
Event Dt: 02-JAN-19 01:18 Event Type: CRT    Destination: COURT    Entered by: JOSEGUSH    Entry Dt: 02-JAN-19 01:18
Comments:

Changed STATUS from IN to CRT.
Event Dt: 01-JAN-19 23:55 Event Type: TRNRES Destination:    Entered by: JOSEGUSH    Entry Dt: 01-JAN-19 23:55
                                                LV
Comments:

RESOLVED EXCEPTION

CSD000352

EXHIBIT 14

CSD00353

JIMS - E000015

Run Date: 15-JUL-2019
Run Time: 09:44

San Diego County Sheriff
Inmate History Report

Show all event types

Booknum: 18181127    Name: GADSDEN, RONALD    Fac: 927 Area:    Hu:

Event Dt:01-JAN-19 23:54 Event Type: TRNEXC Destination:SD011    Entered by: JOSEGUSH    Entry Dt: 01-JAN-19 23:54
                                               PN
Comments:

EXCEPTION entering FAC8 (Facility 8). Inmate is expected at FAC8 (Facility 8)Arrest: 4, Charge: 1, Court: SD011, Court Dt/Tm: 12-
31-2018 0900, ROC: COTP, Document # : SCD275729
Event Dt:31-DEC-18 15:07 Event Type: TRNL    Destination: SD011    Entered by: AGUTI13SH    Entry Dt: 31-DEC-18 15:07
Comments:

Inmate Leaving GBDF (George Bailey Detention Facility). Next stop: FAC8 (Facility 8)Arrest: 4, Charge: 1, Court: SD011, Court
Dt/Tm: 12-31-2018 0900, ROC: COTP, Document # : SCD275729
Event Dt:31-DEC-18 15:06 Event Type: TRNR    Destination: SD011    Entered by: AGUTI13SH    Entry Dt: 31-DEC-18 15:06
Comments:

Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 4, Charge: 1, Court: SD011, Court Dt/Tm: 12-31-2018 0900, ROC:
COTP, Document # : SCD275729
Event Dt:31-DEC-18 14:36 Event Type: IN    Destination: IN    Entered by: GTELLOSH    Entry Dt: 31-DEC-18 14:36
Comments:

Changed STATUS from CRT to IN.
Event Dt:31-DEC-18 13:00 Event Type: TRNL    Destination: SD011    Entered by: AFABIASH    Entry Dt: 31-DEC-18 13:00
Comments:

Inmate Leaving CSB - San Diego Central. Next stop: GBDF (George Bailey Detention Facility)Arrest: 4, Charge: 1, Court: SD011,
Court Dt/Tm: 12-31-2018 0900, ROC: COTP, Document # : SCD275729
Event Dt:31-DEC-18 08:13 Event Type: TRNR    Destination: SD011    Entered by: GBARR2SH    Entry Dt: 31-DEC-18 08:13
Comments:

Inmate Entering CSB - San Diego Central.Arrest: 4, Charge: 1, Court: SD011, Court Dt/Tm: 12-31-2018 0900, ROC: COTP, Document # :
SCD275729
Event Dt:31-DEC-18 06:42 Event Type: TRNL    Destination: SD011    Entered by: ZBARNESH    Entry Dt: 31-DEC-18 06:42
Comments:

Inmate Leaving GBDF (George Bailey Detention Facility). Next stop: CSB - San Diego CentralArrest: 4, Charge: 1, Court: SD011,
Court Dt/Tm: 12-31-2018 0900, ROC: COTP, Document # : SCD275729
Event Dt:31-DEC-18 03:47 Event Type: TRNR    Destination: SD011    Entered by: ZBARNESH    Entry Dt: 31-DEC-18 03:47
Comments:

Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 4, Charge: 1, Court: SD011, Court Dt/Tm: 12-31-2018 0900, ROC:
COTP, Document # : SCD275729
Event Dt:31-DEC-18 03:38 Event Type: CRT    Destination: COURT    Entered by: DULLOASH    Entry Dt: 31-DEC-18 03:38
Comments:

Changed STATUS from IN to CRT using flood fill.

