ALEX COOLMAN (SBN 250911)
**THE LAW OFFICE OF ALEX COOLMAN**
3268 Governor Drive #390
San Diego, CA 92122
T: (619) 831-7129
E-mail: alex@coolmanlaw.com

Attorney for Plaintiff
**RONALD EARL GADSDEN**

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RONALD EARL GADSDEN,** | **Case No.: 20-cv-02258-WQH-DEB** |
| **Plaintiff,** | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **vs.** | |
| **JOHN GEHRIS, Deputy Sheriff, MICHAEL MCGRATH, Deputy Sheriff** | The Honorable Daniel E. Butcher, Magistrate Judge |
| **Defendants.** | |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................**4**

**STATEMENT OF FACTS** ......................................................................**5**

**ARGUMENT**.........................................................................................**12**

    1.In Responding to Defendant's Motion for Summary This Court Must Accept Plaintiff's Facts and Draw All Inferences in Plaintiff's Favor, Which Defendant's Argument Repeatedly Fails to Do..............................................12

    2..McGrath's Reference to the "IA Form" in His Own Incident Report and His Lack of Any Reference in that Same Report to Any Significant Misconduct By Gadsden Supports an Inference of Retaliatory Motive.  This Inference is Also Supported By Numerous Contextual Factors that McGrath's Motion Ignores.........................................................................................................13

    3.The Evidence of McGrath's Retaliatory Motive, As Well as the Disconnect Between the San Diego Sheriff's Own Disciplinary Policies and the Actions Taken By McGrath, Shows that McGrath's Actions Did Not Reasonably Advance a Legitimate Correctional Goal.  As Gadsden's Correctional Expert Indicated, McGrath's Actions Represented the "Extreme End" of Behavior Management and Were Unwarranted by the Circumstances. .........................18

    4.It Has Been Clearly Established Law for Decades That Correctional Officers May Not Retaliate Against Detainees When Detainees Attempt to Use Grievance Systems.  Qualified Immunity Does Not Apply. ...........................21

**CONCLUSION** ....................................................................................**23**

_____
PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**FEDERAL CONSTITUTION**

U.S. Const. 1st Amend. ...................................................................4, 21, 22

U.S. Const., 7th Amend. ..............................................................................12

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................12

*Austin v. Terhune*, 367 F.3d 1167 (9th Cir. 2004)....................................................20

*Bledsoe v. Martinez*, 2:18-cv-2710 KJM KJN P, 2022 U.S. Dist. LEXIS 134402

   (E.D. Cal. 2022) .....................................................................................14

*Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009) .....................................................21

*Bruce v. Ylst*, 351 F.3d 1283 (9th Cir. 2003)...............................................17, 20, 22

*Garcia v. Blahnik*, No. 14cv875-LAB (BGS), 2017 U.S. Dist. LEXIS 47135 (S.D.

   Cal. Mar. 29, 2017) ...............................................................................23

*Kandi v. Langford*, CV 17-3617 FMO(JC), 2018 U.S. Dist. LEXIS 195259 (C.D.

   Cal. 2018)..............................................................................................14

*McCollum v. CDCR*, 647 F.3d 870 (9th Cir. 2011)..........................................15, 16

*Nev. Dep't of Corr. V. Greene*, 648 F.3d 1014 (9th Cir. 2011) ...........................18

*Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916 (9th Cir. 2004)......................12

*Pratt v. Rowland*, 65 F.3d 802 (9th Cir. 1995)........................................................22

*Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005) ...........................................18, 22

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

**INTRODUCTION**

Plaintiff Ronald Gadsden brings this case for First Amendment Retaliation based on his experience as a detainee of the San Diego County Jail of having his future scheduled family visits cancelled, being moved out of his housing area, and being moved to an extremely dirty segregation cell for seven days because he asked Defendant Michael McGrath, who was at that time a Sheriff's Deputy working in the jail, to give him an Internal Affairs form.

The retaliatory nature of McGrath's actions can reasonably be inferred both because of what McGrath stated in his own Incident Report about what occurred – namely that he took action against Gadsden after Gadsden requested an "IA form" – and because of what McGrath did *not* state in the same report – namely, that Gadsden engaged in any form of misconduct that would normally justify the actions taken against him. In fact, that Report simply indicates that Gadsden and McGrath had a conversation over an intercom.  A few hours after this conversation, McGrath returned to the question of the "IA form" and asked Gadsden whether he still wanted it.  When Gadsden said he did, McGrath immediately told Gadsden to roll up his property, and had him transferred.  The motive for these actions, it can reasonably be inferred, was McGrath's desire to chill Gadsden's attempt to access Internal Affairs.

