ALEX COOLMAN (SBN 250911)
**THE LAW OFFICE OF ALEX COOLMAN**
3268 Governor Drive #390
San Diego, CA 92122
T: (619) 831-7129
E-mail: alex@coolmanlaw.com

Attorney for Plaintiff
**RONALD EARL GADSDEN**

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RONALD EARL GADSDEN,** | **Case No.: 20-cv-02258-WQH-DEB** |
| **Plaintiff,** | **NOTICE OF LODGMENT IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| **vs.** | |
| **JOHN GEHRIS, Deputy Sheriff, MICHAEL MCGRATH, Deputy Sheriff** | The Honorable Daniel E. Butcher, Magistrate Judge |
| **Defendants.** | |

Plaintiff Ronald Earl Gadsden hereby lodges the following exhibits in support of his opposition to Defendant's motion for summary judgment.

**Exhibit 1** – Lesson Plan – Inmate Discipline

**Exhibit 2** – Incident Report of November 12, 2018

**Exhibit 3** – Incident Report of March 18, 2019

**Exhibit 4** – Incident Report of April 16, 2019

**Exhibit 5** – Incident Report of July 23, 2019

**Exhibit 6** – Defendant McGrath's Responses to Plaintiff's Interrogatories, Set One

**Exhibit 7** – Ronald Gadsden's Contemporaneous Notes from Segregation

**Exhibit 8** – Declaration of Ronald Gadsden

**Exhibit 9** – Area Activities Summary Report

**Exhibit 10** – Portions of the Deposition of Michael McGrath

**Exhibit 11** – Portions of the Deposition of Ronald Gadsden

**Exhibit 12** – Portions of the Deposition of Tina Jaworski

**Exhibit 13** – Portions of the Deposition of Alex Doyle

**Exhibit 14** – Portions of the Deposition of Kurtis Kellas

**Exhibit 15** – Portions of the Deposition of Desan Tyson

**Exhibit 16** – Portions of the Deposition of John Gehris

**Exhibit 17** – Portions of the Deposition of Stacy Sinner

**Exhibit 18** – Portions of the "Inmate History Summary Report" for Ronald Gadsden

**Exhibit 19** – Incident Report of February 15, 2019

**Exhibit 20** – Discipline Hearing Report

**Exhibit 21** – Gadsden's Request for Immediate Hearing

# EXHIBIT 1

Instructor: **Sgt. Carson**

Revised: 8/15/2014

Course Goal:  **To familiarize staff with Detentions Policy & Procedures**

Module goal: **At the end of this course, staff will have a working knowledge of inmate discipline procedures.**

Module total time: **1/2 Hour**

Learning Objective #1:  **To familiarize staff with Detentions Policy and Procedure with regard to Inmate Discipline.**

| Resources required for this module: |
| --- |
| • **Computer with PowerPoint**<br>• **Laptop Remote**<br>• **Projection screen** |

| Course content | Instructor Notes |
| --- | --- |
| Discuss Types:<br><br>• Minor Discipline<br> • Informal<br>  • Written warning<br>  • Verbal counseling<br> • Formal<br>  • Loss of television<br>  • Loss of stores ( 1 week)<br>  • Loss of inmate worker status<br>  • Fines not to exceed $3.00 per day (Inmate workers only)<br>  • Assignment to extra work detail (Sentenced inmates)<br>• Major Discipline<br> • Lock down<br>  • Not to exceed 72 hours<br> • Loss of visits<br> • Disciplinary isolation<br>  • Not to exceed 10 days<br> • Disciplinary diet<br> • Revocation of good time/ work time credits<br>  • Last step in progressive discipline<br>• Difference between lockdown and disciplinary isolation: | |

EXHIBIT 1                                      CSD003361

| | |
|---|---|
| ● Lockdown-This sanction refers to an inmate(s) being restricted to their bunk area or cell and restricted from being out except for professional visits, showers and legal phone calls.<br><br>● Disciplinary isolation-This means loss of all personal items except bedding, clothing, legal papers, personal correspondence (unless the inmate has violated correspondence regulations) and hygiene items, unless such items are being destroyed by the inmate. A Bible, Koran, or other sacred material shall be the only allowed reading material (no other books or magazines), other than legal items, mail and writing implements (paper and pencil).<br>● Inmates will receive the disciplinary diet at breakfast and dinner only. Inmates on the disciplinary diet do not receive a lunch meal. The use of this special diet shall constitute an exception to the three-meal-a-day standard.<br>● In consultation with medical staff, the Facility Commander shall approve any continuation on the diet every 72 hours after the initial placement.<br>● Discuss disciplined used for inmates committing criminal acts<br><br>● Discuss how to complete Administrative Segregation Housing Order form<br>• Complete inmate information and reason for being segregate<br>• Give inmate a copy, and original is filed in booking jacket<br><br><br>● Discipline Appeals are handled by Watch Commanders<br>● Any inmate has up to 10 days to appeal discipline after notification<br>   ● Shall determine if there was sufficient evidence to prove violation<br>   ● Shall determine if the inmate was provided "due process"<br>   ● Shall determine if discipline was fair and consistent with past discipline for similar violations<br>   ● May reduce, uphold, or increase the discipline | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Display Administrative Segregation Housing Order form |

EXHIBIT 1

CSD003362

# EXHIBIT 2

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident #:**  184046150

**Incident Dt/Tm:** 11-12-2018 1455

**Incident Type Code:**  VBL        VERBAL

**Participants**

| Name (L,F,M,S) | JIM/Book # | Facility | Area | HU | Cell | Bed | Inv |
|---|---|---|---|---|---|---|---|
| ██████ ██████ J. | 400299402 / 18160120 | 0 | | | | | O |

**Incident Occurred:**

**Fac:** 8                    **Area:** 1                        **HU:** A

**Location:** FAC 8

**Officer:** MMCGRASH, MCGRATH                **Submitted Dt/Tm:** 11-12-2018 1457

**Update By:** LANDERSH, ANDERSON            **Update Dt/Tm:** 11-14-2018 0339

**Supervisor:** LANDERSH, ANDERSON          **Approval Dt/Tm:** 11-14-2018 0339

**Use of force?** N          **CS Violence?** N        **Inmate Violence?** N            **Contraband?** Y

**Facility Damage?** N        **Disciplinary?** N      **Hearing Required?** N

**Action Taken:**                                    **Approval Action:**

First verbal warning, ██████ was told do not rip jail
issued blue, next time he will be written up. ripped
blue pants replaced with new ones

**Incident Information:**

**Entry Dt/Tm:** 11-12-2018 1456                **Entered By:** MMCGRASH,MCGRATH

**Update Dt/Tm:** 11-13-2018 1352              **Updated By:** MMCGRASH, MCGRATH

**Approved Dt/Tm:** 11-14-2018 0339            **Approved By:** LANDERSH, ANDERSON

First verbal warning, ██████ was notified do not rip jail issued blue pants,
if done again he will be written up. Ripped blue pants replaced with new ones

Printed:  10-24-2022 0711

Printed By: MJENSESH, JENSEN

CSD000409

EXHIBIT 2

# EXHIBIT 3

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident #:** 194011040

**Incident Dt/Tm:** 03-18-2019 0837

**Incident Type Code:** VBL   VERBAL

**Participants**
**Name (L,F,M,S)**

| | JIM/Book # | Facility | Area | HU | Cell | Bed | Inv |
|---|---|---|---|---|---|---|---|
| ▮▮▮▮▮ | 400442002 / 18177123 | 1 | 7 | B | 13 | B | O |

**Incident Occurred:**

**Fac:** 3   **Area:** 2   **HU:**

**Location:** House 2

**Officer:** MMCGRASH, MCGRATH   **Submitted Dt/Tm:** 03-18-2019 0846

**Update By:** SODELLSH, ODELL   **Update Dt/Tm:** 03-18-2019 1542

**Supervisor:** SODELLSH, ODELL   **Approval Dt/Tm:** 03-18-2019 1542

**Use of force?** N   **CS Violence?** N   **Inmate Violence?** N   **Contraband?** N

**Facility Damage?** N   **Disciplinary?** N   **Hearing Required?** N

**Action Taken:**   **Approval Action:**

verbal warning, ISR written

**Incident Information:**

**Entry Dt/Tm:** 03-18-2019 0838   **Entered By:** MMCGRASH, MCGRATH

**Update Dt/Tm:** 03-18-2019 1542   **Updated By:** SODELLSH , ODELL

**Approved Dt/Tm:** 03-18-2019 1542   **Approved By:** SODELLSH , ODELL

```
ORIGIN:

On 3/18/19 I was assigned as the House 2 floor Deputy at Gorge Bailey Detention
Facility (GBDF), I was conducting a multi deputy walk in Module "B".

DEPUTY'S OBSERVATIONS & ACTIONS:

While conducting a multi Deputy walk in House 2, I found Inmate ▮▮▮▮▮
▮▮▮▮▮) wrist band in a trash bag. He was verbaly warned to keep his wrist
band on at all times and told if it is not on again he would be written up. His
wrist band was replaced.
```

Facility:  1
527I MAIN
Page 1 of 1
Printed: 10-24-2022 0720
Printed By: MJENSESH, JENSEN
CSD000443

EXHIBIT 3

# EXHIBIT 4

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident #:**  194015744

**Incident Dt/Tm:** 04-16-2019 1520

**Incident Type Code:**   ISR      INMATE STATUS REPORT

**Participants**
**Name (L,F,M,S)**

| | JIM/Book # | Facility | Area | HU | Cell | Bed | Inv |
|---|---|---|---|---|---|---|---|
| ███████████ | 400068936 / 19723623 | 0 | | | | | O |

**Incident Occurred:**

**Fac:** 3            **Area:** 1            **HU:** C

**Location:** House 1 Module C

**Officer:** MMCGRASH, MCGRATH            **Submitted Dt/Tm:** 04-16-2019 1521

**Update By:** SODELLSH, ODELL            **Update Dt/Tm:** 04-16-2019 1524

**Supervisor:** SODELLSH, ODELL            **Approval Dt/Tm:** 04-16-2019 1524

**Use of force?** N      **CS Violence?** N      **Inmate Violence?** N      **Contraband?** N

**Facility Damage?** N      **Disciplinary?** N      **Hearing Required?** N

**Action Taken:** _____      **Approval Action:** _____

Info ISR written

Facility:  1
527I MAIN
Page 1 of 2
Printed: 10-24-2022 0725
Printed By: MJENSESH, JENSEN
CSD000465

EXHIBIT 4

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident Information:**

| | | | |
|---|---|---|---|
| **Entry Dt/Tm:** 04-16-2019 1521 | | **Entered By:** MMCGRASH,MCGRATH | |
| **Update Dt/Tm:** 04-16-2019 1524 | | **Updated By:** SODELLSH , ODELL | |
| **Approved Dt/Tm:** 04-16-2019 1524 | | **Approved By:** SODELLSH , ODELL | |

ORIGIN:

On 4/16/19, at approximately 1330 hours, I was working as the House 1 Floor Deputy. Inmate ████████████████ was taken to George Bailey Detention Facility (GBDF) medical for evaluation.

DEPUTY'S OBSERVATION AND ACTIONS

On the above date and time, I escorted ██████ to GBDF medical to be evaluated for open sores on his legs. ██████ was being very boisterous and rude while the Nurses were trying to evaluate and treat him. He denied meds for his high blood pressure and pain meds.

He allowed the Nurses to treat and wrap his legs, but when asked if he would like the High Blood Pressure Meds,██████ stated, "No I don't want any meds, I'll die and sue you guys."

Facility: 1

527I MAIN

Page 2 of 2

Printed: 10-24-2022 0725

Printed By: MJENSESH, JENSEN

CSD000466

EXHIBIT 4

# EXHIBIT 5

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident #:**  194031457

**Incident Dt/Tm:** 07-23-2019 2304

**Incident Type Code:**  VBL        VERBAL

**Participants**
**Name (L,F,M,S)**

| Name | JIM/Book # | Facility | Area | HU | Cell | Bed | Inv |
|------|-----------|----------|------|-----|------|-----|-----|
| ███████ | 400280490 / 19738975 | 0 | | | | | O |
| ███████ | 400452926 / 19736843 | 3 | 6 | B | 227 | T | O |

**Incident Occurred:**

**Fac:** 3                          **Area:** 3                          **HU:** A

**Location:** Module A dayroom

**Officer:** MMCGRASH, MCGRATH                          **Submitted Dt/Tm:** 07-23-2019 2319

**Update By:** GCORTESH, CORTES-GARCIA                 **Update Dt/Tm:** 07-24-2019 0419

**Supervisor:** GCORTESH, CORTES-GARCIA               **Approval Dt/Tm:** 07-24-2019 0419

**Use of force?** N          **CS Violence?** N          **Inmate Violence?** N          **Contraband?** N

**Facility Damage?** N          **Disciplinary?** N          **Hearing Required?** N

**Action Taken:**                          **Approval Action:**

Verbal warning

EXHIBIT 5

CSD000490

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident Information:**

| | | | |
|---|---|---|---|
| **Entry Dt/Tm:** 07-23-2019 2320 | | **Entered By:** MMCGRASH,MCGRATH | |
| **Update Dt/Tm:** 07-24-2019 0419 | | **Updated By:** GCORTESH , CORTES-GARCIA | |
| **Approved Dt/Tm:** 07-24-2019 0419 | | **Approved By:** GCORTESH , CORTES-GARCIA | |

Origin:

On 07/23/19, I was assigned to the House 3 Floor Deputy Position at the George Bailey Detention Facility (GBDF) when the following incident took place in the day room of Module "A".

Deputies Actions and Observations:

At approximately 1900 hours, while conducting medication pass in Module "A." I saw Inmates ███████ 19736843) and ████ (19738975) walking around the dayroom without permission. The facility was on "Restricted Time" at the time of the incident; thus, the inmates were not allowed to walk around the dayroom. I verbally warned them several times to lock down and to secure their cell doors after medication pass.

They inmates ignored my warning and continued to talk to other inmates at the cell doors; ██████████ eventually locked down.

I had no further contact with ██████████████

Facility: 1

527I MAIN

Page 2 of 2

Printed: 10-24-2022 0729

Printed By: MJENSESH, JENSEN

EXHIBIT 5

CSD000491

# EXHIBIT 6

CLAUDIA G. SILVA, County Counsel (SBN 167868)
By: ADAM C. PHILLIPS, Senior Deputy (SBN 277410)
     ROBERT A. ORTIZ, Senior Deputy (SBN 246849)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-6416; Fax: (619) 531-6005
E-mail: adam.phillips@sdcounty.ca.gov

Attorneys for Defendants Sergeant John Gehris and Deputy Michael McGrath

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD EARL GADSDEN,<br><br>        Plaintiff,<br><br>    v.<br><br>SERGEANT JOHN GEHRIS, DEPUTY SHERIFF; DEPUTY MICHAEL MCGRATH, DEPUTY SHERIFF,<br><br>        Defendants. | No. 20-cv-02258-WQH-DEB<br><br>**DEFENDANT MICHAEL MCGRATH RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET ONE**<br><br>Date: August 22, 2022<br>Courtroom: 14B<br>Judge: Hon. William Q. Hayes |

PROPOUNDING PARTY:      Plaintiff RONALD EARL GADSDEN

RESPONDING PARTY:      Defendant MICHAEL MCGRATH

SET NUMBER:      One (1)

Defendant County of San Diego ("Defendant" or "Responding Party") anticipates that further discovery, investigation, legal research and analysis will supply additional factual conclusions and legal contentions. Responding Party reserves the right to rely on such additional discovery, investigation, legal research and analysis to make such

EXHIBIT 6

1   additions, changes, and variations to these responses as warranted thereby.  These

2   responses are made in a good faith effort to supply as much information and specification

3   as is presently known, but shall not prejudice Responding Party in relation to further

4   discovery, research, or analysis.

5        Each response herein is subject to all objections on any grounds that would require

6   exclusion of all or part of any statement herein as if such request was asked of or

7   statements contained herein were made by a witness testifying at trial, all such objections

8   being expressly reserved.

9        No incidental or implied admissions are intended by the responses made herein.

10  The fact that Responding Party has answered or objected to any request is not an

11  admission of the existence of any facts set forth or assumed by such request.

12  **<u>GENERAL OBJECTIONS</u>**

13       A.    Responding Party objects to all requests that attempt to require Responding

14  Party to provide information not within its possession, custody, or control, or not within

15  the possession, custody, or control of any of its representatives, employees, agents, or

16  attorneys.

17       B.    The absence of an objection that a request is irrelevant is not intended to be a

18  waiver of that objection and Responding Party reserves the right to object on relevancy

19  grounds at any stage of these proceedings.

20       C.    Where Responding Party objects to a request, a subsequent response to the

21  request shall not constitute a waiver of the objection.  Furthermore, the failure to restate a

22  general objection in response to a specific request does not waive the general objection.

23       D.    Responding Party has responded to the requests to the extent of its current

24  knowledge and available information.  However, Responding Party's discovery and

25  investigation in preparation for trial of this matter has not been completed as of the date

26  of these responses, and therefore Responding Party does not purport to state anything

27  more than the information presently known to or discovered by it.  Responding Party

28  specifically reserves the right to supplement, modify, or amend its responses or to present

1   additional information at a later date.

2        E.     Due to the fact that there are thousands of County-affiliated employees and

3   officers, and dozens of County-affiliated departments and agencies, and some or all of

4   their information or records may be privileged and confidential by law, each of the

5   following responses is (except if otherwise specifically stated) limited to non-privileged,

6   non-confidential matter known or reasonably available to the individual responding

7   parties, and to non-privileged, non-confidential matter contained in any relevant records

8   of Responding Party.  Unless privileged and confidential matter has been expressly called

9   for in the discovery requests, these responses assume that no such matter is being sought.

10  Failure in these responses to invoke privilege and confidentiality with specificity in

11  response to general discovery requests is not intended as waiver of any applicable

12  privilege or confidentiality.

13        Referring and expressly incorporating each of these general objections,

14  Responding Party responds as follows:

15  **Request No. 1:**

16        Please summarize your education and work history beginning with high school

17  graduation, naming each educational institution and employer, location, and start and end

18  dates.

19  **Response to Request No. 1**

20        Objection. This request is clearly compound as it requests a summarization of two

21  different discrete subject matters expressly using the term "and." One is the educational

22  history of Responding Party. The second is the work history of Responding Party. Thus,

23  Responding Party will treat these as two separate interrogatories for purposes of

24  calculating the total allowable interrogatories pursuant to Fed. R. Civ. P. 33, and responds

25  and renumbers the interrogatories as provided below. Further, this request does not seek

26  information that is relevant to any party's claim or defense and proportional to the needs of

27  the case.

28  ///

1  **Response to renumbered Request No. 1**

2        Responding Party attended Monte Vista high school, Spring Valley California

3  from 1997 to 2001 and Cuyamacha college, in San Diego California from 2003 to 2004.

4  **Response to renumbered Request No. 2**

5  Responding Party's work history includes the following:

6  - Coronado Golf Course, Coronado CA 1998-2000;

7  - Pizza Hut, San Diego CA 2000-2001;

8  - Pete Paniagua Pest Control, Lemon Grove CA,  2001-2016;

9  - San Diego County Sheriff's Department, 2016-2022;

10 - McGrath Pest Services, Spring Valley CA. 2018 - present

11 **Request No. 2 (renumbered 3):**

12       Describe each job you held in the Department, including facility, title, rank, job

13 responsibilities, dates employed, and reason for leaving that job assignment.

14 **Response to renumbered Request No. 3**

15       I worked as a Detentions Deputy for San Diego County Sheriff, Detention Services

16 Bureau from 2016-2022.  I was stationed at the Gorge Bailey Detention Facility, Facility

17 8 and South Bay Detention Facility. My job responsibilities included operating the jail

18 facilities and would depend on the particular assignment for a shift. I left the job because

19 the shift hours required to work took away valuable time with my family and church.

20 **Request No. 3 (renumbered 4):**

21
22       Describe in detail your job assignment on the date of the matter sued upon,

23 including the area to which you were assigned, and any secondary assignments.

24 **Response to renumbered Request No. 4**

25       On the date of the incident, I was working the control position at Facility 8, which

26 is located in the control tower. The control position is responsible for monitoring all

27 inmates, deputies, staff and doors in all modules as well as facilitating movement and

28 operations.

**Request No. 4 (renumbered 5):**

Describe any/all corrective actions directed to you by the Department, the allegations, identity of the complainant, and how it was resolved

**Response to renumbered Request No. 5**

Objection. The interrogatory does not seek information that is relevant to any party's claim or defense and proportional to the needs of the case. The interrogatory is vague and ambiguous as to the meaning of the phrases "corrective actions" and "directed to you" as they require this responding party to speculate as to their meaning.

Without waiving said objections, and to the extent the phrase "corrective actions" means a complaint about Responding's Party performance as a Detentions Deputy, Defendant responds as follows:

I am not aware of any corrective actions directed to me by the Sheriff's Department.

**Request No. 5 (renumbered 6):**

Describe in full detail your **current** job and your duties in that job.

**Response to renumbered Request No. 6**

Pest control technician, providing monthly pest control for homeowners.

**Request No. 6 (renumbered 7):**

**This case**. Describe in detail, after diligent inquiry, how the incident sued upon happened, giving all events in chronological order, including events before, during, and after the occurrence, which had any bearing on the cause and manner of the happening of the occurrence, and identifying all persons present at the time of the events. To the extent that you rely on records, pursuant to Fed.R.Civ.P. 33(d), please attach the records hereto.

**Response to renumbered Request No. 7**

Objection. This interrogatory is compound, premature, over-broad, unduly burdensome and invades attorney work-product. Plaintiff asks this Responding Party to provide the equivalent of a narrative account of the case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents.

EXHIBIT 6                    No. 20-cv-02258-WQH-DEB

He does not attempt to limit the scope in terms of time or perception but refers to the entirety of all events that may have transpired.  It is premature as discovery has just begun in this case and no depositions of witnesses or the Plaintiff have been taken. Asking this Responding Party to list all facts "which had any bearing on the cause and manner of the happening of the occurrence" is a clear attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of interrogatories and border too closely to protected work-product. *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 WL 12844083, at *2 (E.D. Wash. Jan. 18, 2012).

Further, the integratory is vague and ambiguous as to the meaning of the phrases "how the incident sued upon happened" and "events…which had any bearing on the cause and manner of the happening of the occurrence" as they require this responding party to speculate as to their meaning. Responding Party can hardly be expected to "describe" every "detail" related to Plaintiff's decision to bring a lawsuit in this case much less all events in chronological order that may have some bearing on the cause or manner of that occurrence. Finally, an interrogatory may not request documents. Fed.R.Civ.P. 33.

Without waiving said objections, and to the extent the phrases "how the incident sued upon happened" and "events…which had any bearing on the cause and manner of the happening of the occurrence" mean the incident involving Plaintiff's rule violations on February 15, 2019 that Responding Party recalls, Defendant responds as follows:

On 02/15/19, I was assigned to work the Facility 8 control position. I was watching deputies from the control tower windows, while they were in multiple modules conducting safety and security checks and accounting for all inmates. While observing the Deputies from the windows, I had to answer multiple calls and requests coming in from three different modules. The notifications were answered in the order they came into the control tower, as I was going back and forth from the control area and the windows overlooking the modules. As I answered the intercoms, I received multiple

1  questions from inmates housed in all three modules, answering and moving on to the next

2  call, as best I was able to while also watching the deputies. At some point I pressed the

3  button for the next call to be answered. The inmate who had called, Plaintiff, demanded

4  the cell door be opened in a loud voice.  I did not open the door at that time for the safety

5  of the deputies. I responded "excuse me" and he again demanded the door be opened,

6  shouting "let me out now."  I explained to him if he has a video visit he needs to ask

7  respectfully to be let out and to call me back when he can do so. The intercom notified

8  me of another call. I answered and it was Plaintiff again. He immediately demanded I

9  open the door again, so he could have his video visit. He continued shouting over the

10  intercom. I notified Plaintiff his video call will be canceled, due to his disrespect. He said

11  he did not care. He shouted multiple times "Fuck this, I need an IA form."

12      Once the deputies finished with safety and security checks and accounting for all

13  inmates they returned to the control tower. I notified them I was writing a Rule Violation

14  Report for Plaintiff because he was disrupting the jail operations, was disrespectful to

15  staff and continued his boisterous activity. Because he was a high-level inmate, he would

16  need to be transferred to the George Bailey Detention Facility, House 6 for processing. I

17  wrote a Rule Violation Report for Plaintiff and gave it to one of the deputies along with a

18  description of inmate rights regarding the violation. Plaintiff was later transferred to

19  George Bailey Detention Facility.

20  **Request No. 7 (renumbered 8):**

21      Describe where you were physically when you spoke with Ronald Gadsden about

22  his video call and where Ronald Gadsden was physically.

23  **Response to renumbered Request No. 8**

24      I was physically located in the control tower at Facility 8.  Plaintiff was physically

25  located in his cell.

26  **Request No. 8 (renumbered 9):**

27      Describe what effects your conversation with Ronald Gadsden about his video call

28  had on your work or on any other aspect of jail operations that you observed.

EXHIBIT 6                    No. 20-cv-02258-WQH-DEB
-7-

**Response to renumbered Request No. 9**

Objection. The interrogatory is compound and vague and ambiguous as to the meaning of the phrases "what effects" and "work or on any other aspect of jail operations" as they require this responding party to speculate as to their meaning.

Without waiving said objections, and to the extent the phrases "what effects" and "work or on any other aspect of jail operations" means the disrupting effect Plaintiff's multiple calls and refusal to follow the rules applicable to inmates, Defendant responds as follows:

It generally resulted in the delay of all Facility 8 operations for deputies, staff and inmates. It also caused potential safety risks to deputies, staff and inmates in all modules.

**Request No. 9 (renumbered 10):**

If you consulted with or requested approval from a supervisor or anyone else prior to transferring Ronald Gadsden to disciplinary segregation, what were the names and titles of the people you consulted with or requested approval from, and how did that occur? If any record of such consultation or request for approval exists, please attach those records.

**Response to renumbered Request No. 10**

Objection. The interrogatory is compound and vague and ambiguous as to the meaning of the phrases "disciplinary segregation" and "consulted with" as they require this responding party to speculate as to their meaning.

Without waiving said objections, and to the extent the phrase "disciplinary segregation" means Plaintiff's transfer to George Bailey Detention Facility, Defendant responds as follows:

I did not consult with a supervisor prior to Plaintiff's transfer to George Bailey Detention Facility, House 6.

///

///

///

**Request No. 10 (renumbered 11):**

How, specifically, was Ronald Gadsden moved to disciplinary segregation? In other words, did you walk him there, did you drive him there, or did he get there in some other way?

**Response to renumbered Request No. 11:**

Objection. The interrogatory is compound and vague and ambiguous as to the meaning of the phrase "disciplinary segregation" as it requires this responding party to speculate as to its meaning.

Without waiving said objections, and to the extent the phrase "disciplinary segregation" means Plaintiff's transfer to George Bailey Detention Facility, Defendant responds as follows:

I don't recall how Plaintiff was moved to the George Bailey Detention Facility.

**Request No. 11 (renumbered 12):**

Who did you deliver Ronald Gadsden to at disciplinary segregation?

**Response to renumbered Request No. 12:**

Objection. The interrogatory is compound and vague and ambiguous as to the meaning of the phrase "disciplinary segregation" as it requires this responding party to speculate as to its meaning. Without waiving said objections, and to the extent the phrase "disciplinary segregation" means Plaintiff's transfer to George Bailey Detention Facility, Defendant responds as follows:

I did not deliver him to anyone. I did not leave Facility 8.

**Request No. 12 (renumbered 13):**

Did you explain to the persons to whom you delivered Ronald Gadsden the reason he was being moved to disciplinary segregation, and if so, how was that explanation conveyed? If there is any record of that explanation, please provide it.

///

///

///

EXHIBIT 6                                    No. 20-cv-02258-WQH-DEB

1 **Response to renumbered Request No. 13:**

2      Objection. The interrogatory is compound and vague and ambiguous as to the

3 meaning of the phrase "disciplinary segregation" as it requires this responding party to

4 speculate as to its meaning.

5      Without waiving said objections, and to the extent the phrase "disciplinary

6 segregation" means Plaintiff's transfer to George Bailey Detention Facility, Defendant

7 responds as follows:

8      I did not deliver him to anyone. I did not leave Facility 8.

9 **Request No. 13 (renumbered 14):**

10      What, if anything, did you explain to Ronald Gadsden about his procedural rights

11 in connection with the transfer to disciplinary segregation? If you provided any

12 documents to Ronald Gadsden related to these rights, please provide a copy of those

13 documents.

14 **Response to renumbered Request No. 14:**

15      Objection. The interrogatory is compound and vague and ambiguous as to the

16 meaning of the phrase "disciplinary segregation" as it requires this responding party to

17 speculate as to its meaning. Further, an interrogatory may not request documents.

18 Fed.R.Civ.P. 33.

19      Without waiving said objections, and to the extent the phrase "disciplinary

20 segregation" means Plaintiff's transfer to George Bailey Detention Facility, Defendant

21 responds as follows:

22      I did not transfer him to "disciplinary segregation." I wrote his Rule Violation

23 Report which automatically required his transfer to the George Bailey Detention Facility.

24 A description of inmate rights associated with the rule violations was included with a

25 copy of the Rule Violation Report that was provided to Plaintiff.

26 **Request No. 14 (renumbered 15):**

27      Did you have any contact with Ronald Gadsden after February 15, 2019? If so,

28 please describe that contact.

1   **Response to renumbered Request No. 15:**

2        No.

3   **Request No. 15 (renumbered 16):**

4        For any training course you have received (including academy training) relating to

5   the Internal Affairs system **or** the use of disciplinary segregation, name the instructor, the

6   course name, the approximate date and number of hours of training.

7   **Response to renumbered Request No. 16:**

8        Objection. The interrogatory is compound and vague and ambiguous as to the

9   meaning of the phrases "disciplinary segregation" and "Internal Affairs system" as they

10  require this responding party to speculate as to their meaning.

11       Without waiving said objections, Defendant responds as follows:

12       I don't recall any particular training course related to the Internal Affairs system or

13  the use of "disciplinary segregation."

