UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD EARL GADSDEN,<br><br>                          Plaintiff,<br><br>v.<br><br>MICHAEL MCGRATH, Deputy<br>Sheriff,<br><br>                          Defendant. | Case No.:  20-cv-2258-WQH-DEB<br><br>**ORDER** |

HAYES, Judge:

The matters before the Court are the Motion for New Trial (ECF No. 173) filed by Defendant Michael McGrath, and the Motion for Fees and Expenses (ECF No. 170) filed by Plaintiff Ronald Earl Gadsden.

## I.    Background

On October 14, 2021, Gadsden filed the First Amended Complaint ("FAC"), which is the operative pleading. (ECF No. 29.) The FAC alleges one cause of action under 42 U.S.C. § 1983 for First Amendment retaliation against Defendants McGrath and John Gehris.

On April 19, 2022, the Court dismissed Plaintiff's claim against Gehris, leaving McGrath as the sole remaining Defendant in this action. (ECF No. 41.)

The FAC alleges that on February 15, 2019, McGrath, who was at the time working as a Sheriff's Deputy in the George Bailey Detention Facility ("GBDF") in San Diego, retaliated against Gadsden, who was at the time a detainee in the GBDF, because Gadsden

asked McGrath to give him an Internal Affairs complaint form ("IA form") after McGrath canceled Gadsden's scheduled video visit. The FAC alleges that in retaliation for Gadsden making this request for an IA form, McGrath confined Gadsden to his cell for several hours, then had him "paraded" in front of other detainees, cancelled all his future scheduled visits, recommended that he no longer be housed in the jail housing unit where he had been living, and had him transferred to segregation in a different housing unit in an unsanitary cell, where he remained for seven days. The FAC requests compensatory and punitive damages, and attorneys' fees and costs.

On April 24, 2023, McGrath filed a motion for summary judgment, contending that Gadsden could not prove the elements of a claim for First Amendment retaliation and that McGrath was entitled to qualified immunity. (ECF No. 62.) After receiving full briefing on the motion for summary judgment and a related motion to strike, the Court issued an Order denying the motion for summary judgment on November 8, 2023. (ECF No. 69.)

On December 7, 2023, McGrath filed a notice of appeal of the Court's Order denying qualified immunity. (ECF No. 74.) On October 30, 2024, the Court of Appeals for the Ninth Circuit issued a Mandate affirming this Court's Order denying qualified immunity. (ECF No. 82.)

On August 25, 2025, a jury trial began. The jury heard evidence on August 25th, 26th, and 27th. On August 28, 2025, the jury returned a Verdict in favor of Gadsden, awarding Gadsden $12,000 in compensatory damages and $16,000 in punitive damages. (ECF No. 156.)

On September 12, 2025, the Court entered Judgment consistent with the jury's Verdict. (ECF No. 166.)

On September 26, 2025, Gadsden filed the pending Motion for Fees and Expenses. (ECF No. 170.) Pursuant to 42 U.S.C. § 1988, Gadsden seeks an attorney fee award of $398,910 and litigation expenses of $5,297.22. On October 20, 2025, McGrath filed an opposition to the Motion for Fees and Expenses. (ECF Nos. 176, 188.) On October 25,

2025, Gadsden filed a reply in support of the Motion for Fees and Expenses. (ECF No. 178.)

On September 26, 2025, Gadsden filed a Bill of Costs, requesting $12,089.01 in costs. (ECF No. 171.) On October 27, 2025, McGrath filed objections to the Bill of Costs. (ECF No. 179.) On November 3, 2025, Gadsden filed a reply in support of the Bill of Costs. (ECF No. 185.)

On October 10, 2025, McGrath filed the pending Motion for New Trial. (ECF No. 173.) On November 10, 2025, Gadsden filed an opposition to the Motion for New Trial. (ECF No. 186.) On November 17, 2025, McGrath filed a reply in support of the Motion for New Trial. (ECF No. 187.)

On December 8, 2025, Gadsden filed a Supplement to the Motion for Attorney Fees, requesting additional fees and costs incurred in post-trial matters. (ECF No. 189.)

On January 9, 2026, the Court heard oral argument on the pending motions. (ECF No. 191.)

**II.    Motion for New Trial**

McGrath contends that "[a] new trial is necessary because Plaintiff's inflammatory comments in closing argument, as well as the preclusion of key evidence, prevented the jury from full and careful consideration of the facts in reaching its determination." (ECF No. 173-1 at 5.) McGrath asserts three arguments in support of this request for a new trial. First, McGrath contends:

> In closing argument, Plaintiff's counsel directed the jury to award punitive damages to send a message to the Sheriff's office/County (who are not defendants). Such comments were patently improper, not only because of their tendanc[y] to inflame the jury's passions but in that they distract from the jury's proper purpose of assessing the amount of punitive damages necessary to punish this Defendant (Michael McGrath) for his conduct and prevent any future misconduct.

*Id*. Second, McGrath contends: "Plaintiff . . . made improper statements in closing argument contending that Defense counsel had used deceptive tactics causing the jury to

doubtless discount key pieces of evidence presented on the Defendant's behalf." *Id*. Finally, McGrath contends that he "was precluded from introducing evidence about the general cleanliness of the cells of the Administrative Separation housing unit to which Plaintiff was transferred which was necessary to counter Plaintiff's claims that Defendant McGrath knowingly sent him to an unclean cell." *Id*.

## A. Legal Standards

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party on all or part of the issues, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Rule 59 does not specify the grounds on which a motion for a new trial may be granted." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)). "Rather, the court is bound by those grounds that have been historically recognized." *Id*. (quotation omitted). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Id*. (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The Ninth Circuit "ha[s] held that '[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice.'" *Id*. (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has 'the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Id*. (quoting, *inter alia*, *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)).

Defendant's first two arguments in support of the Motion for New Trial assert attorney misconduct on the part of Plaintiff's attorneys. "A new trial is warranted on the ground of attorney misconduct during the trial where the flavor of misconduct sufficiently

4

permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Anheuser-Busch, Inc. v. Nat'l Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995) (quotations omitted). "Improprieties in counsel's arguments to the jury do not constitute reversible error unless they prejudice the defendant and that prejudice has not been remedied by the trial judge." *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 359–60 (9th Cir. 1996) (quotation omitted). "The burden of making a concrete showing of prejudice resulting from improper closing argument falls upon appellant." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (quotation omitted). "In evaluating the likelihood of prejudice from the comments, [a court] should consider the totality of circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself." *Id.* (quotation omitted).

Defendant's third argument in support of the Motion for New Trial concerns the exclusion of evidence. Courts "review evidentiary rulings for abuse of discretion and only reverse if any abuse was prejudicial." *Kaffaga v. Est. of Steinbeck*, 938 F.3d 1006, 1013 (9th Cir. 2019) (citations omitted). "A new trial is only warranted when an erroneous evidentiary ruling substantially prejudiced a party." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008) (quoting, *inter alia*, *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995)).

"The district court also is not limited to the grounds a party asserts to justify a new trial, but may sua sponte raise its own concerns about the damages verdict." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014) (citing Fed. R. Civ. P. 59(d)). "Ultimately, the district court can grant a new trial under Rule 59 on any ground necessary to prevent a miscarriage of justice." *Id.* (citing *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)).