EXHIBIT 14

CSD000354

JIMS - E000015

San Diego County Sheriff
Inmate History Report

Show all event types

Page: 25 of 27

Effective Date:
01-JAN-2000
TO 15-JUL-2019

Run Date:   15-JUL-2019
Run Time:   09:44

Booknum: 18181127        Name: GADSDEN, RONALD        Fac: 927   Area:        Hu:

Event Dt: 31-DEC-18 03:26  Event Type: TRNL   Destination: SD011              Entered by: DULLOASH   Entry Dt: 31-DEC-18 03:26

Comments:

Inmate Leaving FAC8 (Facility 8). Next stop: GBDF (George Bailey Detention Facility)Arrest: 4, Charge: 1, Court: SD011, Court
Dt/Tm: 12-31-2018 0900, ROC: COTP, Document # : SCD275729

Event Dt: 28-DEC-18 14:24  Event Type: PCAL   Destination: PHONE CALL         Entered by: FWILL2SH   Entry Dt: 28-DEC-18 14:26

Comments:

Attorny call back 619-338-4632   Att Mangarin

Event Dt: 28-DEC-18 00:07  Event Type: TRNRES  Destination:                   Entered by: DULLOASH   Entry Dt: 28-DEC-18 00:07
                                              LV
Comments:

RESOLVED EXCEPTION

Event Dt: 28-DEC-18 00:04  Event Type: TRNEXC  Destination: 008               Entered by: DULLOASH   Entry Dt: 28-DEC-18 00:04
                                              PN
Comments:

EXCEPTION entering FAC8 (Facility 8).  Inmate is expected at FAC8 (Facility 8)VDF to FAC8Daily Transfers

Event Dt: 27-DEC-18 10:39  Event Type: MOVE   Destination: NEW HOUSING        Entered by: FWILL2SH   Entry Dt: 27-DEC-18 10:39

Comments:

Moved Book #18181127 TO fac 8 area 1 hu C cell 246 bed T.

Event Dt: 27-DEC-18 10:31  Event Type: TRNL   Destination: 008                Entered by: ZBARNESH   Entry Dt: 27-DEC-18 10:31

Comments:

Inmate Leaving GBDF (George Bailey Detention Facility).  Next stop:  FAC8 (Facility 8)VDF to FAC8Daily Transfers

Event Dt: 27-DEC-18 10:30  Event Type: TRNR   Destination: 008                Entered by: ZBARNESH   Entry Dt: 27-DEC-18 10:30

Comments:

Inmate Entering GBDF (George Bailey Detention Facility).VDF to FAC8Daily Transfers

Event Dt: 27-DEC-18 09:25  Event Type: TRNL   Destination: 008                Entered by: JMONT3SH   Entry Dt: 27-DEC-18 09:25

Comments:

Inmate Leaving SDCJ (San Diego Central Jail).  Next stop:  GBDF (George Bailey Detention Facility)VDF to FAC8Daily Transfers

Event Dt: 27-DEC-18 05:40  Event Type: MOVE   Destination: NEW HOUSING        Entered by: GBIGUYSH   Entry Dt: 27-DEC-18 05:40

Comments:

Moved Book #18181127 TO fac 8 area X

Event Dt: 27-DEC-18 05:40  Event Type: RELSTO  Destination: RELEASE STORAGE    Entered by: GBIGUYSH   Entry Dt: 27-DEC-18 05:40

Comments:

VIBIN: 000057, VIHANGER: 000398

Event Dt: 27-DEC-18 05:40  Event Type: XVIS   Destination: NEW HOUSING        Entered by: GBIGUYSH   Entry Dt: 27-DEC-18 05:40

Comments:

Deleted future visits because of facility transfer

EXHIBIT 14

CSDD000355

```
JIMS - E000015                          San Diego County Sheriff                          Page: 26 of 27
                                        Inmate History Report
Run Date:  15-JUL-2019                                                                    Effective Date:
Run Time:  09:44                        Show all event types                                01-JAN-2000
                                                                                          TO 15-JUL-2019

Booknum: 18181127        Name: GADSDEN, RONALD              Fac: 927  Area:            Hu:
Event Dt: 27-DEC-18 05:37  Event Type: TRNR    Destination: 008
Comments:

Inmate Entering SDCJ (San Diego Central Jail).VDF to FACBDaily Transfers               Entered by: JMONT3SH   Entry Dt: 27-DEC-18 05:37
Event Dt: 27-DEC-18 05:36  Event Type: TRNL    Destination: 008
Comments:

Inmate Leaving VDF (Vista Detention Facility).  Next stop:  SDCJ (San Diego Central Jail)VDF to FACBDaily Transfers  Entered by: GBIGUYSH   Entry Dt: 27-DEC-18 05:36
Event Dt: 27-DEC-18 05:08  Event Type: MOVE    Destination: NEW HOUSING
Comments:

Moved Book #18181127 FROM fac 7 area NM hu 4 cell 22 bed B TO fac 7 area X .          Entered by: EFLOR2SH   Entry Dt: 27-DEC-18 05:08
Event Dt: 26-DEC-18 15:36  Event Type: TRNR    Destination: NCV
Comments:

Inmate Entering VDF (Vista Detention Facility).Arrest: 1,  Charge: 1,  Court: NCV,  Court Dt/Tm: 12/26/2018 08:00:00,  ROC: ARR,  Entered by: GBIGUYSH   Entry Dt: 26-DEC-18 15:36
Court Case #: CN358372
Event Dt: 26-DEC-18 15:10  Event Type: TRNL    Destination: NCV                        Entered by: LRODR4SH   Entry Dt: 26-DEC-18 15:10
Comments:

Inmate Leaving CSB - North County.  Next stop:  VDF (Vista Detention Facility)Arrest: 1,  Charge: 1,  Court: NCV,  Court Dt/Tm:
12/26/2018 08:00:00,  ROC: ARR,  Court Case #: CN358372
Event Dt: 26-DEC-18 13:07  Event Type: IN     Destination: IN                          Entered by: JFRAGOSH   Entry Dt: 26-DEC-18 13:07
Comments:

Changed STATUS from CRT to IN using flood fill.                                        Entered by: MRIEBESH   Entry Dt: 26-DEC-18 09:01
Event Dt: 26-DEC-18 09:01  Event Type: CRT    Destination: COURT
Comments:

Changed STATUS from IN to CRT using flood fill.                                        Entered by: LRODR4SH   Entry Dt: 26-DEC-18 06:18
Event Dt: 26-DEC-18 06:18  Event Type: TRNR    Destination: NCV
Comments:

Inmate Entering CSB - North County.Arrest: 1,  Charge: 1,  Court: NCV,  Court Dt/Tm: 12/26/2018 08:00:00,  ROC: ARR,  Court Case #:
CN358372
Event Dt: 26-DEC-18 04:45  Event Type: TRNL    Destination: NCV                        Entered by: GBIGUYSH   Entry Dt: 26-DEC-18 04:45
Comments:

Inmate Leaving VDF (Vista Detention Facility).  Next stop:  CSB - North CountyArrest: 1,  Charge: 1,  Court: NCV,  Court Dt/Tm:
12/26/2018 08:00:00,  ROC: ARR,  Court Case #: CN358372
Event Dt: 24-DEC-18 20:51  Event Type: BADM    Destination: NEW HOUSING                Entered by: PPALUMSH   Entry Dt: 24-DEC-18 20:51
Comments:

Moved Book #18181127 TO fac 7 area NM hu 4 cell 22 bed B.Class Mismatch:   Res Class=4  Cell Class=1-3
```

EXHIBIT 14

CSD00356

JIMS - E000015                    San Diego County Sheriff                    Page: 27 of 27

Run Date:  15-JUL-2019              Inmate History Report                Effective Date:
Run Time:  09:44                    Show all event types                   01-JAN-2000
                                                                          TO 15-JUL-2019

Booknum: 18181127      Name: GADSDEN, RONALD       Fac: 927 Area:       Hu:
Event Dt: 24-DEC-18 20:51  Event Type: MOVE    Destination: NEW HOUSING    Entered by: PPALUMSH   Entry Dt: 24-DEC-18 20:51
Comments:
  Moved Book #18181127 TO fac 7 area NM hu 4 cell 22 bed B.Class Mismatch:  Res Class=4  Cell Class=1-3
Event Dt: 24-DEC-18 20:02  Event Type: MOVE    Destination: NEW HOUSING    Entered by: CWEBSTSH   Entry Dt: 24-DEC-18 20:02
Comments:
  Moved Book #18181127 FROM fac 7 area RM hu BK cell 4 bed 005 TO fac 7 area X -
Event Dt: 24-DEC-18 06:35  Event Type: WW      Destination: WANTS/WARRANTS CHECK    Entered by: SCLAR3SH   Entry Dt: 24-DEC-18 06:35
Comments:
  Initial Clearance set to C
Event Dt: 24-DEC-18 04:37  Event Type: RELSTO  Destination: RELEASE STORAGE    Entered by: TBRUMMSH   Entry Dt: 24-DEC-18 04:37
Comments:
  VIBIN: 000057
Event Dt: 23-DEC-18 22:08  Event Type: MOVE    Destination: NEW HOUSING    Entered by: ASAENZSH   Entry Dt: 23-DEC-18 22:08
Comments:
  Moved Book #18181127 TO fac 7 area RM hu BK cell 4 bed 005.

EXHIBIT 15

Cam 112

Module C

Dayroom 181


See Physical CD Lodged Concurrently with Motion

EXHIBIT 16

Cam 113

Module C

Dayroom 181


See Physical CD Lodged Concurrently with Motion

# EXHIBIT 17

Cam 115

Module C

Dayroom 181

See Physical CD Lodged Concurrently with Motion