McGrath has moved for summary judgment, arguing that a retaliatory motive cannot be established, that it cannot be shown that his actions did not reasonably advance a legitimate correctional goal, and that qualified immunity applies to his actions.  ECF 62-1 at 7-10.[1]  In making these arguments, McGrath repeatedly ignores both the factual presumptions that apply in this context and a

---

[1] Citations to this document are to the pagination assigned by the ECF system, which differs slightly from the pagination of the original document.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

significant body of evidence that bears directly on the issues.  All of these claims are based on disputed facts, and the facts are to be viewed in the light most favorable to Gadsden for purposes of deciding this motion. The claim of qualified immunity is also unsupported, as it has long been clearly established (by a line of cases that McGrath omits) that it is against the law for correctional officers to retaliate against inmates for attempting to use the grievance procedures of jails and prisons.

The defense's motion should therefore be denied in its entirety.

## STATEMENT OF FACTS

Viewed in the light most favorable to Gadsden as the non-movant, the facts are the following:

On February 15, 2019, Gadsden was incarcerated in cell 241, module, C of Facility 8 of the San Diego County Jail.  Module C is a wedge-shaped housing area, with two tiers of cells forming the broad base of the wedge, as depicted in Defendant's Exhibit 17, Cam 115.

At the narrow tip of the wedge of Module C is a two-story control area with one-way glass, from which correctional officers can monitor the activities of the module.  Defendant Michael McGrath, who was working an overnight shift at the jail on February 15, 2019, was in this control area at all relevant times. (Deposition of Michael McGrath ("McGrath Depo.") 9:3-5.)

On the wall of the day room of Module C are two video kiosks that can be used by jail detainees to conduct video visits, as shown in Defense Exhibit 16, Cam 113.  The video visits are scheduled by persons who wish to call *into* the jail, who use a website to set up the visits.  (Deposition of Tina Jaworksi ("Jaworski Depo.") 12:18-14:3; Deposition of Ronald Gadsden ("Gadsden Depo.") 45:1-20.) Tina Jaworski, the girlfriend of Gadsden, used this website to schedule a video

visit with Gadsden to occur on the evening of February 15, 2019.  (Jaworski Depo. 23:19-24:9.)

Gadsden checked the video kiosk schedule on the morning of February 15th and noted that he had a video visit with Jaworski scheduled to begin at 7 p.m. (Gadsden Depo. 49:1-9.)  Prior to February 15, Gadsden's experience had typically been that the door to his cell would be popped open at the scheduled time for his visit and a guard would announce "Gadsden, you have a visit."  (Gadsden Depo. 56:11-15.)

At around 7 p.m. on February 15, Gadsden watched through the door of his own cell (which faced directly onto the day room) as another inmate was released from his cell, walked over to the video kiosks, and began using one of the kiosks. (Gadsden Depo. 56:20-25.)  Surveillance video from Facility 8 on this evening shows this individual exiting his cell, walking over to the kiosks, pulling up a chair, and sitting in front of a kiosk for about half an hour. (See Defense Ex. 16, Cam 113, starting at 19:11.)

Gadsden, however, was not released from his cell even as the time to start the visit with Jaworski arrived and a few additional minutes passed.  (See Gadsden Depo. 60:1-3.)  At some point roughly a few minutes after 7 p.m., he therefore pushed the button on the intercom in his cell, which allowed him to speak to Defendant McGrath in the control area.  (Gadsden Depo. 60:3-19; McGrath Depo. 20:12.) McGrath answered: "How can I help you?"  (Gadsden Depo. 60:23.) Gadsden said: "I have a video visit.  Can you open my door, please?"  (Gadsden Depo. 61:4-5.)

McGrath did not respond.  (Gadsden Depo. 61:9-10.)  McGrath hung up on Gadsden.  (McGrath Depo. 29:22-30:4.) Gadsden heard only silence.  (Gadsden Depo. 61:24-25.) Gadsden walked over to the door of his cell, assuming that the door was about to be opened, but it did not open.  (Gadsden Depo. 61:25-62:2.)

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Gadsden pressed the intercom button a second time, roughly a minute after he had pressed it the first time.  (Gadsden Depo. 63:11-16.)  McGrath again said "How can I help you?"  (Gadsden Depo. 64:4.)  Gadsden said: "I have a video visit.  This is the third time you guys have done this.  Can you pop my door, please."  (Gadsden Depo. 64:10-12.)

McGrath replied: "Check your tone."  (Gadsden Depo. 64:20.)   Again, Gadsden waited for the cell door to be opened, but again McGrath did not open the door for Gadsden to conduct his visit.  (Gadsden Depo. 65:16-17.)

A "soft count" of inmates in the module that began around 7 p.m. was completed at 7:10 p.m., but McGrath still did not release Gadsden to conduct his visit.  (Ex. 9, Area Activities Summary Report, 5.)