14

15  DATED:  September 28, 2022          CLAUDIA SILVA, County Counsel,

16                                      By: s/ADAM C. PHILLIPS, Senior Deputy
                                        Attorneys for Defendants County of San Diego
17                                      and Michael McGrath
                                        E-mail: adam.phillips@sdcounty.ca.gov
18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 6          11          No. 20-cv-02258-WQH-DEB

# EXHIBIT 7



I'VE BEEN IN ISOLATION from 8:27pm 2/16/19 - 3:03pm 2/17/19
WITHOUT ANY EXPLANATION THUS FAR. THE ONLY THING I WAS TOLD IS, I WAS BEING DISRESPECTFUL
TO DEPUTY McGRATH, AND I WAS BEING TRANSFERRED. WHERE? I CURRENTLY AM IS CALLED "THE HOLE"
THE OTHER INMATE IN THIS CELL IS CHEATUM KAROND. P. THE HOUSING UNIT IS A-FACILITY 3-AREA 6-CELL 213
BED B. - SUPERVISOR GEHRISH, GEHRIS, UPDATED by MATA. CHEATUM - 4004048/14704005 BXMIX
I WAS JUST UPDATED BY FLOOR DEPUTY VONNUM THAT THE INCIDENT THAT I WAS INVOLVED
IN HAPPENED AFTER HIS SHIFT TWO DAYS AGO AND THE SUPERVISOR FOR THAT SHIFT WILL BE
ON DUTY AFTER THIS SHIFT. IDK IF THIS IS RELATED TO MY I.A. FORM SUBMISSION ON DEPUTY DAVID, SMITH.
DEPUTY AGUIRRA IS THE ONE WHO SENT IT TO TINA JANOFSKI, HSA IS ON THE ORIGINAL ENVELOPE.
SPOKE TO WALKING DEPUTY. HE STATED THAT HE WOULD LEAVE A NOTATION IN REGARDS TO MY IDENTITY,
LOCATION, AND INQUIRE ABOUT REASON AND LONGEVITY OF "HOLE" STAY. I WAS CONTACTED AT 7PM
BY NIGHT CREW AND THERE WAS A CORPORAL ON BOTTOM FLOOR. I EXPLAINED THAT WALKING
TOP FLOOR DEPUTY ABOUT MY BEING HERE FOR 48 HRS W/O KNOWING OR BEING NOTIFIED WHY.
HE STATED HE WILL HAVE CORPORAL CONTACT ME ON HIS NEXT WALK. 7:03pm I FEEL
MY LIFE MAY BE IN DANGER DUE TO SUBMITTING AN I.A. FORM AGAINST A DEPUTY WHILE
INCARCERATED. ALSO, BEING FROM A CONSTRUCTION BACKGROUND, THE INSULATION THAT HAS BEEN
SPRAYED ON THE CEILING SHOULD BE TENTED. THE BIRDS LIVING IN THESE BUILDINGS ARE NOT ONLY
A HEALTH HAZARD, BUT THEY KNOCK DOWN THE INSULATION AND WE BREATHE IT. 8:00pm
CORPORAL WALKED ON BOTTOM AND I ASKED THE TOP FLOOR DEPUTY ABOUT MY SITUATION. HE STATED THAT HE WAS
ALREADY INFORMED THE CORPORAL, AND HE WILL CHECK HIMSELF, THEN INFORM ME. THE CORPORAL AVOIDED
ALL CONTACT WITH ME. I TRIED TO GET HIS ATTENTION, W/O EYE CONTACT. I AM 15 YARDS UPSTAIRS FROM HIS EXIT
LOCATION. SAME DEPUTY CAME BY WITH CORPORAL AT BOTTOM. STATED THERE IS NO INFO ABOUT
MY SITUATION. HE STATED THAT HE WILL TALK WITH THE SARGEANT. 8:25pm SPOKE WITH CORPORAL
EXPLAINED WHAT I'VE DONE THRU THUS FAR HE STATED THAT HE HAS TO FIND OUT WHAT'S GOING ON.
9:15pm I'VE ASKED EVERY EMPLOYEE THAT HAS WALKED FOR THE LAST 7 HOURS ABOUT MY SITUATION. NOONE
WILL PROVIDE ME WITH DOCUMENTATION NOR EXPLANATION NOR ANY PROBLEM. MY SKIN IS BREAKING OUT.
I HAVEN'T SHOWERED IN 3 DAYS AND I HAVE NOT HAD A CHANGE OF CLOTHES (DUE TO BEING MOVED) ID
NIGHT CREW NOR HE LOCKED DOWN WHILE THE OTHERS CHANGED OUT 2 DAYS AGO. 7 AGAIN ASKED
CORPORAL ABOUT MY SITUATION UPDATE. HE SAID "NO WORD YET." 10:20 pm I ASKED BUTTON ON ROLAND
ASKED IF I COULD SPEAK WITH A SARGEANT, AND I WAS TOLD THAT THERE ARE 3 ON DUTY. I
ASKED TO SPEAK WITH A SUPERVISOR. I WAS ASKED IF I JUST WANTED TO MAKE MY PUNISHMENT"
ASKED TO SPEAK WITH A SUPERVISOR. I WAS ASKED IF I JUST WANTED TO MAKE AN ISSUE W/ NOT
THE EXPLANATION OR DOCUMENTATION. HE STATED THAT HE WILL LOOK INTO IT. THE CHIEF. 10:55pm
...AND I STOPPED HIM AND ASKED ABOUT MY SITUATION. HE SAID A SARGEANT IS GOING TO COME BACK TO ME 11:35pm I REFUSED
DEPUTY J. VELISQUEZ STATED THAT A SARGEANT IS GOING TO COME BACK TO ME 11:35am 2/18/19 SPOKE WITH SARGEANT ABOUT
TO SIGN WAIVER ADMITTING GUILT AND TAKING PUNISHMENT. 11:35am 2/18/19 SPOKE WITH SARGEANT ABOUT
SITUATION THAT OCCURRED AND HE STATED THAT HE WOULD READ THE REPORT AND GET
BACK TO ME AFTER. 1:41am I SPOKE WITH DEPUTY MATA AND HE STATED THAT I WILL BE RELEASED
FROM THE HOLE ON 2/21/19, SO, I WILL HAVE SERVED SIX DAYS IN "THE HOLE" THIS IS BY FAR
EXTREME AND EXCESSIVE. 11:25am INMATE RIGHTS HAVE BEEN VIOLATED! I HAVE NEVER RECIEVED A WRITTEN
DAY OF MY CHARGES. I WAS NOT GIVEN THE RIGHT TO CALL WITNESSES. I HAVE NOT RECIEVED
HE DISCIPLINARY OFFICERS FINDINGS IN WRITING I SPOKE WITH DEPUTY ON THE CALL BOX AND HE STATED THAT
AM IN THE HOLE FOR THE TIME STATED FOR BEING DISRESPECTFUL I STATED (HOW? HE
SAID YOU DON'T REMEMBER SAYING, "FUCK THIS! GIVE ME AN I.A. FORM" I STATED, "YES."
AFTER BEING SUBJECTED TO MENTAL ANGUISH OVER AND OVER BY DEPUTY McGRATH. HE STATED
E WILL GIVE ME MY PAPERWORK WHEN THEY'RE ABLE TO. ASKED WALKING DEPUTY RE PLACE TOP
UP PAPERWORK 2:36pm. HE SAID HE WILL LOOK INTO IT. JEANTON I WAS LET OUT OF ISOLATION AT 2:26
JUST SPOKE WITH A WALKING DEPUTY. HE SAID "YOU'RE HERE FOR THREE MORE DAYS AND YOU GET OUT ON THE 21ST" LOOKS LIKE
HERE WILL BE ZERO PAPERWORK. SARGEANT KELLIS HAS NEVER REMEMBERED ME. I ASK NICELY IF I SPOKE WITH DEPUTY AND HE SAID
I WOULD PERSONALLY BRING ME THE REQUIRED PAPERWORK. DEPUTY MATA A SARGEANT, TWO TRANSFERS DEPUTIES DENIED A MAN NAMED
FAMILY. WITNESSED MY PAPERWORK BEING GIVEN TO AN OLD ELDERLY AND IN NEED OF MEDICAL ATTENTION. 4:35 pm.
ASKED TO SARGEANT RUIZ HE SAID THAT IM OUTTA HERE NOW. THANK GOD! 5:15pm NIGHT CREW ASK DID NIGHT
SHIFT. I'VE BEEN ASKING TO SHOWER FOR 4 HOURS TO NO AVAIL. SET RUIZ STATED THAT I WOULD BE RELEASED FROM THIS
ISOLATION HOLE, BUT IT HASN'T HAPPENED. I HAVEN'T SHOWERED SINCE THURSDAY. I HAVEN'T BEEN ALLOWED OUT
OF THIS CELL SINCE FRIDAY NIGHT. I FEAR FOR MY LIFE I CAN'T STAY AWAKE ANY LONGER. 10:50pm 2/19/19 WON'T
COUNT, RETURNED TO "THE HOLE." 11:27 SPOKE WITH WALKING DEPUTY ABOUT NOT STANDING IN 3 DAYS AND THAT SARGEANT SAID I'D
OUT OF ISOLATION YESTERDAY. HE STATED THAT, THEY HAVE TO FIND SOMEWHERE TO HOUSE ME & THIS THE CASE. SPOKE WITH DEPUTY
MATA AND HE STATED MY EXCEEDING THIS 2/21/19 PERIOD HE STATED THAT DUE TO THE DISCIPLINARY DEPUTY FOR
DID NOT OR DIDN'T GIVE LESS TERM TO DAYS, IF HE HAS TO WRITE A REPORT 8:00 pm. RECEIVED MY PAPERWORK.
2:35am 2/20/19 THIS PAPER WORK CLEARLY HAS BEEN TAMPERED. IT ALSO GIVES A LIST OF INMATE RIGHTS. EVERY TIME
IN VIOLATED. I'M SUPPOSED TO BE RELEASED FROM ISOLATION AT 11:55am ON 2/21/19. STILL WON'T LET A JUDGE INTERROGATE
4:50am STILL IN ISOLATION. 6:00am STILL IN ISOLATION. 9am STILL IN ISOLATION 11am STILL IN ISOLATION 11:15 LUNCH
LOOT THE BOX AND ASKED ABOUT SITUATION. THEY STATED THAT I WILL BE MOVED AFTER COUNT.

EXHIBIT 7

# EXHIBIT 8

ALEX COOLMAN (SBN 250911)
**THE LAW OFFICE OF ALEX COOLMAN**
3268 Governor Drive #390
San Diego, CA 92122
T: (619) 831-7129
E-mail: alex@coolmanlaw.com

Attorney for Plaintiff
**RONALD EARL GADSDEN**

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RONALD EARL GADSDEN,** | **Case No.: 20-cv-02258-WQH-DEB** |
| **Plaintiff,** | **DECLARATION OF RONALD GADSDEN IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **vs.** | |
| **JOHN GEHRIS, Deputy Sheriff, MICHAEL MCGRATH, Deputy Sheriff** | The Honorable Daniel E. Butcher, Magistrate Judge |
| **Defendants.** | |

Plaintiff Ronald Gadsden declares under penalty of perjury pursuant to the laws of the United States as follows:

1. I kept contemporaneous notes while I was in held in segregation between February 15, 2019 and February 21, 2019.

2. The handwritten page of notes submitted as Defendant's Exhibit 7 are the notes I kept in segregation.

---

1
DECLARATION OF RONALD GADSDEN

EXHIBIT 8

3. The sergeant with whom I spoke at 1:35 a.m. on February 18, 2019 while in segregation did not tell me that he was conducting a disciplinary hearing or inform me of any rights related to such a hearing.

4. I did not tell the sergeant with whom I spoke at 1:35 a.m. on February 18, 2019 that I was "guilty" of anything.

5. When I was initially transferred from Facility 8 to segregation, I was not given a copy of any Incident Report.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 24, 2023 at Oceanside, California.

Ronald Gadsden

2

DECLARATION OF RONALD GADSDEN

EXHIBIT 8

# EXHIBIT 9

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

| | | | | | | |
|---|---|---|---|---|---|---|
| **Fac:** 008 | **Area:** | **Hu:** | | **Type:** | | |
| **Start Dt/Tm:** 02-15-2019 1810 | | **End Dt/Tm:** 02-16-2019 0609 | | | | |

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|---|---|---|---|---|---|---|---|---|
| END OF SHIFT | 02-16-2019 0609 | 8 | 1 | ALL | 0 | Team 2 | 02-16-2019 0609 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-16-2019 0605 | 8 | 1 | ALL | 0 | Carlson, 3438, Mann, 4303** | 02-16-2019 0606 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0600 | 8 | 1 | ALL | 0 | Carlson, 3438, Mann, 4303 | 02-16-2019 0600 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-16-2019 0515 | 8 | 1 | ALL | 0 | Julian, 3675,  Mann, 4303** | 02-16-2019 0515 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0509 | 8 | 1 | ALL | 0 | Julian, 3675,  Mann, 4303 | 02-16-2019 0509 | MCGRATH, MICHAEL |
| SUPERV. LOG REVIEW | 02-16-2019 0437 | 8 | 1 | | 0 | Lt. Gardenhire | 02-16-2019 0437 | GARDENHIRE, CARL |
| SUPERV. LOG REVIEW | 02-16-2019 0436 | 8 | 1 | | 0 | DISREGARD PREVIOUS ENTRY*** S | 02-16-2019 0436 | ODELL, SARAH |
| 11-53 STARTED | 02-16-2019 0436 | 8 | 1 | | 0 | Sgt. Odell | 02-16-2019 0436 | ODELL, SARAH |
| SOFT COUNT<br>A51<br>B50<br>C52 | 02-16-2019 0431 | 8 | 1 | ALL | 153 | Complete** | 02-16-2019 0431 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-16-2019 0430 | 8 | 1 | ALL | 0 | Carlson, 3438, Julian, 3675** | 02-16-2019 0431 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0423 | 8 | 1 | ALL | 0 | Carlson, 3438, Julian, 3675 | 02-16-2019 0424 | MCGRATH, MICHAEL |

Facility: 3
2410 MAIN
Page 1 of 6
EXHIBIT 9
Printed: 12-14-22 1611
Printed By: CCEBALSH, CEBALLOS

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

**Fac:** 008          **Area:**          **Hu:**          **Type:**

**Start Dt/Tm:** 02-15-2019 1810          **End Dt/Tm:** 02-16-2019 0609

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|---|---|---|---|---|---|---|---|---|
| 11-53 ENDED<br>Check ok | 02-16-2019 0333 | 8 | 1 | ALL | 0 | Julian, 3675,  Mann, 4303** | 02-16-2019 0333 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0327 | 8 | 1 | ALL | 0 | Julian, 3675,  Mann, 4303 | 02-16-2019 0328 | MCGRATH, MICHAEL |
| SUPERVISOR ON FLOOR | 02-16-2019 0253 | 8 | 1 | ALL | 0 | Sgt. Odell #3058 | 02-16-2019 0255 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>check ok | 02-16-2019 0236 | 8 | 1 | ALL | 0 | Carlson, Sosa* | 02-16-2019 0237 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0231 | 8 | 1 | ALL | 0 | Carlson, Sosa | 02-16-2019 0232 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>check ok | 02-16-2019 0150 | 8 | 1 | ALL | 0 | Julian, Sosa* | 02-16-2019 0150 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0135 | 8 | 1 | ALL | 0 | Julian, 3675, Sosa, 3509 | 02-16-2019 0135 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-16-2019 0044 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303** | 02-16-2019 0044 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-16-2019 0038 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303 | 02-16-2019 0038 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-15-2019 2347 | 8 | 1 | ALL | 0 | Carlson, 3438, Sosa, 3509** | 02-15-2019 2348 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-15-2019 2341 | 8 | 1 | ALL | 0 | Carlson, 3438, Sosa, 3509 | 02-15-2019 2341 | MCGRATH, MICHAEL |

Facility: 3
241O MAIN

Page 2 of 6

EXHIBIT 9

Printed: 12-14-22 1611
Printed By: CCEBALSH, CEBALLOS

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

| Fac: 008 | Area: | Hu: | Type: |
|---|---|---|---|

**Start Dt/Tm:** 02-15-2019 1810  **End Dt/Tm:** 02-16-2019 0609

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|---|---|---|---|---|---|---|---|---|
| 11-53 ENDED<br>Check ok | 02-15-2019 2250 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303** | 02-15-2019 2250 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-15-2019 2244 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303 | 02-15-2019 2244 | MCGRATH, MICHAEL |
| SUPERV. LOG REVIEW | 02-15-2019 2234 | 8 | 1 | | 0 | Sgt. Odell | 02-15-2019 2234 | ODELL, SARAH |
| HARD COUNT<br>A51<br>B50<br>C52 | 02-15-2019 2234 | 8 | 1 | ALL | 153 | Complete** | 02-15-2019 2235 | MCGRATH, MICHAEL |
| RAZORS DISTRIBUTED | 02-15-2019 2232 | 8 | 1 | C | 0 | Refused | 02-15-2019 2233 | MCGRATH, MICHAEL |
| HARD COUNT | 02-15-2019 2216 | 8 | 1 | ALL | 0 | Started | 02-15-2019 2216 | MCGRATH, MICHAEL |
| LOCKDOWN | 02-15-2019 2201 | 8 | 1 | ALL | 0 | All modules for Hard Count | 02-15-2019 2202 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Carlson, 3438, Sosa, 3509 | 02-15-2019 2152 | 8 | 1 | ALL | 0 | Lt. Gardenhire, 3301, Sgt. Odell, 3058* | 02-15-2019 2153 | MCGRATH, MICHAEL |
| GRIEVANCES COLLECTED | 02-15-2019 2147 | 8 | 1 | ALL | 0 | Sgt. Odell, 3058 | 02-15-2019 2147 | MCGRATH, MICHAEL |
| SUPERV. INSPECTION | 02-15-2019 2147 | 8 | 1 | ALL | 0 | Lt. Gardenhire, 3301, Sgt. Odell, 3058 | 02-15-2019 2147 | MCGRATH, MICHAEL |
| 11-53 STARTED<br>Carlson, 3438, Sosa, 3509 | 02-15-2019 2146 | 8 | 1 | ALL | 0 | Lt. Gardenhire, 3301, Sgt. Odell, 3058* | 02-15-2019 2146 | MCGRATH, MICHAEL |

EXHIBIT 9

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

**Fac:** 008　　**Area:**　　**Hu:**　　**Type:**

**Start Dt/Tm:** 02-15-2019 1810　　**End Dt/Tm:** 02-16-2019 0609

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|------|---------------|-----|------|-----|-------|-------------|-------------|------------|
| SUPERVISOR ON FLOOR | 02-15-2019 2136 | 8 | 1 | ALL | 0 | Lt. Gardenhire, 3301, Sgt. Odell, 3058 | 02-15-2019 2137 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-15-2019 2057 | 8 | 1 | ALL | 0 | Carlson, 3438, Sosa, 3509** | 02-15-2019 2057 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-15-2019 2049 | 8 | 1 | ALL | 0 | Carlson, 3438, Sosa, 3509 | 02-15-2019 2050 | MCGRATH, MICHAEL |
| RAZORS COLLECTED | 02-15-2019 2040 | 8 | 1 | B | 13 | | 02-15-2019 2040 | MCGRATH, MICHAEL |
| RAZORS COLLECTED | 02-15-2019 2039 | 8 | 1 | A | 14 | | 02-15-2019 2040 | MCGRATH, MICHAEL |
| DAYROOM / PHONE TIME | 02-15-2019 2035 | 8 | 1 | C | 0 | Resumed C module | 02-15-2019 2201 | MCGRATH, MICHAEL |
| LAUNDRY EXCHANGE | 02-15-2019 2030 | 8 | 1 | ALL | 0 | Complete | 02-15-2019 2201 | MCGRATH, MICHAEL |
| RAZORS DISTRIBUTED | 02-15-2019 2007 | 8 | 1 | A | 14 | | 02-15-2019 2007 | MCGRATH, MICHAEL |
| RAZORS DISTRIBUTED | 02-15-2019 2004 | 8 | 1 | B | 13 | | 02-15-2019 2004 | MCGRATH, MICHAEL |
| DAYROOM / PHONE TIME | 02-15-2019 1956 | 8 | 1 | ALL | 0 | Resumed B module | 02-15-2019 1956 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-15-2019 1956 | 8 | 1 | ALL | 0 | Mann, 4303, Sosa, 3509** | 02-15-2019 1956 | MCGRATH, MICHAEL |

Facility: 3
241O MAIN

Page 4 of 6

EXHIBIT 9

Printed: 12-14-22 1611
Printed By: CCEBALSH, CEBALLOS

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

| | | | | | |
|---|---|---|---|---|---|
| **Fac:** 008 | **Area:** | **Hu:** | **Type:** | | |
| **Start Dt/Tm:** 02-15-2019 1810 | **End Dt/Tm:** 02-16-2019 0609 | | | | |

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|---|---|---|---|---|---|---|---|---|
| 11-53 STARTED | 02-15-2019 1952 | 8 | 1 | ALL | 0 | Mann, 4303, Sosa, 3509 | 02-15-2019 1952 | MCGRATH, MICHAEL |
| DAYROOM / PHONE TIME | 02-15-2019 1931 | 8 | 1 | A | 0 | Resumed A module | 02-15-2019 1931 | MCGRATH, MICHAEL |
| LAUNDRY EXCHANGE<br>Blue pants and shirt<br>White rolls, shirt, socks, underwear | 02-15-2019 1919 | 8 | 1 | ALL | 0 | Started** | 02-15-2019 1920 | MCGRATH, MICHAEL |
| SOFT COUNT<br>A52<br>B50<br>C54 | 02-15-2019 1910 | 8 | 1 | ALL | 156 | Complete** | 02-15-2019 1911 | MCGRATH, MICHAEL |
| 11-53 ENDED<br>Check ok | 02-15-2019 1910 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303** | 02-15-2019 1910 | MCGRATH, MICHAEL |
| 11-53 STARTED | 02-15-2019 1857 | 8 | 1 | ALL | 0 | Julian, 3675, Mann, 4303 | 02-15-2019 1857 | MCGRATH, MICHAEL |
| FENCE CHECK<br>Sosa, 3509 | 02-15-2019 1848 | 8 | 1 | ALL | 0 | Complete** | 02-15-2019 2232 | MCGRATH, MICHAEL |
| LOW BUNK/TIER REVIEW | 02-15-2019 1842 | 8 | 1 | ALL | 0 | List reviewed 1 on list | 02-15-2019 1843 | MCGRATH, MICHAEL |
| RAZOR RESTR. REVIEW | 02-15-2019 1842 | 8 | 1 | ALL | 0 | None on list | 02-15-2019 1842 | MCGRATH, MICHAEL |
| PSA LIST REVIEW | 02-15-2019 1841 | 8 | 1 | ALL | 0 | None on list | 02-15-2019 1842 | MCGRATH, MICHAEL |
| NALOXONE | 02-15-2019 1841 | 8 | 1 | ALL | 0 | Accounted for | 02-15-2019 1841 | MCGRATH, MICHAEL |

Facility: 3
241O MAIN
Page 5 of 6
EXHIBIT 9
Printed: 12-14-22 1611
Printed By: CCEBALSH, CEBALLOS

# SAN DIEGO SHERIFFS DEPARTMENT

## Area Activities Summary Report

| Fac: 008 | Area: | Hu: | Type: |
|---|---|---|---|

**Start Dt/Tm:** 02-15-2019 1810   **End Dt/Tm:** 02-16-2019 0609

| Type | Activity Dt/Tm | Fac | Area | Hu | Count | Description | Entry Dt/Tm | Entered By |
|---|---|---|---|---|---|---|---|---|
| DNA COLLECTION | 02-15-2019 1841 | 8 | 1 | ALL | 0 | None on list | 02-15-2019 1841 | MCGRATH, MICHAEL |
| KEY AND RADIO COUNT | 02-15-2019 1833 | 8 | 1 | ALL | 0 | All keys accounted for** | 02-15-2019 1834 | MCGRATH, MICHAEL |
| Julian,A , Mann, Visit Carlson,C , Sosa, B | | | | | | | | |
| 10-8, BRIEFED | 02-15-2019 1832 | 8 | 1 | ALL | 0 | Team 2 reviewed logs** | 02-15-2019 1833 | MCGRATH, MICHAEL |
| Lt. Gardenhire, 3301, Sgt. Odell, 3058 McGrath, 3838 Julian, 3675, Mann, 4303 Carlson, 3438, Sosa, 3509 | | | | | | | | |
| END OF SHIFT | 02-15-2019 1810 | 8 | 1 | ALL | 0 | TEAM 1, 10-7 | 02-15-2019 1810 | TELLO, GIOVANNI |

Facility: 3
241O MAIN

EXHIBIT 9

Printed: 12-14-22 1611
Printed By: CCEBALSH, CEBALLOS

# EXHIBIT 10

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3                           ---oOo---

4    RONALD EARL GADSDEN,

5            Plaintiff,

6    vs.                              No. 20-cv-2258-WQH-DEB

7    SERGEANT JOHN GEHRIS, Deputy
     Sheriff, and DEPUTY MICHAEL
8    MCGRATH, Deputy Sheriff,

9            Defendants.
     _____/

10

11

12

13     REMOTE CONFERENCING DEPOSITION OF MICHAEL MCGRATH

14

15

16

17              Taken before NICOLE HATLER

18                  CSR No. 13730

19                 October 13, 2022

20

21

22

23

24

25                  Job No.  912368

EXHIBIT 10

MICHAEL MCGRATH - 10/13/2022

---

Page 2

```
 1            I N D E X
 2                            PAGE
 3  EXAMINATION BY MR. COOLMAN....................4, 77
 4  EXAMINATION BY MR. PHILLIPS...................72
 5
 6
 7
 8            E X H I B I T S
 9                            PAGE
10  PLAINTIFF'S
11  Exhibit 1  Photo of video console...............16
12  Exhibit 2  Photo of inmate going to
               video console.......................19
13
    Exhibit 3  Incident Report.....................29
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1  REMOTE CONFERENCING DEPOSITION OF MICHAEL MCGRATH
 2
 3
 4       BE IT REMEMBERED, that pursuant to Notice, and on
 5  the 13th day of October 2022, commencing at the hour of
 6  9:45 a.m., in the respective locations via Zoom, before
 7  me, NICOLE HATLER, a Certified Shorthand Reporter, State
 8  of California, personally appeared MICHAEL MCGRATH,
 9  produced as a witness in said action, and being by me
10  first duly sworn, was thereupon examined as a witness in
11  said cause.
12              ---oOo---
13  APPEARANCES ALL REMOTELY VIA ZOOM
14  For the Plaintiff:
15       ALEX COOLMAN
         Law Office of Alex Coolman
16       3268 Governor Drive, #390
         San Diego, California  92122
17       (619)831-7129
         alex@coolmanlaw.com
18
    For the Defendant:
19
         ADAM C. PHILLIPS, Senior Deputy
20       Office of San Diego County Counsel
         1600 Pacific Highway, Room 355
21       San Diego, CA  92101-2469
         (619) 539-8357
22       Adam.phillips@sdcounty.ca.gov
23  Also present:
24       Ronald Gadsden
25
```

Page 4

```
 1            MICHAEL MCGRATH
 2          sworn as a witness
 3          testified as follows:
 4       THE REPORTER:  Good morning.  My name is Nicole
 5  Hatler, California Certified Shorthand Reporter No.
 6  13730.  This deposition will be stenographically reported
 7  pursuant to CCP 2025.
 8       All righty.  Go ahead and put your hand down.
 9       Counsel, you may proceed.
10       MR. COOLMAN:  Thanks very much.
11  EXAMINATION BY MR. COOLMAN:
12       Q.  Morning, sir.
13       A.  Morning.
14       Q.  My name is Alex Coolman.  I'm attorney for
15  Mr. Jasmine.  I wanted to mention I've got a second iPad.
16  So if you see another Alex Coolman that's blacked out, I
17  was trying to be redundant and have a backup.
18       A.  Okay.
19       Q.  It's just me.
20       Before we get going, I want to mention a couple,
21  sort of, basic ideas that apply to this depo, which is
22  that you understand that you're under oath here, you just
23  took the oath, correct?
24       A.  Yes.
25       Q.  And you understand that the meaning of that oath
```

Page 5

```
 1  is the same at this proceeding as it is at trial, that
 2  you should tell the truth and not speculate about things,
 3  correct?
 4       A.  Yes.
 5       Q.  You know also that you're going to get a
 6  transcript of your remarks at the conclusion or soon
 7  after of this depo, and you'll have a chance to look over
 8  those -- that transcript, right?
 9       A.  Yes.
10       Q.  And you can make any corrections that you may
11  think relate to that transcript?
12       A.  Yes.
13       Q.  And -- and you understand that, in the event
14  this case goes to trial, your remarks here could
15  potentially be played or read to the jury?
16       A.  Yes.
17       Q.  Okay.  Very good.  Thank you.
18       A.  Uh-huh.
19       Q.  I'm going to just jump into some, kind of, broad
20  level background stuff.
21       You worked for the San Diego County Sheriff's
22  Department, correct?
23       A.  Yes.
24       Q.  And that was from 2016 to 2022?
25       A.  Correct.
```

EXHIBIT 10

MICHAEL MCGRATH - 10/13/2022

Page 6

1    Q.  Okay.  And was your title Detentions Deputy or
2  was there a specific title different than that?
3    A.  Detentions and Court Services.
4    Q.  Okay.  What was your badge number?
5    A.  I can't recall my badge number.
6    Q.  Was it 3838, possibly?
7    A.  3838 was my Arjis.
8    Q.  What's that?
9    A.  That is, kind of, like, an ID for every deputy
10 that is used.
11   Q.  Okay.
12   A.  It's like an identifier.
13   Q.  Okay.  Got you.
14      3838 was your Arjis number?
15   A.  Correct.
16   Q.  Okay.  Thank you.
17      One of the places you worked was Facility 8 of
18 George Bailey Detention Facility; is that right?
19   A.  Yes.
20   Q.  Okay.  And then at some point, you also
21 transferred to South Bay?
22   A.  Yes.
23   Q.  Okay.  And the whole time you were with the
24 sheriff's department, were you working full time?
25   A.  Yes, full time.

Page 7

1    Q.  Okay.  Was the first place you worked at George
2  Bailey with the sheriff's department -- I mean, was the
3  first department you worked at the sheriff's department
4  was George Bailey?
5    A.  First place assigned was George Bailey.
6    Q.  Okay.  Thank you.  Got it.
7       And were you working at that facility --
8  Facility 8 at George Bailey on February 15th, 2019?
9    A.  Can you repeat the question?
10   Q.  Were you working at Facility 8 of the George
11 Bailey detention facility on February 15th, 2019?
12   A.  Yes.
13   Q.  Okay.  Prior to coming to work that day,
14 February 15th, 2019, did you interact with anybody from
15 the sheriff's department at all?
16   A.  Every morning before we started our shift, we
17 had briefing with the whole entire team.
18   Q.  And that was at work, correct?
19   A.  That's at work, correct.
20   Q.  Okay.  I'm asking about before even coming in,
21 so for example, did you call anybody, text anybody,
22 e-mail anybody from the sheriff's department on February
23 15th, 2019?
24   A.  No.
25   Q.  Okay.  What hours were you working on

Page 8

1  February 15th, 2019?
2    A.  Night shift, 1800 hours to 6 -- 6:00, 6:30 a.m.
3    Q.  Okay.  So 1800 is 6:00 p.m., correct?
4    A.  Yes.
5    Q.  And you alluded a moment ago to, kind of, having
6  an initial briefing period when you got into work,
7  correct?
8    A.  Correct.
9    Q.  Where does that take place?
10   A.  That takes place in briefing room -- just
11 outside the locker room there's a briefing room.
12   Q.  Okay.
13   A.  We meet in there and have a meeting.
14   Q.  Okay.  And, kind of, roughly, how long does that
15 briefing go on?
16   A.  It could be -- it ranges, it could be a few
17 minutes all the way up to 30 minutes.
18   Q.  Okay.  On this specific day, do you have any
19 recollection of how long it was?
20   A.  I don't recall how long.
21   Q.  Okay.  In that briefing, was there any
22 discussion of Ronald Gadsden?
23   A.  I don't recall.
24   Q.  Okay.  When you're done with the briefing, where
25 do you go to, essentially, perform your job?

Page 9

1    A.  Once briefing was finished, I would exit George
2  Bailey and drive around the back to Facility 8.
3    Q.  Okay.  And at Facility 8, is it correct that you
4  were working in the control position?
5    A.  Yes, control position Facility 8.
6    Q.  Okay.  And is control position a title or a
7  place or is it both?
8    A.  Control position is -- I'm up there operating
9  all the doors, gates, letting deputies in and out, nurses
10 in and out, transfers in and out, professional visits in
11 and out, as well as monitoring deputy safety inside the
12 modules.
13   Q.  Okay.  When you say, I'm up there, where --
14 where do you mean specifically?
15   A.  Control is above the modules.  It would have
16 been probably, like, called the second floor.
17   Q.  Uh-huh.
18   A.  We'd walk up some stairs and then control tower,
19 there's windows to see inside of all the modules to
20 monitor for safety, security, keeping an eye on the
21 deputies.
22   Q.  Okay.  So the control position is this physical
23 space that's up on the second floor where you're looking
24 out at the modules, right?
25   A.  Yes.

MICHAEL MCGRATH - 10/13/2022

Page 18

```
1   detainees -- you didn't affirmatively let detainees out
2   unless they asked to be let out; is that correct?
3       A.  Most of -- most of them knew they had a visit,
4   and they would call.
5       Q.  Okay.  And what I'm asking is, if they don't
6   ask, would you just follow the schedule and let them go
7   out, or do people affirmatively have to ask to be let
8   out?
9       A.  It would vary.  Every day was different.  Some
10  days, they would be notified.  If there was multiples --
11  we wanted them to have their visits.  So if there was a
12  lot scheduled, we would try to make sure that people
13  weren't hogging up the phone so that other -- others
14  could get their visit on time.  And every day --
15      Q.  Uh-huh.  You -- sorry.  What?
16      A.  Every day was different.
17      Q.  Okay.  You wanted them to have their visits,
18  why?
19      A.  They're scheduled for a visit, and they would
20  get their visit.
21      Q.  I'm asking, why did you want that to happen?
22      A.  For -- for operation purposes, running a smooth
23  shift, getting things done on time.  There's a lot going
24  on at any one given time, so we try to be as efficient as
25  possible during a busy shift.
```

Page 19

```
1       Q.  Right.  Aside from efficiency, the jail policies
2   also state, don't they, that detainees are to have their
3   visits unless they're being disciplined for some serious
4   misconduct?
5       A.  I don't know what the exact wording would be for
6   the policy.  I -- I would need to -- to look at that, but
7   the -- the visits would get done.
8       Q.  Uh-huh.  Let me show you a video real quick, if
9   I can do this correctly.  If I can -- this is a short
10  clip of this same area we just saw.
11          Are you able to see this?
12      A.  Yes.
13      Q.  Okay.  It's just two clips that are, kind of,
14  run together, and I want to direct your attention to the
15  lower left where the guy is coming out of the cell.
16      A.  Okay.
17      Q.  And it shows the second angle of the same thing.
18      A.  Okay.
19      Q.  Now you -- you saw, again, set down a sheet of
20  paper and pull up the chair at this video kiosk, right?
21      A.  Yes.
22      Q.  Okay.  Let's call this exhibit --
23          (Reporter clarification.)
24      MR. COOLMAN:  -- 2.
25      (Exhibit 2 was marked for identification.)
```

Page 20

```
1   BY MR. COOLMAN:
2       Q.  Do you have any recollection of letting this
3   individual out of his cell to make a video call?
4       A.  I do not.
5       Q.  Okay.  Let me turn to the specific interaction
6   with Mr. Gadsden on the -- or just slightly before that.
7          Had you had any interaction with Mr. Gadsden
8   before the intercom conversation on February 15th, 2019?
9       A.  I don't recall.
10      Q.  But you did end up having a conversation with
11  Mr. Gadsden over the intercom?
12      A.  Yes.
13      Q.  Do you have any idea what time that conversation
14  started?
15      A.  I don't recall the time.
16      Q.  Can you walk me through a little bit of how it
17  goes initially.
18          Do you get a call or a buzz or a signal that
19  he's trying to contact you, or what does that sound like?
20      A.  The control computer has multiple screens,
21  different cameras are available on there, that shows all
22  the -- all the modules.  The notifications would come
23  through some type of beeping sound, and that would be the
24  notification that there's a call coming in from somewhere
25  in the facility.
```

Page 21

```
1       Q.  Okay.  So you answered the -- the beep or
2   whatever the signal is, correct?
3       A.  Yes.
4       Q.  And what did you say?
5       A.  The beeping can be anything coming in from any
6   cell, any crossover, any gate.  It ranges from any
7   question, people asking if they're coming out for day
8   room, if commissary is coming that night, if -- if
9   they're going to get to watch TV, channel check, just a
10  multitude of different questions come in every day.
11      Q.  Right.
12      A.  Every day is different.
13      Q.  Maybe I'm not being clear.  I'm asking what did
14  you say when you got the signal from -- that Ron Gadsden
15  was trying to talk to you.  What did you say?
16      A.  I don't recall exactly how I answered that call.
17      Q.  How do you typically answer those calls?
18      A.  Typically, I would answer a call and say, How
19  can I help you?
20      Q.  Okay.  You write in your answers to the
21  interrogatories that -- that Gadsden started speaking, he
22  demanded that the cell be opened in a loud voice; is that
23  correct?
24      A.  That's correct.
25      Q.  What specifically did he say?
```

EXHIBIT 10

MICHAEL MCGRATH - 10/13/2022

Page 26

1  like the incident report you prepared?
2      A.  Can you scroll down a little bit?
3      Q.  Sure.  Sorry.
4      A.  Okay.  That looks like the one that I wrote.
5      Q.  Okay.  Just backing up a little.
6          You have been trained on writing reports,
7  haven't you?
8      A.  Yes.
9      Q.  And you know your reports are supposed to be
10 complete, correct?
11     A.  Say that one more time, please?
12     Q.  You know that your reports are supposed to be
13 complete, correct?
14     A.  Yes.
15     Q.  Your reports are supposed to be accurate, right?
16     A.  Yes.
17     Q.  Because you know that reports can be used in
18 legal proceedings, right?
19     A.  Yes.
20     Q.  Okay.  In the incident report, you don't make
21 any reference to concern about the safety of other
22 deputies, do you?
23     A.  There's no specific wording in the report.
24     Q.  Is there any non-specific wording in the report
25 about the safety of deputies?