/ / /

/ / /

20-cv-2258-WQH-DEB

**B. Argument Regarding Punitive Damages**

Defendant first contends that a new trial is warranted because "Plaintiff's closing remarks that the jury had a responsibility in its punitive damages award to send a message to the Sheriff's office on behalf of the community [were] grossly improper." (ECF No. 173-1 at 8.) Defendant contends that "Plaintiff improperly argued that the jury should use its damages award to send a message to the Sheriff's Office and its Deputies, none of whom were a defendant in this action. (In fact, Defendant had left the department in 2022.)" *Id*. Defendant bases this argument on the following portion of Plaintiff's closing argument:

> This case is not simply about litigating what happened six years ago. It is about what will happen in the future and what message the Sheriff's Department will take and what has occurred. . . .[1]

> So that aspect of the case, that concern about the future, poses to you, really, like a choice of "Where do we go from here?" What world are we trying to get to? Because there's a version of the world in the future, like a year from now, when we've all kind of forgotten about this case, when Sheriff's deputies are sitting around and talking about some obnoxious person who's requested an IA form, and they say to each other, "You know what? Just transfer that guy." It's like a meat grinder. You just get it started, and it goes and goes. And that's all you've got to do. You're not going to have any more problems with IA. And this is the version of the world that is encouraged by the defense position and the approach that the Defense has taken to this case.

> And then there's a different world, where the same question is posed, and what the deputies say is, "You know what? We have a duty, and the duty is to the law, and the duty is to the Constitution. So let's follow our duty." And I think that is the -- that is the world we want to encourage.

> And so I encourage you to use your verdict to move us in that direction, to move us toward exactly this value that the Sheriff's Department asserts in terms of how it's going to behave, the manner of behaving in a reasonable, lawful, and impartial manner, always respecting the rights of all persons.

---

[1] Defendant's objection at this point was overruled.

(ECF No. 173-3 at 5–6.) During rebuttal argument, Plaintiff's attorney also stated: "Please use your verdict to create a better future for this community." *Id*. at 7.

Section 1983 "was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well." *Owen v. City of Independence*, 445 U.S. 622, 651 (1980); *see also McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights."). "[P]unitive damages, by their very nature, are not awarded to compensate the injured party. . . . [D]eterrence of future egregious conduct is a primary purpose of both § 1983 . . . and of punitive damages." *Smith v. Wade*, 461 U.S. 30, 49 (1983) (citations omitted); *cf. Owen*, 445 U.S. at 651 ("The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights."). In *Smith*, the Supreme Court approved a punitive damages jury instruction that began: "In addition to actual damages, the law permits the jury, under certain circumstances, to award the injured person punitive and exemplary damages, in order to punish the wrongdoer for some extraordinary misconduct, and *to serve as an example or warning to others not to engage in such conduct*." *Id*. at 33 (emphasis added).[2]

In *Settlegoode v. Portland Public Schools*, 371 F.3d 503, 519 (9th Cir. 2004), the Ninth Circuit rejected a defense challenge to a plaintiff's closing argument that "urged the jury to 'send a message' to the [defendant school] district." *Id*. at 519 n.13. The Ninth Circuit stated that it was not inappropriate "to urge the jury to 'send a message'" because "[t]his case . . . involves a claim for punitive damages." *Id*. at 519. "Reminding the jury

---

[2] Similarly, the Court's final instructions to the jury in this case included Ninth Circuit Model Civil Instruction 5.5, which includes the statement: "The purposes of punitive damages are to punish a defendant and to deter similar acts in the future." (ECF No. 157 at 26.)

that they have the capacity to deter defendants and others similarly situated is certainly legitimate where punitive damages are at stake." *Id*.; *see also Carr v. Cnty. of San Diego*, No. 19-CV-1139 JLS (MDD), 2022 WL 2161513, at *7 (S.D. Cal. June 15, 2022) ("As to exhortations [for the jury] to 'send a message,' the Court agrees with Plaintiff that such argument is permissible when punitive damages are at issue, as here.") (citations omitted); *Mueller v. Hawaii Dep't of Pub. Safety*, 595 F. Supp. 3d 920, 934 (D. Haw. 2022) ("Punitive damages were available against Defendant Nolan Espinda who was represented by counsel for the State at trial. Statements requesting the jury send a message to Espinda and asking the jury to punish him to deter other Directors of the Department of Public Safety are not improper.").

Here, Defendant recognizes the legal principle stated in *Settlegoode*, but argues that "[t]his matter is distinct because punitive damages are unlikely to have any deterrent effect." (ECF No. 173-1 at 11 n.2.) Defendant contends:

> [T]he evidence presented at trial demonstrated that Defendant Michael McGrath had not worked for the Sheriff's Office since 2022. There was no need for punitive damages to deter Defendant McGrath's future conduct considering he was no longer a Deputy. He no longer held a position which would require him to make a similar determination in the future, nor was any evidence presented at trial to suggest he may one day find himself again in such a position. With respect to future conduct of other deputies, there was no evidence this is repeated practice in the jails. Further, there is no evidence that other Sheriff's Deputies in the future could become aware of the outcome of this matter or that its outcome could in any way affect their future decision-making considering McGrath is no longer with the Sheriff's Office.

*Id*. at 11.

Defendant offers no legal authority in support of this argument. When Defendant argues that "there is no evidence that other Sheriff's Deputies in the future could become aware of the outcome of this matter," *id*., Defendant fails to acknowledge that the jury heard testimony from multiple witnesses who were current Sheriff's Department employees who continued to work at the GBDF. Given this, it would be reasonable for the jury to assume that current employees at GBDF were aware of the facts of the lawsuit and

would be interested in learning the jury's verdict. The Court finds that, despite Defendant leaving the employ of the Sheriff's Department after the events at issue and prior to trial, the *Settlegoode* principle nonetheless applies here, and "[r]eminding the jury that they have the capacity to deter . . . others similarly situated is certainly legitimate where punitive damages are at stake." *Settlegoode*, 371 F.3d at 519. The Court does not find that Plaintiff's "send a message" argument was improper.

The Court also finds that there was no risk of jury confusion about the fact that McGrath was the only Defendant in this action and the County was not a party. The Court's jury instructions and verdict form made this clear. And Plaintiff's counsel began his closing argument by stating: "You know, there's only one defendant in this case, and it's Michael McGrath. And there's only one cause of action that's going on here, and it's this cause of action for First Amendment retaliation." (ECF No. 165 at 2.) Plaintiff's counsel continued:

> The rule that we are suggesting was broken is the rule that is spelled out in the Sheriff Department's own Internal Affairs form. It's just this idea that deputies should behave in a way that's reasonable, that's lawful, it's impartial, and respects the rights of all persons. And that is a value that I think we're all behind. On this side of the courtroom, we're behind it. I'm pretty sure the Sheriff's Department is behind that, too. This is their own form. All of us agree that's an important idea. But the evidence in this case shows that the defendant, Michael McGrath, broke that rule, and he retaliated against the plaintiff on the basis of a request for an Internal Affairs form.

*Id*. at 2–3. The Court finds no indication that the jury was confused about the fact that McGrath was the only Defendant in this action and the County was not a party.

Defendant also contends that "[a]ny punitive damages award in this case should not stand because of the clear influence of passion and prejudice caused by Plaintiff's comments." (ECF No. 173-1 at 9.) "It is well established that 'no verdict can be permitted to stand which is found to be in any degree the result of appeals to passion and prejudice.'" *Watec Co. v. Liu*, 403 F.3d 645, 655 (9th Cir. 2005) (quoting *Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. Moquin*, 283 U.S. 520, 521 (1931)). However, during closing argument, Plaintiff's counsel expressly told the jury that "we're not asking for sympathy

for the plaintiff," and pointed the jury to the jury instructions, explaining that the relevant instruction "says there's no prejudices or sympathy to be brought into your analysis." (ECF No. 165 at 13.) The amount of the punitive damages award—$16,000—does not indicate that the jury was motivated by passion or prejudice, when viewed in light of the evidence at trial or when viewed in relation to the jury's $12,000 award of compensatory damages. Upon review of the record, the Court finds no evidence or indication that the jury's punitive damages award of $16,000 was the result of improper passion and prejudice.