Gadsden waited for five or six minutes, but the door still did not open.  (Gadsden Depo. 65:19-20.) He pressed the intercom button a third time.  (Gadsden Depo. 66:9-10.) Again, McGrath answered "How can I help you?"  (Gadsden Depo. 66:17.) Gadsden said: "This is the third time this has happened.  I don't know what the problem is, but I – are you going to give me my video visit?  We're already 12 minutes or whatever into my visit.  It's not the fault that like – the people that secure these visits shouldn't be getting penalized for whatever reason.  They pay for the stuff.  They should get their full 30 minutes."  (Gadsden Depo. 66:23-67:5.) McGrath responded that the visit was canceled.  (Gadsden Depo. 67:11-12.) Gadsden pushed the intercom button again and said "Who am I talking to?" (Gadsden Depo. 70:9-18.) McGrath identified himself.  (Gadsden Depo. 70:22-23.)

Gadsden told McGrath: "I don't know what your deal is or what your problem is with me, but you're being a bully right now and I need an IA form."  (Gadsden Depo. 81:12-14.)  McGrath replied "You want an IA form."  (Gadsden

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Depo. 81:16.)  Gadsden said: "Yes.  This is bullshit.  I want an IA form."
(Gadsden Depo. 81:17-18.)

In his Incident Report, McGrath's description of the same moment was that
Gadsden said: "Fuck this, I need an IA form."  (Ex. 19, Incident Report of
February 15, 2019, 2.)  McGrath understood the term "IA form" to refer to an
Internal Affairs form.  (McGrath Depo. 32:20-33:2.) The purpose of the Internal
Affairs Department of the San Diego Sheriff is to investigate allegations of
misconduct by employees of the Sheriff's Department.  (Deposition of Alex Doyle
("Doyle Depo.") 7:12-21.) Internal Affairs forms are used to start investigations
related to misconduct. (Doyle Depo. 11:23-25-12:1-3.) The Sheriff's
Department's policy is to provide such a form to a detainee if a detainee requests
one.  (Doyle Depo. 12:13-19.)

Although detainees were allowed to use the day room later in the evening on
February 15, 2019, McGrath did not permit Gadsden out of his cell to use the day
room.  (Gadsden Depo. 96:3, Ex. 9, Area Activities Summary Report, 4 [noting
"DAYROOM/ PHONE TIME" resumed for Module C at 2035].)

A few hours later on the night of the 15th, as Gadsden was still confined to
his cell, McGrath spoke to Gadsden through the intercom again and said "Do you
still want an IA form?"  (Gadsden Depo. 104:17-18.)  Gadsden replied: Yes."
(Gadsden Depo. 104:19.)  McGrath replied: "Roll your stuff up.  You're being
transferred."  (Gadsden Depo. 104:25-105:1.)

Gadsden was given garbage bags for his property.  (Gadsden Depo. 107:14-
17.)  He went down to the sallyport, was handcuffed, and was taken out of the
module.  (Gadsden Depo. 112:8-12.)  He "felt paraded" in front of all the other
detainees in the module, who were asking him what was going on and where he
was going.  (Gadsden Depo. 184:9-14.) Gadsden explained to these people that he

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

did not know what was going on.  (Gadsden Depo. 184:15-16.)  It was not normal for transfers to occur late at night on a Friday.  (Gadsden Depo. 181:20-22.)

Gadsden was given a form indicating that he had a right to an immediate disciplinary hearing, and he requested an immediate hearing.  (Ex. 21, Request for Immediate Hearing.)  However, no immediate hearing took place.

McGrath's Incident Report related to the conversation over the intercom stated that Gadsden "will be transferred to George Bailey Detention Facility (GBDF) House 6 Module A with all his module property."  (Ex. 19, Incident Report,[2] 2.)  McGrath's Report stated: "I recommend he not be housed at FAC 8." (Ex. 19, Incident Report, 2.)

McGrath did not consult with a supervisor in ordering that Gadsden be moved to segregation.  (Ex. 6, McGrath's Responses to Interrogatories, Set One, 8.)

At 10:47 p.m. on February 15, 2019, McGrath deleted all of Gadsden's future scheduled visits.  (Ex. 18, event of 2047.)

On the evening of February 15, 2019, Gadsden was moved initially to a holding cell and then to a cell in Module A of Housing Unit 6, as the Incident Report said would occur.  (Ex. 19, Incident Report, 2.)

Conditions in this segregation cell were extremely unsanitary, with large quantities of hair and feces spread around the walls and floor of the cell.  (Gadsden Depo. 185:16 – 186:8.)  Gadsden's cellmate in this cell was a suicidal military veteran.  (Gadsden Depo. 172:12-16.)  Gadsden worried that he was being set up to be killed or injured.  (Gadsden Depo. 172:23-173:5.)