Page 27

1      A.  Safety check and soft count started.
2      Q.  Uh-huh.  Is there any reference to anything that
3  Ron Gadsden is doing that raised the concern about the
4  safety of other people?
5          MR. PHILLIPS:  Objection.  Asked and answered.
6          You can answer, if you understand it, Mike.
7          THE WITNESS:  Repeat the question?
8  BY MR. COOLMAN:
9      Q.  Is there any reference in the incident report to
10 Ron Gadsden taking any action that raised a concern about
11 the safety of other people?
12         MR. PHILLIPS:  Same objection.  Vague and
13 ambiguous.
14         You can answer.
15 BY MR. COOLMAN:
16     Q.  Let me get -- let me break it down.
17         Is there any reference in here, for example, to
18 Ron Gadsden threatening somebody?
19     A.  No.
20     Q.  Is there any reference in here to Ron Gadsden
21 using force against anybody?
22     A.  No.
23     Q.  Is there any reference in here to Ron Gadsden
24 having a weapon?
25     A.  No.

Page 28

1      Q.  Is there any reference to Ron Gadsden destroying
2  property?
3      A.  No.
4      Q.  In fact, on this page, there are categories
5  about in the middle of the screen, one of which says,
6  Inmate violence.  And there's a notation, N, for no
7  inmate violence, correct?
8      A.  Correct.
9      Q.  There's a contraband question.  It says, N, no
10 contraband?
11     A.  Correct.
12     Q.  There's a facility damage question, and the
13 notation there is, N, no facility damage?
14     A.  That's correct.
15     Q.  Ron Gadsden didn't do anything that raised a
16 security risk, did he?
17         MR. PHILLIPS:  Objection.  Vague and ambiguous.
18         You can answer, Mike.
19         THE WITNESS:  My concern in control is for
20 safety.  If I feel that there is a cell in any module
21 that is calling and demanding to be let out now, I'm not
22 going to allow that cell door to be opened for the safety
23 of my deputies in the module.  I -- I don't know how
24 angry that person could be when that door opens and want
25 they may be upset about something.  I don't want someone

Page 29

1  to be let out that is already angry and that may decide
2  they want to attack a deputy.  My job is for their safety
3  while they are in the module.
4  BY MR. COOLMAN:
5      Q.  Uh-huh.  Were any of those concerns noted in the
6  incident?
7          MR. PHILLIPS:  Objection.  Asked and answered.
8          You can answer it again, Mike, if you want.
9          THE WITNESS:  Safety check and soft count.
10 BY MR. COOLMAN:
11     Q.  All right.  Let's rewind a little bit to the
12 interaction that went on with Ron.
13         He asked to be let out; you don't let him out.
14 What happens next?  I'm going to stop sharing this -- I'm
15 sorry to interrupt, but we'll call this 3.
16         (Exhibit 3 was marked for identification.)
17 BY MR. COOLMAN:
18     Q.  So he asked to be let out of the cell.  You
19 don't let him out.  You hang up on him?
20     A.  Multiple calls come in through the intercom --
21     Q.  Sir, I'm just asking a question.
22         Did you hang up on him?
23     A.  I answered the next call.
24     Q.  Okay.  But what happened to the call with Ron?
25     A.  Once another call is answered, the previous call

EXHIBIT 10

MICHAEL MCGRATH - 10/13/2022

Page 30

1  is hung up.
2      Q.  Okay.  So you did hang up on him.  It's just
3  what happened, right?
4      A.  By default, the machine hangs up.
5      Q.  Okay.  And then what happens next?
6      A.  I'm monitoring deputies while they're doing
7  their security check and soft count.  The intercom is
8  still buzzing, multiple calls from all three modules.  I
9  have to walk away from the window that overlooks the
10  module, leaving my deputies with no one to watch their
11  back, and I have to walk -- physically walk over to the
12  intercom and key up the intercom again, and another call
13  comes through.
14      Q.  Okay.  And you answer it, correct?
15      A.  Yes.
16      Q.  And what do you say?
17      A.  How can I help you?
18      Q.  Okay.  And what does Ron say?
19      A.  Intercom was answered, again, demanding to be
20  let out of the cell.
21      Q.  And is it the case here, as well, that you don't
22  remember the specific words?
23      A.  I don't recall the specific words in order.
24      Q.  And you don't let him out of the cell, correct?
25      A.  Correct.

Page 31

1      Q.  You understood why he was asking to be let out
2  of the cell, right?
3          It wasn't that he wanted to just run around in
4  the day room?
5          MR. PHILLIPS:  Objection.  Calls for
6  speculation; vague and ambiguous.
7  BY MR. COOLMAN:
8      Q.  Well, I'm asking, did you understand why he
9  wanted to go out of his cell?
10          MR. PHILLIPS:  Same objections.
11  BY MR. COOLMAN:
12      Q.  You can answer, sir.
13      A.  Calls come through asking for a visit, any
14  question for property, TV, multiple questions come in.
15      Q.  Sure.
16          My question was, did you understand why Ron was
17  asking to be let out of his cell?
18      A.  Yes.
19      Q.  Okay.  And what -- what was the reason you
20  thought he wanted to be let out of his cell?
21      A.  Say that again, please?
22      Q.  What was the reason you thought Ron wanted to be
23  let out of his cell?
24      A.  He wanted to be let out for his video visit.
25      Q.  Thank you.

Page 32

1          By the way, I want to say, if at any point you
2  want to take a break or whatever, it's fine.  I want to
3  go a little more here, but then, myself, I got to step
4  out.
5      A.  Actually, I need to use the restroom.  So could
6  we --
7      Q.  You want to step out for a few minutes or
8  something?
9          MR. COOLMAN:  Let's go off the record for ten
10  minutes.
11          MR. PHILLIPS:  Are we taking a break?  Sorry.  I
12  missed that.
13          MR. COOLMAN:  Yeah.  Just take a quick bathroom
14  break for ten minutes.
15          MR. PHILLIPS:  Ten minutes.  Okay.
16          MR. COOLMAN:  Thank you.
17  (A recess was held from 10:31 a.m. until 10:45 a.m.)
18          MR. COOLMAN:  Back on the record.
19  BY MR. COOLMAN:
20      Q.  Okay.  Going back to the incident report, the
21  incident report does refer to the data that Ron Gadsden
22  requested an IA form, correct?
23      A.  Correct.
24      Q.  And did you know what he meant by an IA form?
25      A.  Yes.

Page 33

1      Q.  What was that?
2      A.  Internal affairs.
3      Q.  Okay.  Was that an important detail to you?
4      A.  No.
5      Q.  It was not an important detail, but you included
6  it in your report, correct?
7      A.  It was included in my report.
8      Q.  Uh-huh.  Why did you include it in your report?
9      A.  It was included in the report because of the
10  foul language used in requesting.
11      Q.  Okay.  But you didn't just describe the foul
12  language.  You also referred to the request for an IA
13  form, right?
14      A.  The foul language with the request for an IA
15  form.
16      Q.  Right.  What -- how many incident reports do you
17  think you've filed or wrote in the six months prior to
18  this incident, just ballpark?
19      A.  I can't recall how many.
20      Q.  Okay.  But were there some?
21      A.  Yes.
22      Q.  Do you think it might be as many as ten?
23      A.  I can't put a number on it.  I don't recall how
24  many were written.
25      Q.  Okay.  But there were some?

EXHIBIT 10

Page 54

1  half an hour and makes a video call?
2      A.  I don't recall anyone coming out for a visit.
3      Q.  Whether you recall it or not, that's what the
4  video shows, doesn't it?
5      A.  It doesn't specify that he wasn't ordering
6  commissary or on a video call.
7      Q.  All right.  Let's shift gears a little bit.
8          Are you familiar, broadly speaking, with the
9  sheriff's department policies on disciplinary action?
10     A.  Repeat the question, please?
11     Q.  Are you familiar, generally speaking, with the
12  San Diego Sheriff's policies on disciplinary action?
13     A.  I'm familiar with the RVR.
14     Q.  What does RVR stand for?
15     A.  Rule violation report.
16     Q.  Okay.  To the best of your knowledge, under the
17  policies of the San Diego Sheriff's Department, what was
18  the difference between a major and a minor disciplinary
19  violation?
20     A.  I don't recall the exact policy.  I would have
21  to review that.
22     Q.  What are some examples of a minor disciplinary
23  violation?
24     A.  Minor could be the disrespect to staff;
25  boisterous activity; interfering with jail operations;

Page 55

1  tampering with locks, doors, lights; not locking down
2  when they are supposed to; not being clothed; tearing
3  apart clothes; destruction of jail property.
4      Q.  Okay.  Maybe -- I just want to make sure I
5  understand your testimony.  It sounded to me like you
6  said the three factors that are cited in the incident
7  report are all minor violations; is that right?
8      A.  As a rule violation.
9      Q.  But -- but you consider those to be minor
10  violations; is that correct?
11     A.  The severity of it being minor that -- as far as
12  the discipline, I don't have any control over that.  The
13  sergeant makes the decision on how far they're going to
14  go with the discipline.
15     Q.  Well, I think that's a different issue.  I'm
16  asking what you personally consider those violations to
17  be, whether they be major or minor.
18     A.  It is a rule violation.  The rules of the
19  facility were broken.  Therefore, the -- the report was
20  written.
21     Q.  Okay.  And you don't have an opinion on whether
22  they're major or minor?
23     A.  For them being major or minor, I don't -- I
24  don't have any specific.
25     Q.  Okay.  So when I asked you for some examples of

Page 56

1  minor rule violations and you referred to those three
2  things, disrespect to staff and interfering with jail
3  operations, was that a mistake or are you changing your
4  testimony?
5          MR. PHILLIPS:  Objection.  Argumentative;
6  mischaracterizes testimony.
7          You can answer.  Are you changing your testimony
8  or did you understand what minor or major meant as
9  Mr. Coolman described it or something else?
10         THE WITNESS:  The differences between minor and
11  major, I don't know the specifics of that.
12  BY MR. COOLMAN:
13     Q.  Okay.  What was your goal in writing --
14         (Reporter clarification.)
15  BY MR. COOLMAN:
16     Q.  What was your goal in writing up Mr. Gadsden?
17     A.  The write-up was written due to Gadsden's
18  boisterous activity, the yelling over the intercom, the
19  raised voice, the demanding to be let out, the repetitive
20  call -- the multiple calls that came in after I had
21  already explained, When you can be more respectful, call
22  me back.  And when the call came back in, there was the
23  disrespect again and the yelling and demanding to be let
24  out.
25         And the third call had came through, again, with

Page 57

1  the yelling and the demanding, and at that point, I made
2  the decision to write the rule violation, and I notified
3  my floor deputies that he needed to be transferred.
4      Q.  Okay.  I get that.  What I'm asking about is
5  what were you trying to accomplish.  What was your
6  objective?
7      A.  The rule violation is to inform Gadsden that he
8  has broke the rules at Facility 8 and to let him know
9  that Facility 8 was a facility that inmates wanted to be
10  at -- they had more privileges, they got longer TV time,
11  there was less -- less fighting over the phones, and more
12  time for them to enjoy phone time, TV, they had the nicer
13  chairs to sit in.
14         And once that -- the basic rules were broken,
15  then there was the -- you needed to be transferred out.
16  You could no longer be at this facility and enjoy the --
17  the perks that came along with being at that facility.
18     Q.  Okay.  So let me -- let me say back to you what
19  I think I heard you say, and you tell me if this is
20  correct.  One idea was to inform Gadsden that he had
21  broken rules, and the other is, essentially, to say,
22  Look, Facility 8 has some perks and you're going to lose
23  those if you miss behave; is that correct?
24     A.  Yes.
25     Q.  Okay.  Now to accomplish this goal, you took

Page 70

1    A.  Yes.
2    Q.  Okay.  Thank you.
3        Do you know a sheriff's department employee
4  named David Smith?
5    A.  No.
6    Q.  You have no association with him at all?
7    A.  No.
8    Q.  Okay.  Have you ever spoken with David Smith?
9    A.  I think there was a David Smith on my team.
10   Q.  Which team would that be?
11   A.  Team 2.
12   Q.  I'm sorry.  I don't know the inner workings of
13 the whole thing.
14       Can you give me a little more context?
15   A.  So there was four teams at the facility.  Two
16 teams typically worked a 12 1/2-hour shift, and then once
17 their shift was over, the oncoming team would come in and
18 they would work 12 1/2-hour shift.  And then after that
19 shift, the next team would come in.
20       Typically team -- two teams would share, like, a
21 week schedule, and then we would be off work, and then
22 the other two teams would share the next week schedule.
23   Q.  Okay.  So did I understand you to say that David
24 Smith was on Team 2 with you?
25   A.  I recall a Smith on Team 2.

Page 71

1    Q.  You don't know his first name?
2    A.  I don't recall his first name.
3    Q.  Okay.  Did you ever have any conversations with
4  Mr. Smith regarding Ron Gadsden?
5    A.  I don't recall.
6    Q.  Okay.  And do you know if you, after
7  February 15, 2019, ever had any additional interactions
8  with Ron Gadsden?
9    A.  I don't recall any interactions.
10   Q.  Okay.  I -- that's all I basically have.  If
11 you -- if you don't mind, I want to look at my notes for
12 a minute and may follow up on one or two things.
13       Let me just ask you a little bit more about the
14 whole structure of the sergeants of a facility.
15       Did I understand correctly that you testified
16 that there was three sergeants over the facility?
17   A.  There -- in a shift, there typically was three
18 sergeants.
19   Q.  Okay.  And those people varied from day-to-day?
20   A.  It could vary.  If someone was out sick or on
21 vacation, there would have been a sergeant to fill in for
22 them.
23   Q.  But in general, it was the same three people?
24   A.  For -- for a period, a lot of sergeants would --
25 would get hired and come in, and we would lose one, gain

Page 72

1  one, lose one, gain one.  So that was constantly
2  happening.
3    Q.  Okay.  And do I understand correctly that
4  you're -- you don't recall the names of any of the
5  sergeants who were in charge in February of 2019 --
6  February 15, 2019?
7    A.  For -- for the facility, I don't recall who was
8  in charge.
9    Q.  Okay.  I think that's all I've got.  Thank you
10 very much for your time today.  I appreciate it.
11       MR. PHILLIPS:  I just have a couple follow-up
12 questions.
13 EXAMINATION BY MR. PHILLIPS:
14   Q.  Mr. McGrath, is there something unique about the
15 security of Facility 8 versus other facilities?
16   A.  Facility 8 was outside of George Bailey.  It was
17 located in the back.  Deputies were placed there because
18 they had -- typically had good rapport with inmates, they
19 could handle high stress situations with -- with getting
20 situations under control.
21       The facility, if there was any -- any security
22 issues, if a deputy got jumped or there was a fight, to
23 get cover from the other facility, deputies would have to
24 leave George Bailey, go out the back, and essentially run
25 down the street.  And it would take several minutes for

Page 73

1  them to get there, leaving us at a higher risk to where
2  our -- our cover couldn't be there in ten seconds.  It
3  took a long time.  And by the time they got there, it
4  could have been over.  There could have been significant
5  injury to deputies, inmates.  There was only so many of
6  us and we had -- we would have to rely on outside help
7  from George Bailey.
8    Q.  You have looked at an exhibit earlier.  I think
9  it was Plaintiff's Exhibit 3.  It was entitled an
10 incident report, there was several pages, and you said
11 that you -- you wrote that report, right?
12   A.  Yes.
13   Q.  Did you write everything in that report or is
14 there a portion of that -- how does that get processed
15 into JIMS, if you recall?
16       MR. PHILLIPS:  And maybe, Alex, if you don't
17 mind putting that up if you have it readily available?
18       MR. COOLMAN:  Sure.  Yeah.  It sounds like there
19 were two questions there.  Those were good questions
20 though.
21       MR. PHILLIPS:  You're right.  Sorry.
22 BY MR. PHILLIPS:
23   Q.  Going back to Exhibit 3, the Plaintiff's
24 Exhibit 3, the incident report, Mr. McGrath, what portion
25 of that did you write?

# EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

RONALD EARL GADSDEN,                )

                                    )

              Plaintiff,            )

                                    )

      vs.                           )  Case No.

                                    )  20-cv-02258-WQH-DEB

                                    )

SERGEANT JOHN GEHRIS, DEPUTY        )

SHERIFF; DEPUTY MICHAEL MCGRATH,    )

DEPUTY SHERIFF,                     )

                                    )

              Defendants.           )

- - - - - - - - - - - - - - - - - -


VIDEOTAPED DEPOSITION OF RONALD EARL GADSDEN

OCEANSIDE, CALIFORNIA

MONDAY, NOVEMBER 7, 2022



REPORTED BY:

AMY R. NEYHART

CSR No. 12469

Job No. 279576

1

EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

---

**Page 2**

1        UNITED STATES DISTRICT COURT
2        SOUTHERN DISTRICT OF CALIFORNIA
3
4    RONALD EARL GADSDEN,          )
                                   )
5           Plaintiff,             )
                                   )
6       vs.                        ) Case No.
                                   ) 20-cv-02258-WQH-DEB
7                                  )
     SERGEANT JOHN GEHRIS, DEPUTY  )
8    SHERIFF; DEPUTY MICHAEL MCGRATH, )
     DEPUTY SHERIFF,               )
9                                  )
            Defendants.            )
10   - - - - - - - - - - - - - - - -
11
12
13
14
15
16        VIDEOTAPED DEPOSITION OF RONALD EARL GADSDEN, a
17   witness herein, appearing remotely in Oceanside,
18   California, taken on behalf of the Defendant Deputy
19   Michael McGrath, beginning at 10:05 a.m. and ending at
20   4:57 p.m., on Monday, November 7, 2022, before
21   Amy R. Neyhart, CSR 12469
22
23
24
25

---

**Page 4**

1                      INDEX
2    WITNESS:  RONALD EARL GADSDEN
3    EXAMINATION BY                    PAGE
4    MR. PHILLIPS                      6
5    MR. COOLMAN                       220
6
7          E X H I B I T S
8    EXHIBIT       DESCRIPTION          PAGE
9    1       San Diego County Sheriff's   114
             Department document
10
11   2       Document                  134
12
13   3       Document                  140
14
15   4       Appeal of Discipline      142
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1    APPEARANCES:
2
3    For Plaintiff:
4        LAW OFFICE OF ALEX COOLMAN
5        BY ALEX N. COOLMAN, ESQ.
6        3268 Governor Drive, Suite 390
7        San Diego, California 92122
8        619.831.7129
9        alex@coolmanlaw.com
10
11   For Defendant Deputy Michael McGrath:
12       OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
13       BY ADAM C. PHILLIPS, ESQ.
14       1600 Pacific Highway, Room 355
15       San Diego, California 92101
16       619.531.6416
17       adam.phillips@sdcounty.ca.gov
18
19   Also Present:  Abel Sibrel, Videographer
20
21
22
23
24
25

---

**Page 5**

1              OCEANSIDE, CALIFORNIA
2         MONDAY, NOVEMBER 7, 2022; 10:05 A.M.
3
4
5        THE VIDEOGRAPHER:  Good morning.  The time on
6    the record is 10:05 a.m.  Today's date is November 7,
7    2022.  My name is Abel Sibrel with Peterson Reporting,
8    Video & Litigation Services.  The court reporter for
9    today is Amy Neyhart at Peterson Reporting, located at
10   530 B Street, Suite 350, San Diego, California 92101.
11       This begins the Zoom recorded deposition of
12   Ronald Earl Gadsden testifying in the matter of Ronald
13   Earl Gadsden versus Sergeant John Gehris, et al., in the
14   United States District Court, Southern District of
15   California; Case No. 20-cv-02258-WQH-DEB.
16       Will counsel please identify yourselves and
17   state whom you represent.
18       MR. PHILLIPS:  Adam Phillips on behalf of
19   Defendant Michael McGrath.
20       MR. COOLMAN:  Alex Coolman for Mr. Gadsden.
21       THE VIDEOGRAPHER:  Thank you, Counselors.
22       Can I have our court reporter please swear in
23   the witness.
24   ///
25   ///

---

EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

1  that we're back at February 15, 2009 [sic], Facility 8.
2       With that context in mind, are -- what are the
3  differences between those cells, if any?
4       MR. COOLMAN:  I'm going to object as the
5  question is vague, and it's all over the place.
6  Compound.
7  BY MR. PHILLIPS:
8       Q   You can still answer the question, Mr. Gadsden.
9  What's the difference between any of those
10 cells, if any?
11      A   Well, the one at Facility 8, originally that
12 was like -- I don't know.  It was probably the cleanest
13 out of all of them.  And -- I don't know.  It was -- I
14 was -- I guess you would say not even -- it wouldn't be
15 comfortable there because you're never really
16 comfortable, but I -- I -- you know, it was cleaned to
17 my expectations, I would say.  Like because I -- we -- I
18 had a regimen in a sense, like a program going to where,
19 like, my day was in -- it was structured.
20      And then the hole was the worst thing ever
21 because it -- I mean, that -- immediately after when I
22 walked in there, I knew I had to clean this place
23 because it was just -- I don't know.  The accumulation
24 of however long it was like that -- which I don't know.
25 That was -- it was pretty -- pretty bad.

38

1       And then the -- the last one -- or not the last
2  one.  The -- the reception one, it wasn't bad.  It
3  was -- it was quite clean.  So it went from clean --
4  South Bay, again, it was a -- it was -- like a revolving
5  door of program because we had three people in there.
6  So, you know, you kind of have to stay on top of that
7  kind of stuff because it could easily get messed up.
8       But, yeah, if that -- if that answers your
9  question.
10      Q   So you recall Facility 8 generally being
11 cleaner than the other cells at either George Bailey or
12 South Bay.  Is that fair to say?
13      A   Well, the Facility 8 one is the one -- I mean,
14 like, we -- I -- the person that was in there with me
15 and myself, we had a structure to where, I mean, we were
16 both pretty clean guys, so that -- that particular spot
17 was pretty clean, yeah, because we cleaned it, not
18 because it was cleaned naturally or somebody else did
19 it.  It's because we stayed on top of it, that's why it
20 was clean.
21      Q   And you said that the -- the cell that you
22 described as isolation or the hole, the week at George
23 Bailey, was quite a bit dirtier than that.  Could you go
24 into more detail about that cell and describe it as best
25 you recall?

39

1       A   I apologize for saying this, but there was
2  feces on the wall, on the bed.  It smelled like urine.
3  There's -- I mean, multiple ethnicities' hair everywhere
4  in there.  Roaches, like, literally crawling on you.
5  And the sink and the toilet, I mean, it's -- it's
6  just -- I don't know.  It just seems like hepatitis
7  everywhere in there.  Just disgusting.  That's about the
8  gist of it.
9       Q   And did you ever talk to the cellmate, Koran --
10 or however you said his name was -- about that?
11      A   Well, in a sense, yes.
12      Q   Did you believe it was something he did or do
13 you believe it was something that predated him?  How do
14 you think that stuff got there, I guess?
15      A   I don't know.  It was pretty bad.  I'd assumed
16 it -- it accumulated over, like, a lengthy amount of
17 time.  I don't think they clean those cells.  I
18 wouldn't -- I don't know.  It's pretty -- it was
19 collective, I would say.
20      Q   And what did you talk to the cellmate about in
21 regards to the condition of the cell?
22      A   Well, mind you, it's -- it's, like, late at
23 night, and that was, like, kind of stressful situation,
24 you know.  So what I did is right when I walked in
25 there -- for one, I'm shocked that I'm even in there.

40

1  So -- and then I'm shocked that there's somebody in the
2  cell.
3       So then when I get in there, I look and I --
4  and I didn't know who I was dealing with.  So I -- you
5  know, I talked to him briefly because it was late and he
6  was asleep and I didn't want to be rude.  So I just kind
7  of woke him up a little bit and said, hey -- you know,
8  introduced myself.  And then I looked around, and it was
9  so bad that I had to figure out a way to clean this
10 place.  So I -- you know, I just asked him, "Hey, is it
11 cool if I clean this up, you know, clean this place?"
12      He's like, "Yeah," you know, and just went back
13 to sleep.
14      But if it answers your question, I -- right
15 when I walked in there, it was obvious that this place
16 has never been -- it was a cumulation of a long time of
17 gross, disgusting stuff, basically.  Body -- body --
18 like body sheddings, basically, and -- and dirt.
19 Just -- I don't -- it's gross.
20      Q   And did you clean it up?
21      A   As well as I could.  I mean, it -- it took --
22 because I was in there for a week, so I cleaned as
23 much -- as well as I possibly could to make it
24 somewhat -- you know, I don't know.  It was pretty bad.
25 Can't say I cleaned it up, but I tried.

41

11

EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

---

**Page 42**

1    Q   And did you say anything else to the cellmate
2  about the condition of the cell other than just try not
3  to wake him up and saying, "Hey, you know, do you mind
4  if I clean this up?"
5    A   Not at that moment in time, no.
6    Q   Okay.  It's been about an hour, Mr. Gadsden.
7  I'm going to try and take breaks about every hour just
8  to allow you to kind of go to the restroom, get a drink
9  of water, kind of relax a little bit.  Because I know
10  that this can be stressful.  It can be, you know -- and
11  so we're going to try and make it as -- as less
12  impactful as possible.  So I like to take breaks every
13  hour for about ten minutes.
14      So if it's all right with you, we can take a
15  quick ten-minute break.  You're welcome to use the
16  restroom.  Make sure you turn the camera off and mute
17  your microphone because it's still live for everyone
18  else if they wanted to look -- look into that.
19    A   Yeah.  Thank you.
20      THE VIDEOGRAPHER:  We're off the record.  Time
21  is 11:01 a.m.
22      (Off the record.)
23      THE VIDEOGRAPHER:  We're back on the record.
24  Time is 11:12 a.m.
25  ///

---

**Page 43**

1  BY MR. PHILLIPS:
2    Q   Mr. Gadsden, I'd like to go now to February 15,
3  2019, and talk about what occurred on that day.
4    A   Okay.
5    Q   And you were in a cell at Facility 8 on that
6  day, right?
7    A   I was.
8    Q   How long had you been in that cell?
9    A   Oh, I don't know.  Maybe a month, month and a
10  half.
11    Q   And did you have any cellmates?
12    A   Yes, I had one.
13    Q   And who was that?
14    A   The Samoan gentleman that I spoke of earlier.
15    Q   And that's the same person you were in a cell
16  with in May of 2019 when you came back?
17    A   No.
18    Q   So different Samoan guy?
19    A   No.  The guy that -- the guy that -- when I
20  came back, the guy from Atlanta was black.  He wasn't
21  Samoan.
22    Q   So on February 15, 2019, you had one cellmate
23  who was Samoan?
24    A   Correct.
25    Q   Do you remember his name?

---

**Page 44**

1    A   I think his name was John, Jonathan.
2    Q   And was that the person you described earlier
3  as you guys had sort of an understanding on, you know,
4  how to -- your schedule and your shift and how the cell
5  operated in terms of cleanliness, that kind of thing?
6    A   Yes.  And generally -- generally that's how it
7  usually is.  Like -- so the guys in -- in South Bay was
8  the same situation.  I mean, they were pretty clean
9  guys.
10    Q   And you had a video visit scheduled on
11  February 15, 2019; is that right?
12    A   I did.
13    Q   Is that -- well, let's go back to sort of the
14  beginning of that day.
15      Did you have any video visits earlier in the
16  day?
17    A   No.
18    Q   Are those only at particular times?
19    A   Yes.  It's like a time slot.
20    Q   And as best you recall, what was your
21  understanding of how that worked?
22    A   Which part?
23    Q   The -- the timing of video visits, the slots.
24  How does that system work?  Pretend I don't know
25  anything about it, which is --

---

**Page 45**

1    A   Okay.  I get it.
2      So the -- so what happens is at 12:00 a.m., the
3  person -- the people on the outside -- so I'll just use
4  my situation as -- as a template.
5      My girlfriend -- so 12:00 a.m. the whole thing
6  resets.  The whole kiosk and the time slots, they reset
7  to go completely blank.  So what they -- the people
8  that -- so what my girlfriend does -- or did was she
9  would call in to -- I believe it's called Securis and
10  talk to the -- talk to the people that handle that -- or
11  they go online and do it.  I'd imagine you could do
12  either or.
13      And so the faster -- first-come first-served
14  basis, basically.  So if you -- if you get 12:01, you
15  get to pick whatever time slot fits the format of your
16  day.  So what they would do is it's like -- they pay $5
17  for a 30-minute time slot.  And I think they start
18  from -- actually I don't know what time they start in
19  the morning, but they start in the morning and they end
20  at 9:00.
21      Are you there?
22    Q   Yeah, so any -- like 12 minutes and one second,
23  you want -- or midnight and one second, you want to be
24  one of the first ones on there and then you get sort of
25  your carte blanche pick, whichever time you want?

---

EXHIBIT 11

12

Ronald Earl Gadsden, 11/7/2022

1    A   Exactly.
2    Q   Okay.  And then there's really -- that's how
3    it's picked who is at which time?
4    A   Right.
5        So the people -- so the -- you can't do it.  If
6    you're inside there -- like if you're in jail, you can't
7    request anything.  It has to be somebody requesting to
8    visit you.  Similar to -- it's basically like if someone
9    was going to visit you in physical form, they would have
10   to come -- they would have to set the reservation and
11   then come physically do that.
12       So what that does is does it virtual, and
13   you're able to set -- the people that are free, I would
14   say, they have to pay for it for one.  They have to --
15   they have to -- you know, first-come first-served, be on
16   point with setting up the appointment, and then they
17   have to sign on to the appointment in order for it to
18   turn into a meeting, I would say.
19   Q   And so on that particular day -- whatever slot
20   you got was kind of chosen for you, that was the slot.
21   And you didn't have any other video visits earlier in
22   the day prior to, after 6:00 p.m.?
23   A   Correct.
24   Q   How do you learn that you have a video visit?
25   How -- how does that work?

46

1    A   Generally in the morning at breakfast.  Because
2    they serve breakfast at 4:00 or 4:30 in the morning.
3    You get up, you know, you go to breakfast, and then you
4    can check the little kiosk thing, the terminal.  You can
5    check it and look and see if -- if you even have one.
6    Q   And then it would just list anybody who has a
7    video visit?
8    A   No.  It's kind of like an Excel spreadsheet.
9    It's -- it's set up with time slots all the way --
10   running all the way from the beginning of the starting
11   of the visits for that day to the end.  And so you
12   find -- you know, if your name's not on it, then you
13   don't have one.  But if your name is, then it's set in
14   that particular slot.
15   Q   Is that the same kiosk that you would then have
16   a video visit on or is that, like, a different kiosk?
17   A   No.  I think it was on -- it would be on that
18   kiosk.  Well, it would say -- so there's two of them.
19   So if it's -- it will tell you either one.  You know
20   what I mean?  One -- T1, or whatever it was, or T2.  And
21   so -- they're -- they're numbered.
22   Q   Right.  So even if there's two different
23   kiosks, I guess, it's the same machine, type of machine.
24   The machine where either one or two or however many
25   there are that you can do the video visit on is the same

47

1    one that displays that -- that sort of, like, Excel
2    spreadsheet you were talking about.  Is that right or am
3    I wrong?
4    A   They -- they -- no.  They both display the same
5    thing, but they designate which one that you will be on.
6    So it will have two names for that hour -- or for that
7    half hour, and it will say one or two.  You know what I
8    mean?  So it would -- it would let you know.  It would
9    designate it already.  It would separate it for you.
10   You'd know.
11   Q   So if I'm going there at breakfast and I want
12   to see whether I have one, you know, like after lunch,
13   it shows me the whole day, right?  I can see if I have
14   it later that day or no, you have to wait until before?
15   A   If you waited until lunch and your -- and your
16   meeting was at 8:00 in the morning, then I don't think
17   it would still be on there.  I think it just erases.
18   Like -- so it will keep things that are in the future,
19   but it won't hold the past.
20   Q   Okay.  So -- but, like, what you just
21   described, you went to breakfast, you would look at
22   that.  And if you had one say at 6:00 p.m. or even
23   8:00 p.m. or whenever they ended, you could see that at
24   that time at breakfast?
25   A   Yes.