The Motion for New Trial on the basis of Plaintiff's closing argument regarding punitive damages is denied.

## C. Closing Argument "Improperly Insinuat[ing] that Defense Counsel Committed Misconduct"

Defendant contends that a new trial is warranted because Plaintiff's counsel made "improper closing argument that alleged without evidence improper conduct by defense counsel." (ECF No. 173-1 at 12.) The basis of Defendant's contention is the following italicized portions of Plaintiff counsel's closing argument:

> *It's also that aspects of the defense strategy are focused so much on deflecting blame elsewhere.* We saw, for example, the expert who got up on the stand that was paid $10,000 to testify for ten minutes about nothing, essentially. We saw the images of the cells that have been whitewashed and polished and swept clean; and of course those look nothing like the way it was actually on the night that this all started. *But that's the way the evidence is being presented as a strategy of deflection. And I think that rejection of accountability fundamentally underestimates your own intelligence and is kind of condescending towards you as members of the community, because you can see what's going on. And that's not okay.*

(ECF No. 165 at 9–10 (emphasis added).) Defendant made no objection to this argument at the time.

In the pending Motion for New Trial, Defendant relies upon two Ninth Circuit cases in support of his argument that this closing argument was improper. In *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir.1983), the Ninth Circuit found that a state-court prosecutor violated a criminal defendant's rights under the Sixth Amendment and the Due Process Clause of

the Fourteenth Amendment by suggesting that the defendant's lawyer had pressured key witnesses to change their stories, despite no "specific evidence in the record" to support this allegation. *Id*. at 1194–95. Among other things, the prosecutor in *Bruno* made a biblical analogy, saying that "the criminal justice system is the cathedral," and "the defense is the Judas in this case, and they have betrayed that system and there are thirty pieces of silver, or the $12,000 given over by the defendant to his counsel." *Id*. at 1194 n.3. The Ninth Circuit found that this argument, which was not supported by evidence in the record, was improper.

In the second Ninth Circuit case relied upon by Defendant, *Williams v. Borg*, 139 F.3d 737 (9th Cir. 1998), the Ninth Circuit stated that a state-court prosecutor calling opposing counsel's argument "'trash' cannot be characterized as improper." *Id*. at 745. The Court explained:

> He did not say the man was 'trash'; he said the argument was. A lawyer is entitled to characterize an argument with an epithet as well as a rebuttal. There is one troubling part of the prosecutor's argument, and that is his attack on defense counsel personally. He argued that the defense lawyer had concocted a scheme for letting the jury hear Williams' story even though it would be stricken for Williams' refusal to answer questions on cross-examination.

*Id*. In criminal cases, the Ninth Circuit has explained that "[c]riticism of defense theories and tactics is a proper subject of closing argument," *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997), but a prosecutor is prohibited from launching "[a] personal attack on defense counsel's integrity," *United States v. Santiago*, 46 F.3d 885, 892 (9th Cir. 1995).

Here, setting aside that this is a civil case (rather than a criminal case as in *Bruno* and *Williams*) and that the defense did not object to the challenged argument, Plaintiff's counsel tethered his argument to the evidence and tactics of the defense rather than making a personal attack on defense counsel. Plaintiff's statements about the defense "strategy of deflection" came just after Plaintiff's argument about "Deputy McGrath g[etting] on the stand, and . . . ha[ving] a lot of trouble just answering basic questions and certainly a lot of

trouble acknowledging his own role in anything. It was very much a focus on what everybody else did." (ECF No. 165 at 9.) Plaintiff's statements about the defense "strategy of deflection" also referenced the defense proffering an expert "to testify for ten minutes about nothing, essentially," and showing "images of the cells that have been whitewashed and polished and swept clean; and of course those look nothing like the way it was actually on the night that this all started." *Id*. Each of these arguments had adequate support in the evidence. Plaintiff's arguments at closing about a defense "strategy of deception" that "underestimates [the jury's] intelligence and is kind of condescending towards [the jury] as members of the community," *id*. at 9–10, are akin to calling an attorney's argument "trash," which "cannot be characterized as improper." *Williams*, 139 F.3d at 745; *see also Sayetsitty*, 107 F.3d at 1409 ("Criticism of defense theories and tactics is a proper subject of closing argument."). Plaintiff's argument did not include personal attacks on the character of defense counsel such as occurred in *Bruno*, when the prosecutor suggested without evidence that the defendant's lawyer had pressured key witnesses to change their stories and compared defense counsel to Judas, and *Williams*, when the prosecutor "attack[ed] . . . defense counsel personally" and argued that the defense lawyer had "concocted a scheme for letting the jury hear Williams' story" knowing it would not be subject to cross-examination. *Williams*, 139 F.3d at 745.

The Motion for New Trial on the basis of Plaintiff's closing argument critical of the defense strategy and tactics is denied.

### D. Lt. Odell's Testimony About the Cleanliness of the Cells

Defendant finally contends that a new trial is warranted because the Court sustained an objection to Defendant's attempt to "introduce evidence through the testimony of Lieutenant Sarah Odell that the area where Plaintiff was transferred, Housing Unit 6A, had a reputation for cleanliness at the time of the incident." (ECF No. 173-1 at 10.) Defendant offered this testimony in response to Plaintiff's testimony that, after Plaintiff requested an IA Form to report McGrath, McGrath wrote a rules violation report "recommending" that

Plaintiff be transferred, which ultimately resulted in Plaintiff being transferred to a filthy cell with a mentally unstable cellmate in a less desirable housing unit.

Lt. Odell testified that she "walk[ed] through the cells in February of 2019 that were in Module . . . 6A," and if the cells were dirty, "they would be cleaned." (ECF No. 168 at 18.) Defense counsel then asked Lt. Odell, "based on your experience, when an incarcerated person was placed into a cell in 6A, would they ever be placed in a dirty cell?" *Id*. The Court sustained Plaintiff's objection. The Court explained to counsel at sidebar:

> I sustained the objection because I don't think it's relevant, and I don't see the foundation. The issue is whether the cell that the plaintiff was placed in – the condition on that day, and the fact that generally, at some undisclosed time, [Lt. Odell] may have walked through and seen the cells I don't think is relevant….
>
> [T]o say at a particular date or a particular time period that there were no dirty cells, I just don't find that to be -- that she has the foundation for it, and the issue is whether it was on that particular day….
>
> If they have a policy against putting people in a dirty cell, that's been covered. But she can't say that "I walked through, and I know there were no dirty cells."
>
> You've covered practices. If you want to ask if there was a dirty cell, what would happen, you can do that. But she can't testify that there were no dirty cells.

*Id*. at 19–20. Lt. Odell then testified as follows:

> Defense counsel: [W]hat would happen if someone was going to be placed into a cell in 6A and it was dirty?
>
> Lt. Odell: So either we would not place them in there, we would place them in a clean cell, or we would clean the cell prior to placing them in there.
>
> Defense counsel: Okay. And what would happen in 6A if someone asked for cleaning supplies?
>
> Lt. Odell: We would provide them to that person, or we would have a worker come and clean the cell.

*Id*. at 20–21.