After Gadsden had been in the segregation cell for a little over 72 hours, Sergeant Kurtis Kellas spoke to Gadsden briefly at his cell at 1:35 a.m. on February 18, 2019.  (Ex. 20, Discipline Hearing Report, 1 [noting hearing time of

---

[2] The term "Incident Report," when not accompanied by any specific date, refers to the Incident Report of February 15, 2019.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

"0135"].) Kellas wrote up paperwork claiming that this 1:35 a.m. meeting was a "disciplinary hearing" and that in the hearing Gadsden declared himself guilty of all charges.  (Ex. 20, Discipline Hearing Report, 1.) Kellas acknowledged that Gadsden would have had a right to call witnesses in a disciplinary hearing and that no witnesses had been called at this 1:35 a.m. conversation.  (Deposition of Kurtis Kellas ("Kellas Depo.") 8:22-25.) Sergeant John Gehris, who supervised housing in Unit 6, testified that no witness is *ever* allowed into that unit, and that he has never seen it occur at all.  (Deposition of John Gehris ("Gehris Depo.") 7:15-21, 25:10-26:12.) Gadsden kept contemporaneous notes of his experiences in segregation and wrote in those notes both that he refused to sign a form admitting guilt and that, at exactly 1:35 a.m. on February 18, 2019, he had a conversation with a sergeant who told Gadsden "that he would read the report and get back to me."  (Ex. 7, Gadsden's Contemporaneous Notes from Segregation.)  Gadsden was not informed that this 1:35 a.m. conversation was intended to be a disciplinary hearing, and Gadsden did not tell Sergeant Kellas that he was "guilty" of anything. (Ex. 8, Declaration of Ronald Gadsden.)

Gadsden was ultimately released from segregation on February 21, 2015, on his seventh day.  (Gadsden Depo. 126:14-23.)

The San Diego Sheriff's Department's discipline policy is intended to be "progressive," meaning that the degree of discipline imposed is supposed to be calibrated to the severity of the conduct by a detainee and the detainee's prior history of discipline issues.  (Deposition of Sergeant Desan Tyson ("Tyson Depo.") 22:9 – 23:19, Kellas Depo. 11:8 – 12:12.) Under the Sheriff's policy, both cancelling visits and the use of disciplinary segregation are forms of "major" discipline. (Ex. 1, Lesson Plan – Inmate Discipline, 1.) When asked at his deposition to list examples of "minor" disciplinary violations, McGrath stated: "disrespect to staff, boisterous activity, interfering with jail operations" – i.e., the

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

conduct he listed in his own Incident Report. (McGrath Depo. 54:24-25; see Ex. 19, Incident Report, 2.)

There is no evidence that Gadsden had any history of disciplinary problems in the jail prior to February 15, 2019.

**McGrath's Response to Other Disciplinary Incidents**

On November 12, 2018, McGrath responded to an incident in Facility 8 in which a detainee was ripping up his jail-issued blue plants. McGrath gave this detainee a verbal warning and had his pants replaced. No other discipline was imposed. (Ex. 2, Incident Report of November 12, 2018.)

On March 18, 2019, McGrath responded to an incident in which a detainee tore off his wrist band and threw it in the trash. McGrath gave this detainee a verbal warning, and no other discipline was imposed. (Ex. 3, Incident Report of March 18, 2019.)

On April 16, 2019, McGrath responded to an incident in which a detainee was being "very boisterous and rude" while nurses were trying to treat the detainee. No disciplined was imposed. (Ex. 4, Incident Report of April 16, 2019, 1-2.)

On July 23, 2019, McGrath responded to an incident in which two detainees were walking around a dayroom without permission and ignored his warning to lock down. (Ex. 5, Incident Report of July 23, 2019, 2.) McGrath gave these detainees a verbal warning, and no other discipline was imposed. (*Id.* at 1.)

//

//

//

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# ARGUMENT

1. **In Responding to Defendant's Motion for Summary This Court Must Accept Plaintiff's Facts and Draw All Inferences in Plaintiff's Favor, Which Defendant's Argument Repeatedly Fails to Do.**

McGrath's motion for summary judgment disregards the summary judgment principle, grounded in the Seventh Amendment guarantee of a jury trial, that the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* A court "must determine, viewing the evidence in the light most favorable to . . . the non-moving party, whether there are any genuine issues of material fact." *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004).

Not only does McGrath's motion not apply that standard, it omits many of the basic facts that support Gadsden's position, and characterizes as "undisputed" issues that are very much in dispute.  Some of McGrath's most notable failures to properly apply the summary judgment standard include:

- Omitting the fact that McGrath's *own Incident Report* explicitly quotes Gadsden as having said "Fuck this, I need an IA form" in explaining why McGrath took action against Gadsden. (Ex. 19, Incident Report of February 15, 2019, 2.)

- Omitting Gadsden's allegation that McGrath re-contacted him and asked him whether he "still wanted that IA form" immediately before informing Gadsden that he was being transferred. (Gadsden Depo. 104:17-18.)