48

1    Q   Okay.  So did you check the screen that day on
2    February 15, 2019, when you were at breakfast?
3    A   I did.
4    Q   And -- and what did you see?
5    A   That I had a visit.
6    Q   And what did it tell you about that visit, if
7    anything?
8    A   That it was my girlfriend, and it's at 7:00,
9    7:00 p.m.
10   Q   And, apologies, what's your girlfriend's name
11   again?
12   A   Her name is Tina Jaworski.
13   Q   Could -- could you spell the last one -- for
14   the court reporter too?
15   A   J-, as in Jack, -a-w-o-r-s-k-i.  Jaworski.
16   Q   Did you have any other in-person visits or
17   anything else that you did that day?  Calls, anything
18   like that to people outside of the jail?
19   A   I don't -- I don't believe so, no.  But you
20   don't get in-person visits there.  The only way that you
21   can see your family, like -- like how you can see me
22   now, is the video visits.  They don't do in-person
23   visits there.  That's the only way.
24   Q   Can you call people, too, or is it -- is it
25   just the video visit?

49

13

Ronald Earl Gadsden, 11/7/2022

1  money.  There's a multitude of things that can be going

2  on.

3      But generally, I mean, it's your -- wake up,

4  you eat.  Depending on your workout schedule, you work

5  out depending on the guards if they let you work out.

6  And then, you know, again you eat.  And then you, you

7  know, try to keep yourself busy, try to keep your mind

8  active and not, like, focus on being in there, you know,

9  because that will probably drive you crazy if you're

10  just stuck focused on that.  So you just -- I would just

11  keep my mind busy, honestly.

12      Q  So let's go to the 30 minutes, hour approaching

13  the video visit.  At some point you call the control

14  tower, right?

15      A  Prior to the video visit?

16      Q  Yes.

17      A  No, I did not call them prior.

18      Q  Okay.  You had a video visit scheduled at

19  7:00 p.m.?

20      A  Correct.

21      Q  You didn't call anyone prior to that?

22      A  No.

23      Q  Okay.  Why don't you walk me through sort of

24  what you did approaching the time period for your video

25  visit, like in preparation for the video.

54

1      A  Okay.

2      Q  Just generally I'm --

3      A  So what I did earlier is I'd worked out with

4  that gentleman Willy that was the prior cell that I was

5  in.  I had worked out with him pretty hard earlier.

6  And -- and he was a day worker that day.  It fell on his

7  cell, so they were out all day.  Their cell doors were

8  open all day.  So what -- what I had asked him --

9  because I knew in between 4 o'clock and 7 o'clock how

10  hard we worked out that I am probably going to fall

11  asleep.

12      So I told him that I had a video visit at

13  7 o'clock and could he wake me up half hour beforehand

14  so I could, you know, brush my teeth and get, you know,

15  ready to be presentable somewhat for my video visit.

16  And then about ten minutes before, you know, 20 minutes

17  or half hour or whatever I asked him to do, he said --

18  he came and knocked on the door, woke me up.  And I woke

19  up, got ready.  And that's it.

20      Q  Okay.  Did he come into the cell?

21      A  No.  No.  The door is closed.

22      Q  Okay.  So he woke you up from outside the cell?

23      A  Correct.

24      Q  Like a banging on the door or kind of just

25  saying something loud?  Could you hear that?

55

1      A  Yeah.  I mean, he -- he woke me up.  He wasn't

2  rude about it, but he woke me up.

3      Q  Right.  Okay.  And then you got ready, like you

4  said, making yourself presentable.

5      A  (Witness nods head.)

6      Q  What did you do next?

7      A  I waited.

8      Q  In -- in your cell?

9      A  Yes.

10      Q  Okay.  And -- and what were you waiting for?

11      A  For the door to pop.  Because generally they

12  would pop the door.  Like from prior visits -- I mean,

13  prior video visits and any other visit, generally they

14  will just pop your door.  Even if I was asleep, they'd

15  pop my door and say "Gadsden, you have a visit."  And

16  then you go do that because they have, ultimately, the

17  control of you having your visit.

18      Q  So did you just keep waiting there or did you

19  do something at some point?

20      A  No.  I waited.  I waited until -- well, I saw

21  the other gentleman with -- with the other kiosk that

22  had the same time -- time slot as me.  I saw him go and

23  grab a chair and sit down and prepare for his visit.  So

24  I -- I assumed that my door was going to be popped any

25  moment.  So I just sat there waiting.

56

1      Q  And do you know who that other inmate was?

2      A  I don't recall his name.  But, I mean, I

3  could -- I could find out his name.

4      Q  How did you know that you both had a video

5  visit scheduled at the same time?

6      A  Well, because, like I said about the kiosk,

7  when you look on there, you'll have -- you'll -- I mean,

8  it's pretty easy to discern or differentiate what and

9  whatnot.

10      Q  And when you checked that list, did you know

11  who that was?  Did you recognize his name or did you

12  both look at the screen at the same time and kind of

13  realize that you both had the visit?  How did -- how

14  did -- how did you come to that realization that you

15  both had the -- that that particular person had a visit

16  at the same time prior to him walking out?

17      A  Well, I mean, I didn't -- I can't say that I

18  even did know it was him, per se, because I didn't speak

19  to that gentleman much in general.  So I -- I didn't

20  really recall his name.  Even if I would see it, I

21  wouldn't have known it was him.  But once he got on to

22  the kiosk, it was obvious.

23      Q  Okay.  So when you -- when you saw him, you

24  could see him through the cell, through the window in

25  the cell?

57

Peterson Reporting Video & Litigation Services

EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

**Page 58**

1  A  Yeah.  The windows are probably like four --
2  4 inches by a foot and a half maybe.  So, yeah, through
3  that little window I could see directly over there, and
4  he was already on his video visit.  Like he went right
5  on.
6  **Q  Okay.  So you didn't know whether he'd been**
7  **scheduled or whether he had the same time as you, but**
8  **at -- when -- you saw him go over to the kiosk and go**
9  **through a video visit from your cell.  Is that fair to**
10  **say?**
11  A  Yeah, I could see that he was -- I mean, he
12  was -- besides the two workers, he was the only other
13  person permitted out.  They popped his door.  So, I
14  mean, it's pretty obvious when you're looking at it from
15  my point of view.  There's only two other people out
16  because they're cleaning and doing whatever they have to
17  do and then there's a video visit -- that's two video
18  visits supposed to take place, and one person goes out
19  and goes straight to the video visits.  So, I mean, it's
20  pretty -- I mean, I saw the camera footage.  It's pretty
21  basic.  You can -- you can discern it easily.
22  **Q  And is that a memory you have independent from**
23  **looking at the camera footage, the video footage, or is**
24  **that something that you recall because you were seen in**
25  **the video?**

**Page 59**

1  A  Oh, no.  I completely recall it from my own eye
2  view through the window.
3  **Q  From your perception in the cell?**
4  A  Correct.
5  **Q  On the day of the incident?**
6  A  Yes.  At the time, date, yes.  I completely
7  remember it.
8  **Q  Okay.  But going back to when you realized that**
9  **someone else is having a video visit, when you see him**
10  **out there, that's why you know you had a visit at**
11  **the same time.  You didn't talk to him about it or you**
12  **guys didn't have discussions about it prior to?**
13  A  No.  I never talked to him and clarified that
14  he's the other person with the video visit, if that's
15  what you're asking.  No.
16  **Q  Did you ever talk to him at all about his video**
17  **visit?**
18  A  No.
19  **Q  Okay.  After you see this other inmate going up**
20  **to one of the kiosks, what do you do next?**
21  A  I waited.
22  **Q  And how long did you wait?**
23  A  I don't know.  He was let out maybe a minute or
24  two before 7:00.  So I waited probably five minutes.
25  **Q  Okay.  And what did you do next?**

**Page 60**

1  A  Once -- once it was into my, like, pretty -- I
2  don't know, a couple minutes into my visit, I pressed
3  the button.  There's an intercom in my cell to where,
4  like, if somebody was -- I don't know -- hurt or having
5  some kind of problem or whatever, you know, they press a
6  button and then you have -- it's an intercom.  So
7  one -- I guess you would call it a two-way intercom.
8  And then the person on the other end -- you know, you
9  press a button, the person on the other end answers it.
10  **Q  And when you first pressed the intercom, that**
11  **was a couple of minutes past 7 o'clock?**
12  A  Yes.
13  **Q  And after you pressed the intercom, what**
14  **happened next?**
15  A  Somebody answered it, actually.  Someone --
16  someone answered it.
17  **Q  And do you know who answered it?**
18  A  I know now.  But at that time, no, I didn't
19  know who it was.
20  Q  Did the person who answered it say anything?
21  A  They did.
22  Q  What did he or she say?
23  A  Said, "How can I help you?"
24  Q  Did they say anything else?
25  A  No, not at that -- that moment in time, no.

**Page 61**

1  Q  And did you say anything in response?
2  A  I did.
3  Q  And what did you say?
4  A  I said, "I have a video visit.  Can you open my
5  door, please."
6  Q  Did you say anything else?
7  A  I didn't.  Not at that time, no.  I was --
8  that's all I said.
9  **Q  And did he say anything in response to that?**
10  A  He did not.
11  Q  What happened next?
12  A  I pressed the button again.
13  **Q  So going back to the first pushing of the -- of**
14  **the button, the person answered "How can I help you?"**
15  **You responded "I have a video visit.  Can you open my**
16  **door, please."  And there was no more conversation**
17  **either from you or from the other person?**
18  A  Right.  So they left me at a dead silence.
19  **Q  Okay.  Did you hear any noises or anything like**
20  **that?**
21  A  No.  I mean -- well, it depends on what you
22  mean.  Like through the speaker of the intercom.
23  Q  Through the speaker of the intercom.
24  A  No, I didn't hear anything.  It was just kind
25  of a dead silence.  So I kind of walked back to my

Ronald Earl Gadsden, 11/7/2022

1    door -- the door thinking that somebody's going to pop
2    the door so -- and then but they didn't, so I pressed
3    the button again.
4        Q    Okay.  So it's dead silence, you don't hear
5    anything coming through the speaker, so you walk over to
6    the door thinking the door is going to be opened.  Is
7    that fair to say?
8        A    Correct.
9        Q    And then the door doesn't open?
10       A    Does not.
11       Q    Then how -- how far away is the door from the
12   intercom speaker?  Is it like a couple steps?  Give me a
13   sense for how long that it takes you to do that.
14       A    Literal -- I don't know.  Like, 4 feet.  It's
15   right here, so like over there -- like, yeah, about
16   4 feet.  Give or take about 4 feet.
17       Q    So would you have to step between the door and
18   the speaker in order to press the speaker and then come
19   back to where the door was or could you reach it from
20   that far?
21       A    I -- well, I definitely -- I mean, I wouldn't
22   stretch like that, so I'd have to walk back over to it.
23   I'd take a step or two and take a step back.
24       Q    Okay.  And that's what you did here on
25   February 15, 2019, after the door didn't open when you

                                                    62

1    expected it to, you took a step back over to the speaker
2    and then pressed the button again?
3        A    Well, I -- well, I went to the door.  I waited
4    a second.  It didn't open, so I'm just standing there.
5    And mind you, it was a dead silence, so I didn't know
6    whether or not he's going to open the door, what -- you
7    know, I assumed he's going to open the door.  And then
8    he -- as it didn't open and time's going by, I pressed
9    the button again because I was -- I didn't have any -- I
10   didn't understand.  I didn't get what was going on.
11       Q    Do you recall how long of a period that was
12   after you said "I have a video visit.  Can you open my
13   door, please," and the next time that you pressed the
14   button?
15       A    I don't know.  Maybe one minute, two -- a
16   minute.  Well, I wasn't sure what -- that he even heard
17   me or who -- like I said, I was left in a dead silence.
18   I -- by him not answering, I figured that he was just
19   going to pop the door so I -- I just -- I don't know.
20   I -- I don't know.  I'd say a minute.
21       Q    And then you press the button a second time?
22       A    I did.
23       Q    Did you say anything at that time?
24       A    He -- I didn't say anything initially, no.
25       Q    Did the person on the other side of the speaker

                                                    63

1    say anything?
2        A    He did.
3        Q    What did he say?
4        A    "How can I help you?"
5        Q    Did he say anything else?
6        A    He didn't.
7        Q    And did you say anything in response?
8        A    I did.
9        Q    And what did you say in response?
10       A    I said, "I have a video visit.  This is the
11   third time you guys have done this.  Can you pop my
12   door, please."
13       Q    And did he say anything in response?
14       A    No.  I -- I don't recall if he said anything at
15   that time.  I don't -- I don't think he did.  I think he
16   left me hanging again.  I think he left me in a dead
17   silence again, I believe, because I went back to the
18   door again and was assuming that the door was going to
19   pop because -- oh, actually, yes, he did say something
20   to me.  He said, "Check your tone."  That's what he
21   said.  He told me to check my tone.  I'd assume he means
22   my vocal tone.
23       Q    And that happened after you said, "I have a
24   video visit.  This is the third time you guys have done
25   this to me.  Pop my door, please"?

                                                    64

1        A    I said, "This is the third time this has
2    happened.  Can you pop my door?"
3             But then he said -- he said "Check your tone,"
4    and that -- that was kind of -- I didn't expect that.
5        Q    So it wasn't dead silence.  He responded,
6    "Check your tone"?
7        A    It was dead silence the first time.  The second
8    time he told me to check my tone.
9        Q    And did he say that specifically, "Check your
10   tone"?
11       A    Verbatim.
12       Q    Did he say anything else?
13       A    No.  No, he did not.
14       Q    Did you say anything in response to that?
15       A    Not -- not -- no, I did not.
16       Q    What did you do next?
17       A    I waited.
18       Q    And how long did you wait for?
19       A    A good five, six minutes.  I waited until --
20   until about, I'd say, eight after, ten after the hour.
21       Q    And after you waited, did you do anything after
22   that?
23       A    Yes.
24       Q    What did you do?
25       A    I pressed the button.  I pressed the intercom

                                                    65

                                                    17

EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

button.

Q   So after someone on the speaker says "Check your tone," you don't respond verbally at all and you wait five to six minutes?

A   Right.

Q   And then at that time after you waited the five or six minutes, it was approximately 7:08 or 7:10 p.m.?

A   Correct.

Q   And then you pressed the button a third time?

A   Correct.

Q   Do you say anything after you pressed the button or does the person on the other side say something?  Who speaks first?

A   The person on the other side responds.

Q   Okay.  And what did he say -- he or she say at that time?

A   "How can I help you?"

Q   And what do you say in -- or do you respond?

A   I did.

Q   And what did you say in response?

A   Again I said, "This is the third time you guys have" -- or "This is -- not that you guys specifically have done this."  I said, "This is the third time this has happened.  I don't know what the problem is, but I -- are you going to give me my video visit?  We're

66

already 12 minutes or whatever into my visit.  It's not their fault that like -- the people that secure these visits shouldn't be getting penalized for whatever reason.  They pay for the stuff.  They should get their full 30 minutes," is basically what I said.  And he told me my video visit is canceled.

Q   And he said that in response to what you just described was what you told him?

A   Yes.

Q   Did he say anything else?

A   No.  He said my video visit is canceled and that's it.

Q   So he answers "How can I help you?" after you press the button a third time.  You say this has happened to you -- this is the third time it's happened to you and you talk about the cost for the people on the other side in securing it and that you've already gone through 12 minutes and why aren't you getting your video visit.  Something to that effect?

A   That's pretty -- yeah, exactly.  Pretty much.

Q   And then he responds "Your video visit is canceled"?

A   Correct.

Q   And did you say anything in response to that?

A   I said, "Canceled?"  And then that -- that was

67

basically it.  I said, "My video visit is canceled?"  I mean, there's nothing I can do about it so there's -- I can't do anything about that.

Q   So you -- in response you said, "My video visit is canceled?" like a question?

A   Yeah.  Exactly.

Q   And does the person on the other side of the speaker say anything back?

A   No.

Q   Is there -- can you describe for me the speaker box or however you want to describe that?  What would you call it?

A   An intercom or speaker box, either or.  I'd say an intercom.

Q   And does the intercom have one button?

A   Yes.

Q   Are you able to tell whether someone is still on the line or not?

A   Not really, no.  You can't -- you can't -- I mean, you can't see them.  Like the window we were discussing earlier, you can't see the -- the guards because there's a reflective mirror on their module.  So you can't see them at all.

And with the intercom, you can't -- I mean, you just press the button and hope, basically, because you

68

don't have any -- you don't have any control of that.  They don't have to answer you.  They can just click it or turn it off or whatever -- whatever they do up there.

Q   What did you do next after you asked that question, "My video visit's canceled?" question?  What do you do next?

A   I -- I was sitting there kind of confused.  Like just waiting, hopefully -- I didn't -- well, after he told me to check my -- my tone, I knew he was serious.  Prior, I thought he was joking because of the way that he was answering the intercom.  You know, "How can I help you?"  It didn't seem, like, threatening or -- or, you know, or malicious or whatnot.  But then when he told me to check my tone, I knew he was absolutely serious because that isn't -- I'm not used to somebody saying that to me or -- I mean, people just don't generally talk to other people like that.  So once he said that, I knew he was serious.

So I was more confused of what -- you know, like, what -- maybe my girlfriend canceled it.  I didn't know.  I had -- I didn't know.  I was confused.  And disappointed a little bit.

Q   And when you say you knew he was serious versus joking, what did you think he was joking about earlier?  Did he say something else besides "How can I help you?"

69

Ronald Earl Gadsden, 11/7/2022

**Page 70**

1    A   It was just the way he said it.  Like, "How can
2   I help you?"  It didn't -- it just came off as kind
3   of -- I don't know.  Gesture, like -- like jokingly, you
4   know.  Like he -- it didn't sound like he was in a very
5   bad mood, but I'm just assuming.  Who knows.  You know,
6   to me it just sounded kind of like he was -- like not --
7   you know, not having a bad day I would say.
8       **Q   So after you were confused and you asked that**
9   **question and you had pressed the button the third time**
10  **on the intercom, did you ever press the button again?**
11      A   I did.
12      **Q   Okay.  When -- what happened next after your**
13  **confusion?**
14      A   Well, so he had -- the -- the guard had
15  contacted me in my cell and said, "Your visit's canceled
16  now" -- your -- "Your visit is really canceled now."
17      And then once he said that, I pressed the
18  button again and said, "Who am I talking to?"  Because I
19  didn't know who I was talking to, so I had to clarify
20  who I'm talking to because this -- it was going to -- it
21  was going far, like a little too far.  And so I asked
22  who I was talking to, and he told me who I -- who he
23  was.
24      And I said I'd -- "I'd like an IA form because
25  what you're doing, you're being a bully and this is"

**Page 71**

1       **Q   So when -- did that occur immediately after the**
2   **confusion you were talking about or did you -- was that**
3   **over a period of time?  When did that occur?**
4       A   I -- I think you're misconstruing the way that
5   I used confused.  I was -- I was confused in the -- as
6   in the tone of his voice or the way that he put -- the
7   way that he answered the intercom, you know, "How can I
8   help you?"  Because it reminded me of, like, when you go
9   to McDonald's and you go through the drive-through and
10  someone says "How can I help you" -- "Welcome to
11  McDonald's.  How can I help you" or whatever.  So it
12  didn't -- and -- not at any point in time have I gone to
13  a drive-through and somebody say that to where I
14  didn't -- I thought that -- you know, that they'd be
15  disgruntled or anything of that nature.  So that -- I
16  wasn't confused; I was just caught off guard.
17      **Q   And thank you for clarifying that.**
18      **What I'm talking about is after that third time**
19  **you pressed the intercom, right, and you -- and he says**
20  **your video visit is canceled and you respond "My video**
21  **visit is canceled?" and you said you were confused next**
22  **about why it was canceled, that kind of thing.**
23      A   Right.
24      **Q   What -- what happens next?  Then someone calls**
25  **your intercom or what do you recall happening after**

**Page 72**

1   that?
2       A   Someone called my intercom -- well, really what
3   happened is the -- the guy Willy, he had come up to my
4   cell and said, you know, "Why aren't you out for your
5   visit?"
6       And I said, "I don't know.  They won't let me
7   out."
8       And so he went -- he -- he's like, "Well, what
9   do you want me to do" -- well, he came up, after I told
10  him that, and said, "No.  Your visit is still on the
11  intercom.  It's not canceled."
12      I said, "Well, hey, here's my code.  Go in
13  there and -- and talk to my girlfriend and tell her that
14  they won't let me out so I can't do this visit and for
15  her to call up there and complain."  That's what I said
16  prior to him saying that my video visit is canceled,
17  really canceled now.
18      **Q   So after that third interaction on the intercom**
19  **and you say my visit is canceled, question mark, nothing**
20  **happens.  Then Willy comes up to your cell and asks you**
21  **why you weren't out for your visit?**
22      A   Correct.
23      **Q   And then you say, "I don't know"?**
24      A   Correct.
25      **Q   And then he leaves and then checks the kiosk**

**Page 73**

1   for your name or did he already know at that point and
2   told you?
3       A   Truthfully -- no, he left.  But truthfully I
4   don't -- I didn't watch him do that because I didn't ask
5   him to do that.  He did it on his own accord and then
6   came back up and informed me that it's still on there.
7       **Q   And that's when you said you'd give him your**
8   **code?**
9       A   Yes.  In order to get into my -- for me to
10  connect from my side and to get into my -- I don't know
11  what you call it, my access, my file or whatnot.  I have
12  a designated code that I -- I only know.
13      **Q   And so you give that code to Willy and say,**
14  **"Hey, talk to my girlfriend," or what did you say**
15  **exactly to him as far as you can remember?**
16      A   "If you can, contact my girl and ask her -- and
17  tell her what's going on and to call up here and file a
18  complaint."
19      **Q   So you give him the code.  You tell him, talk**
20  **to your girlfriend, tell her to call somebody and figure**
21  **out what's going on and file a complaint?**
22      A   No.  I told him to tell her to call the jail
23  that I'm being housed at and file a complaint.
24      **Q   Okay.  So you hand him the code and you -- and**
25  **you tell him, "Tell my girlfriend to call the jail and**

EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

1  time you see the screen go dark, that's when the voice
2  on your intercom in your cell comes through and says,
3  "Now your video's really canceled"?
4     A   Actually, the screen kind of like -- it looked
5  like a power surge hit it, like an old television in the
6  sense if you ever saw an old TV, like a -- like a
7  plasma screen or whatever these are now.  But like an
8  old TV, it -- like if a certain amount of power went to
9  it, it would make it look, like, wavy.  It looked like
10  that, and it reset back to the -- to the screen saver
11  for the whole thing.  It never went black.  It went --
12  it just reset.
13     Q   Okay.  My apologies.  Okay.
14        So you're in your cell.  You see Willy and your
15  girlfriend talking.  You see the screen go, you know,
16  kind of black and white, wavy like an old timey TV.  And
17  then it goes back to the normal home screen.  And at the
18  same time that that happens on the video kiosk, you get
19  a call on the intercom in your cell that says, "Now your
20  video visit is really canceled"?
21     A   Correct.
22     Q   After you received that intercom call, did you
23  respond in any way?
24     A   Well, after -- so then Willy comes up to my
25  door.  And he's, you know, giving me the rundown of

78

1  basically what happened, you know, and the conversation,
2  saying that it got situated or whatever and then it got
3  cut off.
4        As he's saying that -- I mean, he wasn't even
5  there very long at all.  And somebody gets on the
6  microphone for the whole module -- not just on my
7  intercom, but on the -- like -- like an auditorium
8  microphone and says, "Get the F away from that cell."
9  So he just skirmished off.  You know, he got scared and
10  ran away.  He didn't want to -- you know, and I didn't
11  want him to get into any trouble so --
12     Q   And prior to that coming on the -- the
13  speakerphone for the module or -- or what you were
14  talking about, were you able to say anything back?  Did
15  you respond back through the intercom to the person who
16  said, "Now your video visit is really canceled"?
17     A   Well, once -- once he -- he screamed over the
18  intercom, I pressed my intercom, and I -- just to
19  clarify who I was talking to, "Who -- who is this that
20  I'm talking to?"  I did ask who I was talking to.
21     Q   Okay.  So after the person on the intercom
22  says, "Now your video visit is really canceled," you
23  press the intercom button again?
24     A   Correct.
25     Q   Okay.  And does -- does the other person

79

1  respond first or do you then say, "Hey, who am I talking
2  to?"  How -- how did that happen?
3     A   Well, they have to respond in order for you to
4  understand that they're communicating.  Because if
5  they -- if you just press the button and start talking,
6  there might not be anybody there.
7     Q   Got it.
8        So he says --
9     A   Correspond with them, communicate.
10     Q   Okay.  Sorry.  I didn't mean to interrupt you.
11        So the person on the intercom says, "Now your
12  video visit is really canceled."  In order for you to
13  talk to them, you have -- you have to press the button.
14  You press the button and then the other person has to
15  respond so you know that the communication is open?
16     A   Yes.
17     Q   Okay.  Does -- does he or she respond?
18     A   Yes.
19     Q   And -- and what does -- what do they -- is it a
20  he or a she?
21     A   It's a he.
22     Q   Okay.  What does he say?
23     A   I don't remember exactly what he said to answer
24  that time, but it wasn't "How can I help you?" that's
25  for sure.  I don't remember what he said verbatim, but

80

1  he acknowledged the fact that I'm pressing the button.
2     Q   And do you remember what -- if you said
3  anything in response?
4     A   I did.
5     Q   What did you say?
6     A   I said, "Who am I talking to?"
7     Q   And what did he say?
8     A   He said, "This is Deputy McGrath."
9     Q   Did he say anything else?
10     A   No.
11     Q   And what did you say?
12     A   I said, "Deputy McGrath, I don't know what your
13  deal is or what your problem is with me, but you're
14  being a bully right now and I need an IA form."
15     Q   Did you say anything else?
16     A   Well, he said, "You want an IA form?"
17        And I said, "Yes.  This is bullshit.  I want an
18  IA form."  Excuse my language.
19     Q   No.  It's okay.  I need to know what you
20  recall, so don't -- don't -- I've heard way worse.
21  Don't feel like you have to censor it for me.
22     A   Okay.  Okay.  But that's what I said.
23     Q   So he says, "You want an IA form?"  And you
24  understood that to be a question.  And then you
25  responded, "Yes.  This is bullshit.  I want an IA form"?

81

21

EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

1  Q  And do you recall how that announcement was
2  made?
3  A  Yeah.  I mean, I think there's a button that
4  they can press or something to where they -- it -- over
5  the loud speaker and all the intercoms in -- inside of
6  the cells, so that's basically how it went.
7  Q  How did you know that anyone else was getting
8  the same message you were on their intercom?
9  A  Because it was -- it was stated in a broad
10 spectrum.  It wasn't directly to me.  It was stated for
11 everyone's -- everyone's --
12 Q  So it was the -- the content of the message
13 made you think it was being sent to everybody?
14 A  Well, and you could hear it echoing through --
15 I mean, it was loud.  You could -- it wasn't just
16 directed in my cell alone.  It was everywhere.  It was
17 broadcasted loud in -- like in the -- in the dining hall
18 or whatever you call that, the day room.  It was
19 broadcasted live out there.
20 Q  Okay.  I'd like to go back to kind of where we
21 picked up -- or where we left off, excuse me, before we
22 took the break for lunch.
23     We were talking about at the tail end of your
24 conversation with McGrath and Willy sort of leaving
25 after being -- after the announcement coming over the

94

1  loud speaker, so I'd kind of like to pick up from there.
2  What happens next after Willy leaves?  What do you do
3  next after Willy leaves your cell area?
4  A  After he told him to get away, I -- I
5  believe -- I just went back into my cell.  I wasn't out
6  of it, but I just -- I just -- I did nothing, really.
7  There's nothing I can do.
8  Q  Was -- was John, your cellmate, in there as
9  well?
10 A  He was.  He was asleep.
11 Q  What's the next thing you remember doing after
12 that?
13 A  Somebody tried to come up there and bring me
14 food and was -- and was told, again, to get away from
15 the cell door.
16 Q  And how long -- excuse me?
17 A  Go ahead.
18 Q  No.  Sorry.  Go ahead.
19 A  And then John woke up and said, "Hey, is the
20 day room open?"
21     He's like -- I said, "Yeah."
22     He said, "Did you go for your visit?"
23     I said, "No."
24     He said, "Well, why?"
25     "I don't know, man, you know."

95

1  <mark>But then he's like, "Well, why aren't you</mark>
2  <mark>outside in the day room?"</mark>
3  <mark>And I said, "They won't let me out."</mark>
4  And he said, "Well, I have a phone call.  I
5  need to get out of there."  That's how that conversation
6  started.
7  Q  Do you recall how long of a period -- how
8  long -- how much time transpired between when Willy left
9  and when someone else tried to bring you food?
10 A  I can't recall exactly.  I don't want to -- I
11 don't want to guess.
12 Q  When they brought you food, is it something
13 that they serve at, like, dinner or was it something
14 like commissary items?  What was it?
15 A  It was something -- because we had already had
16 a deal made out, something that they had made.  But
17 workout -- like, you know, you work out, you eat, so --
18 and they don't give you food after 4:30 there, so I --
19 we had, you know, like a potluck type of deal to where
20 when, you know, they open the door and stuff and we're
21 out in the day room watching whatever show or whatever's
22 on or whatever we're doing, you have some food.
23     So I -- he tried to bring me that because I had
24 gave them food from my food to make food, if that makes
25 sense.

96

1  Q  And is that everyone's commissary items?  They
2  kind of contribute into it and then it's a big potluck?
3  A  It wasn't everyone.  It was just -- sorry for
4  cutting you off.
5     It wasn't everyone.  It was just three
6  people -- myself and two other gentlemen.
7  Q  And that was sort of your guy's habit, just
8  "Hey, let's -- I'll put in this, you put in that, and we
9  kind of share and make a meal"?
10 A  No, I wouldn't say habit.  And generally I -- I
11 didn't like doing that with people.  But that particular
12 day I was -- I mean, I had that video visit coming up
13 and I had -- I'd worked out, so we'd be stuck in that
14 cell for three hours, and I knew I'd be hungry.  So I --
15 really didn't want to do my visit and then, like, make
16 food and have to take a shower and all this other extra
17 stuff.
18 Q  And who was the person that -- that was
19 bringing you the food?
20 A  I believe it was Willy that brought me -- tried
21 to bring me the food.  It might have been his -- his
22 celly, though, or his -- his roommate or whatever you
23 consider it.
24 Q  And did -- did you know his cellmate's name?
25 A  I forget his name.

97

Peterson Reporting Video & Litigation Services
EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

1  in the cell and it's closed, do you have any further
2  interactions with Deputy McGrath through the intercom
3  system?
4      A   I did.
5      Q   Okay.  When's the next time you have another
6  interaction with McGrath through the intercom system?
7      A   I don't know.  It's probably like an hour or
8  more later.
9      Q   And when you say an hour later, is that an hour
10  later than when John was let out of his cell?
11      A   Yes.
12      Q   Okay.  And how did that interaction get
13  initiated?
14      A   I was contacted via intercom.
15      Q   So McGrath called into your cell through the
16  intercom?
17      A   Yes.
18      Q   Okay.  Was John back at that point or was he
19  still gone?
20      A   No.  The day room was open.  So once they
21  released John for his -- oh, sorry.  That was my phone
22  ringing.  I apologize.
23          Once -- once they let -- once John was out for
24  his call, the day room was open, also, I believe, or --
25  or it got opened while he was out there so he was able

102

1  to remain out there.  So he was out there until 10
2  o'clock or probably later because I was being
3  transferred at that point.
4      Q   Did you have an understanding why day room had
5  been closed?
6      A   Day room was closed because from 4:00 to 7
7  o'clock -- I mean, that's when they have it closed every
8  day.
9      Q   So does Deputy McGrath, does he say something
10  through the intercom system or how did you know he was
11  calling you?
12      A   Yeah, he said something through the intercom.
13      Q   Okay.  And -- and what did he say?
14      A   He said, "Gadsden."
15          Would you like me to go on?
16      Q   Is that all he said?
17      A   He said, "Gadsden."
18          And then I said, "Yeah."  I -- I responded,
19  "Yeah, what's up?"
20          And he said, "You want an IA form?"
21          And I said, "Yes, I do."
22          He said, "Okay.  Roll your stuff up.  You're
23  being transferred."
24      Q   So he says "Gadsden," meaning -- and you took
25  that to mean he's asking you to respond?