Defendant also offered the testimony of Sergeant Desan Tyson, who testified that it is not part of any Sheriff's Department disciplinary scheme for a cell to have hair and feces on the walls, and that it would be a violation of Department policy to put a detainee in such a cell and do nothing about those conditions. (ECF No. 181 at 18.) Defense counsel also offered the testimony of Sergeant John Gehris, and showed the jury a photograph of a clean segregation cell in the housing unit where Plaintiff was transferred.

Defendant McGrath testified that he did not "make any determination of what cell Mr. Gadsden would be transferred into" after McGrath wrote a rule violation report recommending that Gadsden be transferred out of Facility 8. (ECF No. 169 at 74, 76.) Defense counsel elicited testimony from McGrath that McGrath did not have the authority to order Plaintiff's transfer to a different housing unit; Defendant testified that only a supervisor had such authority. *Id*. at 45. McGrath testified that "it [was] fairly common for individuals being moved from one module to another," and it was not "considered punitive to transfer someone from one module to another." *Id*. at 43. McGrath testified that he did not "personally transfer Mr. Gadsden" and he did not "make any determination of what cell Mr. Gadsden would be transferred into." *Id*. at 75–76. McGrath further testified that "[r]egular hygiene inspections [of the cells] were conducted, and deputies would go through and notate every bunk that was potentially dirty or unkempt," *id*. at 45, and that "[d]eputies were trained to do the hygiene inspections to go through, make sure that the conditions were sanitary." *Id* at 46.

In closing argument, defense counsel stated:

> Now, you heard [Plaintiff] get up and testify about finding that the cell was dirty and volleyball-sized hair and blood and fecal matter, and he got up on the stand, and he told you that. But you also heard from Sheriff's -- from Sheriff's sergeants who were in charge of that unit at the time, who described to you exactly what the policies were at the facility, that they never would have put somebody in there. You also heard that they would have given a brand new mattress, a clean mattress, clean linens, a hygiene kit when he got in there.

14

> Don't take my word for it; don't take Sergeant Gehris's word for it. Take Plaintiff's word for it. In a phone call he made the day after he was released from disciplinary isolation, where when asked by his girlfriend about his time in disciplinary isolation, he said it was fine. "It was a little dirty, but I cleaned it up."

(ECF No. 175 at 25.)

The relevant issue at trial was whether McGrath had control over whether and where Plaintiff would be transferred, and, if so, whether McGrath knew of the cleanliness of the cell into which Plaintiff was ultimately transferred. The defense was given unfettered opportunity to explore these areas of inquiry during its examination of McGrath. The defense failed to lay a foundation for how Lt. Odell's knowledge or opinion of the cleanliness of the cells was relevant to the jury's determination of *McGrath's* knowledge. In any event, the defense was permitted to elicit from Lt. Odell that she "walk[ed] through the cells in February of 2019 that were in Module . . . 6A," and if the cells were dirty, "they would be cleaned." (ECF No. 168 at 18.) There was no showing that Lt. Odell personally transferred Plaintiff into the cell or saw the condition of Plaintiff's cell while he was in it. The defense was permitted to elicit from Lt. Odell that "if someone was going to be placed into a cell in 6A and it was dirty," "either we would not place them in there, we would place them in a clean cell, or we would clean the cell prior to placing them in there." *Id*. at 20–21. Given the testimony that the jury was permitted to hear, the Court finds no error in excluding Odell's testimony regarding whether "an incarcerated person . . . would [] ever be placed in a dirty cell." *Id*. at 18. Even if the Court erred in its ruling, Defendant has failed to show that the ruling "substantially prejudiced" him. *Harper*, 533 F.3d at 1030.

Finally, in the Motion for New Trial, Defendant asserts that the evidence he was seeking to introduce "through the testimony of Lieutenant Sarah Odell" was "that the area to which Plaintiff was transferred, Housing Unit 6A, had a *reputation for cleanliness* at the time of the incident." (ECF No. 173-1 at 10 (emphasis added).) The defense did not inform the Court that it was seeking to elicit evidence about the cell's "reputation for cleanliness."

20-cv-2258-WQH-DEB

The word "reputation" does not appear in the trial transcript of Lt. Odell's testimony. The Court only ruled on the admissibility of the questions asked and objected to. But even if the defense had informed the Court of a desire to introduce evidence through Lt. Odell of a "reputation for cleanliness" of the cells, the Court would have sustained an objection as cumulative of the admitted testimony. The Court also finds that, even if such testimony was admissible, its exclusion would not have substantially prejudiced Defendant in light of the testimony that was admitted.

The Motion for New Trial on the basis of excluding Lt. Odell's testimony about the cleanliness of the cells is denied.

### III.    Motion for Fees and Expenses

In the Motion for Fees and Expenses, Plaintiff requests a total attorneys' fee award of $398,910 and litigation expenses of $5,297.22. (ECF No. 170-1 at 14.) In the Supplement to Motion for Attorney Fees, Plaintiff requests additional fees for the 15.7 hours Plaintiff's attorney Alex Coolman spent preparing responses to the Motion for New Trial and Defendant's opposition to the Motion for Fees and Expenses, and an additional $733.50 in costs to obtain transcripts to respond to the Motion for New Trial. (ECF No. 189 at 2.) Plaintiff contends that these amounts are recoverable, stating:

> Plaintiff seeks attorney fees and litigation expenses under the authority of 42 U.S.C. § 1988 in this long-running civil rights case, which the Defendant never made any attempt to settle for anything more than a waiver of costs. It is a case where there has been an obvious evidentiary basis for liability based on Defendant's own statements in his Incident Report—a point that has been apparent since the first day the case was filed. However, Defendant's negotiating stance forced this case to go to trial after five years of litigation and an unsuccessful interlocutory appeal. As this Court is aware, the jury both found liability and awarded punitive damages. Under the circumstances, a full award of fees is appropriate….

(ECF No. 170-1 at 4.)

In response, Defendant contends:

> Plaintiff has failed to demonstrate the hourly rates requested are in line with those prevailing in the community for similar services by lawyers of

comparable skill, experience and reputation. Similarly, the number of hours should be reduced to the extent Plaintiffs' counsel spent excessive time, billed for clerical or administrative activities, provided an insufficient description and/or block billed entries. Further, Plaintiff failed to prove all of his litigation expenses were reasonable, and some of the claimed costs do not constitute litigation expenses.

Defendant respectfully requests the Court award Plaintiff only those fees to which he is entitled—those hours reasonably expended in this litigation, charged at a reasonable hourly rate. Defendant also requests the Court limit Plaintiffs litigation expenses recover to those reasonable expenses authorized by law.

(ECF No. 176 at 1.)

In reply, Plaintiff contends:

[I]t bears re-emphasis that the time and effort expended in this case is a function of the approach Defendant took toward resolution of the case – namely, to reject any attempt at settlement, make no offer whatsoever, and to aggressively pursue every avenue of possible litigation, including an interlocutory appeal whose main function was to require a year of additional work.

Defendant has the legal right to do all of these things. Defendant has the right to do still more yet, and to make this case even more expensive.

But it is not necessarily reasonable, in a case where there has been an obvious basis for liability on the face of Defendant's own Incident Report from day one, for Defendant to make no effort to resolve the case, to make the litigation as long and arduous as possible, and then to complain after the fact that it took a considerable amount of time to respond to these tactics. Plaintiff would have been happy to have resolved this case years ago, and at a lower cost, but Defendant refused to negotiate.

(ECF No. 178 at 10–11.)

### A. Motion for Fees

### 1. Standard of Review

"In an action brought under 42 U.S.C. § 1983, a prevailing plaintiff is entitled to reasonable attorney's fees." *Roberts v. City of Honolulu*, 938 F.3d 1020, 1023 (9th Cir.