- Asserting that it is "undisputed" that a sergeant needed to approve transferring Gadsden when McGrath's own statement in his response to an interrogatory was that he did *not* consult with any supervisor before

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

having Gadsden moved. (Ex. 6, McGrath's Responses to Interrogatories, Set One, 8.)

- Asserting that rule violations are flatly "not tolerated" in Facility 8 when McGrath's own Incident Reports from other dates show that that is not the case.  (Ex. 2, Incident Report of November 12, 2018.)

- Omitting the fact that McGrath's Incident Report explicitly states: "I recommend [Gadsden] not be housed at FAC 8."  (Ex. 19, Incident Report, 2.)

- Omitting the fact that McGrath personally cancelled Gadsden's future visits on the evening of February 15, 2019. (Ex. 18, event of 2047.)

All of these facts are obviously relevant to the inquiry, and yet they are simply missing from the defense's motion.  Application of the basic presumptions that apply in evaluating McGrath's motion should result in denial of summary judgment.

**2. McGrath's Reference to the "IA Form" in His Own Incident Report and His Lack of Any Reference in that Same Report to Any Significant Misconduct By Gadsden Supports an Inference of Retaliatory Motive. This Inference is Also Supported By Numerous Contextual Factors that McGrath's Motion Ignores.**

Defendant argues that the evidence does not show "any retaliatory motive" contributing to his decision to write up Gadsden, cancel all his future visits, confine him to his cell, have him transferred to segregation, and recommend that he never again be housed in Facility 8.  ECF 62-1 at 7.  That is a conclusion that can only be urged by ignoring the standard that applies on summary judgment, which requires taking the facts in the light most favorable to Gadsden.

McGrath's own Incident Report explicitly refers to Gadsden's request for an "IA form." (Ex. 19, Incident Report, 2.)  A fact-finder could reasonably conclude

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

that McGrath included the reference to the "IA form" in his report because the reference to an "IA form" was significant to McGrath and contributed to McGrath's decision to take action against Gadsden, whether or not Gadsden had done anything that justified the actions that were taken against him.  See, e.g., *Bledsoe v. Martinez*, 2:18-cv-2710 KJM KJN P, 2022 U.S. Dist. LEXIS 134402 at * 27-28 (E.D. Cal. 2022) (sergeant's statements in his own report, and tension between those statements and his declaration "raise[] an inference of a retaliatory motive"); *Kandi v. Langford*, CV 17-3617 FMO(JC), 2018 U.S. Dist. LEXIS 195259 * 31 (C.D. Cal. 2018) (noting that "pretextual reasons for the Incident Report ... might plausibly raise an inference of retaliatory motive").

The Incident Report is also notable in what it does *not* describe: namely, any form of misconduct that would warrant the discipline that was imposed, given the Sheriff Department's policies on discipline. It is undisputed that Gadsden had a scheduled video visit, that he asked McGrath to open his door to permit him to participate in the visit, and that McGrath instead repeatedly hung up on him and then abruptly canceled the visit altogether. A fact-finder could reasonably conclude that for Gadsden to state "fuck this, I need an IA form" in response to this baffling situation was not "misconduct" at all, and certainly not misconduct that warranted cancelling his future visits, recommending that he no longer be housed in Facility 8, and transferring him to segregation. Thus, both what is included in McGrath's Incident Report and what is missing from that report, viewed in the light most favorable to Gadsden, support an inference that McGrath acted in substantial part because of a retaliatory motive.

Numerous contextual factors also support this conclusion.

First, Gadsden's testimony is that after the initial series of conversations about the visit, McGrath later came back on the intercom and asked Gadsden again whether he still wanted the IA form.  (Gadsden Depo. 104:17-18.)  When Gadsden

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

replied that he did, McGrath told him: "Roll your stuff up.  You're being transferred."  (Gadsden Depo. 104:25-105:1.) The tight temporal proximity between this renewed reference to the "IA form" and the order for Gadsden to roll up his property bears on the question of whether the reference to the "IA form" was significant to McGrath.  See *McCollum v. CDCR*, 647 F.3d 870, 882 (9th Cir. 2011) ("proximity in time between the protected conduct and the alleged retaliation" circumstantially supports an inference of retaliatory motive).