103

1      A   Well, he was just basically getting me to
2  respond so -- because, like I said, you can't really --
3  if I was sitting down on my bed, you can't see from --
4  because it's a little window, you know, on a solid metal
5  door.
6          So he said "Gadsden."
7          And I responded, "Yeah, what's up?"  And then
8  he continued.
9          So, yes, he did -- he got my attention and made
10  me respond or rhetorically got me to respond by stating
11  my last name, questioning me -- questioning.
12      Q   And then you respond, "Yeah, what's up?"
13      A   Yes.
14      Q   And then he says -- what does he say?
15      A   He said, "You want an IA form, right?"
16      Q   He says, "You want an IA form, right?"
17      A   He said, "Do you still want an IA form?" is
18  what he said exactly.  "Do you still want an IA form?"
19          And I said, "Yes."
20      Q   So he says, "Do you still want an IA form?"
21      A   Correct.
22      Q   And then you respond, "Yes"?
23      A   Yes.  Correct.
24      Q   And then how does he respond?
25      A   He said, "Roll your stuff up.  You're being

104

1  transferred."
2      Q   And do you say anything in response -- well,
3  strike that.
4          Did he say anything else?
5      A   Not after that, no.
6      Q   And did you say anything in response?
7      A   I did.  I said, "I need -- I" -- I said, "Being
8  transferred?" question mark.  "It's late at night and
9  Friday."
10          And he said -- and then I said, "Well, if I'm
11  going to -- I need bags.  I don't -- how am I going to
12  take all this stuff with me?"
13          And he said, "Someone will bring you bags."
14  That's it.
15      Q   And then he -- he responded, "Someone will
16  bring you bags"?
17      A   Correct.
18      Q   Did he say anything else?
19      A   No.
20      Q   Did you say anything in response to that?
21      A   No.
22      Q   And that's how the conversation ended?
23      A   Yes.
24      Q   Okay.  After that interaction, did you have any
25  other interactions through the intercom system with

105

Ronald Earl Gadsden, 11/7/2022

1   Deputy McGrath?

2       A   No.

3       Q   **Going a little bit back in time when you were**

4   **talking about saying something about "This is bullshit.**

5   **I want an IA form," do you recall that?**

6       A   **I do.**

7       Q   **Did you ever say "Fuck this.  I need an IA**

8   **form"?**

9       A   **I could have said that.  I could see myself**

10  **saying that.  Indirectly, though, not directly to him.**

11  **Because I said what I said to him.**

12      Q   **And when you say "indirectly," could you**

13  **explain to me what you mean by that?**

14      A   **Because I could be -- like when -- I don't know**

15  **if that speaker is on or not.  So if I was saying**

16  **something like -- like "Fuck this.  I need an IA form,"**

17  **that -- I -- I could see myself saying that, like,**

18  **openly rather than directly.**

19          So, like, instead of saying it directly to you,

20  I'm speaking -- I'm thinking out loud.  You know what I

21  mean?  I wouldn't -- when I was talking to him in

22  the intercom, I was talking directly to him.  But if I

23  said that outside of the intercom and open -- like

24  thinking out loud, I could see myself saying that, yes.

25      Q   **After that last interaction on the intercom**

106

1   about -- with Deputy McGrath where he talked about

2   rolling your stuff up, did you have any other

3   interactions other than through the intercom system with

4   Deputy McGrath?

5       A   Besides the -- besides in May?

6       Q   Yeah, besides the May 2019 we already

7   discussed.

8       A   No.  No, I did not.

9       Q   Okay.  What -- what happened after that

10  conversation?

11      A   Which conversation?

12      Q   The -- the last conversation you had through

13  the intercom system with Deputy McGrath?

14      A   **I just waited for hours.  I just waited and**

15  **waited and waited and waited.  And then somebody brought**

16  **me bags, and I put my stuff in it and then waited some**

17  **more.**  And then eventually they -- they told me to walk

18  down to the -- to the sally port and, you know, have my

19  stuff ready to go or whatnot, and so I did.  When they

20  opened the door, I took it down there.

21      Q   Do you know how long you were in that cell --

22  well, strike that.

23          Do you recall what time someone came and gave

24  you the bags?

25      A   No, I can't -- I can't put, like, a finger on

107

1   the exact minute, but I'd say like an hour.  I'll --

2   I'll give it an hour, hour or so until I got the bags

3   and then -- like another hour or so or whatnot until I

4   got -- until they, you know, opened the door and took me

5   down there.  So overall probably like -- like 10:30 when

6   I left there.

7       Q   And when you say an hour after, you mean an

8   hour after you had the conversation with Deputy McGrath,

9   the last conversation through -- with Deputy McGrath

10  through the intercom system and he said "Someone will

11  bring you bags," it was an hour later when someone did

12  show up and give you the bags?

13      A   Right.

14      Q   Okay.

15      A   Give or take.  Because, I mean, like I said, I

16  can't put the exact minute on it, but it wasn't -- it

17  wasn't immediate.  That's for sure.

18      Q   And going back to sort of the beginning of your

19  interactions with Deputy McGrath, did you have any

20  interactions with other deputies from that point in

21  time -- from 6:30 p.m. up until the person brought you

22  your bags, did you have any interactions with deputies,

23  speak to them, they speak to you, anything like that?

24      A   No.

25      Q   So Deputy McGrath was the only one you spoke to

108

1   in terms of other deputies, sergeants, County employees

2   from 6:30 up until someone brought you the bags?

3       A   Correct.

4       Q   Okay.  Do you remember who brought you the

5   bags?

6       A   I don't actually, no.

7       Q   Was it a deputy?

8       A   I don't recall.

9       Q   Did they have a uniform on?

10      A   I -- I don't recall.

11      Q   But you were in your cell when that happened?

12      A   I was.

13      Q   Okay.  And those are the -- the brown -- big,

14  brown bags?

15      A   No.  These were big, plastic bags.  Big, like,

16  industrial garbage bags or something to that effect.

17  They were see-through, big, clear bags.

18      Q   And did that person that brought you the bags

19  say anything to you?

20      A   No, but I don't -- as I said, I don't even

21  recall who brought me the bags, so I -- again, I

22  don't -- I don't remember if they did say anything to

23  me.  But, no, because I don't even remember who brought

24  me the bags, honestly.

25      Q   It's okay.

109

Peterson Reporting Video & Litigation Services

EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

1    So they could have said something, they could
2    have not said something.  You don't recall one way or
3    another?
4        A   Well, I'd say no because they -- for one, I was
5    not -- they weren't permitting people to really talk to
6    me in the first place.  So the person brought -- or
7    whoever brought the bags, brought the bags and left them
8    there.
9        Q   Did they leave them outside your cell?  Did
10   they put them in your cell?
11       A   No.  They slid them -- they slid it under the
12   door.
13       Q   When you say "they," was there more than one
14   person or was it just one person?
15       A   Well, I can't -- no.  I mean, they, whoever
16   that was that did it, slid it under the door, meaning --
17   could be -- could have been a female officer or a male
18   officer or a person that has to stay there or anyone.
19   It could -- I mean --
20       Q   Yeah, you just don't know who it was?
21       A   Right.  I don't remember how -- I mean, I
22   remember somebody brought me bags, but I don't remember
23   any -- anything except getting bags.
24       Q   And when the person brought the bags, was John
25   in the cell at that time?

110

1        A   No.
2        Q   Was anything else other than the bags given to
3    you?
4        A   Excuse me?
5        Q   Was anything else other than just bags given to
6    you?
7        A   No.
8        Q   And then you said you waited for about another
9    hour after you got the bags before anything else
10   happened?
11       A   Yep.  That's -- yep.  Yes.
12       Q   And at that point someone opened the door for
13   you?
14       A   The door was popped -- well, the --
15   simultaneously the intercom and the door opened.  The
16   door said -- the intercom said, "Go down to the sally
17   port and" -- you know, "go down there."  And then the
18   door popped open.  So one after the other it transpired
19   like that.  Then I went downstairs.
20       Q   And the person through the intercom said, "Go
21   down to the sally port"?
22       A   Yes.
23       Q   Did they -- did they say anything else?
24       A   No.
25       Q   Did you say anything in response?

111

1        A   No.
2        Q   Did you recognize that to be Deputy McGrath or
3    was that somebody different?
4        A   I don't know, honestly.
5        Q   And then you went down to the sally port?
6        A   I did.
7        Q   And what happened next?
8        A   Then they -- they -- multiple officers came --
9    well, they were there already, and they got -- you know,
10   they got ahold of my belongings and took -- and
11   handcuffed me and took me into the hallway -- or into
12   the sally port I guess you would say.
13       Q   And do you recall how many deputies there were?
14       A   Three, four.  Three or four.
15       Q   Did you -- do you remember any of their names?
16       A   I don't.
17       Q   Was any of them Deputy McGrath?
18       A   No.
19       Q   And had you already put all your belongings in
20   the bags we talked about earlier?
21       A   I did.
22       Q   And what happens next?
23       A   And then the -- well, no.  First they searched
24   me.  That's what they did.  They took me out there and
25   they searched -- they searched me.  And the guard -- I

112

1    don't remember his name, but it's on the piece of paper.
2    He had me sign a piece of paper waiving my right to a
3    72-hour hearing, rather than that I wanted an immediate
4    hearing within 24 hours about the disciplinary action
5    that's supposed to take place.  And then they handcuffed
6    me and put me in a van.
7        Q   So they searched you, they asked you about
8    signing that form, and then they handcuffed you and put
9    you into the sally port?
10       A   No.  The sally port, I believe it's just kind
11   of the hallway.  They took me out -- like the entrance
12   to the -- module, I guess that's technically the
13   sally port.
14       What he did, took me through the sally port,
15   took me left out of the view of -- and then closed the
16   door to the module and out of the view of the people
17   that are in there and then -- then did that.  And
18   then he had me sign a piece of paper because I wanted
19   an -- he -- he asked me if I admitted guilt for -- for
20   what was being said, and I said no.  And he said,
21   "Well" -- I said, "Well, I'd like" -- I mean, "I'm
22   supposed to get a hearing you said."
23       That's what he told me, "You have a hearing in
24   72 hours."  And I said, "Well" -- he said, "If you sign
25   this, then you get it within 24 hours."  And I signed it

113

Ronald Earl Gadsden, 11/7/2022

1    That's the only paperwork that I ever had.
2        Q   And you received that on February 21, 2019?
3        A   I received it -- I received it hours before I
4    was let out of that -- of the -- of isolation.
5        Q   And is your recollection that was February 21,
6    2019?
7        A   Correct.
8        Q   Are you -- are you able to hear me okay or do I
9    need to speak up?
10       A   I am.  I just -- I have this fan on behind me.
11   So -- but I can --
12       Q   No.  No.  It's okay.  I'll -- I'll try to speak
13   louder.  Sometimes I speak pretty soft.
14       Okay.  After you're out of isolation, the six
15   days or week -- or how long was isolation again?
16   Apologize.
17       A   From the 15th to the 21st.
18       Q   Six -- six days.  That's right.  Okay.
19       After -- after you were in isolation for six
20   days and you're out of there, did you ever speak to a
21   Sergeant Carson about the incident?
22       A   I believe that's seven days.
23       Q   Seven days.
24       A   Sergeant Carson?
25       Q   Yeah, after you were out of isolation, did you

126

1    But so what I had learned is you can -- you
2    only have ten days to appeal.  And me being let out on
3    the 21st and filing it on the 28th -- they moved me the
4    29 -- or the -- no.  It would be the 1st, actually,
5    because March has 28 days.  So it would be the 1st.  And
6    I would have just fell right into the gap.  But I
7    figured that the reason why I was being transferred is
8    because I was appealing it.
9        So what I did is right when I got to South Bay,
10   I filled out another appeals form so it still fell right
11   into the cusp of the time frame that I was given to
12   appeal a disciplinary action.  And then some point in
13   time, I believe Sergeant Carson contacted me and asked
14   me why I was filing -- filling these out.
15       Q   And did you have a conversation with him?
16       A   I believe the conversation with Sergeant Carson
17   was just -- I don't recall, actually.  I don't.
18       Q   Do you remember him saying anything to you?
19       A   Like I said, I don't -- I don't remember
20   exactly.
21       Q   Okay.
22       A   I remember the conversation with Sergeant
23   Woods.
24       Q   And when was that?
25       A   Shortly after that -- well, because it goes up

128

1    ever speak to Sergeant Carson?
2        A   I don't recall.
3        Q   Did you speak to Sergeant Carson on March 29,
4    2019?
5        A   March 29, 2019, I -- I don't -- well,
6    March 29th I would have been in South Bay, so I think I
7    did -- I spoke to Sergeant Woods.  I might have spoke to
8    Sergeant Carson.  If that was in South Bay, yeah, I do.
9        Q   And do you recall what that conversation was
10   about?
11       A   It was about the fact that I was trying -- I
12   wanted to get the disciplinary -- so on the grievance
13   form that you fill out to say if you have an issue with
14   whatever may be your grievance, you fill it out, you
15   submit it, and then it goes through the process of being
16   answered.
17       When I was in Bailey, I noticed that on the
18   grievance form it says "Appeal to disciplinary action."
19   So I looked up how long I have to -- to appeal that
20   because I wanted that appeal -- I mean, I wanted that --
21   I felt it was unjust, so I wanted it stricken off of my
22   record, like my internal, like, record in there.  And --
23   and so I filled it out and immediately I was
24   transferred.  The next day I got transferred to South
25   Bay.

127

1    a -- a pecking order.  So it will get -- a general or
2    somebody to that effect has to answer a grievance if
3    they -- if they decide to answer it.
4        Q   Let's stick with Sergeant Carson, though.  You
5    say you -- you recall having a conversation with him,
6    but you don't remember what he said or what you said?
7        A   I'm trying to picture Sergeant Carson.  I
8    can't -- I don't recall.  I'm not -- I'm not going to
9    sit here --
10       Q   Okay.
11       A   -- and --
12       Q   Do you remember ever having a conversation on
13   March 29, 2019, about your appeals and this incident?
14       A   I believe I do.
15       Q   Okay.  And --
16       A   It's the same conversation over and over,
17   though.
18       Q   So you did have a conversation on March 29,
19   2019, with someone -- some County sergeant or deputy
20   about your appeals for this incident; is that right?
21       A   Yes.
22       Q   Okay.
23       A   Well, you're saying March 29th.  By all means
24   you can keep the date of that, but I was trying to have
25   a -- have a conversation with anybody that would listen.

129

Ronald Earl Gadsden, 11/7/2022

1    A   Correct.
2    Q   Do you know how long it went away for?
3    A   Well, I wouldn't even say it totally went away.
4  It subsided for a good, like -- I don't know.  Like I
5  said, like a good month.  I'd say about a month.  Month.
6  About a month, month and a -- yeah, like a month.  It
7  went away for, like, a month without being bothersome,
8  you know.
9    Q   And can you tell me what was bothersome about
10 it?
11   A   Well, it was itchy and -- and -- it was itchy
12 and would spread and would like -- and say if I was
13 going to -- like for instance, they said not to sweat
14 because it's going to make it worse.  So I wasn't -- I
15 was trying not to sweat in a place where you don't
16 really have very much air.  You have to wear like -- you
17 know, I didn't have really much -- much ability to not
18 sweat in there, and they were saying not to sweat or it
19 could potentially get worse.
20   Q   So other than being itchy, was there anything
21 else about it that was bothersome to you?
22   A   Well, yeah, it looked -- it looked it was
23 itchy and it, like, discharged, like it had, like, a
24 little discharge to it.  But it burned.  Like you --
25 basically like you want to itch it, but you can't

170

1  because it will make it worse so you just have to sit
2  there and endure it.
3    Q   Other than it being itchy and burning, was
4  there anything else that was bothersome about it?
5    A   I mean, the look of it looked really -- really
6  out of the norm, I would say.  It looked really bad.
7  But, no, nothing other than that -- painful, itchy,
8  burning, and it looked really bad.
9    Q   Where was the rash located?
10   A   I had it, like, under my armpits, like in my
11 crotch area, my armpits.  Every -- yeah, it was pretty
12 bad.  My stomach, I had it on my stomach.
13   Q   Had you ever had anything like that prior to
14 going -- being in the isolation unit?
15   A   No.
16   Q   I'd like to shift now to, again, some of the
17 damages you're claiming as part of your lawsuit that
18 were caused by the incident.
19       Are there any mental or emotional damages that
20 you are claiming as a result of the February 15, 2019,
21 incident?
22   A   Again, I'm not a doctor, but yes.  I mean, from
23 that moment forward -- from, really, I mean -- so from
24 the beginning I want -- I was looking forward to having
25 a video visit with my girlfriend because that's really

171

1  the only kind of, like, face-to-face communication like
2  we're doing right now that you can actually get.  So I
3  was really looking forward to that.
4        And the -- the -- like being transferred, being
5  put in that van -- well, handcuffed and put in that van
6  at 10:00 something at night on a Friday, that was -- and
7  mind you, we're in the middle of nowhere.  So, mind you,
8  like that was scary in itself because I didn't know what
9  they were going to do.  All I was told is, "You're being
10 transferred" at a random odd time.  And -- so that was a
11 problem in itself.
12       But then being put in there, how dirty it was,
13 that -- that's -- that is one issue.  But to have me in
14 there with a suicidal war veteran that literally, like,
15 talks to people that aren't there, that's dangerous in
16 itself.  So that -- that was an anguish in itself.
17       Not knowing -- getting no answers why you're in
18 there for six days.  Your family doesn't know.  My
19 daughters didn't know where I was.  My mother, my
20 father, my girlfriend, my brother, my sister, nobody
21 knew where I was at because I just got, like, rude --
22 uprooted in a sense.
23       Thinking that at any moment that they're going
24 to come in there and potentially kill me, hurt me, or
25 set me up, like, with that suicidal guy, the war vet

172

1  that was in there, that right there -- I mean, that is
2  something that nobody should have to go through.  And --
3  and then throughout the whole situation, the potential
4  for retaliation, like for them to, like, physically have
5  me hurt is there.
6        It's still there right now every time I get off
7  work and I get out of my car, due to the fact that my
8  address and my -- and -- my car's in my name and my
9  address is, you know, easily accessed by a police
10 officer, is pretty scary if you think about it, you
11 know.  Because every time I get out of my car, I'm
12 looking over my back because I don't -- or even getting
13 out to go to work.  Going anywhere, really, because
14 I'm -- I honestly think he would retaliate.
15       So, yeah, it's constant.  It's ongoing right
16 now, doing this right now.
17   Q   So the mental or emotional damages that you
18 believe are caused by that February 15, 2019, incident
19 include the loss of not being able to see your
20 girlfriend on that particular day, which is something
21 you were looking forward to; being scared and kind of
22 confused as -- because you didn't know where you were
23 going as you're being put into the van; being put into a
24 cell where the condition was terrible, as you described
25 it; you also had to share that cell with someone who was

173

Ronald Earl Gadsden, 11/7/2022

1   start with the physical retaliation that you -- that you
2   fear today.
3        Can you describe to me what that is?
4        A   I don't know.  I just feel like -- I don't know
5   that he could overall just kill me or anybody I'm with.
6   I don't know.  I mean -- that's what I worry about.
7        Q   So your worry is that Mr. McGrath will find you
8   and kill you today, and also you're worried about
9   anybody who may be around you when that happens?
10       A   Correct.
11       Q   Have you received any threats or anything from
12  Mr. McGrath?
13       A   No.
14       Q   What makes you think that he may physically
15  retaliate even today to kill you?
16       A   Like I said, I'm not a psychologist, but, I
17  mean, he -- the -- the whole situation just seems
18  very -- very -- I don't know how to explain it.
19       Basically -- I don't know the word for it, but,
20  like, kind of like -- like they have a lot of power, I
21  would say, and -- and, like, McGrath being a sheriff,
22  there's -- and he had sheriff friends and whatnot.  And
23  the way that I was put -- or forced into the hole like
24  that over this form, if you'll go that far because of
25  this form or from me saying the word bullshit -- excuse

178

1   my language.  But if you're going to go that far as to
2   put me in the hole for six days with no shower and then
3   transfer me all around like that, there's no telling
4   what you'd do given the litigation situation here.  So,
5   yes, I -- it's just different levels of worry.
6        When I was in there, when I was in the hole, I
7   was worried that they're -- when -- when they let
8   Koran -- even with Koran in there, actually, because it
9   was just two different worries.  I was worried about him
10  because he's a crazy war vet that wants to kill himself.
11  And then I'm worried about the guards potentially
12  pulling me out of there and beating me unconscious or
13  killing me or whatever that scenario may be for -- for
14  filing out -- filling out the IA form.
15       But let's -- let's not forget -- and at that,
16  we all know the stories about George Bailey Detention
17  Facility.  So that being said -- also him putting me in
18  there and hearing about the stories about people being
19  killed in there is another reason.
20       And then outside of that, the litigation factor
21  and that -- and that person being so aggressive in the
22  first place, yeah, I -- I don't trust it at all.  I
23  think, you know, there -- there is potential for me to
24  be in danger.
25       Q   And is it your understanding that Mr. McGrath

179

1   is the one that decided where you were going and moved
2   you all around the facilities?
3        A   No.  I can't put all of that on him.  I know
4   that he transferred me to the hole because he said
5   "You're being transferred" after -- when he said -- when
6   he asked me if I wanted an IA form, if I was sure, and I
7   said yes, he said, "Okay.  Pack your stuff.  You're
8   being transferred."  Obviously that translates to me as
9   since you want an IA form, you're being transferred.  I
10  just didn't think I was going to the hole because I'd
11  never been there before so -- and but I --
12       Q   So some of the -- and I'm trying to
13  understand -- and thank you for walking me through this.
14       So the -- the fear of physical retaliation
15  today is because of the nature of what happened to you
16  in the jail facility because of the power that any
17  deputy or police officer may have because of some of the
18  stories about people being hurt or killed in George
19  Bailey and because you have this litigation against
20  Deputy McGrath.
21       Are there any other reasons you're feeling --
22       A   It's not because -- I'm sorry.  It's not
23  because there's stories about George Bailey.  It's
24  because it's fact.
25       Q   Okay.  Excuse me.

180

1        Because there's facts about people being hurt
2   and killed at George Bailey and then this litigation.
3        Other than those, are there any other reasons
4   that you feel that Deputy McGrath may actually try to
5   kill you today?
6        A   No.  Just I -- it just -- yeah.
7        Q   And --
8        A   And I didn't -- I didn't say just today.  I
9   said -- I said from that point forward I felt that way.
10  But the further we get with this litigation situation,
11  it's a little more stressful.
12       Q   Okay.  So the same reasons that you fear
13  physical retaliation today are the same ones you felt
14  back when you were at George Bailey?
15       A   Yes.  It's a different scenario, but in a sense
16  yes.  Because, I mean, George Bailey I'm in the middle
17  of nowhere on the top of a mountain.  And, you know,
18  we're in, like, the desert type mountainous area by
19  Mexico, that it's just very vacant.  And to be
20  transferred at 10:00 at night or 10:30 at night on a
21  Friday when no one ever gets transferred at that point
22  in time -- ever, I've ever seen.  And to go out there in
23  that vast area like that with three guards and then it
24  narrows down to two and then it narrows down -- you
25  know, it just kind of got -- it just kind of got a

181

46

Ronald Earl Gadsden, 11/7/2022

182

1 little scary.
2 But, yes, like I said, the potential -- the
3 power that he has and the access to information that he
4 has, and the -- the situation that we're going through
5 and what had happened prior, yes, I -- like I said, I do
6 feel that way. I mean, you can word it however. I
7 mean, you can continue to ask me the same question if
8 you'd like, but the fact remains, yes, that is true, I
9 feel that that individual is potentially dangerous.
10 Q   And moving on to the loss of being able to see
11 your girlfriend, was it the loss -- well, let me ask you
12 this: Did you -- have you ever -- did you ever have any
13 further video visits with your girlfriend after
14 February 15, 2019?
15 A   Never.
16 Q   And why is that?
17 A   Well, from when I went to the hole that -- for
18 that week and then they moved me to George Bailey where
19 I filed that petition because those didn't work and then
20 they moved me to South Bay where they did not have them.
21 Q   What about the State facilities that you were
22 at, did they have video visits?
23 A   No.
24 Q   And can you describe a little bit what you mean
25 by that in terms of your -- the mental or emotional

183

1 damages, the loss of not being able to see your
2 girlfriend on that particular day, the video visit that
3 was canceled?
4 A   Well, I mean, I was -- when -- I mean, for me,
5 I -- I had -- I have structure, in a sense. So what --
6 what I did was I did my regular day thing, like eat my
7 food and whatever else I did that day and work out
8 really, really hard, and then I went to sleep. So when
9 I woke up, I had already planned my day to see her. So
10 by that not happening -- and really just the give and
11 take of, like, I -- I thought -- I kind of thought he
12 was joking at first and then he just totally changed
13 demeanor on me really quick. And so it kind of like had
14 me at a standstill and thinking that he's going to open
15 the door at any point in time and never did and then --
16 and then completely canceled my visit for no reason.
17 And mind you, you don't really have a lot to
18 look forward to in there, you know. And -- and I wanted
19 to see my -- my -- my girlfriend, and it didn't happen.
20 So that was kind of crushing because I had, like,
21 planned my whole day around it and was looking forward
22 to it. And sometimes that's all you have, you know.
23 You just want to hear -- you know, you're around a bunch
24 of stinky guys all day and all you want to do is see
25 your girlfriend. And that was stripped away from me, so

184

1 it was painful. Hurts talking about it right now,
2 actually.
3 Q   And I apologize. I know it's not fun talking
4 about when you feel wronged.
5 And how about the sending a message, the -- the
6 kind of marching you through the sally port, can you
7 describe the -- the emotional, the mental damages?
8 What -- what did you mean by that?
9 A   I literally felt paraded. I walked from
10 upstairs to downstairs. And everybody's out in the day
11 room asking me, like, "Hey, what -- what's going on,
12 man?" You know, because I'm -- like I never cause any
13 issues in there. You know, so, like, for me to be moved
14 is like, wait, what's going on here, you know.
15 And so I had to explain, like, "I don't know.
16 I don't know."
17 "Where are you going?"
18 "I have no idea. Won't tell me."
19 "Uh-oh." And then people telling me, like,
20 "Uh-oh, that doesn't sound good."
21 You know, and I'm like, "Well, what -- what can
22 I do?" So -- but it definitely got the message across
23 to -- on both ends.
24 I still didn't think I was going to the hole,
25 though, until I actually got there. I thought I was

185

1 just going to Bailey or what -- I mean, I -- I don't
2 know. It was just very odd. It was -- but the -- the
3 timing and the day of it and the reason or logic behind
4 it was just not there. So it was a scary moment that
5 got worse and worse and worse and worse and worse.
6 Q   And you also described the -- the terrible
7 condition of the cell as some of the mental or emotional
8 damages you attribute to the incident. Can you tell me
9 more about how that impacted you mentally or
10 emotionally?
11 A   Well, I'll tell you, after I cleaned that
12 cell -- it's -- it's over time. I mean, from the moment
13 I walked in there, I couldn't even -- right when I saw
14 it, I was like "Oh, my God. This is the" -- I mean,
15 I'll say volleyball.
16 So after I poured water everywhere and soap and
17 stuff and, like, got myself kind of hazmat'd up as
18 well -- as well as I could, I like -- there was an extra
19 shoe, like a slipper in there that was probably, like, a
20 size 14. So I wrapped an old towel around that and I
21 cleaned off the walls and cleaned up the ground a little
22 bit. And there was a ball of hair about as big as a
23 volleyball in there. And so I just continuously cleaned
24 until I got to a certain point where -- where I was just
25 tired, and I tried to go to sleep.

EXHIBIT 11

Ronald Earl Gadsden, 11/7/2022

**Page 186**

1  But I cleaned the bed area and I fell asleep
2  and woke up with a roach on my mouth area like -- and,
3  yeah, it was -- I mean, there's literal feces.  It
4  smelled like urine.  There's feces on the wall.  Like
5  when the door, the sliding door, closes, all on the back
6  side of the door was a bunch of feces, like somebody was
7  in there throwing it out of that little door slot thing.
8  It was bad.  It was -- I mean, bad.  Really bad.
9  Really -- really a hazard I would say.  And no matter
10  how much I cleaned that, there's -- you can't clean all
11  that.  You need to pressure wash it or something.  Some
12  kind of serious chemical to get all of that out of
13  there.
14      Q   And how about being put in that cell with the
15  veteran who was suicidal, what about that impacted you
16  mentally or emotionally?
17      A   Well, I thought isolation in itself -- the word
18  isolation means by yourself.  Alone.  So I -- once I saw
19  that I was in the hole and that dude -- the guy said
20  that, you know, the welcoming phrase to -- I -- once --
21  once the door was opened -- and mind you, there's a guy
22  curled up in the corner of that bed rack area, curled up
23  in the corner under this little fire blanket.  So I
24  didn't know what I was dealing with.  I mean, that --
25  something straight out of a scary movie.

**Page 187**

1  But -- but when he told me that he was -- like
2  his story and that he's suicidal and he wants to kill
3  himself and stuff, that's -- that's a big worry because
4  if he wants to kill himself, definitely he doesn't care
5  about me.  I need to get out of here is what I was
6  thinking.
7  But, yeah, I always had my eye on that guy.
8  And he talked to himself like -- so, I mean, that's
9  dangerous.  That's -- that's pretty -- pretty dangerous.
10  A war vet that's suicidal that is looking at a whole
11  bunch of time in prison and you guys are stuck in the
12  hole together and don't know each other, that's --
13  that's not conducive to a good environment.  That's
14  very, very, very, very, very dangerous.
15      Q   And you also describe sort of being in there
16  and not knowing why you were in there as mental or
17  emotional damage you attribute to the February 15, 2019,
18  incident.  Could you describe that -- how that impacted
19  you mentally or emotionally?
20      A   Not knowing when you're going to get hurt.  I
21  mean, you're scared -- you're -- sleep -- sleep is,
22  like, just not going to happen.  Every little movement,
23  every little key jingle of those guys walking by every
24  half hour or whatnot, my -- my -- my eyes would pop open
25  because -- I mean, every moment, every second of being

**Page 188**

1  in there, I was -- I was just sitting there waiting to
2  get it.
3      Q   And so in your mind is that the same, the fear,
4  the emotional damage from potential retaliation or is
5  that different?
6      A   It's -- it's the same, it's just a different
7  scenario.  The different scenario is I'm not stuck in
8  there like that.  I could -- I could potentially run
9  from you, you know.  Outside of my house, I could
10  potentially run from you.  In there I can't run from
11  you.  You have me dead to rights.  But being cornered in
12  like -- if you were to be outside of my house and I just
13  walk outside of there -- I've had to put cameras on my
14  house because of this.  But to walk out -- I mean, if I
15  were to walk outside right now unbeknownst to me he's
16  standing right there, I wouldn't know.  Yeah, I would --
17  the same scenario would unfold.  I just have more
18  ability to run from you.
19      Q   But what you described as sort of the feeling
20  of not knowing why you were there and the fear of
21  retaliation while you were stuck in isolation, are those
22  to you the same thing or are those two different things?
23      A   It's the same thing.  The fear of retaliation
24  is the same thing.  I mean, it's just two different
25  things.  The retaliation for the paperwork would be --

**Page 189**

1  the paperwork meaning the -- internal affairs form
2  or even asking for it in there, the retaliation for that
3  would be in there.  But it all stems from that so, yes,
4  it would be -- it would be the same, it's just a
5  different aspect.
6      Q   And have you sought any treatment for these
7  mental or emotional damages?
8      A   I have not.  I wouldn't even know where to
9  start.  I don't -- I don't -- I don't know anything
10  about that.
11      Q   Have you ever been treated for any mental or
12  emotional damages?
13      A   No.
14      Q   I'm sorry.  That's a really bad question.
15  Have you ever been to a therapist for any kind
16  of mental or emotional issues or problems?
17      A   No.
18      Q   Are you claiming any property damage that you
19  attribute to the February 15, 2019, incident?
20      A   The only property damage that I would want is
21  the $5 back from them not giving my -- well, my now
22  fiancée that visit because she paid for that.
23      Q   So the $5 -- the deposit you were talking about
24  earlier that people who make those appointments have to
25  put in for the video visits?