17

20-cv-2258-WQH-DEB

2019) (citing 42 U.S.C. § 1988(b)); *see also Chalmers v. City of L.A.*, 796 F.2d 1205, 1210 (9th Cir. 1986) ("Title 42 U.S.C. § 1988 authorizes a district court to award reasonable attorney's fees to a prevailing party in a civil rights action."). Pursuant to section 1988, "out-of-pocket expenses incurred by an attorney which would normally be charged to a fee paying client are recoverable as attorney's fees under section 1988." *Chalmers*, 796 F.2d at 1216 n.7. "A plaintiff prevails for purposes of § 1988 when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Roberts*, 938 F.3d at 1023 (quotation omitted). The parties do not dispute that Plaintiff is a "prevailing party" and thus entitled to a fee award pursuant to section 1988.[3]

"Once a party is found eligible for fees, the district court must then determine what fees are reasonable. Courts begin the analysis by applying the lodestar method," which is "a two-step process." *Id*. (quotation omitted). "First, a court multiplies the number of hours reasonably expended on a case by a reasonable hourly rate. The reasonable hourly rate is determined by assessing the prevailing market rate in the relevant community." *Id*. at 1023–24. (quotations omitted). The resulting calculation is referred to as "the lodestar figure" and "provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

"After the lodestar figure is determined, a district court retains discretion to adjust the lodestar figure upward or downward based on a variety of factors not subsumed in the lodestar figure." *Roberts*, 938 F.3d at 1024 (quotation omitted). "[I]n appropriate cases, the district court may judge the 'presumptively reasonable' lodestar figure based upon the factors listed in *Kerr v. Screen Extras Guild, Inc*. . . . that have not been subsumed in the

---

[3] Similarly, there is no dispute that the fee limits imposed by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(d), do not apply in this case because Plaintiff—who was not in custody at the time the case was filed or at any time during the pendency of the case—is not a "prisoner" within the meaning of § 1997e. *See Page v. Torrey*, 201 F.3d 1136, 1140 (9th Cir. 2000) ("[O]nly individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offenses are 'prisoners' within the definition of 42 U.S.C. § 1997e.").

20-cv-2258-WQH-DEB

lodestar calculation." *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622 (9th Cir. 1993). The *Kerr* factors are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992). "The lodestar amount presumably reflects the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation." *Intel Corp.*, 6 F.3d at 622 (citation omitted).

"The fee applicant has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services." *Id.* (quotation omitted); *see also Seachris v. Brady-Hamilton Stevedore Co.*, 994 F.3d 1066, 1077 (9th Cir. 2021) ("The applicant has an initial burden of production, under which it must produce satisfactory evidence establishing the reasonableness of the requested fee. This evidence must include proof of market rates in the relevant community (often in the form of affidavits from practitioners), and detailed documentation of the hours worked.") (quotation omitted). "If the applicant discharges its legal obligation as to the burden of production, the court then proceeds to a factual determination as to whether the requested fee is reasonable. In the usual case, that factual determination will involve considering both the proponent's evidence and evidence submitted by the fee opponent challenging the accuracy and reasonableness of the facts asserted by the prevailing party." *Seachris*, 994 F.3d at 1077 (quotation omitted). "District courts may also use their 'own knowledge of customary rates and their experience

20-cv-2258-WQH-DEB

concerning reasonable and proper fees.'" *Sam K. ex rel. Diane C. v. Hawaii Dep't of Educ.*, 788 F.3d 1033, 1041 (9th Cir. 2015) (quoting *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011)). "If the applicant satisfies its burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee." *Intel Corp.*, 6 F.3d at 622–23 (quotation omitted).

## 2. Reasonableness of Plaintiff's Hourly Rates

Plaintiff requests the following hourly rates for the three attorneys who worked on this case: (1) $700 per hour for Alex Coolman, (2) $1,000 per hour for Stephen Demik, and (3) $850 per hour for Kimberly Hutchison.[4] (ECF No. 170-1 at 10.) Plaintiff requests $150 per hour for "Litigation Technology Manager" Raymond Christensen, who provided "[a]udiovisual/exhibits assistance . . . at trial." *Id.* at 6. Plaintiff contends that "Mr. Coolman, Mr. Demik, and Ms. Hutchison have extensive expertise in federal civil litigation, they bore the risk of this civil rights litigation, and they seek an hourly rate commensurate with their individual years of experience." *Id*. at 10.

In support, Plaintiff submits declarations from each of the above-named attorneys, with each detailing their qualifications and professional experience. Coolman, who performed the majority of the pretrial work on the case, has 18 years of experience, primarily in the postconviction representation of incarcerated individuals via direct appeal and petitions for habeas corpus. (Coolman Decl. ¶¶ 2–5, 13, ECF No. 170-10.) Coolman began focusing on civil rights work in 2019. *Id*. ¶ 6. It appears that, prior to the trial in this case, Coolman had no experience trying a case before a jury. Demik, who joined the case as trial counsel, has 23 years of experience, including serving as lead or co-counsel in approximately 69 jury trials, with the majority of trials being in federal court. (Demik Decl. ¶¶ 2, 6–11, ECF No. 170-11.) Hutchison has 12 years of experience as an attorney, with

---

[4] Plaintiff asserts that "[a]dditional trial preparation assistance was provided by Singleton Schreiber associates Kristina Aiad Toss and Justin Knowles, and Singleton Schreiber Partner John Lemon," but Plaintiff does not request that this time be compensated in the fee award. (ECF No. 170-1 at 6.)

substantial experience in civil rights cases, both as a pro se law clerk for the United States District Court for the Eastern District of Virginia and at the law firm of Singleton Schreiber, LLP, and served as trial counsel in a civil rights trial that resulted in an $85 million verdict. (Hutchison Decl. ¶¶ 5, 8, 10, ECF No. 170-12.) Plaintiff also submits declarations from two lawyers with significant civil rights litigation experience in the Southern District of California. These lawyers recount their own experience, their experience with Coolman, Demik, and/or Hutchison, and their opinions that the hourly rates requested in this case are reasonable. (*See* ECF Nos. 170-3 & 170-4.) Plaintiff also submits filings from other cases addressing requests for attorney's fees. (*See* ECF Nos. 170-5, 170-6, 170-7, 170-8, 170-9.) In his reply, Plaintiff submits an article from the Thompson Reuters Institute stating that from 2020 onward, as inflation generally surged in the United States, law firm hourly rates have grown even faster. (*See* ECF No. 178-1 at 4.) The Court finds that this evidence is sufficient to satisfy Plaintiff's "legal obligation as to the burden of production," requiring the Court to "then proceed[] to a factual determination as to whether the requested fee is reasonable." *Seachris*, 994 F.3d at 1077.

Defendant contends that Plaintiff's requested hourly rates are unreasonable, Plaintiff's declarations fail to provide sufficient evidence of prevailing market rates, and Plaintiff refers to hourly rates awarded in matters that were more complex or otherwise dissimilar to the present case. (*See* ECF No. 176 at 1–7.) Defendant also submits a declaration from James Schratz, an attorney who operates his own litigation management and consulting firm that "conducts legal fee audits of various law firms throughout the country." (Schratz Decl. ¶ 5, ECF No. 176-2.) Schratz was retained by the San Diego County Office of County Counsel to provide an opinion as to the reasonableness of the requested hourly rates in this case. *Id*. ¶ 35. Schratz recommends that Demik be awarded an hourly rate of $600, and Coolman and Hutchison be awarded hourly rates of $400. *Id*. ¶ 95. Schratz bases this opinion on a 2023 order in a Los Angeles Superior Court case involving a "contract law matter" in which Demik was awarded fees at an hourly rate of $750, and two cases in which a judge on this court awarded hourly rates of $550 and $375

to other attorneys—*see Astorga v. Cnty. of San Diego*, No. 21-CV-463-BEN-KSC, 2023 WL 4748784 (S.D. Cal. July 25, 2023); *Buchannon v. Associated Credit Servs., Inc.*, No. 3:20-CV-2245-BEN-LL, 2021 WL 5360971, at *16 (S.D. Cal. Nov. 17, 2021).