Second, the San Diego Sheriff's Department maintains a discipline policy that is intended to be "progressive," meaning that the degree of discipline imposed is supposed to be calibrated to the severity of the conduct by a detainee and the detainee's prior history of discipline issues.  (Tyson Depo. 22:9 – 23:19, Kellas Depo. 11:8 – 12:12.) Under the Sheriff's policy, both cancelling visits and the use of disciplinary segregation are forms of "major" discipline. (Ex. 1, Lesson Plan – Inmate Discipline, 1.) Yet the conduct that McGrath documented in his own Incident Report is, at most, a minor disciplinary issue, and there is no evidence that Gadsden had any history of disciplinary problems.  When asked at his deposition to list examples of "minor" disciplinary violations, McGrath stated: "disrespect to staff, boisterous activity, interfering with jail operations" – i.e., exactly the conduct he claimed Gadsden engaged in, in his own Incident Report.  (McGrath Depo. 54:24-25.) A reasonable fact-finder could conclude that the imposition of multiple "major" forms of discipline for what were, at most, minor types of disciplinary problems, on the part of a detainee with no history of any prior disciplinary issues, was prompted by a retaliatory motive.

McGrath's record of other Incident Reports created in the period before and after February 15, 2019 also supports an inference of retaliation because it illustrates that, in other situations, both while working in Facility 8 and while working in other San Diego Jail facilities, McGrath responded to comparable or

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

more serious disciplinary issues quite differently than he did in this case.  In these other incidents, McGrath responded to disciplinary situations in a way that was generally consistent with the "progressive" approach mentioned in the prior paragraph, rather than with the approach used here.

On November 12, 2018, for example, McGrath responded to an incident in Facility 8 in which a detainee was ripping up his jail-issued blue plants.  McGrath simply gave this detainee a verbal warning and had his pants replaced.  No other discipline was imposed. (Ex. 2, Incident Report of November 12, 2018.)

On March 18, 2019, McGrath responded to an incident in which a detainee tore off his wrist band and threw it in the trash.  Again, McGrath simply gave this detainee a verbal warning. No other discipline was imposed.  (Ex. 3, Incident Report of March 18, 2019.)

On April 16, 2019, McGrath responded to an incident in which a detainee was being "very boisterous and rude" while nurses were trying to treat the detainee. No disciplined was imposed. (Ex. 4, Incident Report of April 16, 2019, 1-2.)

And on July 23, 2019, McGrath responded to an incident in which two detainees were walking around a dayroom without permission and ignored his warning to lock down.  (Ex. 5, Incident Report of July 23, 2019, 2.)   McGrath gave these detainees a verbal warning, and no other discipline was imposed. (*Id.* at 1.)

This track record of employing a much more lenient approach in other comparable disciplinary situations supports the inference that McGrath singled out Gadsden for unfair, harsh treatment specifically because of a retaliatory motive. See *McCollum*, 647 F.3d at 882 (evidence "showing that defendant's reasons for the challenged action were false or pretextual" supports an inference of retaliation).

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In arguing that his motive was unproblematic, McGrath asserts that it is "undisputed" that he made the decision to write up Gadsden "*prior* to Plaintiff's request for an IA form."  ECF 62-1 at 7.  This point is very much in dispute, because it is circumstantially contradicted by all of the evidence just discussed, and particularly by the facts that Gadsden's actual conduct did not justify the discipline that was imposed and that the Incident Report explicitly referred to Gadsden's request for the "IA form."

The basis for a dispute on this point is all the more obvious if, as McGrath seems to be suggesting, the decision to take all of these actions against Gadsden would have been based purely on the *tone of Gadsden's voice* and the fact that he called back on the intercom[3] to request that he be permitted to make a scheduled video visit after McGrath hung up on him.

McGrath seems to assume that if he can point to some facially neutral policy that could conceivably have supported his actions, that defeats any possibility he acted out of a retaliatory motive, but that is not the case in the context of an argument for summary judgment.  Correctional officials "may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material facts as to whether the action was taken in retaliation for the exercise of a constitutional right." *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003).

Finally, the evidence is that McGrath took additional actions that could be viewed as retaliatory after Gadsden's request for the IA form, including confining Gadsden to his cell, having Gadsden "paraded" out of the module late on a Friday

---

[3] McGrath's argument vacillates on this point, asserting on page 6 that McGrath made the decision to write up Gadsden *prior* to his request for an IA form and then asserting, two pages later, that it is significant that Gadsden "used vulgar language" – but the only time Gadsden used vulgar language was *while asking for an IA form*.  Compare ECF 62-1 at 7, 9.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

night with his belongings in garbage bags, and cancelling all of Gadsden's future visits at 10:47 p.m. on the evening of February 15. (Ex. 18, Inmate History Summary Report, event of 2047.) McGrath's own claims related to the timing of his decision, which are self-serving, should not be used to resolve this fundamental question of his motivation at this stage in the proceedings.

Taken collectively, and viewed in the light most favorable to Plaintiff, these factors strongly support the conclusion that McGrath's actions were substantially motivated by retaliation.