EXHIBIT 11

# EXHIBIT 12

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3
 4    RONALD EARL GADSDEN,           [CERTIFIED COPY]
 5              Plaintiff,
 6    vs.                Case No.:  20-cv-02258-
                                    WQH-DEB
 7
      SERGEANT JOHN GEHRIS, DEPUTY
 8    SHERIFF; DEPUTY MICHAEL
      MCGRATH, DEPUTY SHERIFF,
 9
              Defendants.
10    _____/
11
12    VIDEO-RECORDED DEPOSITION OF TINA JAWORSKI
13          Taken at San Diego, California
14               December 14, 2022
15
16
17
         Reported by Dana E. Simon - CSR
18       Certificate No. 12683
19
20
21
22
23
24
25       Job No. 944158
```

## Page 2

```
                  I N D E X
 2    VIDEO-RECORDED DEPOSITION OF TINA JAWORSKI
      DECEMBER 14, 2022
 3
 4    EXAMINATION                              PAGE
 5    BY MR. PHILLIPS:                           4
 6
 7
 8              INDEX OF EXHIBITS
 9           (No exhibits were offered.)
10
11
12
13        INFORMATION REQUESTED BY COUNSEL
14              PAGE LINE
15               17  22
                 19   5
16
17
18
19
20
21
22
23    Errata Page                              89
24    Witness Signature Page                   90
25    Reporter Certification Page              91
```

## Page 3

```
 1         On Wednesday, December 14, 2022, commencing at
 2    the hour of 9:15 a.m., at 1600 Pacific Highway, Room
 3    355, in the City of San Diego, County of San Diego,
 4    State of California, before me, Dana E. Certified
 5    Shorthand Reporter in and for the State of California,
 6    personally appeared:
 7                   TINA JAWORSKI,
 8    called as a witness by the defendants, who, being by me
 9    first duly sworn, was thereupon examined and testified
10    in said cause:
11            A P P E A R A N C E S
12    FOR THE PLAINTIFF:
13       LAW OFFICE OF ALEX COOLMAN
         BY:  ALEX COOLMAN, ESQ.
14       3268 Governor Drive, Suite 390
         San Diego, California 92122-2902
15       619.831.7129
         coolman@gmail.com
16
      FOR THE DEFENDANT DEPUTY MICHAEL McGRATH:
17
         OFFICE OF COUNTY COUNSEL
18       BY:  ADAM C. PHILLIPS, ESQ.
         1600 Pacific Highway, Room 355
19       San Diego, California 92101-2469
         619.531.6416
20       adam.phillips@sdcounty.ca.gov
21    THE VIDEOGRAPHER:
         Alex Payan
22
23
24
25
```

## Page 4

```
 1    SAN DIEGO, CALIFORNIA; DECEMBER 14, 2022; 9:15 A.M.
 2
 3
 4         THE VIDEOGRAPHER:  Good morning.  We're on the
 5    record at 9:15 a.m. on December 14th, 2022.  My name is
 6    Alex Payan, videographer with Litigation Services.  Our
 7    court reporter today is Dana Simon.
 8         This begins Media No. 1 in the deposition of
 9    Tina Jaworski testifying in the matter of Ronald Earl
10    Gadsden versus Sergeant John Gehris, et al.
11         We're located at 1600 Pacific Highway, Room
12    355, in San Diego, California.  Will Counsel please
13    identify themselves and state whom they represent.
14         MR. PHILLIPS:  Adam Phillips on behalf of
15    defendant Michael McGrath.
16         MR. COOLMAN:  And I'm Alex Coolman for Ron
17    Gadsden.
18         THE VIDEOGRAPHER:  Thank you.  Would the
19    reporter please administer the oath.
20                   TINA JAWORSKI,
21    After having been first duly sworn, testified as
22              follows:
23              EXAMINATION
24    BY MR. PHILLIPS:
25       Q   Good morning, Ms. Jaworski.  Hopefully I'm not
```

TINA JAWORSKI - 12/14/2022

Page 9

1    A    Huh-uh.
2    Q    I'd like to go to really the -- one of the
3  events that the subject of this lawsuit, which is a
4  video visit -- or my understanding is is a video visit
5  between you and Mr. Gadsden on February 15th of 2019.
6         Does that -- do you have an understanding of
7  that event?
8    A    Yes.
9    Q    Okay.  And so when I talk about this video
10  visit and say "video visit," you'll understand that I'm
11  talking about that February 15th, 2019, event?
12   A    Mh-hmm.
13   Q    Yes?
14   A    Yeah.
15   Q    Okay.  Sorry.
16   A    Yeah.
17   Q    And I apologize.  I'll try not to talk over to
18  you -- talk over you.  I know it's a little weird
19  because in normal conversation, right, you know, there's
20  a little quicker back and forth.  I'm trying to keep the
21  court reporter sane.  So we'll try and take a break
22  because she's got to write down everything we say.
23   A    Let us know if you need me to slow down.  I am
24  from New York so I'm a quick talker.
25   Q    I talk fast, too, so I have to consciously

Page 10

1  remind myself --
2    A    Slow down.
3    Q    -- to slow down.
4    A    Okay.
5    Q    So I'll -- I'll try not to talk over you --
6    A    Okay.
7    Q    -- if you wouldn't mind just giving me a brief
8  pause after my question for the court reporter, that
9  would be greatly appreciated.
10   A    Got it.
11   Q    So prior to that video visit on February 15th,
12  had you scheduled or -- had you scheduled any other
13  video visits with Mr. Gadsden prior to that day?
14   A    Yes.
15   Q    Okay.  How many?
16   A    I have no idea.
17   Q    And it's --
18   A    Multiple.
19   Q    It's been four years, right?  I understand you
20  may not remember precisely the number.
21   A    As many as I could.
22   Q    And I guess my question would be -- I would --
23  we are entitled to your best estimate, right?  So if it
24  was once a week, and you know he was in there for a
25  couple months, you know, is there a way that you can

Page 11

1  base an estimate, a reasonable estimate for us as to how
2  many times?  Like more than ten?  Less than ten?  Or
3  even a range that you think would be accurate?
4    A    I honestly can't give you a range because I
5  feel like it would just be inaccurate.
6    Q    Sure.
7    A    Like I can't -- I know it was many.  I was
8  really familiar with the process.
9    Q    Okay.
10   A    Knowing what time they opened up, you know, the
11  timeframes and things like that.
12   Q    Okay.  So certainly more than once?
13   A    (Witness nods head.)
14   Q    Would you say it was more than twice?
15   A    I would say it was more than five times, at
16  least.
17   Q    And that would have been the period between the
18  end of December 2018 through February 15th, 2019, when
19  the incident occurred?
20   A    No.
21   Q    Okay.
22   A    He -- he hadn't been transferred there.  He was
23  at another place that they didn't have video visits.
24   Q    Oh, okay.
25   A    So I did in-person visits at the places that

Page 12

1  they didn't have the video visits.
2    Q    And when was the first time that you were able
3  to do video visits?  Was it in January of 2019?
4    A    Whenever he was transferred to that facility.
5    Q    Okay.
6    A    I think it's the only facility in San Diego
7  County that has the video visit capabilities, which was
8  great because it's a lot cheaper than phone calls.  It's
9  just more personal, so I was stoked.
10   Q    And when you say that facility, that's the same
11  facility he was in on February 15th, 2019, as far as you
12  understand it?
13   A    Yep.
14   Q    So you were talking about the scheduling of
15  these video visits.  Seems like you were pretty familiar
16  with that.  Could you describe how that worked as far as
17  you understood it?
18   A    There was a certain time of the day that
19  appointments would become available, and then you chose
20  a timeframe.  And that's how it was scheduled.  So you
21  had to be on there right at a particular time when they
22  opened up to get a good time that worked with my
23  schedule, because I'm -- I work a lot.  So I had to
24  schedule them around my clients.
25   Q    And do you remember what time of day that was

EXHIBIT 12

TINA JAWORSKI - 12/14/2022

1   that this opened up where you could schedule the visits?
2       A    No.  I think -- I think I remember it being in
3   the evening time, because I remember sitting there
4   working and doing my notes and waiting for it to open.
5       Q    And when you say "evening," is that like
6   midnight?  Is that like dinnertime?  Is that before
7   dinnertime?
8       A    I don't know.  Between three and midnight.
9       Q    And was that online?
10      A    It was through the computer.
11      Q    Did you have to go on a browser, or how did you
12  access that?
13      A    It was through whatever company the service
14  there is.
15      Q    And do you recall when you got on the computer
16  how you accessed that system?  Was it an application in
17  your computer?  Was it -- did you go to a website?
18      A    I don't remember, to be honest.  I definitely
19  accessed it through my phone but I don't remember
20  because there was -- phone calls were one service.  The
21  video calls were another service.  It's -- I could have
22  told you four years ago, but now, I mean, I erased all
23  that stuff behind me.
24      Q    And on that phone -- so you said it would show
25  you like available times --

1       A    Mh-hmm.
2       Q    -- and you would select it?
3       A    Mh-hmm.
4       Q    Would that be like a calendar?
5       A    Well, no.  Because it was only open for that
6   day.
7       Q    Okay.
8       A    So and then it would say, like, you know --
9   it's kind of like when you make a doctor's appointment.
10  You know, there's these ones open.  You select it.
11      Q    And you would typically do that at home?
12      A    Mh-hmm.
13      Q    And either on your phone or your computer?
14      A    Mh-hmm.  Yes, sir.  Sorry.  "Mh-hmm" doesn't --
15  I'm sorry.
16      Q    Was there anyone else in the house when you
17  would do that, or were you by yourself?
18      A    It was me and my dog.
19      Q    What kind of dog do you have?
20      A    I had a Rottweiler at the time.
21      Q    Oh, I'm sorry to hear that.
22      A    That's okay.
23      Q    And go kind of at that -- go back to sort of
24  the timeline of when you met Mr. Gadsden and where you
25  were living at the time.  So at the Ice Cube concert,

1   where were you living at that time?
2       A    I've always lived at the same address.  I own
3   my home on 788 C-u-c-h-i-l-l-o Street in Oceanside.
4       THE REPORTER:  One more time?
5       THE WITNESS:  788 Cuchillo Street.
6   C-u-c-h-i-l-l-o.  It's actually "knife" in Spanish.  I
7   live on knife street.  And that's in Oceanside.
8   BY MR. PHILLIPS:
9       Q    Cuchillo Street.
10      A    Uh-huh.
11      Q    So you lived at that address in 2018 at the Ice
12  Cube concert, and you've lived at that address since
13  that time to today?
14      A    Mh-hmm.  It's the great thing about owning a
15  home.  You don't move a lot.  You don't have to change
16  your address as much.
17      Q    Definitely simplifies things.
18      A    Mh-hmm.
19      Q    And was anyone else living at that house at
20  that time when you had the video visit on February 15th,
21  2019?
22      A    I had a roommate, Gina.
23      Q    And what were the times that she lived there?
24      A    I can't recall.  I don't know.  Years.
25      Q    Did she live there at the Ice Cube -- during

1   the time of the Ice Cube concert?
2       A    Yeah.
3       Q    Did she live there at the time of the video
4   visit, February 15th, 2019?
5       A    Yes.
6       Q    Okay.  Does she still live there today?
7       A    No.
8       Q    Okay.  When did she move out?
9       A    Few years ago.  Couple years ago.  I don't
10  remember the date.
11      Q    Do you remember if it was before or after the
12  pandemic shutdown?
13      A    Shortly after.  Because she had to hardwire her
14  computer, like direct connect to work from home.  It's a
15  really good marker, huh, the pandemic?  A lot of people
16  could use that as a solid marker.
17      Q    A lot of people remember what they were doing
18  at that time.  So that would've been --
19      A    I was working a lot in person.  It was great.
20  The roads were really clear.  Gas was cheap.
21      Q    I had one day where I drove through downtown
22  L.A.  Literally downtown L.A.  Not a soul on the
23  freeway.  Not a car.  It looked like a movie.  I almost
24  stopped and took a picture, but I was afraid I was going
25  to get hit by a car.

TINA JAWORSKI - 12/14/2022

1   a clinical director of a small non-profit Milestone
2   House for probation and fosters.  I help them start
3   their mental health program.
4       Q    And when did you work there?
5       A    Milestone House?
6       Q    Yes.
7       A    I should have brought my resume for you.
8       Q    We just need approximate.  You can say years,
9   even.  It doesn't have to be specific dates.
10      A    Yeah, about a year.  I gave them about a year.
11  It took me a year to open their program.  Really
12  difficult task that I did, kind of -- just because I
13  love that place.  It's small, non-profit.  And it's a
14  very difficult task to open a mental health program,
15  deal with Medi-Cal and working with the County.  So I
16  helped them do that task, and then I left.
17      Q    Very cool.  And when did you first start there?
18  Do you know the year?
19      A    Yeah.  I was there a year.  I left in May,
20  so....
21      Q    May of this year?
22      A    This year, yeah.  So approximately around May,
23  May or June of 2021.  And today this --
24      Q    I'm sorry.  I didn't mean to interrupt you.
25      A    That's okay.

1       Q    You said you had gotten a license.  When did
2   you receive your license?
3       A    In June 2021.
4       Q    And is there a particular school you went to to
5   get that license?
6       A    Well, no.  I got my master's degree from Cal
7   State San Marcos.  And then as a therapist, after you
8   get your master's degree, you have to be supervised by a
9   certain amount of professionals for 3000 hours before
10  sitting for the licensure test for the state.  I got
11  licensed, and now I can bill insurance on my own.
12      Q    Do you know when you graduated from Cal State
13  San Marcos with the master's degree?
14      A    2016.
15      Q    And then you had to do 3000 hours of --
16      A    Mh-hmm.
17      Q    -- shadowing with other therapists?
18      A    Under -- yeah, under clinical supervision.
19  Three hours a week you have to meet with someone and
20  cover a certain amount of hours in certain categories.
21      Q    How long did that take you?
22      A    Years.  Because, you know, marriage & family
23  therapists, other professionals that do therapy, it's
24  pretty easy to find them out in the community.  But
25  licensed clinical social workers are all doing their own

1   thing.  So it was very hard to find licensed clinical
2   supervisor to do supervising.  So I drove to Hemet for a
3   long time to get those hours.
4       Q    That is a drive from Oceanside.
5       A    It's a grueling process.  It's a lot of
6   education.
7       Q    Did you do anything else for work during that
8   time, after you graduated in 2016 until you were
9   licensed in 2021?
10      A    Mh-hmm.  I worked at a residential treatment
11  facility in Hemet.
12      Q    So you could work there at the same time you
13  were getting your hours?
14      A    Earning hours.  You have to.  You have to have
15  direct client contact.
16      Q    And what was the place in Hemet that you worked
17  at?
18      A    California Family Life Center.
19      Q    Going back to February 15th, 2019, the day of
20  the video visit, so you would have scheduled that visit
21  the day before February 14th, 2019?
22      A    Mh-hmm.
23      Q    Is that correct?
24      A    Mh-hmm.
25      Q    Yes?

1       A    Yes.
2       Q    Sorry.  And do you remember what time that was
3   scheduled for February 15th, 2019?
4       A    I don't.
5       Q    Do you remember if it was the evening or the
6   afternoon?
7       A    It would have been the evening because I work
8   during -- I work during the day.  So could have been
9   anywhere late afternoon to evening.
10      Q    And you just don't remember one way or another?
11      A    No.  Probably not morning, though.  I'm not a
12  morning person.  I don't do mornings unless I have to.
13  Just not my best self in the morning.
14      Q    I definitely understand that.
15           Was -- was that an option?  Do you recall sort
16  of like when the time periods were available?  Was it
17  anytime during the day, or was it only like at lunch or
18  particular hours?
19      A    I don't know, because I only look at the hours
20  that I need.
21      Q    And then what was the system that you used to
22  access to get on to the video visit?
23      A    It was through the same program that I would
24  schedule, and you would just click a link.
25      Q    And do you recall how you did that on

# EXHIBIT 13

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   RONALD EARL GADSDEN,              ) CASE NO.
                                       ) 20-cv-2258-WQH-DEB
 5              Plaintiff,             )
     vs.                               )
 6                                     )
     SERGEANT JOHN GEHRIS, Deputy      )
 7   Sheriff, and DEPUTY MICHAEL       )
     MCGRATH, Deputy Sheriff,          )
 8                                     )
                Defendants.            )
 9   _____)

10

11

12              VIDEOCONFERENCE DEPOSITION OF

13                     ALEX DOYLE

14                 San Diego, California

15                 November 22, 2022

16

17

18

19

20

21

22

23        Reported by Deborah M. DeSilva, CRR, CSR

24              Certificate No. 7307

25              Job No. 938411A
```

EXHIBIT 13

ALEX DOYLE – 11/22/2022

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   RONALD EARL GADSDEN,          ) CASE NO.
                                   ) 20-cv-2258-WQH-DEB
 5              Plaintiff,         )
     vs.                          )
 6                                 )
                                   )
 7   SERGEANT JOHN GEHRIS, Deputy  )
     Sheriff, and DEPUTY MICHAEL   )
     MCGRATH, Deputy Sheriff,      )
 8                                 )
                Defendants.        )
 9   _____)
10
11
12        The Videoconference Deposition of ALEX DOYLE was
13   taken pursuant to Notice of Taking Deposition on
14   Tuesday, November 22, 2022, commencing at 9:30 a.m.,
15   reported by Deborah M. DeSilva, CRR, CSR No. 7307,
16   Certified Shorthand Reporter in and for the State of
17   California.
18
19
20
21
22
23
24
25
```

Page 3

```
 1              VIDEOCONFERENCE APPEARANCES
 2
 3   For Plaintiff:
 4        ALEX N. COOLMAN, ESQ.
          3268 Governor Drive, Suite 390
 5        San Diego, California  92122
          619.831.7129
 6        alex@coolmanlaw.com
 7
 8   For Defendants:
 9        OFFICE OF SAN DIEGO COUNTY COUNSEL
          BY:  ADAM C. PHILLIPS, Senior Deputy
10        1600 Pacific Highway, Suite 355
          San Diego, California  92101
11        619.539.8357
          adam.phillips@sdcounty.ca.gov
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                     I N D E X
 2
 3   WITNESS:  ALEX DOYLE
 4   EXAMINATION BY:                           PAGE
 5        By Mr. Coolman                         5
 6        By Mr. Phillips                       17
 7
 8
 9
10                 INDEX OF EXHIBITS
                       (None)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1               VIDEOCONFERENCE PROCEEDINGS
 2                TUESDAY, NOVEMBER 22, 2022
 3                     9:30 A.M.
 4
 5        THE REPORTER:  Good morning.  My name is Debbie
 6   DeSilva, Certified Shorthand Reporter No. 7307, and I
 7   will be reporting today's deposition remotely by
 8   stenographic means.
 9        Would counsel please state your appearances for
10   the record, beginning with the noticing attorney.
11        MR. COOLMAN:  Good morning.  Alex Coolman for
12   the plaintiff, Ron Gadsden.
13        MR. PHILLIPS:  Good morning.  Adam Phillips on
14   behalf of Defendant, Michael McGrath.
15                       -o0o-
16                     ALEX DOYLE,
17   having been administered an oath remotely by the court
18   reporter, testified as follows:
19
20               E X A M I N A T I O N
21   BY MR. COOLMAN:
22        Q.  Good morning, Mr. Doyle.  Thank you for being
23   here.
24        A.  Good morning, sir.
25        Q.  I want to go through a couple of preliminary
```

EXHIBIT 13

ALEX DOYLE - 11/22/2022

Page 6

1  things -- actually, if I can, I'm not totally sure --
2  before we start, there was five areas of inquiry that I
3  pointed out in my deposition notice.  I'm not sure which
4  ones you're speaking to today.  Do you know?
5      A.  It is my understanding Items 1 and 2.
6      Q.  1 and 2?
7      A.  Internal Affairs.
8      Q.  Right.  Thank you very much.
9          Just preliminary stuff.  You understand that
10  you're under oath today, correct?
11      A.  I do, sir.
12      Q.  Thank you.  And that the effect of the oath is
13  the same as it would be at a trial?
14      A.  I do.
15      Q.  All right.  And then you'll be given an
16  opportunity to look at your remarks later, and you can
17  make any corrections that you might need to make in
18  terms of your representations about the facts, correct?
19      A.  Yes, that is correct.
20      Q.  Okay.  Can you tell me, please, what's your
21  title at the sheriff's department -- or actually, let me
22  ask, you're with the sheriff's department?
23      A.  I am, sir.  I am a sergeant.  I'm a sergeant
24  employed by the San Diego County Sheriff's Department.
25      Q.  And what is your background with Internal

Page 7

1  Affairs?
2      A.  I've been assigned to the Internal Affairs Unit
3  for approximately eight months.
4      Q.  Okay.  Great.  So in that role, you have an
5  understanding of how the Internal Affairs system is
6  intended to function?
7      A.  I do.
8      Q.  Okay.  And do you have some understanding of
9  how Internal Affairs forms are used in the Internal
10  Affairs system?
11      A.  I do.
12      **Q.  Okay.  Can you tell me real broadly, what is**
13  **the purpose of the Internal Affairs system of the**
14  **sheriff's department?**
15      **A.  The Internal Affairs system provides**
16  **administrative investigative services; we investigate**
17  **allegations of staff misconduct.**
18      **Q.  Okay.  And when you say "staff misconduct,"**
19  **you're referring to staff of the sheriff's department,**
20  **right?**
21      **A.  That is correct.**
22      Q.  If you know, what values is the Internal
23  Affairs system intended to promote?
24      A.  We intend to enhance the confidence of the
25  public as well as our employees.

Page 8

1      Q.  In what respect?  How would the confidence of
2  the public be enhanced?
3      A.  By providing a --
4          MR. PHILLIPS:  Objection.  That calls for
5  speculation.
6  BY MR. COOLMAN:
7      Q.  You can answer, if you understand the question.
8      A.  If I understand your question, sir, it's how --
9  what is the purpose or how does -- how do we enhance
10  confidence?
11      Q.  Yes.
12      A.  By providing an investigative service to look
13  into allegations of misconduct.
14      Q.  Okay.  And maybe you answered this already --
15  I'm sorry if I'm repeating myself -- but the values that
16  the Internal Affairs system is intended to promote, do
17  you have a general sense of what those values are in
18  terms of the performance of sheriff's employees?
19          MR. PHILLIPS:  Objection.  Vague and ambiguous
20  as to "values."
21          MR. COOLMAN:  You're right.  That's pretty
22  vague.  Let me sort of flip it over.
23  BY MR. COOLMAN:
24      Q.  What sort of problems is the Internal Affairs
25  system intended to avoid or address?

Page 9

1      A.  Our unit is designed to investigate any matters
2  of staff misconduct as it relates to breaking of a
3  policy, an established sheriff's policy.
4      Q.  Does that differ from something like a more
5  run-of-the-mill performance problem?  For example, if a
6  deputy is merely not competent or something like that,
7  is that handled by Internal Affairs?
8      A.  There are situations where a failure to meet
9  standards could delve into the Internal Affairs realm,
10  if you will, but generally, that is a matter of training
11  and our employee evaluations, if you will.
12      Q.  Okay.  So it would be correct -- you tell me.
13  Is it correct to say that the Internal Affairs regime is
14  more focused on matters of integrity, for example, than
15  like mere competence?
16      A.  I would have to say it would be depending on
17  the situation, sir.
18      Q.  Okay.  Is there something about a law
19  enforcement -- I know these are kind of broad questions,
20  and I'm sorry, this is just the way I think -- is there
21  something about a law enforcement agency or running a
22  law enforcement agency that makes it important for there
23  to be an Internal Affairs system in place?
24      A.  Aside from public trust and the need for that,
25  there is actually, per Penal Code -- California Penal

ALEX DOYLE - 11/22/2022

Page 10

1  Code 832.5.
2      Q.  Oh, what does that say?
3      A.  It entails that any law enforcement agency that
4  employs law enforcement agents, we have to have an
5  oversight or administrative investigative body.
6      Q.  Got you.  Okay.
7          And what about in the context of running a jail
8  or a facility where there are people being detained, is
9  Internal Affairs an important aspect of the operations
10  of a jail?
11         MR. PHILLIPS:  Objection.  Outside the scope to
12  the extent it's talking about operations of the jail's
13  facility versus the Internal Affairs system itself.
14         You can answer.
15         THE WITNESS:  Sorry, I can provide an answer,
16  but it would be essentially my opinion, as our Internal
17  Affairs Unit handles employees assigned -- sheriff's
18  employees assigned to any -- any of our offices,
19  facilities, stations.
20  BY MR. COOLMAN:
21     Q.  Okay.  But I guess what I'm wondering is, does
22  Internal Affairs play a unique role in the jail compared
23  to -- well, I'm wondering about the conditions of a jail
24  and specifically about the fact that there are, for
25  example, inmates and deputies who have a power

Page 11

1  differential.  Do you see that as playing into the need
2  for Internal Affairs?
3      A.  I feel that --
4         MR. PHILLIPS:  Objection.  Form.
5         You can answer.
6         THE WITNESS:  The Internal Affairs Unit
7  provides an investigative service for anyone filing a
8  complaint.  That could be a member of our public or a
9  member of our public that's incarcerated in a facility.
10  BY MR. COOLMAN:
11     Q.  Okay.  Well, let me turn to this question of
12  forms, then.  What role do forms -- Internal Affairs
13  forms play in initiating Internal Affairs
14  investigations?
15     A.  The Internal Affairs form or any piece of
16  written correspondence that comes to the Internal
17  Affairs office will be reviewed to determine if an
18  investigation is warranted.
19     Q.  Okay.  So do I understand correctly, then, that
20  it's not necessarily required to use a form to initiate
21  an investigation; that's just one way it can be done?
22     A.  That is correct.
23     Q.  Okay.  But the form -- you tell me -- is the
24  form intended to facilitate beginning an investigation?
25     A.  Yes, that would be reasonable to say, that the

Page 12

1  IA-1 Standard Sheriff's Internal Affairs form is
2  intended to provide a means to start an investigative
3  process.
4      Q.  Okay.  Now, the IA-1, that's an Internal
5  Affairs form?  That's like the standard one?
6      A.  Yes.  Someone might say it's a complaint form,
7  if you will.
8      Q.  Right.  Okay.
9          Do you know, are those forms supposed to be
10  freely available in jails or does it depend on the
11  facility?  What's supposed to be the access to those
12  forms in a jail?
13     A.  Those forms will be printed via our internal
14  website and provided to incarcerated individuals upon
15  request.
16     Q.  Okay.  So they're not just like out on a desk
17  or something, but they should be provided if an inmate
18  requests one?
19     A.  That is correct.
20     Q.  Okay.  And then when somebody submits a form
21  like the IA-1, where does it go?  What happens to it?
22     A.  They will be delivered via US Mail, and they
23  will be delivered to a PO Box; picked up; the front
24  office staff, office assistants, will assign a number, a
25  serialized number per the year; and it will be delivered

Page 13

1  to the lieutenant of Internal Affairs for review.
2      Q.  Would you say the last part again?  It's
3  delivered to the lieutenant.  I didn't catch the last
4  part.
5      A.  I'm sorry, sir.  The lieutenant of the Internal
6  Affairs Unit.
7      Q.  Okay.  And then that person would review the
8  form and decide how to proceed?
9      A.  That is correct.
10     Q.  Okay.  When the form is received, is the person
11  who is the subject of the complaint notified about it?
12     A.  The -- I will deem them "accused employee," if
13  you will.
14     Q.  Sure.
15     A.  The accused employee will be notified upon --
16  if it becomes a correspondence letter, they'll be
17  notified.  If it becomes an investigation, that
18  notification will be up to the investigator as to when
19  they're notified, but they will be notified.  Short
20  answer, yes.
21     Q.  Okay.  Now, the first thing you said is "if it
22  becomes a correspondence letter," I think.  Can you
23  explain that a little bit more?
24     A.  Sure.  A correspondence letter will be -- every
25  single complaint that comes to my office has to be

EXHIBIT 13

# EXHIBIT 14

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   RONALD EARL GADSDEN,              )
                                       )
 5              Plaintiff,             )
                                       )
 6        vs.                         ) No. 20-cv-2258-WQH-DEB
                                       )
 7   SERGEANT JOHN GEHRIS, Deputy      )
     Sheriff, and DEPUTY MICHAEL       )
 8   McGRATH, Deputy Sheriff,          )
                                       )
 9              Defendants.            )
     _____)

10

11

12

13

14             DEPOSITION OF KURTIS KELLAS

15             TUESDAY, DECEMBER 13, 2022

16     APPEARING REMOTELY VIA ZOOM VIDEOCONFERENCE

17

18

19

20

21

22   Reported by Elana Zucconi, CSR No. 9651, RPR, CRR

23                  Job No. 943990

24

25
```

EXHIBIT 14

KURTIS KELLAS - 12/13/2022

Page 2

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 3
 4  RONALD EARL GADSDEN,              )
                                     )
 5            Plaintiff,             )
                                     )
 6       vs.                        ) No. 20-cv-2258-WQH-DEB
                                     )
 7  SERGEANT JOHN GEHRIS, Deputy     )
    Sheriff, and DEPUTY MICHAEL      )
 8  McGRATH, Deputy Sheriff,         )
                                     )
 9            Defendants.            )
    _____)
10
11
12
13
14
15
16
17
18
19
20
21      VIDEOCONFERENCE DEPOSITION OF KURTIS KELLAS, taken
22  remotely from San Diego, California, on Tuesday,
23  December 13, 2022 at 1:00 p.m., before Elana Zucconi,
24  Certified Shorthand Reporter, in and for the State of
25  California.
```

Page 3

```
 1  REMOTE APPEARANCES:
 2
 3  For Plaintiff:
 4          LAW OFFICE OF ALEX COOLMAN
            ALEX COOLMAN, ESQ.
 5          3268 Governor Drive, Suite 390
            San Diego, California  92122
 6          619.831.7129
            alex@coolmanlaw.com
 7
 8
 9  For Defendants:
10          OFFICE OF SAN DIEGO COUNTY COUNSEL
            ADAM C. PHILLIPS, ESQ.
11          1600 Pacific Highway, Room 355
            San Diego, California  92101
12          619.539.8357
            Adam.phillips@sdcounty.ca.gov
13
14
15
16
17
18
19
20
21
22
23
24
25                    INDEX
```

Page 4

```
 1
 2  WITNESS:  KURTIS KELLAS
 3  EXAMINATION                        PAGE
 4  MR. COOLMAN                        6, 23
 5  MR. PHILLIPS                        19
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25           INDEX TO EXHIBITS
```

Page 5

```
 1  EXHIBITS                               MARKED
 2  Exhibit 1   San Diego Sheriff's Department   14
                Hearing Report dated 02-15-2019
 3
    Exhibit 2   San Diego Sheriff's Department   24
 4              Incident Report dated
                02-15-2019
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT 14

Page 6

```
 1              TUESDAY, DECEMBER 13, 2022; 1:00 P.M.
 2            REPORTED REMOTELY FROM SAN DIEGO, CALIFORNIA
 3
 4                        KURTIS KELLAS,
 5        having been first duly sworn, testifies as follows:
 6                         EXAMINATION
 7   BY MR. COOLMAN:
 8       Q    Let's go ahead.  Thank you for being here
 9   today.  Is it Sergeant Kellas?  Is that the correct
10   title?
11       A    Yes, sir.
12       Q    All right.  Thanks very much for taking the
13   time to be here today.  I know you have better things to
14   do and I will try to keep this pretty concise, actually.
15            Before we get going, let me just run through a
16   couple preliminary things.  My name is Alex Coolman.  I
17   am the attorney for the plaintiff, Ryan Gadsden.
18            You understand you are under oath here,
19   correct?
20       A    Yes, sir, I do.
21       Q    And that the oath has the same effect here that
22   it does at a trial, for example, right?
23       A    Yes, sir.
24       Q    And you know that you will be given a chance to
25   go over your -- a transcript of your remarks and make
```

Page 7

```
 1   any corrections to that transcript that you might need
 2   to make, correct?
 3       A    Yes, I am aware of that.
 4       Q    Okay.  Good to know.  The incident that I am
 5   interested in that has to do with this deposition
 6   occurred in 2019.  Were you employed by the sheriff
 7   department of San Diego at that time?
 8       A    Yes, sir, I was.
 9       Q    All right.  And what was your title at that
10   time, if you recall?
11       A    In 2019 I was a sergeant.
12       Q    Okay.  And in that role, did you conduct
13   disciplinary hearings at any time for inmates?
14       A    Yes.
15       Q    Okay.  Were you trained on doing that or is it
16   just something that you kind of learned on the job?
17       A    Trained on the job.
18       Q    I see.  Okay.  In other words, you learned kind
19   of from the experience from doing it or were there
20   special classes for doing that kind of thing?
21       A    I shadowed other sergeants while they did
22   hearings.
23       Q    I got you.  Okay.  What's your understanding of
24   the general purpose of a disciplinary hearing for an
25   inmate?
```

Page 8

```
 1       A    To hear their side of the story and to look at
 2   any evidence or witnesses that they present.
 3       Q    Okay.  And in the disciplinary hearings --
 4   well, let me ask you a more basic question.  You
 5   yourself have conducted disciplinary hearings, right?  I
 6   think I answered that before, but I will ask it again.
 7   You did conduct disciplinary hearings in your time with
 8   the sheriff?
 9       A    Yes.
10       Q    All right.  I am all over the place.
11            Who typically attends the disciplinary hearing?
12       A    Generally speaking, it's just me and the
13   accused.
14       Q    Okay.  Are there some situations where other
15   people also attend the hearing?
16       A    Yes.
17       Q    Can you give me an example?
18       A    Absolutely.  When I have younger deputies
19   sometimes on training or just off training, I will bring
20   them with me just so they can see the other side of what
21   a write-up entails.
22       Q    I see.  Okay.  Do witnesses sometimes attend
23   these hearings?
24       A    If witnesses are presented by the accused,
25   absolutely.
```

Page 9

```
 1       Q    Okay.  Where do disciplinary hearings occur,
 2   typically?  Like, are they at the cell or do they go to
 3   a special room or how does that work?
 4       A    It varies.
 5       Q    Okay.  Can they sometimes occur at a cell?
 6       A    Yes, sir.
 7       Q    Okay.  And what time of day do they typically
 8   take place?
 9       A    I don't know a typical time of day.
10       Q    Okay.  Could it be any time at all?
11       A    Yes, sir.  We run operations 24 hours.
12       Q    Okay.  And if you are the sergeant conducting
13   the hearing, are you the one who makes the call when and
14   where to have the hearing?
15       A    Yes.
16       Q    Okay.  What kinds of procedural protections
17   does the inmate have when they are going through a
18   hearing?
19            MR. PHILLIPS:  Objection; vague and ambiguous.
20   BY MR. COOLMAN:
21       Q    You can answer if you understand my question.
22       A    I don't.  It was a pretty broad question.
23       Q    Sure.  Well, let me break it down, I guess.
24   Does an inmate have a right to a copy of an incident
25   report that is the basis for the hearing?
```

EXHIBIT 14

KURTIS KELLAS - 12/13/2022

Page 10

1    A    Yes, they do.
2    Q    Okay.  And I believe you said they are allowed
3    to call witnesses, correct?
4    A    Yes.
5    Q    And I suppose they can get testimony on their
6    own behalf, correct?
7    A    Yes.
8    Q    Okay.  Are there any other procedural
9    protections that you can think of that the witness can
10   take -- I am sorry -- that the inmate can take advantage
11   of in these hearings?
12   A    Nothing off the top of my head.
13   Q    Okay.  And are these hearings normally recorded
14   in any way?
15   A    No.
16   Q    Okay.  They are not transcribed in any way?
17   A    No.
18   Q    Okay.  And as the hearing officer, is it your
19   duty to make a determination about whether the inmate is
20   guilty of the charges against them?
21   A    Yes.
22   Q    Okay.  What standard do you use to make that
23   determination?  Is there some kind of language used
24   around that standard?
25   A    No, there's no hard and fast rule.