In analyzing the evidence submitted by both parties, and in particular the declarations filed in support of Plaintiff's requested rates, the Court is mindful of the following: "That other attorneys may think that a given rate is 'reasonable' does not necessarily say what the prevailing market rates actually are. That is especially true when the opinions are expressed by attorneys whose own professional interests might motivate them to favor higher rates." *Sam K. ex rel. Diane C.*, 788 F.3d at 1041. Moreover, the Court finds that many of the cases relied upon by Plaintiff are of limited usefulness in assessing the prevailing market rate because they are not civil rights actions and/or presented significantly different facts than this case.

Similarly, the three cases relied upon by Schratz are of limited usefulness. The first Southern District of California case relied upon by Schratz involved a reduction in the attorney's requested hourly rate because "the case raises no novel legal issues." *Astorga*, 2023 WL 4748784, at *3. This basis for reducing an attorney's hourly rate appears to "deviate[] from the admonition that the reasonable hourly rate is generally determined based upon the prevailing rate in the relevant community, rather than upon the complexity of the issues, which should be reflected in the reasonable number of hours." *Van Skike v. Dir., Off. of Workers' Comp. Programs*, 557 F.3d 1041, 1048 (9th Cir. 2009) (citing *Blum v. Stenson*, 465 U.S. 886, 898–99 (1984)). The other Southern District of California case relied upon by Schratz involved a fee award in a Fair Debt Collection Practices Act case rather than a civil rights case, and the court relied on the case being "resolved on a default judgment." *Buchannon*, 2021 WL 5360971, at *16. The Los Angeles County Superior Court decision relied upon by Schratz, apart from not involving a civil rights action, contains no analysis for its decision to award Demik an hourly rate of $750. (*See* ECF No. 176-4 at 276.) Accordingly, the Court finds this out-of-district decision to be of limited persuasive value.

Schratz also devotes a substantial portion of his declaration to his "long-held opinion that law firm size is a factor in determining reasonable billing rates." (Schratz Decl. ¶ 64; *see also id*. at 64–82.) There is some support for this position in an unpublished Ninth Circuit opinion. *See Myles v. Cnty. of San Diego by & through San Diego Sheriff's Dep't*, Nos. 23-55487 & 23-3198, 2025 WL 1367186, at *4 (9th Cir. May 12, 2025) ("Myles's attorneys relied on the declaration of Carol Sobel, but in contrast to the firms Sobel surveyed, Myles's attorneys worked for small, local firms, and the subject matter of this case was far less complex. Myles's attorneys' rates are on the high end of Sobel's range, which suggests that their rates may have been set above the prevailing rates in the market."). However, the Ninth Circuit recently clarified that "district courts may not reduce fee awards based on the size of counsel's firm. As we have held before, the district court is meant to compare *lawyers*, not *firms*." *LA Int'l Corp. v. Prestige Brands Holdings, Inc.*, 168 F.4th 608, 625 (9th Cir. 2026) (citing *Moreno v. City of Sacramento*, 534 F.3d 1106, 1115 (9th Cir. 2008) ("The court may permissibly look to the hourly rates charged by comparable attorneys for similar work, but may not attempt to impose its own judgment regarding the best way to operate a law firm, nor to determine if different staffing decisions might have led to different fee requests.")). The Ninth Circuit explained: "A firm's small size should not automatically result in its attorneys receiving a reduced hourly rate. A firm's size does not directly bear on the factors we must consider when awarding fees— the lawyers' skill, experience, and reputation." *Id*. at 626 (citation omitted).

The Court finds helpful the survey of seven civil rights cases in this district conducted in *Soler v. Cnty. of San Diego*, No. 14-CV-2470-MMA-RBB, 2021 WL 2515236 (S.D. Cal. June 18, 2021), which concluded that, "[o]ver the course of the past several years, courts in this District have awarded hourly rates for work performed in civil cases by attorneys with significant experience anywhere in range of $550 per hour to more than $1000 per hour." *Id*. at *5. More recently, in *Dunsmore v. San Diego Cnty. Sheriff's Dep't*, No. 20-CV-406-AJB-DDL, 2025 WL 2301940 (S.D. Cal. Aug. 8, 2025), another judge in this district surveyed cases and awarded fees in a civil-rights class-action

settlement with hourly rates ranging from $1,251.25 for senior partners to $385 for "brand-new attorneys." *Id*. at *8. The Court also has considered the impact of inflation since the cases relied upon in *Soler*, and the Court's "own knowledge of customary rates and their experience concerning reasonable and proper fees." *Sam K. ex rel. Diane C.*, 788 F.3d at 1041.

In light of the above considerations, the Court finds that, based upon the skill, experience, and reputation of the three lawyers at issue, the requested hourly rates are in line with those prevailing in the San Diego community for similar services. The Court finds that the following hourly rates are reasonable for each attorney's work on this case: $1,000 per hour for Stephen Demik, $850 per hour for Kimberly Hutchison, and $700 per hour for Alex Coolman. The Court also finds that the hourly rate of $150 per hour for "Litigation Technology Manager" Raymond Christensen is reasonable. *See Mansfield v. Sw. Airlines Co.*, No. 13-CV-2337-DMS-KSC, 2015 WL 13651284, at *5 (S.D. Cal. Apr. 21, 2015) (finding an average hourly rate of $146 reasonable for "litigation support staff").

### 3. Hours Reasonably Expended

At the second step of its lodestar calculation, the Court determines the number of compensable hours Plaintiff's counsel and support staff reasonably expended on this litigation. Plaintiff asserts that Alex Coolman expended 422.7 hours, Stephen Demik expended 83.8 hours, Kimberly Hutchison expended 12.8 hours,[5] and Raymond Christensen expended 50 hours. (ECF No. 170-1 at 13–14; ECF No. 176 at 14 n.2.) Plaintiff submits declarations of counsel with timesheets in support of these claimed hours. In the Supplement to Motion for Attorney Fees, Plaintiff submits a timesheet and declaration stating that Coolman expended an additional 15.7 hours responding to Defendant's Motion

---

[5] Defendant notes that Hutchison recorded her time in hh:mm:ss format (*see* ECF No. 170-12 at 7), and converting her time entries into digital format results in 13.03 hours of time, rather than 12.8 hours as stated in the Motion for Fees and Expenses. (*See* ECF No. 176 at 18 n.2.) Defendant does not object to the reasonableness of Hutchison's claimed time expended, and the Court finds it reasonable. However, the Court will accept the calculation method requested by Hutchison—which is slightly less generous than that proposed by Defendant—and award Hutchison fees based on 12.8 hours expended.

20-cv-2258-WQH-DEB

for New Trial and oppositions to the Motion for Attorney Fees and Expenses and Bill of Costs. (ECF No. 189.)

Defendant objects to Plaintiff's calculation of compensable hours, arguing that Coolman, Demik, and Christensen "seek to recover fees for hours that were not reasonably expended because they were insufficiently detailed, excessive, billed in blocks, or administrative/clerical tasks." (ECF No. 176 at 14.) Defendant attaches a seven-page chart containing a detailed list of the specific timesheet entries to which Defendant objects or requests downward adjustment. (*See* ECF No. 176-1.)