**3. The Evidence of McGrath's Retaliatory Motive, As Well as the Disconnect Between the San Diego Sheriff's Own Disciplinary Policies and the Actions Taken By McGrath, Shows that McGrath's Actions Did Not Reasonably Advance a Legitimate Correctional Goal. As Gadsden's Correctional Expert Indicated, McGrath's Actions Represented the "Extreme End" of Behavior Management and Were Unwarranted by the Circumstances.**

The evidence shows that McGrath's actions did not reasonably advance a legitimate correctional goal. Preliminary, two points about the way McGrath frames this analysis are notable.

First, contrary to what McGrath asserts, Plaintiff does not have the burden of proving "the absence of legitimate correctional goals." See ECF 62-1 at 8. The legal standard at issue is whether McGrath's actions would "**reasonably advance**" a "legitimate correctional goal," and Gadsden's burden, at this stage, is to show that a fact-finder could conclude that those actions did not do so. *Nev. Dep't of Corr. V. Greene*, 648 F.3d 1014, 1018 (9th Cir. 2011), emphasis added; *Rhodes v. Robinson*, 408 F.3d 559, 567-568 (9th Cir. 2005). McGrath acknowledges that this is the relevant standard in the introductory sections of his brief (see ECF 62-1 at 2 [asserting that "Plaintiff cannot prove that the RVR did not reasonably advance a legitimate correctional goal"], 7 [asserting that "Plaintiff has the burden to prove that the action did not reasonably advance a legitimate correctional goal"]) but then

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ignores that standard when it comes to making a substantive argument, never applying that standard to the facts of this case.  Instead, McGrath makes the argument that Gadsden fails to show there was "no legitimate penological interest" advanced by his actions – a burden that Gadsden does not need to satisfy.  See ECF 62-1 at 9.

Concretely, this distinction matters because even assuming a given correctional goal is legitimate, a correctional officer might resort to unreasonable means of pursuing that goal.  Assuming for the sake of argument that running an "orderly" jail is a legitimate correctional goal, for example, that does not mean that an inmate can "reasonably" be tortured or killed simply for speaking in a way that a correctional officer finds inconvenient; such actions would not "reasonably advance" the goal because they are inconsistent with the laws and policies that govern the behavior of correctional officers and are therefore unreasonable.

Second, while this portion of McGrath's argument focuses over and over again on "the RVR," as if McGrath's writing a report were the entirety of Gadsden's concerns, that is not the case.  As noted above, Gadsden alleges that McGrath took a number of retaliatory actions against him, including confining him in his cell on the evening of February 15, 2019 when other inmates were allowed out to use the day room, having him "paraded" out in front of the entire module at an unusual time with his belongings in garbage bags, cancelling his future scheduled visits, transferring him to segregation, and recommending that Gadsden never again be housed in Facility 8. The question in this case is whether pursuing all of those actions reasonably advanced a legitimate correctional goal, not merely whether *writing a report* did so.  After all, McGrath also wrote a report in the four other minor disciplinary incidents summarized above: the difference is that his *substantive action* in responding to those situations was far more measured.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In evaluating the evidence in this case, a fact-finder could conclude that McGrath's actions did not reasonably advance a legitimate correctional goal.  That is so, first, because a fact-finder could conclude that McGrath was attempting to retaliate against Gadsden, and retaliation is not a legitimate correctional goal. *Austin v. Terhune*, 367 F.3d 1167, 1171, fn. 3 (9th Cir. 2004); *Bruce v. Ylst*, 351 F.3d at 1289. In *Bruce*, the Ninth Circuit noted that even *assuming* that actions taken by correctional officers could have advanced a legitimate correctional purpose, the evidence that those actions may have been carried out for a retaliatory motive was sufficient to defeat summary judgment because it suggested that "the defendants abused the gang validation procedure as a cover or a ruse to silence and punish Bruce because he filed grievances."  351 F.3d at 1289.  Therefore, based purely on the strong evidence of retaliation, a fact-finder could conclude that this element is satisfied here.

Additionally, a fact-finder could also find that McGrath's actions did not reasonably advance legitimate correctional goals because they were inconsistent with the San Diego Sheriff's Department's policies on the use of discipline, as discussed above. Those policies give an indication of the Department's understanding of how discipline should be used to reasonably advance its own correctional goals. The policy is intended to be "progressive," meaning that the severity of the discipline is required to be calibrated to the severity of the disciplinary issue and the disciplinary history of the detainee. (Tyson Depo. 22:9 – 23:19, Kellas Depo. 11:8 – 12:12.) McGrath did not follow that approach here, and in fact a fact-finder could conclude that he aggressively violated it.  He imposed forms of "major" discipline, in spite of the fact that he regarded the conduct as "minor" – indeed, according to McGrath, the conduct that prompted all of these actions consisted of merely using an *unpleasant tone* in a conversation over the intercom about the fact that McGrath refused to let Gadsden conduct his scheduled

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

visit – and in spite of the fact that there is no evidence that Gadsden had any prior history of disciplinary issues.