Page 11

1    Q    Okay.
2    A    It is judged on a case by case.
3    Q    Okay.  So just, for example, you don't say,
4    like, by a preponderance of the evidence or anything
5    like that, it is just what it seems like to you as you
6    are conducting a hearing, essentially?
7    A    That is correct.
8    Q    Okay.  And then how do you decide what sort of
9    discipline to impose assuming you find somebody guilty
10   of some sort of disciplinary offense?
11   A    I will look at their history to see if this is
12   a reoccurring issue, also the seriousness of what they
13   are guilty of.
14   Q    Okay.  And let's kind of flesh those two things
15   out.  In terms of the history, how does that play into
16   the decision you make?
17   A    Generally speaking --
18        MR. PHILLIPS:  Objection; incomplete
19   hypothetical.
20   BY MR. COOLMAN:
21   Q    Well, let me -- let me be a little more
22   specific.  When you look at an inmate's disciplinary
23   history, if they have, for example, no prior problem,
24   how does that play into your analysis of what kinds of
25   consequences they should experience?

Page 12

1        MR. PHILLIPS:  Same objections, add form.
2        You can answer if you understand.
3        THE WITNESS:  Generally speaking, if somebody
4    has no history, I am going to start at the lower end of
5    the spectrum for discipline.
6    BY MR. COOLMAN:
7    Q    Okay.  Okay.  And then if they have a more
8    dramatic disciplinary history, what -- how do you sort
9    of weigh that as an offense?
10        MR. PHILLIPS:  Same objections.
11        THE WITNESS:  We try to be progressive with
12   discipline.
13   BY MR. COOLMAN:
14   Q    Okay.  And that means that more serious
15   consequences will be imposed if someone has a more
16   extensive disciplinary history?
17   A    That's correct.
18   Q    Okay.  And then on the other point about the
19   severity of whatever their conduct is, can you explain
20   to me a little bit about how that plays into what kinds
21   of consequences they might experience?
22   A    There are several rule violations in our
23   facilities.  Some are as simple as talking out of turn,
24   and some are law violations, which do not carry the same
25   consequences.

Page 13

1    Q    Gotcha.  So to take that talking out of turn
2    point, is that on your kind of more minor end of the
3    spectrum of possible violations?
4    A    It depends on the totality of the
5    circumstances.
6    Q    Well, okay, but I mean compared to something
7    like an assault, for example, would you agree that
8    talking out of turn is less serious as a disciplinary
9    problem than an assault?
10        MR. PHILLIPS:  Objection; form, incomplete
11   hypothetical.
12        THE WITNESS:  Yeah, I honestly couldn't tell
13   you without having a scenario in front of me and a
14   history to review and everything else.
15   BY MR. COOLMAN:
16   Q    Fair enough.  I gotcha.  Okay.  Let me turn --
17   by the way, we are making great progress.  I don't
18   have -- I want to turn to a specific incident, but then
19   I will wrap up.  It is not that much.  I would like to
20   share my screen here, if I can do this without screwing
21   it up, which is debatable.  Let's see.  Share screen.
22   There.  All right.
23        Are you able to see this, sir?
24   A    Yes, I am.
25   Q    Okay.  What I am showing --

KURTIS KELLAS - 12/13/2022

Page 22

1  mail to be distributed the next night shift.
2      Q     And was that your custom and practice in
3  February of 2019?
4      A     Yes.
5      Q     Are you familiar with Facility 8?
6      A     Yes, I am.
7      Q     Is there anything unique about Facility 8?
8      A     Several things different about Facility 8.
9      Q     And in terms of security or safety concerns,
10 can you describe for me what would be different from
11 Facility 8 from the rest of George Bailey?
12     A     Facility 8 is physically separated from George
13 Bailey.  It takes about two to three minutes to walk
14 there, from the back door of George Bailey to Facility
15 8.  There were generally at the time four to five
16 deputies assigned there and their closest cover was a
17 few minutes away.
18     Q     Was it a common practice for deputies in
19 Facility 8 in February of 2019 to transfer high-level
20 inmates to Module 6A at George Bailey facility?
21     A     6A, only pending write-ups.
22     Q     So after a rule violation report?
23     A     Yes, that is correct.
24     Q     Is that an operational thing or is that a
25 discipline thing?

Page 23

1      A     That's operational pending discipline.
2      MR. PHILLIPS:  That's all the questions I have,
3  Alex.
4      MR. COOLMAN:  Okay.  I have two quick
5  follow-ups.
6
7               FURTHER EXAMINATION
8  BY MR. COOLMAN:
9      Q     I had asked earlier about the location of the
10 hearing and Mr. Phillips was asking you whether any of
11 the language in the report seemed inaccurate as far as
12 you could recall and I believe you answered that there
13 is no -- nothing seems inaccurate, with the possible
14 exception of the reference to Deputy Velasquez.
15         In the second paragraph of the report, it
16 refers to the idea that the hearing was conducted in
17 Module C -- I am sorry -- in Module 6A at Cell 213.  As
18 far as you -- I mean, I guess what I am asking is, there
19 is not any basis to believe that that is inaccurate, is
20 there, as far as you know?
21     A     Correct.
22     Q     Okay.
23         And I wanted to ask a clarifying question about
24 the way the hearing data is populated into the incident
25 report, because I thought what you said was that after

Page 24

1  you conduct a hearing, the fact that the hearing was
2  conducted is populated into the incident report.  So am
3  I understanding correctly that the incident report
4  should reflect the fact that the hearing was conducted
5  and that there were conclusions drawn in the hearing?
6      A     Yes, sir, the first page of the incident report
7  will also now show their discipline.  If you scroll to
8  the top of the first page here, it shows just kind of
9  basic housekeeping things and this is for, like, the
10 green report.  The incident report is very similar in it
11 has date, time of the incident and inmate's name and
12 location, and then once I enter the discipline and the
13 hearing notes, it populates on that first page.
14     Q     Okay.  I think I have that.
15     MR. COOLMAN:  Let's call this 2.  And maybe
16 this is what you are talking about here.
17         (Exhibit 2 marked)
18 BY MR. COOLMAN:
19     Q     It looks like -- well, maybe you can tell me.
20         Do you see this incident report?
21     A     Yes, sir, I do.
22     Q     Is there a spot on there where it sort of
23 indicates that the hearing took place?  I guess there
24 is, right, where it says --
25     A     Yes, sir.

Page 25

1      Q     -- (indiscernible crosstalk) 2019.
2      A     Yes, sir.  That's -- right under Gadsden's
3  name, it's the discipline that was imposed and then next
4  to that is the start date of the discipline and then
5  next to that is the end date of the discipline.
6      Q     Okay.  Thank you.  That's helpful.  I've spent
7  a long time trying to interpret all these documents and
8  they are not real easy, but that's very helpful.  I
9  think that's all I've got.
10     MR. COOLMAN:  Adam, do you have anything else?
11     MR. PHILLIPS:  No.  That's all I have.  And I
12 would just ask if I am going per Code to give the
13 witness 30 days to review his deposition for any
14 inaccuracies.
15     MR. COOLMAN:  Yeah.  Sounds good.
16 Sergeant Kellas, thank you for time.  I really
17 appreciate it.
18     THE WITNESS:  Absolutely.
19     THE REPORTER:  Mr. Phillips, would you like to
20 purchase a copy?
21     MR. PHILLIPS:  Yes, I would like a digital.
22         (Deposition concluded at 1:29 p.m.)
23
24
25

EXHIBIT 14

# EXHIBIT 15

# EXHIBIT 15

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   RONALD EARL GADSDEN,            ) CASE NO.
                                     ) 20-cv-2258-WQH-DEB
 5              Plaintiff,           )
     vs.                            )
 6                                   )
     SERGEANT JOHN GEHRIS, Deputy    )
 7   Sheriff, and DEPUTY MICHAEL     )
     MCGRATH, Deputy Sheriff,        )
 8                                   )
                Defendants.          )
 9   _____)

10

11

12            VIDEOCONFERENCE DEPOSITION OF

13                    DESAN TYSON

14               San Diego, California

15                November 22, 2022

16

17

18

19

20

21

22

23      Reported by Deborah M. DeSilva, CRR, CSR

24               Certificate No. 7307

25                Job No. 938411B
```

EXHIBIT 15

DESAN TYSON – 11/22/2022

Page 2

1           IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA
3
4   RONALD EARL GADSDEN,           ) CASE NO.
                                   ) 20-cv-2258-WQH-DEB
5              Plaintiff,          )
    vs.                            )
6                                  )
    SERGEANT JOHN GEHRIS, Deputy   )
7   Sheriff, and DEPUTY MICHAEL    )
    MCGRATH, Deputy Sheriff,       )
8                                  )
               Defendants.         )
9   _____)
10
11
12          The Videoconference Deposition of DESAN TYSON
13      was taken pursuant to Notice of Taking Deposition on
14      Tuesday, November 22, 2022, commencing at 10:16 a.m.,
15      reported by Deborah M. DeSilva, CRR, CSR No. 7307,
16      Certified Shorthand Reporter in and for the State of
17      California.
18
19
20
21
22
23
24
25

Page 3

1              VIDEOCONFERENCE APPEARANCES
2
3   For Plaintiff:
4        ALEX N. COOLMAN, ESQ.
         3268 Governor Drive, Suite 390
5        San Diego, California  92122
         619.831.7129
6        alex@coolmanlaw.com
7
8   For Defendants:
9        OFFICE OF SAN DIEGO COUNTY COUNSEL
         BY:  ADAM C. PHILLIPS, Senior Deputy
10       1600 Pacific Highway, Suite 355
         San Diego, California  92101
11       619.539.8357
         adam.phillips@sdcounty.ca.gov
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                    I N D E X
2
3   WITNESS:  DESAN TYSON
4   EXAMINATION BY:                          PAGE
5       By Mr. Coolman                       5, 44
6       By Mr. Phillips                      43
7
8
9
              INDEX OF EXHIBITS
10
    EXHIBIT                                  PAGE
11
    Exhibit 1    Incident Report            14
12
    Exhibit 2    Hearing Report             16
13
    Exhibit 3    JIMS printout              25
14
    Exhibit 4    Disciplinary Hearing Rights Waiver   45
15
16
17
18
19
20
21
22
23
24
25

Page 5

1              VIDEOCONFERENCE PROCEEDINGS
2              TUESDAY, NOVEMBER 22, 2022
3                    10:16 A.M.
4
5           THE REPORTER:  Good morning.  My name is Debbie
6   DeSilva, Certified Shorthand Reporter No. 7307, and I
7   will be reporting today's deposition remotely by
8   stenographic means.
9           Would counsel please state your appearances for
10  the record, beginning with the noticing attorney.
11          MR. COOLMAN:  Good morning.  Alex Coolman for
12  the plaintiff, Ron Gadsden.
13          MR. PHILLIPS:  Good morning.  Adam Phillips on
14  behalf of defendant, Michael McGrath.
15                    -o0o-
16              DESAN TYSON,
17  having been administered an oath remotely by the court
18  reporter, testified as follows:
19
20              E X A M I N A T I O N
21  BY MR. COOLMAN:
22      Q.  Good morning, Sergeant Tyson.
23      A.  Good morning, sir.
24      Q.  Thanks for being here.  I went relatively
25  quickly through the first witness, and I'm not going to

EXHIBIT 15

DESAN TYSON - 11/22/2022

Page 10

```
 1       Q.  Well, for the sheriff's department, right?
 2       A.  Well, it's -- we have discretionary -- each
 3  deputy can -- have their discretion on whether they
 4  want to separate an inmate depending on the totality of
 5  the situation.
 6       Q.  Okay.  So is there a difference between
 7  physically separating an inmate and disciplining an
 8  inmate?
 9       A.  Yes.
10       Q.  Okay.  And can you spell that out a little bit?
11  When does separation occur?
12       A.  Separation can occur, for an example, if -- if
13  you have an inmate who's being unruly or boisterous and
14  they're amongst a general housing setting.
15       Q.  Okay.
16       A.  To separate them would mean to remove them from
17  the housing unit and place them in isolation.  That
18  could be pending discipline or it could -- it could be
19  in a holding cell until they calm down.  But as far as
20  separation, it's removing them from a general housing
21  area.
22       Q.  Okay.  So being separated, then, if I
23  understand correctly, isn't necessarily the same thing
24  as being disciplined.  It's more of a physical movement?
25       A.  It's a physical movement, but the discipline is
```

Page 11

```
 1  pending what rule violation will go along explaining
 2  what the reason for the immediate separation was for
 3  or why you're separating them.
 4       Q.  Right.  Okay.
 5           So is that decision to physically move an
 6  inmate one that a deputy can make his or herself?
 7       A.  Initially they have the discretion to separate
 8  an individual from a general housing -- general housing
 9  area, yes.  They have that discretion, but they are
10  not -- they do not make the final decision on whether
11  that will be finalized.
12       Q.  And when you say "that will be finalized," you
13  mean the movement could be reversed or --
14       A.  It could be, depending on the supervisor who
15  will be reviewing the situation.
16       Q.  Okay.  Well, let's turn to that.
17           When there is a rule violation report, that
18  goes to a disciplinary review officer, or where does the
19  report go?
20       A.  The report is written, and then that -- a copy
21  of that report should be given to the inmate that's
22  alleged to commit the violation.  That report is also
23  given or put in a supervisor's queue, which is the
24  hearing officer; that's generally a sergeant.
25       Q.  Okay.  I've got to move my screen because I'm
```

Page 12

```
 1  getting sun here.  Sorry about that.
 2           So is it, then, the disciplinary hearing
 3  officer who approves discipline?
 4       A.  Along with that rule violation, a segregated
 5  housing order form should be given to the supervisor to
 6  approve the separation, and it's -- usually there's a
 7  box -- there's several boxes on that form.  The box that
 8  should be checked because of the rule violation should
 9  be "Administratively Segregated Pending Discipline," or
10  a hearing, pending a hearing.
11       Q.  You referred to, I think, a surrogate housing
12  form?  Was that correct?
13       A.  Segregating housing order.
14       Q.  Segregating housing order.  Okay.
15           And I'm sorry, I just have to go over it slowly
16  so I understand.  The segregated housing order is
17  generated by whom?
18       A.  It's generated by the deputy, along with the
19  incident report rule violation, and that form needs to
20  be given to the supervisor to approve -- to review, to
21  give the final decision on whether that -- that person
22  will be -- will remain separated pending the hearing.
23       Q.  Okay.  So does that segregated housing order
24  get generated any time an inmate is moved to a different
25  housing area?
```

Page 13

```
 1       A.  No, it's only generated when someone's
 2  segregated or separated from the general population.
 3       Q.  Okay.
 4       A.  If they're going to be placed in an area
 5  designated for administrative segregation or
 6  disciplinary segregation.
 7       Q.  Okay.  And that is something that would be
 8  created by the deputy rather than by the supervisor?
 9       A.  Yes, the deputy needs to include that with
10  their rule violation if they're going to be segregating
11  an inmate pending the hearing.
12       Q.  Okay.  So would it ever occur that an inmate
13  would be moved to segregation but no segregated housing
14  order would be created?
15       A.  I'm sorry, can you --
16       Q.  I'm sorry, yeah.
17           Would it ever happen that an inmate would be
18  moved to segregation but no segregated housing order
19  would be created?
20           MR. PHILLIPS:  Objection.  Calls for
21  speculation.  Incomplete hypothetical.
22           You can answer, if you understand it.
23  BY MR. COOLMAN:
24       Q.  You can answer, if you understand the question.
25       A.  Okay.  Individuals are moved to disciplinary
```

DESAN TYSON - 11/22/2022

Page 22

1        But it's not a go-to discipline-type approach
2  for first-time, minor incidents, is it?
3        A.  It depends on the severity of the incident.
4        Q.  Right.  I'm saying for minor incidents.
5        A.  For minor incidents, no.
6        Q.  Would using disciplinary segregation in
7  response to minor incidents advance a legitimate
8  correctional goal?
9        A.  If it's progressive, depending on the history
10  of behavior.  If we -- if we have a history of
11  disciplinary issues, minor or major, disciplinary
12  isolation may be warranted for those -- for those
13  actions, yes.
14        Q.  Okay.  Can you tell me more about this word
15  "progressive"?  What do you mean by that?
16        A.  Progressive discipline?
17        Q.  Yes.
18        A.  Well, in the beginning, I had mentioned what an
19  example would be of a minor rule violation, a wristband,
20  not wearing it.  If there's documentation maybe in the
21  incident report, not necessarily a rule violation, and
22  the deputy looks that up and sees that the inmate has
23  already had a rule or an incident report for the same
24  thing and it's maybe the third time, that may constitute
25  them getting a rule violation, and their discipline

Page 23

1  could be disciplinary separation for a day, depending on
2  whatever, as an example.
3        Q.  Right.  So tell me if this sounds right.  A
4  progressive discipline approach is one in which more
5  serious discipline is imposed for more serious acts with
6  a more serious context?
7        MR. PHILLIPS:  Objection.  Vague and ambiguous.
8  Form.
9        You can answer, if you understand it.
10        THE WITNESS:  In my experience, I follow that
11  model, progressive discipline, yes.
12  BY MR. COOLMAN:
13        Q.  And flipping it around, less serious
14  disciplinary responses should be used to respond to less
15  serious forms of disciplinary problems of a less serious
16  context; is that right?
17        MR. PHILLIPS:  Same objections.
18        THE WITNESS:  In my -- in my experience, that's
19  the model that I've used as far as issuing discipline.
20  BY MR. COOLMAN:
21        Q.  Okay.  Do you know if segregation can be
22  accomplished within Facility 8 without moving an inmate
23  somewhere else?
24        A.  In my experience, Facility 8, it can -- you can
25  segregate someone there within the facility, but it

Page 24

1  presents operational issues as far as allowing other
2  inmates out, or if another inmate's celled with the
3  person who's being segregated, it presents an
4  operational issue.  I think that's -- you know, I
5  haven't worked at Facility 8 in a while, but I believe
6  that's why they -- they typically will transfer someone
7  out to George Bailey where they have an area designated
8  for disciplinary lockdown or separation, so it doesn't
9  impact the operations at Facility 8.
10        Q.  Okay.  Can you explain that in a little more
11  detail?  How would having somebody segregated affect the
12  operations?
13        A.  For example, if you have -- at Facility 8,
14  there's two inmates that are housed per cell.  So if you
15  have one individual who is placed on lockdown, that
16  means they're not going to be able to come out to day
17  room or they'll be excluded from normal activities
18  because their door will be locked.  Well, that prevents
19  their cellmate from coming out and, hence, they'll have
20  to call the deputy through the box.  It will delay them
21  from getting day room, potentially social visits or any
22  other activity that's going on in the day room or that
23  they're afforded.
24        Q.  All right.
25        A.  It also may cause a delay amongst the other

Page 25

1  inmates when it comes to maybe inmate meals.  They --
2  they have to make sure -- if the inmates aren't able to
3  come out on their own when there's a group released, the
4  inmates may now have to account for all the meals so
5  that those inmates aren't forgotten about.  Typically,
6  the deputy should separate them, but sometimes there's a
7  mixture that will come out on carts, and they may get forgotten
8  about.  So it can impact the operations.
9        Q.  Okay.  Do you know if Facility 8 has any empty
10  cells that can be used for segregation or --
11        A.  They do not have a designated area for
12  separation.
13        Q.  Okay.  I'm still sharing my screen, correct?
14        A.  Yes.
15        Q.  Okay.  I wanted to show you a JIMS printout
16  related to the same incident that we're talking about in
17  this case.
18        MR. PHILLIPS:  And then this will be Exhibit 3,
19  Alex?
20        MR. COOLMAN:  Yes.  I'm sorry.
21        MR. PHILLIPS:  That's okay.
22        MR. COOLMAN:  I'm a little too informal.
23        (Exhibit 3 was identified.)
24  BY MR. COOLMAN:
25        Q.  If you look at the -- let me scroll up a little

DESAN TYSON – 11/22/2022

Page 26

1  bit.
2          If you look at the top, I guess, five entries
3  here, all of which have a little bit of yellow
4  highlighting on them, there are some JIMS entries
5  related to the transfer of Ron Gadsden to disciplinary
6  segregation that occurred on February 15th, 2019.
7          My question is, does this appear to be a
8  complete printout of JIMS entries related to that
9  incident or would you expect to see other JIMS entries
10  for somebody who was transferred to disciplinary
11  segregation?
12          MR. PHILLIPS:  Objection.  This is outside the
13  scope of the noticed deposition.
14          You can answer, if you understand it.
15          THE WITNESS:  In my experience from dealing
16  with this type of report, it has all the movement or
17  activity that's occurred with that inmate's -- within
18  their history.  So if there's movement from one facility
19  to another, it should be annotated in this report.
20  BY MR. COOLMAN:
21      Q.  So it should be.  But I guess what I'm asking
22  is, does it appear that anything else would be here
23  that's not here in terms of the decision to put him in
24  disciplinary segregation?
25      A.  That wouldn't be in this report.

Page 27

1      Q.  Okay.  And so just rewinding, if I understand
2  correctly --
3      A.  I'm sorry, can I --
4      Q.  Yes.
5      A.  There's an -- I see an incident that was logged
6  in this history, that incident on the 15th.  It's the
7  last highlighted one.
8      Q.  Yes.
9      A.  I don't know what that incident is referencing,
10  so it could be, because it doesn't go into detail.  It's
11  just -- it's just time-stamping it in his history.
12          It looks like a Deputy "Grath" wrote an
13  incident report.  So that could actually be a rule
14  violation.  I'm not sure what type of incident report
15  that is.
16      Q.  And are you referring to the very first entry?
17  It's, I guess, at 21:58.
18      A.  It's at 20:17 on February 15th.  There's an
19  incident report there that was inputted by "MMCGRASH."
20      Q.  Right.  Got you.
21      A.  And that's an incident report.  I don't know
22  what type of incident report that is.  And then shortly
23  after that, at 20:45, the inmate was moved.
24      Q.  Right.  Got you.  Okay.
25          So I'm still on the trail, as you know, of the

Page 28

1  question of who made the decision.  And as far as I
2  understand your answer -- and tell me if I'm wrong --
3  the only document that would describe who made the
4  decision is the segregated housing order?
5      A.  Depending on the severity of the incident, the
6  deputy has the discretion to move the inmate to -- to
7  separate them.  There's a J-72 form, or segregated
8  housing order form, that needs to go along with a rule
9  violation, and that needs to be given to the supervisor.
10  That supervisor would then make that decision, if the
11  separation would continue, or the segregation would
12  continue pending the hearing.
13          So the deputy has the discretion to
14  initially -- to separate the inmate.
15          And I'm sorry, I keep going back and forth with
16  "segregate," "separate."  It's the same.
17      Q.  Yeah.  It's a little tricky, but I understand
18  what you're saying.
19          So the deputy, then, has the discretion to
20  separate the inmate into a different housing area,
21  potentially even into segregation, correct?
22      A.  That decision would lie on the supervisor who's
23  going to -- who's going to make the final decision on
24  it.
25      Q.  Well -- but I don't mean for purposes of

Page 29

1  discipline, but I just mean to move, physically move --
2      A.  To initially move them, that could be at the
3  discretion of the deputy.
4      Q.  Okay.  Thank you.
5          And then it will be later in the hearing that
6  the decision is made whether to keep the inmate in
7  segregation, correct?
8      A.  That's part of it.
9          So after the deputy initially moves the inmate
10  to separation pending the hearing, they would -- they
11  would then submit a form, a segregated housing form, to
12  the supervisor that's working the area to make the final
13  decision on if that inmate will remain in separation
14  pending the hearing for that rule violation.
15      Q.  Okay.  And that's the J-72 form?
16      A.  Yes.
17      Q.  Okay.  And I'm sorry, I'm just being lawyerly,
18  I guess, but the J-72 form is filled out by the deputy,
19  right, the deputy who initially transfers the person?
20      A.  Yes.  And that should reference the incident on
21  that form.
22      Q.  All right.  Okay.  Let me rewind real quick to
23  the hearing report that we looked at earlier.
24          At the bottom of this page, or I guess,
25  actually, in the center of the page, there's a statement

# EXHIBIT 16

```
1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   RONALD EARL GADSDEN,              ) CASE NO.
                                      ) 20-cv-2258-WQH-DEB
5              Plaintiff,             )
    vs.                               )
6                                     )
    SERGEANT JOHN GEHRIS, Deputy      )
7   Sheriff, and DEPUTY MICHAEL       )
    MCGRATH, Deputy Sheriff,          )
8                                     )
               Defendants.            )
9   _____)

10

11

12            VIDEOCONFERENCE DEPOSITION OF

13                    JOHN GEHRIS

14               San Diego, California

15               December 14, 2022

16

17

18

19

20

21

22

23      Reported by Deborah M. DeSilva, CRR, CSR

24              Certificate No. 7307

25                Job No. 944510
```

EXHIBIT 16

JOHN GEHRIS – 12/14/2022

**Page 2**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE SOUTHERN DISTRICT OF CALIFORNIA
3
4   RONALD EARL GADSDEN,          ) CASE NO.
                                  ) 20-cv-2258-WQH-DEB
5             Plaintiff,          )
    vs.                           )
6                                 )
    SERGEANT JOHN GEHRIS, Deputy  )
7   Sheriff, and DEPUTY MICHAEL   )
    MCGRATH, Deputy Sheriff,      )
8                                 )
              Defendants.         )
9   _____)
10
11
12        The Videoconference Deposition of JOHN GEHRIS
13   was taken pursuant to Notice of Taking Deposition
14   on Wednesday, December 14, 2022, commencing at
15   2:57 p.m., reported by Deborah M. DeSilva, CRR, CSR
16   No. 7307, Certified Shorthand Reporter in and for the
17   State of California.
18
19
20
21
22
23
24
25

**Page 3**

1        VIDEOCONFERENCE APPEARANCES
2
3   For Plaintiff:
4        ALEX N. COOLMAN, ESQ.
         3268 Governor Drive, Suite 390
5        San Diego, California  92122
         619.831.7129
6        alex@coolmanlaw.com
7
8
    For Defendants:
9
         OFFICE OF SAN DIEGO COUNTY COUNSEL
10       BY:  ADAM C. PHILLIPS, Senior Deputy
         1600 Pacific Highway, Suite 355
11       San Diego, California  92101
         619.539.8357
12       adam.phillips@sdcounty.ca.gov
13
14
    Also Present:
15
         Ronald Earl Gadsden
16
17
18
19
20
21
22
23
24
25

**Page 4**

1              I N D E X
2
3   WITNESS:  JOHN GEHRIS
4   EXAMINATION BY:                       PAGE
5        By Mr. Coolman                   5, 31
6        By Mr. Phillips                  29
7
8
9
10           INDEX OF EXHIBITS
11  EXHIBIT                               PAGE
12  Exhibit 1     Incident Report (3 pages)   21
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1        VIDEOCONFERENCE PROCEEDINGS
2        WEDNESDAY, DECEMBER 14, 2022
3              2:57 P.M.
4
5        (Mr. Gadsden was not present for the following
6   proceedings.)
7
8        THE REPORTER:  Good afternoon.  My name is
9   Debbie DeSilva, Certified Shorthand Reporter No. 7307,
10  and I will be reporting today's deposition remotely by
11  stenographic means.
12       Would counsel please state your appearances for
13  the record, beginning with the noticing attorney.
14       MR. COOLMAN:  Good afternoon.  My name is Alex
15  Coolman.  I'm for the plaintiff, Ronald Gadsden.
16       MR. PHILLIPS:  Good afternoon.  Adam Phillips
17  on behalf of defendant, Michael McGrath.
18                    -o0o-
19                 JOHN GEHRIS,
20  having been administered an oath remotely by the court
21  reporter, testified as follows:
22
23            E X A M I N A T I O N
24  BY MR. COOLMAN:
25       Q.  Sergeant, is that the correct title for you,

EXHIBIT 16

JOHN GEHRIS - 12/14/2022

Page 6

1  sir?

2      A.  It is, Sergeant Gehris.

3      Q.  Okay.  First of all, I just wanted to say thank
4  you for being here.  I know you were working really
5  hard, and this is probably not the funnest thing in the
6  world.

7          I'm going to try to be concise and get through
8  this relatively quickly and let you get on with your
9  life.

10     A.  Okay, sir.

11     Q.  The preliminary stuff I want to ask you, you
12 understand you're under oath here today, correct?

13     A.  I do.

14     Q.  And you know that the oath has the same effect
15 here as it would in a trial, right?

16     A.  Yes.

17     Q.  And you know that you'll get an opportunity to
18 look over a transcript of your remarks and you can make
19 corrections to those remarks if there's anything that
20 looks inaccurate, correct?

21     A.  I was unaware that I would get the opportunity
22 to do that, but I understand.

23     Q.  Okay.  Good deal.  And other than being
24 overworked, is there any reason why you can't give your
25 best testimony here today?

Page 7

1      A.  There is no reason why we can't continue, no.

2      Q.  Okay.  Thank you very much.

3          You may know that the general time frame that
4  I'm concerned with in this case is 2019.  Let me ask
5  you, in 2019 were you employed with the San Diego County
6  Sheriff's Department?

7      A.  I was.

8      Q.  Okay.  And what was your title at that time?

9      A.  Up until February 1st of 2019, I was a
10 sheriff's deputy working at San Diego Central Jail.  I
11 was promoted to sergeant on February the 1st of 2019,
12 and I have been a deputy sheriff sergeant since that
13 time.

14     Q.  Okay.  Got you.

15         And then I have the impression -- I don't know
16 if it's right -- you could tell me -- that part of your
17 work was in kind of a supervisory capacity for the
18 housing in Housing 6; is that correct?

19     A.  That is part of the responsibilities of a
20 sergeant assigned to the George Bailey Detention
21 Facility, yes.

22     Q.  Okay.  And so are there several different
23 sergeants who occupy that role depending on the day and
24 so forth?

25     A.  Typical deployment, there are three sergeants:

Page 8

1  one that covers central, which is the central part of
2  the facility; then there's a north side, which is
3  Houses 1, 2, and 3; and then a south side, which is 4,
4  5, and 6.

5      Q.  Okay.  Got you.

6          So you would sometimes have under your
7  authority the south side with 4, 5, and 6; is that
8  right?

9      A.  That is part of my responsibility, yes.

10     Q.  Okay.  And do I understand correctly that
11 House 6 has some modules that are used for segregation?

12     A.  House 6, Module A is a mixed-use administrative
13 separation module.

14     Q.  I've got you.  Okay.

15         Does that mean that if an individual is
16 initially detained in 6A for administrative reasons and
17 then is put in disciplinary segregation, would they then
18 move somewhere else or not necessarily?

19     A.  Are you saying if somebody is housed there, can
20 they then be moved elsewhere?

21     Q.  I guess I'm saying -- so it's administrative
22 segregation, as I understand it, in 6A.  Once a
23 disciplinary hearing occurs and somebody is sent to
24 disciplinary segregation, are they necessarily moved
25 somewhere else or not always?

Page 9

1      A.  If they're in 6A and they are placed in
2  administrative separation, are they moved somewhere
3  else?

4      Q.  I'm sorry, I'm not being clear.

5          So, like, the administrative segregation can
6  sometimes precede a disciplinary hearing, right?

7      A.  Yes, it can.

8      Q.  Okay.  And so I'm asking about after a
9  disciplinary hearing, assuming somebody's found to have
10 done something and they're going to be put in
11 disciplinary segregation, are they typically moved
12 somewhere else or could they continue to be in 6A after
13 that time?

14     A.  Once somebody finishes their disciplinary
15 isolation time in 6A, we typically move them to other
16 housing locations because there are a finite number of
17 cells --

18     Q.  Okay.

19     A.  -- and other persons going into the
20 disciplinary isolation may need that cell.

21     Q.  Okay.  Is it your role as the sergeant to
22 decide which individual cell folks go into when they're
23 in 6A?

24     A.  No, that is not my role.

25     Q.  Who does make that determination?

EXHIBIT 16

JOHN GEHRIS - 12/14/2022

Page 22

1  housed with anybody?

2      A.  To my knowledge, I've never interacted with

3  Mr. Gadsden.

4      Q.  Okay.  Can you help me understand, are there

5  any documents that would show the housing arrangement

6  that did occur in 6A starting on February 15, 2019, for

7  Mr. Gadsden?  I mean, is this in JIMS or is it anywhere

8  at all that shows who was in the cell that he was in?

9      A.  I mean, you'd have to contact the county to

10  request any records of who was housed in the cell at a

11  specific time.

12     Q.  Well, right, records I understand.  I'm asking

13  what records specifically.

14         You are a supervisor of this area, right?

15     A.  I do supervise that area.

16     Q.  Okay.  So what I'm asking is, is there any

17  internal documentation of the celling arrangements,

18  who's in the cells?

19     A.  Twice per day hard count is conducted, which is

20  physical proof of life check, and I don't know the

21  length that they're archived, but I do know that the

22  hard count sheets are archived.

23     Q.  Okay.  That's really helpful.

24         Is there a more formal name for the hard count

25  sheets or is that just what they're called, "hard count

Page 23

1  sheets"?

2      A.  To my knowledge, that's what they are called.

3      Q.  Okay.  That's really helpful.

4         And this is probably a dumb question too:  Do

5  you have any recollection of a disciplinary hearing

6  being held for Mr. Gadsden at any point while he was in

7  6A?

8      A.  I do not have any recollection of that, no.

9      Q.  Okay.  Do you know if Sergeant Kurtis Kellas

10  interacted with Mr. Gadsden at any point while

11  Mr. Gadsden was in 6A?

12     A.  I do not know that, no.

13     Q.  Okay.  Let me ask you more generally about

14  disciplinary separation hearings.

15         Are those something that you yourself have

16  conducted at some point?  I don't mean in connection

17  with this incident, but just in general, have you

18  conducted disciplinary hearings?

19     A.  I have conducted disciplinary hearings, yes.

20     Q.  Okay.  Can you tell me, prior to a disciplinary

21  hearing, is an inmate supposed to be given an incident

22  report describing whatever it is that they are accused

23  of doing?

24     MR. PHILLIPS:  Objection.  Vague and ambiguous.

25  Incomplete hypothetical.

Page 24

1         You can answer.

2     THE WITNESS:  So you're saying prior to --

3  rephrase the question, please, or restate the question.

4  BY MR. COOLMAN:

5      Q.  Yeah.  Basically, I'm trying to figure out if

6  an inmate is going to have a disciplinary hearing, are

7  they supposed to be given an incident report that

8  describes whatever it was that they did wrong prior to

9  the hearing?

10     MR. PHILLIPS:  Same objection.

11     THE WITNESS:  Yes, they should receive a copy

12  of the rule violation report.

13  BY MR. COOLMAN:

14     Q.  And are they told in advance what time and what

15  day the hearing is going to take place?

16     MR. PHILLIPS:  Same objection.

17     THE WITNESS:  They are not told in advance when

18  the hearing will take place.  When they are served with

19  their rule violation, they are asked whether they would

20  like to have an immediate hearing or waive an immediate

21  hearing to wait 24 hours.  It's on the disciplinary

22  hearing rights waiver form.

23  BY MR. COOLMAN:

24     Q.  Right.  So if they request an immediate

25  hearing -- well, I'm sorry, I'm just confusing myself

Page 25

1  here.

2         So there's not a specific time and day

3  specified.  They can request an immediate hearing, and

4  they may or may not get the immediate hearing; is that

5  correct?

6      A.  That is correct.

7      Q.  Okay.  At the disciplinary hearing, inmates are

8  allowed to call witnesses, correct?

9      A.  That is one of the inmate rights, yes.

10     Q.  And how is that facilitated?  I mean, if an

11  inmate in 6A wants to have a witness called at the

12  disciplinary hearing, how would that occur?

13     MR. PHILLIPS:  Objection.  Vague and ambiguous.

14  Incomplete hypothetical.  Calls for speculation.

15         You can answer.

16         THE WITNESS:  I don't know specifically how

17  that would occur.

18  BY MR. COOLMAN:

19     Q.  Have you ever seen witnesses brought into 6A

20  for a disciplinary hearing?

21     A.  I personally have never had anyone request

22  witnesses for a disciplinary hearing.

23     Q.  Okay.  So then I guess in 6A, you've never seen

24  even one witness brought in for a disciplinary hearing

25  ever?

EXHIBIT 16

JOHN GEHRIS - 12/14/2022

Page 26

1        A.  I --
2            MR. PHILLIPS:  Objection.  Mischaracterizes
3    prior testimony.
4    BY MR. COOLMAN:
5        Q.  Well, I'm asking.
6            Have you ever seen even a single witness
7    brought into 6A for a disciplinary hearing?
8        A.  That's not the mech- -- we wouldn't bring a
9    witness into 6A.  That would -- that would not be how
10   that would occur in the event they called for a witness.
11   We would -- it's a security module.  We wouldn't bring a
12   witness into there.
13       Q.  So what policy would have to be followed, then,
14   in order to have a witness at a hearing for somebody in
15   6A?
16           MR. PHILLIPS:  Objection.  Vague and ambiguous.
17           You can answer.
18           THE WITNESS:  I can't speculate because I've
19   never actually spoken -- I've never had somebody request
20   a witness.
21           I would imagine if somebody requested a
22   witness, it would probably have to be a separate
23   interview wherever the witness was.
24   BY MR. COOLMAN:
25       Q.  Okay.

Page 27

1        A.  But I can't -- I can't speak to how that would
2    occur, having never done it.
3        Q.  Right.  Okay.
4            Can you tell me a little bit more about the
5    idea that you could not bring a witness into 6A because
6    it's a security module?  Why does that matter?
7        A.  We are not allowed to bring other incarcerated
8    individuals, other than inmate workers, into housing
9    modules where they're not currently housed for security
10   purposes.
11       Q.  I see.  So, for example, if Ron Gadsden had
12   wanted to have someone from Facility 8 brought over to
13   his disciplinary hearing in 6A, that would not have been
14   possible, would it?
15           MR. PHILLIPS:  Objection.  Incomplete
16   hypothetical.  Vague and ambiguous.
17           You can answer.
18           THE WITNESS:  I don't see how -- you're asking
19   if he -- if Ronald Gadsden were in 6A and he wanted
20   another incarcerated person from Facility 8 to be
21   brought over to 6A?  Is that what you're asking?
22   BY MR. COOLMAN:
23       Q.  Exactly.
24       A.  That would not happen.  That would not occur.
25       Q.  Okay.  That's helpful.  Thank you.

Page 28

1            And just to kind of beat a dead horse here, as
2    far as you can recall, no person from another housing
3    area has ever been brought in as a witness to 6A for a
4    disciplinary hearing, correct, in your own -- as far as
5    you recall?
6        A.  I have never seen that, no.
7        Q.  Okay.  At the disciplinary hearing, does the
8    inmate who participates in it -- in other words, the
9    person who's sort of under trial -- do they sign a
10   document or do anything sort of indicating that they are
11   present at the hearing?
12       A.  At the hearing, no.
13       Q.  Okay.  So there's not like a written -- I guess
14   the only written confirmation of the hearing is the
15   hearing report that ultimately gets generated?  Does
16   that sound correct?
17       A.  I'd say that's correct, yes.
18       Q.  Okay.  But there are surveillance cameras in
19   6A, correct?
20       A.  There are CCTV cameras in the module, yes.
21       Q.  Okay.  And if a deputy or a sergeant were
22   conducting a disciplinary hearing at Cell 213 in 6A,
23   that would be captured on those cameras, correct?
24       A.  I would have to look at the specific angle of
25   that camera that looks in that direction.

Page 29

1        Q.  That's fair.
2            But many areas of the interior of 6A are
3    documented in those video cameras, are they not?
4        A.  Yes, many areas of 6A are documented on the
5    video cameras.
6            MR. COOLMAN:  Okay.  I think that's all I've
7    got.  If you'll give me a second, let me look through my
8    notes and see if I have anything else.
9            Adam, if you have a question, please go ahead,
10   and I'll look at what I've got here.
11           MR. PHILLIPS:  Sure.  Yeah, I just have one
12   question, Alex, if you wouldn't mind just taking down
13   the exhibit.
14           MR. COOLMAN:  Sorry.
15           MR. PHILLIPS:  Thank you.
16                      -o0o-
17             E X A M I N A T I O N
18   BY MR. PHILLIPS:
19       Q.  Sergeant Gehris, I just have one clarifying
20   question.
21           There was a lot of back and forth about
22   witnesses and being brought into 6A and the security
23   concerns that you talked about, and that's what I'm
24   interested in the subject matter.
25           I understood your testimony to be that if --

# EXHIBIT 17

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3  RONALD EARL GADSDEN,        )  Civil Action No.:
                                )  20-cv-02258-WQH-DEB
 4             Plaintiffs,      )
                                )
 5  vs.                         )
                                )
 6  SERGEANT JOHN GEHRIS,       )
    DEPUTY SHERIFF; DEPUTY      )
 7  MICHAEL MCGRATH, DEPUTY     )
    SHERIFF,                    )
 8                              )
               Defendants.      )
 9  _____ )
10
11
12
13
14           DEPOSITION OF STACY SINNER
15                    Volume I
16          Wednesday, February 22nd, 2023
17
18
19
20
21  Reported By:
    Monica Lepe-Georg
22  CSR No. 11976
    Appearing Remotely From Cloverdale, California
23
    Job No. 10115310
24
25  Pages 1 - 99
```

## Page 2

```
 1
 2
 3        REMOTE DEPOSITION OF STACY SINNER, VOLUME
 4  NO. I, taken on behalf of Defendant Deputy Michael
 5  McGrath, beginning at 8:59 a.m. and ending at
 6  11:27 a.m., on Wednesday, February 22nd, 2023, before
 7  Monica Lepe-Georg, Certified Shorthand Reporter No.
 8  11976.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              REMOTE APPEARANCES
 2
 3  FOR PLAINTIFF:
 4      LAW OFFICE OF ALEX COOLMAN
 5      BY:  ALEX N. COOLMAN, ESQ.
 6      3268 Governor Drive
 7      Suite 390
 8      San Diego, California 92122-2902
 9      Telephone:  619.831.7129
10      Fax:  n/a
11      E-mail:  alex@coolmanlaw.com
12
13  FOR DEFENDANTS:
14      OFFICE OF COUNTY COUNSEL
15      COUNTY OF SAN DIEGO
16      BY:  ADAM C. PHILLIPS, ESQ.
17      1600 Pacific Highway
18      Room 355
19      San Diego, California 92101-2469
20      Telephone:  619.531.6416
21      Fax:  619.531.6005
22      E-mail:  adam.phillips@sdcounty.ca.gov
23
24  ALSO PRESENT:
25      Vincent Taisague, Aptus Monitor
```

## Page 4

```
 1              INDEX OF EXAMINATIONS
 2
 3                                          PAGE
 4  EXAMINATION BY MR. PHILLIPS               7
 5  EXAMINATION BY MR. COOLMAN               94
 6
 7
 8
 9              INDEX OF EXHIBITS
10          (Electronically submitted)
11
12  EXHIBIT NO.        DESCRIPTION         PAGE
13  Exhibit A    Résumé, Stacy Sinner        14
14  Exhibit B    December 10, 2022, Expert   31
15               Witness Report, Six pages
16  Exhibit C    San Diego County Sheriff's  39
17               Department Detention Services
18               Bureau - Manual of Policies
19               and Procedures, Bates-Nos.
20               CSD000039 to CSC000044
21
22
23               Information Requested
24                  Page 12, Line 18
25
```

EXHIBIT 17
www.aptusCR.com

Page 1..4

Page 49

1   So, it's the prehearing segregation and the
2   disciplinary segregation as two different kinds of
3   segregation, so I think I'm speaking of both of them.
4   **Q.  Okay.  And in terms of the use of segregation**
5   **prior to the hearing, focusing on that area, how is**
6   **that not narrowly tailored to advance a legitimate**
7   **correctional goal?**
8   A.  Sure.  I -- you know, Mr. Gadsden was in his
9   cell.  He wasn't, you know -- you know, free to roam
10  around or start swinging at people, or anything like
11  that.  It was unnecessary to move him to segregation
12  because he was expressing a legitimate frustration for
13  someone who has very little control over the things
14  that they can -- can control in their -- in the
15  environment that they're in.
16  So I think it's reasonable for a person to be
17  upset that their visitor is waiting for them, to
18  express that frustration as the visit time ticks away
19  and they're not able to be in there.  And I think that
20  the response from the staff -- if you were to narrowly
21  focus that, the -- the response might look something
22  like, "You know, Mr. Gadsden, I'm sorry that you're
23  late for your visit.  Let's get you over there and
24  maybe see if we can add some minutes to your visit
25  because we want justice and fairness, right?  And then

Page 50

1   you and I are going to have a conversation, after your
2   visit is over, about how to handle these kind of things
3   in the future."  That would be narrow, right, that
4   would be the narrowly focus.
5   I think they went, you know, all the way to
6   the extreme end of the -- this is a continuum.  Not
7   unlike a use-of-force continuum, which maybe people are
8   more familiar with, but a -- but a behavior management
9   continuum.  And so always using the lowest level, the
10  least restrictive way of managing inmate behavior in a
11  correctional environment and taking the totality of the
12  circumstances into consideration.
13  So, gosh, I can understand why he would be
14  upset about this.  He doesn't get to see his family or
15  his loved ones the way that I get to see mine or as
16  often as he wants to.  And the visits are short and
17  they're timed and they -- they stop at a certain period
18  of time, and he wants to take advantage of all of that
19  time.  That seems reasonable.
20  When -- when I do training -- and I ask
21  correctional officers this question, and I'm relating
22  this to Maslow's hierarchy of needs, as I pointed out
23  in my report, too.  And when I say to correctional
24  officers, "If you were unable to see your family
25  members, if that was very strictly being -- there's

Page 51

1   hours for it, somebody else was in control of when you
2   got to see your family and you were -- and they were
3   not getting you to see your family on time, would you
4   act out or would you do what you needed to do in -- in
5   order to try to facilitate that?"  To a person, they
6   raise their hands that they would, a correctional
7   officer would do this.
8   And I say, similarly, you know, "If you didn't
9   feel safe, would you do what you needed to do to feel
10  safe?"  They say, "Yes, to a person."
11  If -- if you weren't able to feed your family,
12  would you steal?  To a person, they say, "Yes, I
13  would."
14  So, even in a correctional environment, they
15  will say, "Yes, if I put myself in that person's
16  situation and I was being essentially denied" -- and
17  I'm not saying that this was malicious intent by any
18  stretch -- "but if I was being denied the ability, I
19  knew my family member, my loved one, was waiting for
20  me, and that time was ticking away, would I express
21  frustration, yes, I would."
22  **Q.  And when you say "this wasn't malicious**
23  **intent," what do you mean by that?**
24  A.  Well, I mean, I just don't think that the
25  correctional officer is -- is saying, "Oh, here is my

Page 52

1   opportunity to, you know, put my thumb on you."  I just
2   think it's -- it's a skill that he may not be adept at.
3   Or perhaps not trained in how to interact with inmates
4   and how to, you know, get the best behavior from
5   inmates and how to, you know, kind of apologize if the
6   system has done something that has harmed the inmate
7   and how to make that right in order to then get -- when
8   you do things like that, then you have relationship
9   equity with the inmates, and you end up with better
10  behavior and more cooperation in the future.
11  **Q.  So, based on your review of the record and**
12  **documents, you don't believe it was malicious intent by**
13  **the correctional officer, but perhaps either poor**
14  **training, he wasn't equipped with the tools necessary**
15  **to do that, or poor execution of the tools to --**
16  MR. COOLMAN:  Object -- I'm sorry.  Let me
17  just object as to what -- I'm not clear on what the
18  word "it" refers to in that question.
19  MR. PHILLIPS:  You can answer, Ms. Sinner, if
20  you understand.
21  THE WITNESS:  I think I would give him the
22  benefit of the doubt if I didn't know differently.
23  BY MR. PHILLIPS:
24  **Q.  And my question is:  It isn't malicious**
25  **intent, in your opinion, on the correctional officer,**

EXHIBIT 17                                          Page 49..52
www.aptusCR.com

Page 61

1   Deputy Gadsden [sic] had anything to do with it?
2       A.  I'm sorry, can you repeat that?
3       Q.  Sure.  You said that Mr. Gadsden -- assuming
4   what -- if it occurred, what he says, that he was
5   denied the ability to maintain a basic cleanliness in
6   segregation and that's your opinion, is that denial,
7   was that -- did Deputy McGrath deny Mr. Gadsden's
8   ability to maintain basic cleanliness in segregation;
9   is that your opinion?
10      MR. COOLMAN:  Objection.  The question is
11  vague.
12      MR. PHILLIPS:  I'll strike that.
13  BY MR. PHILLIPS:
14      Q.  Is it your opinion, assuming what Mr. Gadsden
15  says is true, is that Deputy McGrath is the one that
16  denied Mr. Gadsden the ability to maintain basic
17  cleanliness in segregation?
18      A.  I wouldn't know that.
19      Q.  So you have no opinion on that?
20      A.  I have no opinion.
21      Q.  Do you have an opinion regarding the use of
22  segregation as it relates specifically to
23  Deputy McGrath?
24      MR. COOLMAN:  Objection.  Question is vague.
25  ///

Page 62

1   BY MR. PHILLIPS:
2       Q.  Ms. Sinner, you --
3       A.  I'll try to answer it.
4       I think if you're asking if it was
5   Deputy McGrath's decision that Mr. Gadsden go
6   immediately to segregation, in other words, prehearing
7   segregation, yes, I have an opinion about that.  I
8   think that was excessive; it was unnecessary.  There
9   was no threat to security.  He was just expressing
10  frustration.  He could have stayed in that housing area
11  until after his hearing.
12      Q.  And in terms of the use of segregation in the
13  disciplinary setting, do you have an opinion as to
14  Deputy McGrath's involvement in that?
15      A.  No.
16      Q.  How about the cancelation of Mr. Gadsden's
17  video visits, in terms of as a disciplinary --
18  discipline imposed, do you have an opinion about
19  Deputy McGrath's involvement in that?
20      A.  I don't think Deputy McGrath made that
21  decision, so, no, I don't criticize that, for him
22  specifically.
23      Q.  And -- well, I think that's it.
24      A.  And he did -- he did make the decision to not
25  allow him to have that initial visit, so from that

Page 63

1   point of view, I would say that, yes, that visit, but
2   the -- the subsequent canceled visits, I don't know
3   that he had anything to do with.
4       Q.  Okay.  So in terms of Deputy McGrath's
5   involvement, your opinion relates to his use of
6   segregation not related to discipline, in other words,
7   transferring him initially, as well as the cancelation
8   of that particular video visit that was the subject of
9   a rule violation report; is that right?
10      A.  That's right.
11      Q.  So I'd like to go now to the purpose and role
12  of internal affairs.  And there's a couple paragraphs
13  here generally about the purpose and role of internal
14  affairs.
15      My first question is:  Is that one of the job
16  duties, responsibilities you would have as the
17  deputy -- as the jail administrator?
18      A.  As jail administrator?
19      Q.  Yes.
20      A.  Internal affairs, yes.  Not every organization
21  is large enough to have its own internal affairs
22  department, but the idea is, is that every organization
23  should take complaints seriously and investigate them.
24      Q.  And how did that work for you as the jail
25  administrator?  How did the internal affairs system

Page 64

1   work, generally?
2       A.  So depending on who got a complaint or where
3   that complaint came from, I would sometimes handle them
4   myself, depending on what it was, or I would assign to
5   a captain.
6       And at the time that I was the jail
7   administrator, there were additional captain positions
8   added, so we had -- we had two captains.  Depending on
9   what the issue was, I might assign it to an
10  administrative captain or to an operations captain to
11  investigate, do some interviews, come back and let me
12  know what the conclusion, what the finding is, and then
13  give some feedback to the complainant.
14      Sometimes make policy changes.  Sometimes just
15  have conversations with people.  Sometimes a discipline
16  is appropriate.
17      There's a wide variety of things that can come
18  of an internal affairs investigation.
19      Q.  And generally that was handled -- well,
20  in-house; you didn't have a separate department for
21  internal affairs?
22      A.  We did not in Olmsted County.  Although there
23  were times when I -- when I would ask, perhaps, a
24  captain in the law enforcement division, rather, you
25  know, but it was always internal in the office, yeah.

EXHIBIT 17                                                        Page 61..64
www.aptusCR.com

# EXHIBIT 18

# SAN DIEGO SHERIFFS DEPARTMENT
## Inmate History Summary Report

| Book #: 18181127 | Name: GADSDEN, RONALD | Fac: 927 | Area: | Hu: |
|---|---|---|---|---|
| Start Dt/Tm: 12-23-2018 | End Dt/Tm: 07-01-2019 | Event Type: | | |

| Event Dt/Tm | Event Type | Destination | Entry Dt/Tm | Entered By |
|---|---|---|---|---|
| 02-19-2019 1147 | TRNR | SD012 | 02-19-2019 1147 | AGUTI3SH, GUTIERREZ |
| Inmate Entering GBDF (George Bailey Detention Facility).Arrest: 4, Charge: 1, Court: SD012, Court Dt/Tm: 02-19-2019 0900, ROC: FP, Document # : SCD275729 ||||||
| 02-19-2019 1030 | TRNL | SD012 | 02-19-2019 1030 | RROBI2SH, ROBISON |
| Inmate Leaving CSB - San Diego Central. Next stop:  GBDF (George Bailey Detention Facility)Arrest: 4, Charge: 1, Court: SD012, Court Dt/Tm: 02-19-2019 0900, ROC: FP, Document : SCD275729 ||||||
| 02-19-2019 0654 | TRNR | SD012 | 02-19-2019 0654 | CCORBESH, CORBELL |
| Inmate Entering CSB - San Diego Central.Arrest: 4, Charge: 1, Court: SD012, Court Dt/Tm: 02-19-2019 0900, ROC: FP, Document # : SCD275729 ||||||
| 02-19-2019 0623 | TRNL | SD012 | 02-19-2019 0623 | KCAVACSH, CAVACO |
| Inmate Leaving GBDF (George Bailey Detention Facility). Next stop:  CSB - San Diego CentralArrest: 4, Charge: 1, Court: SD012, Court Dt/Tm: 02-19-2019 0900, ROC: FP, Document # : SCD275729 ||||||
| 02-19-2019 0443 | CRT | COURT | 02-19-2019 0443 | ELUNAXSH, LUNA |
| Changed STATUS from IN to CRT. ||||||
| 02-19-2019 0009 | SHWR | REFUSED SHOWER | 02-19-2019 0009 | ELUNAXSH, LUNA |
| 02-18-2019 1814 | WW | WANTS/WARRANTS CHECK | 02-18-2019 1814 | VSALAZSH, SALAZAR |
| Initial Clearance set to C ||||||
| 02-15-2019 2158 | MOVE | NEW HOUSING | 02-15-2019 2158 | MHINOJSH, HINOJOSA |
| Moved Book #18181127 TO fac 3 area 6 hu A cell 213 bed T. ||||||
| 02-15-2019 2047 | MOVE | NEW HOUSING | 02-15-2019 2047 | MMCGRASH, MCGRATH |
| Moved Book #18181127 TO fac 3 area X . ||||||
| 02-15-2019 2047 | XVIS | NEW HOUSING | 02-15-2019 2047 | MMCGRASH, MCGRATH |
| Deleted future visits because of facility transfer ||||||
| 02-15-2019 2045 | MOVE | NEW HOUSING | 02-15-2019 2045 | MMCGRASH, MCGRATH |
| Moved Book #18181127 FROM fac 8 area 1 hu C cell 241 bed M TO fac 8 area X . ||||||
| 02-15-2019 2015 | INCI | INC #194006340 | 02-15-2019 2017 | MMCGRASH, MCGRATH |
| INCIDENT TYPE CODE(S): 101, 105, 701; INVOLVEMENT: OTHER. ||||||
| 02-13-2019 1432 | PCAL | PHONE CALL | 02-13-2019 1433 | FWILL2SH, WILLIS |
| Attorny Call back 819-338-4758 ||||||
| 01-31-2019 1559 | MOVE | NEW HOUSING | 01-31-2019 1559 | KWILS2SH, WILSON |
| Moved Book #18181127 FROM fac 8 area 1 hu C cell 246 bed T TO fac 8 area 1 hu C cell 241 bed M. ||||||
| 01-31-2019 1226 | IN | IN | 01-31-2019 1226 | FWILL2SH, WILLIS |
| Changed STATUS from SICK to IN using flood fill. ||||||

EXHIBIT 18

CSD000026

# EXHIBIT 19

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident #:** 194006340

**Incident Dt/Tm:** 02-15-2019 2015

| | | |
|---|---|---|
| **Incident Type Code:** | 101 | Disrespect to Staff |
| **Additional Code 2 :** | 105 | Boisterous Activity |
| **Additional Code 3 :** | 701 | Interfering w/Jail Operations |

---

**Participants**

| Name (L,F,M,S) | JIM/Book # | Facility | Area | HU | Cell | Bed | Inv |
|---|---|---|---|---|---|---|---|
| GADSDEN, RONALD E. | 700000460 / 18181127 | 3 | 6 | A | 213 | T | O |

| DISCIPLINARY ISOLATION 3 DAYS | 02-18-2019 0135 | 02-21-2019 0135 |
|---|---|---|
| DISCIPLINARY ISOLATION 3 DAYS | 02-18-2019 0135 | 02-21-2019 0135 |

**Incident Occurred:**

**Fac:** 8     **Area:** 1     **HU:** C

**Location:** Module C cell 241

**Officer:** MMCGRASH, MCGRATH     **Submitted Dt/Tm:** 02-15-2019 2017

**Update By:** SODELLSH, ODELL     **Update Dt/Tm:** 02-16-2019 1941

**Supervisor:** SODELLSH, ODELL     **Approval Dt/Tm:** 02-16-2019 1941

**Use of force?** N     **CS Violence?** N     **Inmate Violence?** N     **Contraband?** N

**Facility Damage?** N     **Disciplinary?** Y     **Hearing Required?** Y

---

**Action Taken:**     **Approval Action:**

RVR written

Facility: 3

527I MAIN

Page 1 of 3

EXHIBIT 19

EXHIBIT A

Printed: 02-19-2019 1903

Printed By: ABRITOSH, BRITO

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

**Incident Information:**

| | |
|---|---|
| **Entry Dt/Tm:** 02-15-2019 2016 | **Entered By:** MMCGRASH,MCGRATH |
| **Update Dt/Tm:** 02-16-2019 1941 | **Updated By:** SODELLSH,ODELL |
| **Approved Dt/Tm:** 02-16-2019 1941 | **Approved By:** SODELLSH,ODELL |

ORIGIN:

On 02/15/19, I was assigned to work the Control Position at FAC8 when inmate
Ronald Gadsden (18181127) was being disrespectful to deputies at Facility 8.

DEPUTY'S OBSERVATIONS & ACTIONS:

At approximately 1850 hours, I was logging a safety check and soft count
started. The intercom was ringing from several video visits and inmates with
questions. I answered the calls in the order they were received. The last call
received was Cell 241. As soon as the intercom was turned on, inmate Gadsden
demanded the cell door be opened. I responded with, "Excuse me?" He again
demanded the door be opened, shouting "let me out now!"

I explained to Gadsden if he has a video visit he needs to ask respectfully to
be let out and to call me back when he can do so. Gadsden called back
immediately and demanded his video visit again, stating I was not releasing him
and I have done this to him three times. Gadsden continued shouting over the
intercom, " Fuck this, I need an IA form."

Gadsden will be transferred to George Bailey Detention Facility (GBDF) House 6
Module A with all his module property. Per Gadsden displaying unwillingness to
follow rules at FAC 8, I recommend he not be housed at FAC 8. Gadsden is in
violation of the following rules and regulations.

101-Disrespect to Staff

105- Boisterous Activity

701-Interfere with jail operations

INMATE RIGHTS

As an inmate charged with a violation of the San Diego County Detention
Facility Services rules and regulations referred to the Disciplinary Hearing
Officer for disposition, you have the following rights:

1. The right to have a written copy of the charges(s) against you at least 24

Facility: 3
5271 MAIN
Page 2 of 3
EXHIBIT 19
EXHIBIT A
Printed: 02-19-2019 1903
Printed By: ABRITOSH, BRITO

# SAN DIEGO SHERIFFS DEPARTMENT

## Incident Report

hours prior to appearing before the Disciplinary Hearing Officer.

2. If you are illiterate or unable to represent yourself, you have the right to have a full-time member of the staff who is reasonably available to represent you before the Disciplinary Hearing Officer.

3. The right to call witnesses (or present written statements of unavailable witnesses) and to present documentary evidence in your behalf provided institutional safety would not be jeopardized.

4. The right to present a statement or to remain silent. Your silence may be used to draw an adverse inference against you. However, your silence alone may not be used to support a finding that you committed a prohibited act.

5. The right to be advised of the Disciplinary Hearing Officer?s decision and the facts supporting the decision in writing.

6. The right to appeal the decision of the Disciplinary Hearing Officer by means of the Grievance procedure within 10 calendar days once notified of disposition.

7. I also have the right to an immediate hearing before the Disciplinary Hearing Officer if I sign a waiver.

Facility: 3
527I MAIN

Page 3 of 3
EXHIBIT 19
EXHIBIT A

Printed: 02-19-2019 1903
Printed By: ABRITOSH, BRITO

# EXHIBIT 20

# SAN DIEGO SHERIFFS DEPARTMENT

## Hearing Report

---

**JIM:** 700000460

**Book #:** 18181127

**Name (L,F,M,S):** GADSDEN, RONALD E.

**Incident #:** 194006340

**Incident Dt/Tm:** 02-15-2019 2015

---

**Hearing #:** 400068179          **Tape #/Side (Recording Info) :** NONE:

**Hearing Dt/Tm:** 02-18-2019 0135

**Administrative Segregation?** Y      pending hearing

**Hearing Assistance Provided?** N

**Other Evidence Considered?** N

**Pending:** N

| | | |
|---|---|---|
| **Incident Type Code:** | 101 | Disrespect to Staff |
| **Inmate Plea:** | G | GUILTY |
| **Finding:** | G | GUILTY |
| | | |
| **Additional Code 2 :** | 105 | Boisterous Activity |
| **Inmate Plea:** | G | GUILTY |
| **Finding:** | G | GUILTY |
| | | |
| **Additional Code 3 :** | 701 | Interfering w/Jail Operations |
| **Inmate Plea:** | G | GUILTY |
| **Finding:** | G | GUILTY |

---

Facility: 1

528I MAIN

Page 1 of 2

Printed: 06-17-2022 1428

Printed By: MJENSESH, JENSEN

CSD000004

EXHIBIT 20

# SAN DIEGO SHERIFFS DEPARTMENT
## Hearing Report

**Entry Date / Time:** 02-18-2019 0324          **Entry By:** KKELLASH, KELLAS

On 02/15/19, Deputy Velasquez wrote an incident report documenting the violation of Inmate Rules and Regulations by inmate Ronald Gadsden. Inmate Gadsden was provided a copy of the incident report and advised of his/her right to a disciplinary hearing. Inmate Gadsden signed the 24-hour waiver and requested an immediate hearing.

I conducted a hearing with inmate Gadsden on 02/18/19, at 0135 hours, in Module 6A, at Cell 213.

I asked Gadsden to explain what happened the other day.  He said he was trying to get the tower deputy to pop his cell door for a visit.  Gadsden said he has been consistently late to his visits and wanted to ensure he was on-time. Gadsden admitted to being aggressive and boisterous, but added he felt disrespected.

I find that inmate Gadsden committed violation(s):

101- Disrespect to staff
105- Inmates shall not take part in aggressive or boisterous activity
701- Delaying Jail operations

I based my decision on the rule violation and Gadsden's statements.

I recommend Gadsden receive three days of disciplinary separation.

THREE DAYS DISCIPLINARY SEPARATION

**Approval:**  Y          **Approval Officer:** CGARDESH, GARDENHIRE          **Date:** 02-18-2019 0353

**Appeal:**  Y     received appeal of discipline dated 02/28/19

EXHIBIT 20

CSD000005

# EXHIBIT 21



6A,213

1708

# San Diego County
# SHERIFF'S DEPARTMENT

## DISCIPLINARY HEARING RIGHTS WAIVER

☐ SDCJ    ☐ GBDF    ☒ FAC8    ☐ EMRF    ☐ LCDRF    ☐ SBDF    ☐ VDF

| INMATE NAME: | Ronald Gadsden | | INCIDENT # | 194006340 | | |
|---|---|---|---|---|---|---|
| BOOKING #: | 18181127 | | DATE: | 2/15/19 | TIME: | 1850 |
| VIOLATION (S): | 101, 105, 701 | | | | | |

### RIGHT TO A 24 HOUR DELAY IN DISCIPLINARY HEARING

☒ I am waiving my rights to a 24-hour delay of the Disciplinary Hearing for the violations listed above, and request an immediate hearing on the rule violation(s) brought against me.

☐ I do not want to waive the 24-hour delay in the Disciplinary Hearing (No signature required).

| INMATE SIGNATURE: | *signature* | DATE: | 02/15/19 |
|---|---|---|---|
| DEPUTY SIGNATURE: | Julvn  3C75 | ARJIS: | 3C75 |

### RIGHT TO BE PRESENT AT HEARING WAIVER

☐ I have been advised of my right to appear before the Disciplinary Hearing Officer. I do not wish to appear, and thereby waive that right.

| INMATE SIGNATURE: | | DATE: | |
|---|---|---|---|
| DEPUTY SIGNATURE: | | ARJIS: | |

☐ It is the Disciplinary Hearing Officer's opinion that the inmate's presence at the disciplinary hearing would be disruptive.

| DISCIPLINARY HEARING OFFICER: | | ARJIS: | | DATE: | |
|---|---|---|---|---|---|

J-72B REV 12/14

EXHIBIT 21                                    CSD000124



# San Diego County
# SHERIFF'S DEPARTMENT

GA 213
0135
DELAYING UNIT
MINIMUM DISRESPECT

## DISCIPLINARY HEARING RIGHTS WAIVER

☐ SDCJ   ☒ GBDF   ☐ FAC8   ☐ EMRF   ☐ LCDRF   ☐ SBDF   ☐ VDF

| INMATE NAME: | Gadsden, Ronald | | INCIDENT #: | 194006340 | |
|---|---|---|---|---|---|
| BOOKING #: | 18181127 | | DATE: 2/18/19 | TIME: | |
| VIOLATION (S): | 701,101,105 | | | | |

### RIGHT TO A 24 HOUR DELAY IN DISCIPLINARY HEARING

☑ I am waiving my rights to a 24-hour delay of the Disciplinary Hearing for the violations listed above, and request an immediate hearing on the rule violation(s) brought against me.

☐ I do not want to waive the 24-hour delay in the Disciplinary Hearing (No signature required).

| INMATE SIGNATURE: *Ron Gadsden* | DATE: 2·18·19 |
|---|---|
| DEPUTY SIGNATURE: *J Velasquez # 400* | ARJIS: 4000 |

### RIGHT TO BE PRESENT AT HEARING WAIVER

☐ I have been advised of my right to appear before the Disciplinary Hearing Officer. I do not wish to appear, and thereby waive that right.

| INMATE SIGNATURE: | DATE: |
|---|---|
| DEPUTY SIGNATURE: | ARJIS: |

☐ It is the Disciplinary Hearing Officer's opinion that the inmate's presence at the disciplinary hearing would be disruptive.

| DISCIPLINARY HEARING OFFICER: | ARJIS: 4611 | DATE: 02/18/19 |
|---|---|---|

J-72B  Rev. 2/17

EXHIBIT 21                                   CSD000125