"The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992) (citing *Hensley*, 461 U.S. at 433, 437). "The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Id*. at 1397–98 (citing, *inter alia*, *Blum*, 465 U.S. at 892 n.5 (1984)). "By and large, the district court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1111 (9th Cir. 2014) (quotation omitted). A court "should exclude from [the] initial fee calculation hours that were not reasonably expended." *Hensley*, 461 U.S. at 434 (quotation omitted). Hours are not "reasonably expended" if they are "excessive, redundant, or otherwise unnecessary." *Id*. When hours not "reasonably expended" are included in the fee application, "the court may conduct an 'hour-by-hour analysis of the fee request,' and exclude those hours for which it would be unreasonable to compensate the prevailing party." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1203 (9th Cir. 2013) (quoting *Gates*, 987 F.2d at 1399). Also, "when faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of [excluding non-compensable hours] from a fee application." *Id*. (quoting *Gates*, 987 F.2d at 1399).

20-cv-2258-WQH-DEB

The Court has undertaken a thorough review of billing records of Plaintiff's counsel, Defendant's general objections and objections to specific billing entries, and Plaintiff's reply.

Defendant objects to many billing entries as inadequately detailed. The Court agrees that the following entries claimed by Coolman are so vague as to prevent the Court from conducting an adequate review of the reasonableness of the entry: 0.4 hours claimed on 1/11/21 for the task of "Names for him"; 0.2 hours claimed on 1/29/21 for the task of "That fact to Ron"; 0.5 hours claimed on 3/17/21 for the task of "McGrath"; 0.2 hours claimed on 4/18/21 for the task of "Complaint"; 0.4 hours claimed on 11/3/21 for the task of "Upcoming stuff"; 0.3 hours claimed on 7/28/22 for the task of "of McGrath"; 1.1 hours claimed on 8/01/22 for the task of "For production"; 0.6 hours claimed on 8/10/22 for the task of "Obstacle or no?"; 0.4 hours claimed on 9/17/22 for the task of "Privilege"; 0.1 hours claimed on 10/10/22 for the task of "dates"; 0.3 hours claimed on 10/17/22 for the task of "Conference"; 0.4 hours claimed on 11/11/22 for the task of "Talk to Tina?"; 0.4 hours claimed on 11/14/22 for the task of "requests"; 0.1 hours claimed on 11/15/22 for the task of "Cheatum"; 0.2 hours claimed on 11/16/22 for the task of "Cheatum"; 0.3 hours claimed on 11/16/22 for the task of "Cheatum"; 0.2 hours claimed on 11/27/22 for the task of "Phone call with Tina"; 0.3 hours claimed on 1/6/23 for the task of "deputies"; 0.3 hours claimed on 2/10/23 for the task of "employee?"; 0.1 hours claimed on 2/13/23 for the task of "Sheriff's dept."; 0.1 hours claimed on 3/23/23 for the task of "ucsd visit"; 0.1 hours claimed on 4/5/23 for the task of "Different?"; 0.2 hours claimed on 12/6/23 for the task of "Ron"; 0.5 hours claimed on 2/7/24 for the task of "That it is"; and 0.2 hours claimed on 7/23/25 for the task of "Review." The Court sustains Defendant's objections to these entries.[6] The Court overrules Defendant's other objections that specific time entries claimed by Coolman and Christensen contain insufficient descriptions; the Court finds that

---

[6] The total of these entries to which the objections are sustained is 7.9 hours.

these descriptions are adequate for the Court's review and are reasonable. (*See* ECF No. 176-1.)

Defendant objects to many billing entries as containing "excessive hours" based upon an argument that "Plaintiff's counsel . . . spends an inordinate amount of time on tasks that should be relatively straightforward and not particularly time intensive." (ECF No. 176 at 11.) The Court finds that Coolman's claim of 0.7 hours on May 18, 2021 and 0.6 hours on May 5, 2022 on the tasks of "Draft opening argument" and "Drafting opening" are excessive given that Coolman went on to spend 1.9 hours "work[ing] on opening statement" in 2023 and 1.4 hours "revis[ing]" the opening statement in July 2025, and the opening statement was ultimately delivered by Demik rather than Coolman.[7] Otherwise, the Court overrules Defendant's objections to Coolman's and Christensen's billing entries as excessive. Most notably, the Court finds that Coolman reasonably billed a total of 7.4 hours to draft the Complaint and a total of 31.3 hours to review Defendant's Motion for Summary Judgment and single-handedly draft the opposition.

Defendant objects to billing entries claimed by Demik and Christensen on the basis of "block billing," which is "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945 n.2 (9th Cir. 2007) (quotation omitted). Both Demik and Christensen appear to have joined the defense team approximately a month prior to trial. The largest challenged block of time is Demik's entry of 4.5 hours on the day before trial for "Prep with Justin; mock cross; debrief with client." (ECF No. 176-1 at 12.) Similarly, on the same day, Demik billed 3.8 hours for "Final Trial Prep; type cross; opening slides." *Id*. The Court finds that these descriptions are adequate to permit judicial review and are reasonable given the proximity to the date of trial, the short length of time Demik had been on the case, and the significant role Demik

---

[7] The total of these entries to which the objections are sustained is 1.3 hours.

played at trial. The other challenged entries by Demik and Christensen are similarly adequate to permit judicial review and reasonable under the circumstances.

Defendant objects to certain billing entries by Coolman on the grounds that he was performing administrative or clerical tasks. "[P]urely clerical or secretarial tasks should not be billed at a paralegal [or lawyer's] rate, regardless of who performs them . . . [The] dollar value [of such non-legal work] is not enhanced just because a lawyer does it." *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989) (quotation omitted). "It simply is not reasonable for a lawyer to bill, at her regular hourly rate, for tasks that a non-attorney employed by her could perform at a much lower cost." *Davis v. City & Cnty. of San Francisco*, 976 F.2d 1536, 1543 (9th Cir. 1992). For example, "filing, transcript, and document organization time" has been found to be "clerical in nature." *Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009). After review of each of Defendant's objections, the Court agrees that the following entries claimed by Coolman represent administrative or clerical tasks that are inappropriate to bill at Coolman's $700 hourly rate: 0.6 hours claimed on 12/04/20 for the task of "Assembling binder"; 0.3 hours claimed on 11/29/22 for the task of "Collecting invoices for depos"; 0.3 hours claimed on 12/2/22 for the task of "Paying court reporters for depos"; 0.1 hours claimed on 12/8/22 for the task of "Reschedule Kellas depo"; 0.3 hours claimed on 1/3/23 for the task of "Bates index"; 0.5 hours claimed on 2/6/23 for the task of "Try to schedule depo of the nurse"; 0.3 hours claimed on 2/21/23 for the task of "Follow up re subpoena for villegas"; and 0.3 hours claimed on 5/23/24 for the task of "Send paper copies to printer." Coolman submits a declaration in reply stating that he "was a sole practitioner for most of this time spent in this case and had no secretarial or administrative support." (ECF No. 178-2 at 2.) While this explains why Coolman performed the above administrative tasks, the explanation does not make it reasonable for Coolman to bill hours for administrative tasks at his attorney rate of $700 an hour. Accordingly, the Court sustains Defendant's objections to the above-

stated entries.[8] The Court overrules Defendant's other objections that other specific time entries claimed by Coolman represented administrative or clerical tasks that are inappropriate for a lawyer to bill at his usual hourly rate. (*See* ECF No. 176-1.)

After filing the reply, Plaintiff submitted a Supplement to the Motion for Attorney Fees, requesting a supplement to his fee request for the additional 15.7 hours expended by Coolman in responding to Defendant's Motion for New Trial, Defendant's opposition to the Motion for Attorney Fees, and Defendant's opposition to Plaintiff's Bill of Costs. (ECF No. 189.) Defendant did not file a response to this supplement. The Court has reviewed Plaintiff's Supplement to the Motion for Attorney Fees and finds the hours requested to be reasonable.

After ruling on Defendant's objections and reviewing Plaintiff's requested fees, the Court finds that the lodestar figure for Coolman is $700/hour multiplied by 426.5 hours,[9] which equals $298,550; the lodestar figure for Demik is $1,000/hour multiplied by 83.8 hours, which equals $83,800; the lodestar figure for Hutchison is $850/hour multiplied by 12.8 hours, which equals $10,880; and the lodestar figure for Christensen is $150/hour multiplied by 50 hours, which equals $7,500. Adding these figures together results in a total lodestar figure of $400,730.

As discussed above, the lodestar is presumptively reasonable, but can be adjusted by an appropriate multiplier if necessary to achieve reasonableness. The Court considers the following factors to determine whether the attorneys' fees are reasonable:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the

[8] The total of these entries to which the objections are sustained is 2.7 hours.

[9] Coolman requested reimbursement for 422.7 hours in the motion and requested an additional 15.7 hours in the supplement. The Court finds all but 11.9 hours to have been reasonable, resulting in a finding of 426.5 hours to have been reasonably expended by Coolman.

20-cv-2258-WQH-DEB

ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Kerr*, 526 F.3d at 70. "Many of these factors are subsumed within the initial calculation of hours reasonably expended at a reasonable rate, and the *Kerr* factors only warrant a departure from the lodestar figure in rare and exceptional cases." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7 (9th Cir. 2011) (quotation omitted).[10]

This case did not present unusually difficult or novel issues. The attorneys' skills, the preclusion of other work due to accepting this case, and the experience, reputation and ability of counsel are already reflected in the billing rates approved by the Court. Plaintiff raised a single claim and prevailed fully on that claim. Although the fees are far greater than the $12,000 in compensatory damages and $16,000 in punitive damages awarded by the jury, the jury's award appears to be a reasonable assessment of the full measure of Plaintiff's damages, as was apparent at the outset of the litigation in 2020 and continuing to trial. This is not a case where an attorney's fee is rendered excessive due to plaintiff's limited success. *Cf. Hensley*, 461 U.S. at 436 ("If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount."). Instead, Plaintiff obtained a damages award apparently representing the jury's assessment of the full extent of Plaintiff's claimed injury. After Gehris was dismissed at the pleading stage, the size of Plaintiff's attorneys' fees appears to have been increased to a significant degree by the litigation strategy of the defense, which included numerous substantive motions and an unsuccessful interlocutory appeal. The Court casts no judgment on the defense for fully exercising its right to vigorously litigate this case; by the same token, the Court declines to reduce Plaintiff's fees solely because Plaintiff vigorously responded to the defense. After

---

[10] "At least one [*Kerr*] factor is no longer valid—whether the fee was fixed or contingent." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 942 (citing *Davis v. City and Cnty. of S.F.*, 976 F.2d 1536, 1546 (9th Cir. 1992)).

consideration of the relevant *Kerr* factors, the Court finds the lodestar to be reasonable, and no adjustment is necessary. Accordingly, the Court awards Plaintiff attorneys' fees in the amount of $400,730.

### B. Motion for Expenses

Plaintiff requests an award of $5,297.22 in litigation expenses. (*See* ECF No. 170-10 at 32.) "It is well established that attorney's fees under 42 U.S.C. § 1988 include reasonable out-of-pocket litigation expenses that would normally be charged to a fee paying client, even if the court cannot tax these expenses as 'costs' under 28 U.S.C. § 1920." *Trs. of Const. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006) (citations omitted). Defendant objects to Plaintiff's expense request for $3,575 as "Payment to correctional expert Stacy Sinner for case eval." (ECF No. 170-10 at 32; ECF No. 176 at 19.) Plaintiff concedes that recovery for this amount is inappropriate. (*See* ECF No. 178 at 11.) The Court sustains Defendant's objection to the claimed expenses of $3,575 for Plaintiff's expert, who did not testify at trial. *See Gates v. Deukmejian*, 987 F.2d 1392, 1407 (9th Cir. 1992) ("[T]he prevailing party . . . is not entitled to anything for services rendered by experts in a nontestimonial capacity.") (citation omitted). Accordingly, the Court awards Plaintiff litigation expenses in the amount of $1,722.22.

### IV. Supplemental Request for Costs

On September 26, 2025, Plaintiff filed a Bill of Costs, requesting a taxation of costs in the amount of $12,089.01. Defendant objected to certain requested costs and the Clerk of Court held a hearing on the issue. On June 16, 2026, the Clerk taxed costs in favor of Plaintiff in the amount of $11,449.02.[11] (ECF No. 194.) The Clerk did not consider Plaintiff's supplemental request, which was made after the hearing on costs, for an

---

[11] The Court will consider any objections to the Clerk's disposition of the original Bill of Costs if and when any party files a motion to retax costs pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Rule 54.1(h).

20-cv-2258-WQH-DEB

additional $733.50 in costs to obtain transcripts used to respond to the Motion for New Trial. (ECF No. 189.) The Court now considers Plaintiff's supplemental request for $733.50 in costs.

Federal Rule of Civil Procedure 54(d)(1) provides, in relevant part: "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." This rule "[b]y its terms ... creates a presumption in favor of awarding costs to a prevailing party, but vests in the district court discretion to refuse to award costs." *Assoc. of Mexican-Am. Educators v. California*, 231 F.3d 572, 591 (9th Cir. 2000) (en banc). If the district court disallows costs, it must "specify reasons for its refusal to award costs." *Id*. (quotation omitted). However, the district court "need not give affirmative reasons for awarding costs; instead, it need only find that the reasons for denying costs are not sufficiently persuasive to overcome the presumption in favor of an award." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003).

In the supplemental request for costs, Plaintiff provides a declaration from Coolman and receipts showing that Plaintiff paid $733.50 for portions of three trial transcripts used for responding to the Motion for New Trial. (ECF Nos. 189-2 & 189-3.) Defendant has not objected to the supplemental request for costs. Pursuant to 28 U.S.C. § 1920, "[a] judge or clerk of any court of the United States may tax as costs . . . (2) [f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." Based upon Coolman's declaration and the arguments raised in the Motion for New Trial, the Court finds that the transcripts at issue in the supplemental request for costs were necessarily obtained for use in the case. The Court taxes $733.50 in favor of Plaintiff as supplemental costs.

/ / /

/ / /

/ / /

/ / /

/ / /

32

20-cv-2258-WQH-DEB

## V.    Conclusion

IT IS HEREBY ORDERED that the Motion for New Trial is denied. (ECF No. 173.)

IT IS FURTHER ORDERED that the Motion for Fees and Expenses is granted in part and denied in part. (ECF No. 170.) As discussed above, the Court awards Plaintiff attorneys' fees in the amount of $400,730 and litigation expenses in the amount of $1,722.22. Plaintiff's supplemental request to tax $733.50 as costs is granted. Plaintiff's "Calendar Inquiry" is denied as moot. (ECF Nos. 192 & 193.) This case remains closed.

Dated:  June 18, 2026

Hon. William Q. Hayes
United States District Court

20-cv-2258-WQH-DEB