The analysis of Gadsden's correctional expert – former director of detention services for Olmsted County, Minnesota and former military police officer Stacy Sinner – reinforces this conclusion. Sinner testified in her deposition that, in her opinion, given that Gadsden was already confined in his cell at the time of the conversation with McGrath, it was "unnecessary to move [Gadsden] to segregation because he was a expressing a legitimate frustration for someone who has very little control over the things that they can – can control in their – in the environment that they're in. (Deposition of Stacy Sinner ("Sinner Depo.) 49:11-15.) Her opinion was that McGrath "went, you know, all the way to the extreme end of the – this is a continuum. Not only like a use-of-force continuum, which maybe people are more familiar with, but a behavior management continuum." (Sinner Depo. 50:5-9.) Moving Gadsden to segregation, in her opinion, "was excessive; it was unnecessary." (Sinner Depo. 62:7-11.)

Given all of these contextual factors, as well as the theme of retaliation noted above, a fact-finder could conclude that the cluster of actions taken by McGrath against Gadsden did not reasonably advance a legitimate correctional goal

**4. It Has Been Clearly Established Law for Decades That Correctional Officers May Not Retaliate Against Detainees When Detainees Attempt to Use Grievance Systems. Qualified Immunity Does Not Apply.**

McGrath's claim of qualified immunity is baseless because it has been "clearly established" for decades that correctional officers may not retaliate against a detainee for the detainee's attempt to use a grievance system. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) ("It is well-established that, among the rights they retain, prisoners have a First Amendment right to file prison grievances. [Citations.] Retaliation against prisoners for their exercise of this right is itself a

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

constitutional violation, and prohibited as a matter of clearly established law,"
internal quotations omitted); *Bruce v. Ylst*, 351 F.3d at 1288; *Rhodes v. Robinson*,
408 F.3d at 569, citing *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).

McGrath's argument for qualified immunity fails to acknowledge any of
these cases, despite the fact that they are directly on point.  Indeed, despite
asserting generically that "clearly defined" law should not be defined at too high a
level of generality, McGrath never attempts to distinguish the facts of this case
from other cases that involve similar situations.  ECF 62-1 at 10.  *Rhodes v.
Robinson* and *Bruce v. Ylst*, in particular, are specifically about correctional
officers retaliating against inmates for submitting grievances, and both conclude
that it is "clearly established" that such retaliation is prohibited. *Rhodes*, 408 F.3d
at 569; *Bruce*, 351 F.3d at 1290.

*Rhodes v. Robinson* was a claim of First Amendment retaliation brought by a
prison inmate who alleged that correctional officers threatened to transfer him,
confiscated his property, and assaulted him for filing prison grievances. 408 F.3d at
563-566.  The Ninth Circuit's response to the officers' assertion of qualified
immunity was to "reiterate our firm recognition that 'the prohibition against
retaliatory punishment is 'clearly established law' in the Ninth Circuit for qualified
immunity purposes.'" 408 F.3d at 569, quoting *Pratt*, 65 F.3d at 806. *Bruce v. Ylst*
was also a claim of First Amendment retaliation, one brought by a prison inmate
who alleged that he was validated as a gang member and held for a month in
administrative segregation in retaliation for filing grievances.  351 F.3d at 1287.
*Bruce* again held that the prohibition against retaliatory punishment is clearly
established in the Ninth Circuit.  *Id.* at 1290.

McGrath's failure to even acknowledge the holding of these cases, much
less attempt to distinguish the facts, is telling.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

The sole substantive point McGrath makes to support the qualified immunity argument is a citation to *Garcia v. Blahnik*, No. 14cv875-LAB (BGS), 2017 U.S. Dist. LEXIS 47135 (S.D. Cal. Mar. 29, 2017) – a case that is not about qualified immunity and says nothing about the contours of "clearly established" law.  ECF 62-1 at 11.  While it is correct, as McGrath emphasizes, that *Garcia* speaks to whether there might have been a legitimate penological interest for the actions of the correctional officers in that case, *Garcia* neither asks nor answers the question whether the law on retaliation against prisoners for attempting to file grievances is "clearly established." No analysis of that question was necessary, since *Garcia* lost on the merits of his claim in any event.

In short, McGrath's assertion of qualified immunity is unsupported and conspicuously fails to engage with the caselaw that bears directly on that issue.  It is certainly not a basis upon which to grant summary judgment.

## CONCLUSION

McGrath's argument for summary judgment ignores the evidentiary presumptions that apply at summary judgment, ignores facts that directly contradict McGrath's claims about what is "undisputed," and ignores law that is directly on point.  Gadsden respectfully submits that this Court should deny the motion for summary judgment and allow a jury to hear this case.


Dated: May 25, 2023                    /s/Alex Coolman
                                       Alex Coolman (SBN 250911)
                                       Attorney for Plaintiff

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT